## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JAMES R. ZAZZALI, as Trustee for the DBSI
Estate Litigation Trust and as Trustee for the
DBSI Private Actions Trust,

                       Plaintiff,

       v.

DOUGLAS L. SWENSON; CHARLES
HASSARD; JOHN M. MAYERON;
WALTER E. MOTT; FARRELL BENNETT;
JOHN D. FOSTER; THOMAS VAR REEVE;
GARY BRINGHURST; JEREMY
SWENSON; DAVID SWENSON; MICK &
ASSOCIATES PC LLO; BRYAN S. MICK;
JOHN DOE 1-50; and XYZ CORPORATION
1-50.

                     Defendants.

Civil Action No.

**COMPLAINT**

**Demand for Jury Trial**

## INTRODUCTION

This action is brought by James R. Zazzali (the "Trustee"), the Court-approved trustee for

the DBSI Estate Litigation Trust ("Estate Litigation Trust") and the DBSI Private Actions Trust

("Private Actions Trust"), in his own name as the duly authorized representative to hold, manage

and dispose of: (a) all claims and causes of action formerly owned by the bankruptcy estate of

DBSI Inc. (formerly DBSI Housing Inc., and hereinafter "DBSI Inc.") and its direct and indirect

debtor and non-debtor subsidiaries (the "Debtor Entities"), including, but not limited to, DBSI

Investments Limited Partnership ("DBSI Investments") and DBSI Redemption Reserve

("DRR"); and (b) all claims and causes of action formerly owned by creditors and equity interest

holders of the DBSI Companies.  The Trustee brings this action against Douglas L. Swenson,

Charles Hassard ("Hassard"), John M. Mayeron ("Mayeron"), Walter E. Mott ("Mott"), Farrell

Bennett ("Bennett"), John D. Foster ("Foster"), Thomas Var Reeve ("Var Reeve"), Gary Bringhurst ("Bringhurst"), Jeremy Swenson and David Swenson (collectively the "Insiders"), Mick & Associates PC LLO ("Mick & Associates"), and Bryan S. Mick ("Mick"), for their roles in a massive scheme of corporate looting and financial fraud that provided little to no benefit to DBSI Inc. nor its direct and indirect subsidiaries (collectively the "DBSI Companies" or "DBSI"), but rather benefited the Insiders.

For purposes of this Complaint, the following terms shall have the meaning ascribed to them below:

a.     "Accountable Reserves" shall mean the funds routinely designated by the DBSI Companies to be set aside to pay costs and expenses in connection with property over the terms of a master lease.  The specified, authorized uses of Accountable Reserves funds included, *inter alia*, tenant improvements, leasing commissions, capital improvements for improved real estate, management fees, taxes, insurance and other related fees for unimproved real estate.

b.     "Assigning Investors" shall mean Investors who, pursuant to the Plan, assigned or will assign their claims against the Insiders to the Private Actions Trust.

c.     "Bond Corps." shall refer to DBSI entities that issued bonds; among these entities were Guaranteed Capital Corporation ("GCC") and DBSI Real Estate Funding Corporation ("REF Corp.").

d.     "Control Group" or "Control Group Defendants" shall mean Defendants Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst.

e.     "DBSI Investments" shall mean DBSI Investments Limited Partnership, an Idaho limited partnership a/k/a DBSI Properties Limited Partnership.

f.     "DBSI Realty" shall mean DBSI Realty Inc., an Idaho corporation.

g.       "DBSI" or "DBSI Companies" shall mean, among others, the Consolidated Debtor and Non-Debtor Entities identified in the Plan, including exhibits thereto, which include, among many others, DBSI Inc., DRR, FOR 1031, DBSI Investments, DBSI Realty, Master Leaseco, Kastera, Stellar, and Project Subsidiaries.

h.       "Debtor Entities" shall refer to DBSI Inc. and its direct and indirect debtor and non-debtor subsidiaries whose claims were assigned to the Estate Litigation Trust.  A list of Debtor Entities is attached as Exhibit A.

i.       "Development Funds" shall refer to DBSI entities that were organized as limited liability companies and issued debt units and sharing units via private placements.  The stated purpose of raising funds through the Development Funds was to raise capital to invest in real estate development projects.  Each Development Fund specialized in a different stage of the development process.  The Development Fund was to invest the proceeds through affiliated special purpose entities.

j.       "DRR Partners" shall refer to the numerous, dormant, legacy, real estate limited partnerships that were the general partners of DRR.

k.       "DRR" shall mean DBSI Redemption Reserve, an Idaho general partnership.

l.       "Estate Litigation Trust" shall mean the trust created by the Plan to hold all causes of action belonging to the Debtor Entities, including, without limitation, claims against the Insiders.

m.       "FOR 1031" shall mean FOR 1031 LLC, an Idaho Limited Liability Company.

n.       "Funding Entities" shall refer to collectively, the Notes Corps., Bond Corps., and Development Funds.

o.     "Insiders" or "Insider Defendants" shall mean the Control Group Defendants, plus Defendants Jeremy Swenson and David Swenson.

p.     "Internal Funding Programs" shall refer to the offerings in bonds, notes, and fund programs.

q.     "Investments General Partners" shall mean Douglas Swenson, Hassard, Mayeron and Mott.

r.     "Investor(s)" shall mean anyone who invested funds in any of the securities or real estate products sold by DBSI.

s.     "Kastera" shall mean Kastera LLC, Kastera Development LLC, Kastera Homes, LLC and all subsidiaries of these entities.

t.     "LTV" shall refer to loan-to-value ratio.

u.     "Master Leaseco" shall mean DBSI Master Leaseco, an Idaho Corporation.

v.     "Note Corps." shall refer to certain DBSI entities that issued notes to Investors; among these entities were DBSI 2005 Secured Notes Corporation ("2005 Secured Notes Corp."), DBSI 2006 Secured Notes Corporation ("2006 Secured Notes Corp."), DBSI 2008 Notes Corporation ("2008 Notes Corp.").

w.     "Plaintiff" or "Trustee" shall mean James R. Zazzali, the Court-appointed trustee of both the Estate Litigation Trust and the Private Actions Trust.

x.     "Plan" shall mean the Second Amended Joint Chapter 11 Plan of Liquidation for DBSI confirmed by Order of the United States Bankruptcy Court for the District of Delaware, dated October 26, 2010.

y.      "PPM" shall mean private placement memorandum, offering circulars, , other offering materials, and/or any materials used to market funds, notes, and/or bonds by the DBSI Companies.

z.      "Private Actions Trust" shall mean the trust created by the Plan to hold all causes of action assigned to that trust by creditors and equity holders of DBSI, including, without limitation, claims against Insiders.

aa.     "Project Subsidiaries" shall mean the DBSI entities created in connection with the acquisition, ownership, management, leasing or sale of particular real estate projects or used in connection with particular note or bond investment projects.

bb.     "Property Portfolio" shall mean real property managed by the DBSI Companies pursuant to a master lease or other obligation to provide a guaranteed return to Investors.

cc.     "Real Estate Channel" shall refer to the marketing and sale of assets by DBSI as real estate.

dd.     "Securities Channel" shall refer to the marketing and sale of assets by DBSI as securities.

ee.     "Spectrus" shall mean Spectrus Real Estate Inc., an entity wholly owned by DBSI Inc.

ff.     "Stellar" shall mean Stellar Technologies LLC, an Idaho limited liability company.

gg.     "Technology Companies" shall mean all companies in which Stellar or Western Technologies own or previously owned any ownership interest.

hh.     "TIC Investor" shall mean anyone who purchased a TIC interest from DBSI.

ii.     "TIC" shall mean tenant in common.

jj.      "Western Technologies" shall mean DBSI/Western Technologies LLC, an Idaho limited liability company.

## NATURE OF THIS ACTION

1.      This Complaint commences the process of recovering at least a portion of the hundreds of millions of dollars defrauded from Investors in the debacle of the DBSI Companies from those who bilked them.  In 2004, the DBSI Companies presented to the world the illusion of a monolith of wealth, competence and power.  Investors were told of substantial commercial real estate holdings throughout the country, of a history of successful and sophisticated real estate ventures, of assets into nine figures, and that no Investor had ever lost money on a DBSI investment.  DBSI invited Investors, mostly owners of small, commercial real estate, to share in complex tax avoidance transactions, and to purchase bonds, notes and interests in entities engaged in major real estate development projects.

2.      Four years later, the world learned that this monolith was rotten to the core.  Obligations to Investors had outstripped receipts for years.  The edifice was supported by hundreds of empty or half-formed entities that passed assets back and forth to create the impression that it could keep its promises to Investors.  Assets were not as represented.  Positive cash flow came only from new Investor money, which was used to pay off old Investors, a classic Ponzi scheme.  Investor funds that were supposed to be reserved for specific purposes, the Accountable Reserves, were immediately commingled with other funds and the Accountable Reserves alone represent over $80 million in missing funds.

3.      At its center was Douglas Swenson and a cabal of Insiders who moved cash among the entities though transactions of labyrinthine complexity, trying with increasing desperation to maintain the deception of a viable business enterprise.  Meanwhile, Swenson and

his cronies paid themselves millions of dollars from Investor funds, including from the Accountable Reserves.  Other funds were channeled into losing investments in technology start-up companies, generating tax losses that the Insiders took for themselves.  Thus, the Insiders avoided even paying taxes on the funds they misappropriated.  Indeed, these defendants treated the entire DBSI operation as their own alter ego, hiding behind a complex screen of corporate entities to perpetrate their fraud.

4.      Finally, in November 2008, the DBSI Companies were forced to file for bankruptcy.  The Examiner and later the Trustee were appointed and the entire tale of deception, venality and self-dealing came to light.  Tens of thousands of Investors learned that they had lost everything.  The docket of the Bankruptcy Court is crowded with letters from individual Investors telling of lost savings accumulated in some cases through the effort of generations.  In October of 2010, the Plan was confirmed, providing for the creation of the two litigation trusts to prosecute the claims of the DBSI Companies and the defrauded Investors against the Insiders and those who aided them.  Alleged below are claims for federal and state racketeering act violations, securities fraud, common-law fraud, breach of fiduciary duty, conspiracy and other causes of action.  With this Complaint, the Trustee represents the victims of this fraudulent scheme -- to prevent the Insiders and their facilitators from enjoying the fruits of their wrongdoing and to force a reckoning with them to make good the harm that they caused.

## NATURE OF PROCEEDING

5.      This action is brought to remedy Defendants' conduct, which resulted in (i) failure to repay nearly $200 million owed to DBSI by the DBSI Investments General Partners, (ii) multiple breaches of fiduciary duty owed to DBSI and to TIC Investors, and aiding & abetting breaches of fiduciary duty, (iii) civil conspiracy, (iv) racketeering in violation of 18

U.S.C. §1961, *et seq.*, (v) fraud and aiding & abetting fraud, (vi) federal securities fraud, and (vii) misappropriation of hundreds of millions of dollars.

## PROCEDURAL HISTORY

6.     On November 6, 2008 (the "Petition Date"), One Executive Tower LLC, a DBSI entity and Delaware limited liability company, filed a voluntary petition for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").   On various dates thereafter, multiple other Debtor Entities, including but not limited to DBSI Inc., similarly filed parallel bankruptcy petitions in the Bankruptcy Court.  The managing member of One Executive Tower LLC was FOR 1031 LLC, whose Board of Managers was Douglas Swenson, Var Reeve and Bringhurst.  Douglas Swenson, Var Reeve, Bringhurst and the other Insiders chose the District of Delaware as the forum for all the Debtor Entity bankruptcy petitions.  Since the Petition Date, certain of the Debtor Entities' cases have been converted to chapter 7.  The Debtor Entities' cases that are currently administered under chapter 11 are jointly administered pursuant to Orders of the Bankruptcy Court.

7.     On November 21, 2008, the Office of the United States Trustee for Region Three (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").

8.     On April 3, 2009, the U.S. Trustee filed her Notice of Appointment of Examiner wherein she notified Joshua R. Hochberg (the "Examiner") of his appointment to serve as Examiner, pending approval of the Court.  On April 14, 2009, the Bankruptcy Court entered its Order Approving Appointment of Examiner [Docket No. 3308].  The Examiner issued his First

Interim Report on August 3, 2009 [Docket No. 4159] ("Interim Report") and his Final Report on October 19, 2009 [Docket No. 4544] ("Final Report").

9.      By Order dated August 14, 2009, the Bankruptcy Court directed the U.S. Trustee to appoint a chapter 11 trustee in the Debtor Entities' jointly-administered chapter 11 cases.  By Notice of Appointment dated August 31, 2009 (the "Appointment Date"), the U.S. Trustee appointed the Trustee as trustee in the Debtors' chapter 11 cases [Docket No. 4327].  By Order dated September 11, 2009, the Bankruptcy Court approved the U.S. Trustee's appointment of the Trustee [Docket No. 4375].

10.     By Order dated October 26, 2010, the Bankruptcy Court entered an Order of Confirmation, confirming the Plan, in the Chapter 11 cases and proceedings of the Debtor Entities (the "Bankruptcy Proceedings").  The Plan substantively consolidated the estates of the Plan Debtors and certain Consolidated Non-Debtors.  The Plan also creates two trusts: the Estate Litigation Trust and Private Actions Trust.  Upon the substantial consummation and effectiveness of the Plan, on October 29, 2010, the claims and causes of action asserted herein were transferred from the consolidated bankruptcy estate of the Debtor Entities to the Estate Litigation Trust and from the creditors and equity interest holders of DBSI to the Private Actions Trust in exchange for beneficial interests therein.

## PARTIES

A.      **The Plaintiff**

11.     Plaintiff James R. Zazzali is the court-approved Trustee of the Estate Litigation Trust and the Private Actions Trust.  Plaintiff is an individual who is a citizen and domiciliary of the State of New Jersey.

**B.**     **The Insider Defendants**

12.     Defendant Douglas Swenson is an individual who is a citizen and domiciliary of the State of Idaho.

13.     Defendant Hassard is an individual who is a citizen and domiciliary of the State of Idaho.  At times relevant to this Complaint, Hassard was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Asset Management LLC, DBSI Realty, DBSI Securities Corp., Western Technologies, DCJ Inc., DBSI 2001A Funding Corporation, DBSI 2001B Funding Corporation, DBSI 2001C Funding Corporation, 2005 Secured Notes Corp., 2006 Secured Notes Corp., 2008 Notes Corp., GCC, REF Corp., DBSI Funding Corporation, DBSI Investments and Stellar.

14.     Defendant Mayeron is an individual who is a citizen and domiciliary of the State of Texas.  At times relevant to this Complaint, Mayeron was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Asset Management LLC, DBSI Development Services LLC, DBSI Discovery Real Estate Services LLC, DBSI Realty, Inc., DBSI Securities Corp., Western Technologies, DCJ Inc., DBSI 2001A Funding Corporation, DBSI 2001B Funding Corporation, DBSI 2001C Funding Corporation, 2005 Secured Notes Corp., 2006 Secured Notes Corp., 2008 Notes Corp., GCC, REF Corp., DBSI Funding Corporation and DBSI Investments.

15.     Defendant Mott is an individual who is a citizen and domiciliary of the State of Idaho.  At times relevant to this Complaint, Mott was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Development Services LLC, DBSI 2001A Funding Corporation, DBSI 2001B Funding Corporation, DBSI 2001C Funding Corporation, 2005 Secured Notes Corp., GCC, REF Corp., DBSI Funding Corporation, Stellar and DBSI Investments.

16.     Defendant Bennett is an individual who is a citizen and domiciliary of the State of Utah.  At times relevant to this Complaint, Bennett was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Funding Corp. and DBSI Investments.

17.     Defendant Foster is an individual who is a citizen and domiciliary of the State of Idaho.  At times relevant to this Complaint, Foster was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Development Services LLC, DBSI 2001A Funding Corporation, DBSI 2001B Funding Corporation, DBSI 2001C Funding Corporation, DBSI Funding Corporation, Stellar and DBSI Investments.

18.     Defendant Var Reeve is an individual who is a citizen and domiciliary of the State of Idaho.  At times relevant to this Complaint, Var Reeve was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Asset Management LLC, DBSI Discovery Real Estate Services LLC, DBSI Properties Inc., FOR 1031 and Stellar.

19.     Defendant Bringhurst is an individual who is a citizen and domiciliary of the State of Idaho.  At times relevant to this Complaint, Bringhurst was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Discovery Real Estate Services LLC, FOR 1031, Spectrus and Stellar.

20.     Defendant Jeremy Swenson is an individual who is a citizen and domiciliary of the State of Idaho.  At times relevant to this Complaint, Jeremy Swenson was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Development Services LLC, DBSI Discovery Real Estate Services LLC, DBSI Land Development LLC, DBSI Properties Inc., DBSI Realty Inc., DJC Inc. and Spectrus.

21.     Defendant David Swenson is an individual who is a citizen and domiciliary of the State of Idaho.  At times relevant to this Complaint, David Swenson was an officer and/or

director of various DBSI Companies, including, but not limited to, DBSI Inc., DBSI

Development Services LLC, DBSI Discovery Real Estate Services LLC, DBSI Properties Inc.,

DBSI Realty Inc., DJC Inc., FOR 1031 and Spectrus.

22.     Defendants John Doe 1-50 are fictitious names representing one or more persons

who were associated with or acted in concert with Defendants in connection with the allegations

contained herein, and whose identities are presently unknown to Plaintiff.

**C.     The Professional Defendants**

23.     Defendant Mick & Associates is a Nebraska corporation with its principal place

of business in Nebraska.

24.     Defendant Mick is an individual who is a citizen and domiciliary of the State of

Nebraska.

25.     Defendant XYZ Corporation 1-50 are fictitious names representing one or more

persons who are associated with or acting in concert with Defendants in connection with the

allegations contained herein, and whose identities are presently unknown to Plaintiff.

**D.     Jurisdiction and Venue**

26.     By Order dated October 26, 2010, confirming the Plan, the Bankruptcy Court

expressly retained jurisdiction over "all matters arising under, arising out of, or related to,

[DBSI's] Chapter 11 Cases and the Plan, to the fullest extent permitted by law," including

jurisdiction "to hear and determine all Causes of Action by or on behalf of . . . the DBSI

Litigation Trustee, and the Private Actions Trustee."  This Court thus has original jurisdiction

over these bankruptcy matters pursuant to 28 U.S.C. § 1334(b).  Nevertheless, despite the

general order of reference to the Bankruptcy Court, because there are additional bases for this

Court's jurisdiction, as set forth below, and because Plaintiff seeks trial by jury, in an abundance

of caution Plaintiff brings this action in the District Court in the first instance.

27.     This Court also has jurisdiction pursuant to 18 U.S.C. §§ 1331 and 1337.

28.     This Court also has jurisdiction over the Trustee's claims for violations of the

federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et*

*seq*., under 18 U.S.C. § 1964.

29.     This Court has jurisdiction over the Trustee's claims for violations of federal

securities laws under 15 U.S.C. §§ 77o, 78aa and 78j.

30.     This Court has supplemental jurisdiction over the Trustee's state law claims under

28 U.S.C. § 1367(a).

31.     This Court also has jurisdiction under 28 U.S.C. § 1332.  There is complete

diversity of citizenship and the amount in controversy exceeds $75,000.

32.     Venue is proper in this Court under 15 U.S.C. 78aa, 18 U.S.C. § 1965 and 28

U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.     DBSI Overview - A Business Doomed to Fail**

33.     The DBSI operation was a sprawling, fraudulent real estate investment empire,

involving hundreds of corporations and properties, but dominated and controlled by Douglas

Swenson, with the substantial aid of the Insiders.  Whatever Douglas Swenson's original

business plan may have been, for many years DBSI had come loose from and operated

unattached from any rational economic moorings, and ultimately became nothing more than the

instrument of the Insiders' elaborate pyramid or "Ponzi" scheme to defraud Investors.  For as

many as six years before its Chapter 11 filings took place, DBSI had been rapidly losing vast

sums of money.  Very substantial obligations to Investors were met by raising new money bilked from new Investors, who were repaid with money bilked from yet newer Investors.  New real estate inventory was constantly needed to create vehicles for these new investments.  Money was poured into highly speculative technology ventures, realizing zero return.  Defendants, meanwhile, paid themselves handsomely with other people's money and appropriated valuable tax advantages to themselves.  The corporate entities were routinely disregarded; cash, assets and liabilities were shifted among them without regard for actual ownership or equivalent value; funds were commingled with impunity.  The entire organization was a fraud on Investors and operated as the alter ego of Douglas Swenson.  Eventually, the edifice and artifice came crashing down, with billions of dollars lost over the entire episode.  As the Court-appointed Examiner, among other damning findings, found:

- "The DBSI Group businesses were in continuous need of new investor funds to fund pre-existing obligations at least as early as 2005.  In particular, the DBSI Group of companies was burdened by high interest debt and master lease payment obligations, excessive insider distributions, and unrestrained losing investments in the Technology Companies and the Kastera Companies."

- "A small group of management personnel, including Douglas Swenson, regularly tracked cash on a global basis and directed that investor funds be used to meet pre-existing obligations and operating expenses by evading restrictions governing the use of the investor funds.  At times, in an elaborate shell game, loans were made from investor funds that were not backed by adequate security, debt was reallocated through after-the-fact bookkeeping entries in an effort to make it appear that loans were adequately secured, and inflated values were arbitrarily assigned to the assets "securing" loans."

- "The DBSI Group consistently operated at a loss, except for certain time periods when sales to TIC investors created booked profits.  The Non-Debtor Kastera Companies and the Technology Companies also all consistently lost money and required substantial loans and capital contributions by DBSI or its affiliates to keep operating."

- "DBSI Group entities booked profits from inflated markups of real estate for sale to outside investors.  Most of these profits were consumed by the costs of such sales.  The inflated sales prices included arrangements obligating DBSI Inc. to make guaranteed payments to investors.  But the operations of the underlying properties could not support these guaranteed investor payments."

- "DBSI Inc.'s guarantees of investments were illusory and were based on the cultivated false appearance that DBSI Inc. had substantial value. Similarly, the marketing claim that "no investors had ever lost money" was also illusory and reflected that newly raised investor funds were being used to pay off existing investors."

- "The Debtors used tenant-in-common ("TIC") investor and bond and note money interchangeably and pooled such money to make required payments when they came due. Investor funds from all sources were commingled and treated as fungible funds. The Debtors transferred debt obligations and infused cash to different entities as the need arose. The same funds were transferred and retransferred between numerous entities often on a daily basis."

- "Douglas Swenson and others played a critical role in preparing the DBSI financial statements and other documents that were vital to the Debtors' ability to continue to raise new funds from new investors. Most of these financial statements were not independently audited or certified. Swenson and others created a misleading financial picture of the DBSI Group by, among other devices:

  o using inflated values for entities and assets included in financial statements;
  o not fully and adequately disclosing the nature of intercompany accounts receivable in the Debtors' financial statements;
  o failing to make inter-company interest payments on loans and concealing this failure by converting accrued interest into additional principal;
  o concealing mounting loan receivable amounts by converting loans into equity; and
  o engaging in year-end cash manipulations which made it appear that certain entities were well capitalized when, in fact, they were not."

- "DBSI Inc. and its related companies went to great lengths to market investment properties by stressing that the uses of "Accountable Reserves" were restricted to property improvements. In reality, DBSI treated Accountable Reserves as a source of cash for its cash strapped operating companies."

- "DBSI Inc., Douglas Swenson, and others managed and operated the DBSI Group businesses without regard for the separate identities of the companies within the DBSI Group. Transactions among companies in the DBSI Group were rarely documented properly. Accounting functions were mostly centralized."

- "Douglas Swenson and others continuously failed or refused to obtain appropriate outside, independent accounting or legal advice with respect to matters for which they had serious conflicts of interest. They used investor funds under their control for purposes not intended by the investors in order to continue operations, pay themselves distributions, and fund investments in Non-Debtor companies such as the Kastera Companies and the Technology Companies."

- "The Debtors' financial and accounting records and those of the DBSI Group as a whole, particularly the general ledgers, are unreliable, unorganized, inconsistent and often

unintelligible.  In addition, accounting personnel often modified entries explaining transactions well after the transactions occurred."

- "Douglas Swenson and other insiders distributed significant amounts of money to themselves."

Examiner's Final Report at 7-10.

34.     Vastly simplified, DBSI can be separated into three general spheres of activity, although, as will be seen, the entire operation was operated as a single, integrated entity.  For the purposes of these allegations, these spheres of activity were (i) the syndication of commercial real estate properties as allegedly qualified investments under Section 1031 of the Internal Revenue Code, (ii) raising money by issuing debt and equity interests in various DBSI entities, and (iii) siphoning off very large sums for distribution to the Insiders themselves and for investment in new, technology-oriented ventures through the use of a complex system of related partnerships and other entities.

**B.     The TIC Syndication Business**

35.     Section 1031 of the Internal Revenue Code permits owners of real estate to shelter gain they might have in their property when it is sold if the proceeds are used to purchase a similar or "like-kind" property within a certain time.  In 2002, the I.R.S. ruled that the like-kind property may be a tenant-in-common interest in the new property, provided the tenant-in-common interest is of equivalent value.  This permitted 1031 exchange syndicators to sell numerous TIC interests in large real estate properties to Investors with gains in smaller properties.

36.     Following the I.R.S. ruling in 2002, DBSI became a major syndicator of 1031 exchange properties.

37.     To lure purchasers, DBSI guaranteed rent proceeds through a master lease structure ("Master Lease Structure").  The TIC owners leased the property to a DBSI affiliate-

master lessor.  The master lessor sublet the property with DBSI guaranteeing the rent stream to the TIC Investors.

38.     The master leases were held by a number of master lessor entities, including Master Leaseco.

39.     The TIC business did not generate a profit for a number of reasons, including that (i) rents received from sublessees did not cover both the guaranteed return to the TIC Investors under the master lease agreements and the debt service payments, (ii) DBSI paid sums greater than market value for the properties to be syndicated and (iii) profits were eroded by transaction costs and overhead.

40.     As the TIC syndication business failed, the Insiders tried to prop it up with cash raised from, *inter alia*, new TIC syndications.  This led to their increasingly desperate search for new properties for which DBSI paid sums well in excess of what a prudent investor would have paid--all to perpetuate the Insiders' rapidly imploding Ponzi scheme.  The increased volume of TIC syndication projects led to additional overhead and financing costs.

41.     In sum, the TIC syndication business was losing money from 2004 onward and, by and after 2006, cash shortages became chronic and severe.

42.     The TIC syndication/Master Lease Structure exposed DBSI to very significant obligations under the master leases and for reserves paid in by TIC Investors that were supposed to be used for improvements on the properties.

43.     The unprofitability of the TIC business caused chronic cash shortfalls that had to be funded by additional TIC syndications.  This led to a permanent scramble to find new properties to purchase and syndicate, which in turn required financing.

C.     **The Funding Entities**

44.     Not surprisingly, conventional financing was not available to fund the TIC syndication business on the terms DBSI required.

45.     On information and belief, no prudent commercial lender would have loaned money to DBSI if that lender had a full understanding of the economics of the TIC syndication.

46.     On information and belief, no prudent commercial lender would have loaned money to DBSI at rates as favorable as DBSI could obtain from Investors or on terms that would permit DBSI effectively free access to the financing without normal and customary controls or supervision.

47.     The Insiders caused DBSI to use three types of entities and offerings to bilk money from Investors -- the Notes Corps., Bond Corps. and Development Funds.

48.     The offerings made by DBSI through the Funding Entities were through private placements to qualified individuals pursuant to Regulation D of the Securities Act of 1933.

49.     The stated purpose of raising funds through the Funding Entities was to loan the proceeds to other DBSI entities.  In some instances, the proceeds were to be used to purchase properties for TIC syndication.  In other cases, the funds were ostensibly intended to re-finance existing obligations.  In still other instances, no purpose beyond lending the funds to DBSI-related entities was specified.

50.     The Funding Entities were bound by the terms of the offerings to pay high rates of interest return to Investors -- typically between 8 and 11 percent.  The interest obligation was in excess of the realistic rate of return on real estate investments at the time.

51.     The interest rate obligation in conjunction with other financing costs produced a cost of funds borrowed in excess of what DBSI could hope to generate from its TIC syndication business to repay Investors.

52.     With respect to the Note Corps., the stated purpose of issuing the notes was to loan funds to affiliated special purpose entities to purchase real estate for TIC syndication.

53.     The stated purpose of the Bond Corps. was simply to raise money to loan to other DBSI entities.

54.     The Insiders' real purpose behind all of the Funding Entities, however, was the perpetuation of their fraudulent scheme to line the Insiders' pockets with money bilked from Investors.

55.     As a condition of investing, Investors were required to certify that they had read and relied upon the PPM for the issue.

56.     The Funding Entities' PPMs contained numerous representations to induce Investors to purchase the investment on offer, including representations regarding the financial strength of the DBSI Companies, its history and experience in managing successful real estate ventures, and the intended use of funds.

57.     Douglas Swenson was very much involved in the preparation of the PPMs, and he reviewed and signed off on each and every PPM before it went to print.

58.     The notes issued by the Note Corps. and the bonds issued by the Bond Corps. were guaranteed by DBSI Inc.. Thus, representations regarding the financial strength and competence of DBSI, its track record and competence were directly relevant to the perceived value of these guarantees.

59.     In all of the PPMs for the Funding Entities, the issuer made specific representations that the amount of loans to related entities would not exceed a certain percentage of the value of assets held by the recipient affiliate, also known as an LTV.

60.     The frequency and size of the DBSI Companies' fundraising efforts -- all of which increased dramatically beginning in 2004 -- and the uses of the resulting cash illustrate that the DBSI Companies relied on a steady, increasing flow of new Investor money in order to fund its operations, to line the Insiders' pockets and to repay prior Investors.

61.     Approximately $500 million was raised from the Internal Funding Programs. Even as the Petition Date approached, the Insiders were planning to raise up to $30 million more in additional debt, to rob yet another Peter to pay Paul.

62.     DBSI has defaulted on past due principal and interest obligations to Assigning Investors holding the aforementioned notes, bonds, debt and sharing unit interests in at least the amounts set forth in Exhibit B.

**D.     Stellar, DBSI Investments and the Technology Company Investment**

63.     A third area of activity of the DBSI Companies involved a very large and completely unproductive investment of money into emerging technology-oriented companies.

64.     Although the Technology Company investments were neither productive for the DBSI Companies as a whole nor for the Investors whose cash was diverted to pay for them, they were structured in such a way that they facilitated the siphoning off of substantial distributions to the Insiders and the appropriation of significant tax advantages for them that otherwise would have belonged to the DBSI Companies.

65.     The Technology Companies included BioReaction Industries LLC ("BioReaction"), Wavetronix LLC ("Wavetronix"), iTerra Communications ("iTerra"),

GigOptix, Inc. ("GigOptix"), EmergeCore Networks LLC ("EmergeCore"), UltraDesign LLC ("UltraDesign"), BioMatrix Solutions LLC ("BioMatrix"), and Western Electronics LLC ("Western Electronics,").

66.    DBSI funds were channeled to them in the form of loans by Stellar, in which DBSI Inc. had a majority interest.

67.    Stellar received those funds as loans from DBSI Investments, a limited partnership in which Douglas Swenson, certain other insiders, and DBSI Inc. were general partners.

68.    DBSI Investments received funds as loans from DRR and from other Funding Entities.

69.    In addition to serving as a conduit of funds to Stellar and the Technology Companies, DBSI Investments also made distributions to the Insiders.

70.    The Insiders structured DBSI Investments as a partnership so that they could make disproportionate distributions to themselves.

71.    In addition, losses that DBSI Investments incurred due to its investment in the Technology Companies accrued to the general partners of DBSI Investments -- the Insiders -- so that the Insiders could use these losses on their personal tax returns.

72.    Thus, the purpose and effect of this scheme was that the Insiders were taking other people's money and simultaneously managing to avoid or evade taxation on their ill-gotten gain.

E.     **DBSI Redemption Reserve**

73.     An additional entity must be discussed to understand the allegations that follow. DRR was a general partnership.  Its general partners were the DRR Partners.  DBSI Inc. and DBSI Investments were, in turn, general partners of these DRR Partners.

74.     During the time relevant to this Complaint, DRR acted as a funds transfer bank between the various DBSI entities.  As funds were moved from one branch of the DBSI operation to another, or concentrated from several branches or entities to meet a need of some other entity, those transfers were frequently recorded as payments to DRR and then out to the receiving entity.

75.     Cash was managed among the DBSI entities without regard for corporate separateness and the increasingly urgent demands for cash were frequently met by using DRR as a bank for the movement of cash.

76.     DRR was also used to transfer substantial funds from other DBSI entities to DBSI Investments for distribution to Insiders and to Stellar and the Technology Companies.

77.     DRR had no source of funds other than advances from affiliates and no assets of its own.  Many of the transactions recorded did not reflect actual movements of cash through DRR's account.

78.     Little or no formalities were followed with respect to the establishment of DRR.

79.     On the instructions of Douglas Swenson, no written partnership agreement was ever created for DRR.

80.     Although DRR borrowed from and lent money to entities that were not part of DBSI Inc., Douglas Swenson personally held a controlling interest in all such entities.

81.     Douglas Swenson is the only person that consistently had signature authority for DRR's bank account.

82. No corporate minute book or similar records existed for DRR.

83. Earlier in the relevant period, DBSI drew up loan documents between DRR and the other entities to which it funneled money. However, in later years there was no loan documentation, only book accounts.

84. As of December 31, 2008, DBSI records show that DRR owed DBSI Inc. $196,689,254.

85. DBSI Investments owes DRR $101,144,847. Stellar owes DRR $127,869,385. Neither DBSI Investments nor Stellar ever had the means to repay these substantial loans.

86. Notably, as will be discussed *infra*, the bulk of the money "loaned" by DBSI Inc. and other DBSI Companies to DRR, and then loaned by DRR to DBSI Investments, and then from there disbursed to the Insiders, was brazenly misappropriated from cash deposited by TIC Investors as Accountable Reserves. In short, Douglas Swenson and the Insiders took money that was not theirs, moved it among entities until it was hopelessly commingled, and then simply paid it to themselves.

## F. <u>The Failing Business of DBSI</u>

87. The Insiders touted that the DBSI Companies had a long history during which no Investor had ever lost money, and that DBSI had provided significant annual returns even during poor real estate markets. For many years, the Insiders fostered a knowingly false impression of robust financial strength.

88. But, in recent years, DBSI did not accomplish this track record through successful business efforts. Rather, it did so by generating a consistent influx of cash from new Investors through serial bond, note, and fund offerings, and the sales of TIC interests in property at prices that exceeded, in some cases significantly, the fair market value of that property. These offerings

and sales resulted in long-term payment obligations to these new Investors, creating a substantial drain on the DBSI Companies cash flow.

89.     Even at the large mark-up the DBSI Companies charged TIC Investors for the properties, the TIC business generated little real profit.  As a result, the DBSI Companies were forced to move increasingly large volumes of real estate through its TIC syndication and Master Lease Structure, saddling the DBSI Companies with ever-growing and recurring liabilities.

90.     With the increased volume of sales came an increasing number of Investors who needed to be paid a guaranteed rate of return on their investment.

91.     Also during this time, the DBSI Companies overhead increased to accommodate the increased workload from these sales, and at the same time, the Technology Companies and Kastera further drained cash from the DBSI Companies.

92.     Other than the continuing sale of TIC interests on which the DBSI Companies booked a nominal profit, there was no significant source of income to the DBSI Companies.

93.     The profit margin the DBSI Companies could realize even with regard to TIC sales was impaired by the cost of those offerings.

94.     Accordingly, the Insiders became so desperate for "product" (commercial real estate) that they were willing to have DBSI purchase unprofitable real estate at unjustified prices just to continue the cash stream generated by constant buying and selling, in order to prop up their pyramid scheme.

95.     As early as 2004, the Insiders knew that the company was failing because of severe cash shortages.

96.     To address the substantial cash needs of perpetuating their pyramid scheme, the Insiders caused the DBSI Companies to use funds raised from Investors through note offerings to

generate operating cash.  The DBSI Companies created records purporting to reflect that this money was "loaned" to related entities using assets as "collateral."

97.   In general, offering documentation for the Funding Entities provided that loans to other DBSI entities would be limited to 85% of the borrowing entities assets, *i.e*, the LTV ratio.

98.   By 2004, the DBSI Companies had plainly become a Ponzi scheme, in which the guaranteed returns to older deceived Investors could only be satisfied by the flow of funds from the newly deceived Investors.

99.   By 2005, the DBSI Companies were largely dependent on new Investor money to provide cash for operations and to fund payments to prior Investors.

100.   By 2007, the cash demands of operations and required payments to Investors had become even more significant:  the Property Portfolio was losing approximately $3 million per month.

101.   The largest expenses contributing to these losses were TIC Investor payments, which by fourth quarter 2008 totaled $25 million per quarter.

102.   Throughout this period, the Insiders misappropriated the funds of the DBSI Companies and the Investors by taking substantial insider payments -- totaling approximately $75 million -- while also using loans to the Technology Companies as a handsome tax shelter. Exhibit C to this Complaint summarizes these substantial Insider distributions.

**G.    The DBSI Companies Were the Alter Ego of Douglas Swenson and Were Directed
       and Operated with the Complicity of the Control Group**

103.   Douglas Swenson admitted in his June 28, 2005 sworn testimony to the Securities and Exchange Commission that he was the principal in every DBSI Company.  In his own words:  "I'm the major principal in DBSI.  There would be hundreds of entities that I wouldn't

even want to hazard a guess as to what my official position is in each one of those. There's so many of them."

104.    Douglas Swenson's control over the DBSI Companies was breathtaking. When asked whether Douglas Swenson had the authority to convey a security interest in a lease between DBSI Inc. and FOR 1031, Mott, in a December 11, 2009 interview with the Examiner, stated that he assumed that Douglas Swenson "ha[d] the authority to do anything like that between the companies."

105.    Douglas Swenson regularly took action without proper corporate approval. According to Mott, "Doug did a lot of things that we didn't know about. . . . [P]robably one of the best examples is he went out and negotiated a deal to buy Western Electronics and we never knew about it. It was totally confidential and completely secret. . . . He told us after it was done."

106.    Mott admitted that board members were not informed prior to the making of all key decisions. According to Mott, there were "[l]ots of times" that Douglas Swenson "made decisions without" advising and/or consulting with appropriate boards of directors.

107.    Mott also stated that he and Foster were "kept in the dark" by Douglas Swenson regarding where the DBSI Companies derived their revenue and where the monies went.

108.    Beginning no later than 2004, Douglas Swenson regularly began tracking the DBSI Companies' cash flow on a global basis and directed that Investor funds be used to meet pre-existing obligations and operating expenses.

109.    Douglas Swenson oversaw the preparation of and approved DBSI's financial statements and other documents that created a materially false and misleading financial picture

of the DBSI Companies and were vital to the Insiders' fraudulent conduct.  According to other Insiders, Douglas Swenson had the final say in the presentation of financial statements.

110.    Douglas Swenson also prepared numerous highly subjective, not independently analyzed, and grossly inaccurate valuations that served to circumvent true compliance with LTVs.

111.    After reviewing the funding needs of various DBSI Companies, Douglas Swenson decided how proceeds from various Internal Funding Programs would be used.

112.    Douglas Swenson managed and operated the DBSI Companies without regard for the separate identities of the ostensibly separate companies.

113.    Employees of the DBSI Companies, including Matthew Duckett, admitted in their testimony to the Examiner that Douglas Swenson was the ultimate decision maker in most significant aspects of the operations of the DBSI Companies.

114.    Moreover, Douglas Swenson reviewed, approved and signed off on every PPM distributed by the DBSI Companies in their continuing search for influxes of new Investor money.

115.    As the DBSI Companies financial straits continued to worsen, in 2008, Douglas Swenson continued to authorize ill-advised and irresponsible spending decisions, including, but not limited to:  continued funding of Kastera and Stellar; Insider payments in the form of a bonus to Mayeron and the purchase of land from Var Reeve -- at profit to Var Reeve; and the payment of his own, personal tax liabilities.

116.    Some portion of the Control Group has owned, directly or indirectly, 100 percent of the interests of the various DBSI Companies throughout their existence.

117.    In short, the DBSI Companies were owned, controlled, operated and managed by the Control Group.

118.    The Control Group employed control over the DBSI Companies to raise cash, commingle it and then distribute it as needs presented -- both to the DBSI Companies and to themselves -- without regard for the source of the money, ownership of the money or any restrictions on its use.

119.    These efforts were designed to principally benefit the Insiders, not the DBSI Companies.

**(1)    DBSI Inc.**

120.    DBSI Inc. is the parent entity that owns, directly or indirectly, the DBSI Companies.

121.    Douglas Swenson owns 91.38 percent of DBSI Inc.

122.    Other owners of DBSI Inc. include Hassard, Mayeron and Bringhurst.

123.    Former owners of DBSI Inc. include Mott, Bennett, Foster and Var Reeve.

124.    The Board of Directors of DBSI Inc. has included Douglas Swenson, Hassard, Mayeron and Var Reeve.

125.    Executive officers of DBSI Inc. include Douglas Swenson, Hassard, Mayeron, David Swenson and Jeremy Swenson.

126.    Although there have been some changes in the management of DBSI Inc., the involvement and influence of Douglas Swenson, Hassard and Mayeron have been consistent and extensive.

**(2)     Subsidiaries**

127.     The business, operations and management of DBSI Inc. were directed through numerous DBSI Companies.  Each of these subsidiaries served a particular function in facilitating the underlying business of DBSI Inc. and, more important, the Insiders' scheme to defraud.

128.     Each of these subsidiaries is wholly owned, directly or indirectly, by DBSI Inc.

129.     The control and management of these entities has tracked, fairly consistently, the control and management of DBSI Inc.

130.     Douglas Swenson has served without interruption on the board of directors or board of managers of each of these subsidiaries since their formation.

131.     With a few inconsequential exceptions, Douglas Swenson has also served as the most senior officer of each of the subsidiaries and, at one time or another, has served as the sole director or manager of each of these subsidiaries.

132.     With limited exception, Mayeron and Hassard have also been consistently involved with the management and operations of the subsidiaries.

**(3)     Master Leaseco**

133.     Master Leaseco has been owned by DBSI Inc. and, as such, its management has closely tracked the management of DBSI Inc.

134.     Douglas Swenson has served on the board of directors of Master Leaseco and has served as the most senior executive officer of Master Leaseco throughout its existence.

135.     Mayeron and Hassard consistently served on the board of directors of Master Leaseco from its formation in 2004 until February 2009, at which time Douglas Swenson became the sole director.

136.     Hassard served as senior executive officer of Master Leaseco until February 2009.

137.    Master Leaseco's records were grossly inadequate and its corporate formalities unobserved.  The board of directors did not conduct meetings regarding business management and operations nor did they consent to or authorize the majority of the actions of Master Leaseco with any formality.

138.    No consents were granted in connection the Master Leaseco's business operations, including that no consents were granted with respect to the granting or receipt of loans from other DBSI Companies.

**(4)    FOR 1031 LLC**

139.    FOR 1031 was formed for the purpose of acquiring and selling improved real estate to TIC Investors through the Real Estate Channel.

140.    Since its formation, FOR 1031 has been managed and controlled by Douglas Swenson, Var Reeve and Bringhurst.

141.    Effective January 1, 2004, Douglas Swenson became the majority shareholder of FOR 1031.

142.    From January 1, 2004 until March 15, 2006, FOR 1031 was owned by Douglas Swenson and Var Reeve.  But, on March 15, 2006, Douglas Swenson and Var Reeve contributed their interests in FOR 1031 to DBSI Properties Inc. ("DBSI Properties") in exchange for ownership interests in DBSI Properties.

143.    From March 15, 2006 to April 1, 2008, DBSI Properties was owned by Douglas Swenson, Var Reeve and Bringhurst.

144.    In 2008, Douglas Swenson, Var Reeve and Bringhurst exchanged their indirect ownership interests in FOR 1031 for additional interests in DBSI Inc. and all shares of FOR 1031 came to be owned by Spectrus.

145.    FOR 1031 was intimately interwoven with DBSI Inc.

146.    For example, DBSI Inc. often acted as the guarantor of loans from third parties to FOR 1031. DBSI Inc. established, funded and owned subsidiaries that acted as the master tenants in connection with each of the master leases placed on real estate projects sponsored by FOR 1031. Master Leaseco made numerous loans to wholly owned subsidiaries of FOR 1031. FOR 1031 made capital transfers to Master Leaseco.

147.    The Insiders did very little to maintain the separateness of FOR 1031.

148.    FOR 1031 company records are minimal and reflect only one meeting of the board of managers throughout its existence.

149.    There are no documented consents or authorizations by the board of managers regarding the acquisition or ownership of assets by FOR 1031 or its financing activities.

150.    The operations of FOR 1031 and any business decisions and undertakings were taken without any formal member or management consent.

**(5)    DBSI Investments**

151.    DBSI Investments is a limited partnership that is a holding company for other DBSI Companies.

152.    The majority of the interests in DBSI Investments are owned by DBSI Inc., with other remaining interests owned by Douglas Swenson, Mayeron, Hassard and Mott.

153.    Foster and Bennett are former owners of DBSI Investments.

154.    Accordingly, DBSI Inc. controlled DBSI Investments, and Douglas Swenson controlled them both.

155.    Douglas Swenson was the managing partner of DBSI Investments with the management authority to control, manage and direct all activities of the partnership.

156.     DBSI Investments owns interests in Stellar and Western Technologies.

157.     DBSI Investments received substantial funding from other DBSI Companies.

158.     Nevertheless, DBSI Investments has been insolvent since at least 2001 due to the continued and growing losses of its interests in other entities, such as Stellar and the Technology Companies, and due to its unjustified distributions to DBSI Investments' General Partners.

159.     As of December 31, 2008, DBSI Investments owed over $101 million to DRR.

160.     There does not appear to be any corresponding benefit or offset for these monies advanced to DBSI Investments by DRR.

161.     Transfers made to and from DBSI Investments were made without regard for an equivalent exchange value.

162.     DBSI Investments was the primary conduit used to make distributions to the Insiders.

163.     DBSI Investments also served as a pipeline of commingled funds from DRR and other DBSI Companies to Stellar and the Technology Companies.

164.     DBSI Investments maintained few corporate formalities.

**(6)     Stellar**

165.     Stellar is a non-operational holding company that owns interests in the Technology Companies.

166.     The Insiders directly or indirectly own the majority of Stellar.

167.     The control and management of Stellar closely tracks the management of DBSI Inc.

168.     Every Control Group Defendant, except Bennett, has served or continues to serve on Stellar's board.

169.     Stellar functioned as a conduit for the transfer of the commingled funds of the DBSI Companies to the Technology Companies.

170.     In total, Stellar received at least $194 million from various DBSI Companies and made loans of approximately $120 million to the Technology Companies.

171.     None of those funds were ever paid back to the loaning DBSI Companies.

172.     Stellar was never solvent, never received any return on its investments in the Technology Companies, and never repaid any of the funds it borrowed from the DBSI Companies.

173.     As the Bankruptcy Court found after extensive review of the evidence:

- "DBSI ran its businesses and entities as a unified enterprise under common ownership and control.  A small group of insiders employed that control to raise cash, commingle it, and then distribute it as needs presented, without regard for source or restrictions on use.  The practice of running DBSI as a unified enterprise caused investors to rely upon the purported financial strength and competence of the unified enterprise in deciding to invest in various DBSI projects.  The Chapter 11 Trustee's factual investigation revealed transactions of fantastic and tortured complexity. . . .  Moreover, a great many transfers of cash and properties between DBSI entities were either constructively or actually fraudulent or otherwise gave rise to claims between the DBSI entities."

- "Here, the funds of the DBSI enterprise are commingled and inter-entity claims and obligations are a hopeless tangle.  The ledgers maintained by the various DBSI entities reflect transactions of staggering complexity.  Yet, those ledgers do not provide a reliable guide, because the actual movement of funds was frequently quite different than what was recorded.  Assets and liabilities were moved between the DBSI enterprise without regard for arms-length exchanges of value.  Entities loaned money based upon collateral of dubious value.  Funds were commingled and paid out without regard to source.  Important transactions were insufficiently documented."

- "Accountable Reserves, proceeds from the sale of notes and bonds to the Note/Bond/Fund Investors and other revenues were pooled and disbursed based upon the needs of the Debtors at the moment . . . ."

- "Important corporate formalities were frequently ignored."

- "DBSI clearly operated as the alter ego of its Insiders (as such term is defined under Section 101(31) of the Bankruptcy Code). They operated the entities as a single economic enterprise. All of the entities were housed in the central DBSI offices, and their boards, officers and/or general partners were mostly the same Insiders. In addition to the commingling of funds and the use of shared offices, most of the entities shared the same "DBSI" acronym in their names and DBSI management frequently changed the names of various entities (sometimes switching the same name from one entity to another)."

## H.    The Cash Flow Problems of the DBSI Companies

174.    No later than 2004, the DBSI Companies began experiencing substantial cash flow problems.

175.    In 2004, the DBSI Companies began forecasting their anticipated sources and uses of cash. The purpose of that coordinated forecasting was to provide Douglas Swenson and the Insiders an overall picture of the cash flow across the DBSI Companies. That picture was bleak.

176.    When "alarming" concerns regarding the DBSI Companies' cash flow were raised to Bringhurst by Chan (Parmer) Barrieau, DBSI Inc.'s then-accounting manager, Bringhurst transferred the cash forecasting responsibilities from Barrieau to Matthew Duckett.

177.    By no later than 2005, the DBSI Companies were already using Accountable Reserves, a source of funding with limited, stated, permissible uses, as described *infra*, to fund the DBSI Companies' on-going business operations and to fund distributions to the Insiders.

178.    And, by no later than November 2006, the DBSI Companies were able to meet their operating expenses only by using money raised from the Funding Entities.

179.    At about that time, as cash needs became more acute, Douglas Swenson, Bringhurst, Var Reeve, Matthew Duckett, David Swenson and Jeremy Swenson began holding weekly cash meetings to review the DBSI Companies' cash needs. Matthew Duckett communicated the decisions made at the weekly cash meetings to the accounting staff so they

could execute them.  These weekly meetings became a key instrument of the Insiders' ongoing conspiracy to defraud Investors and misappropriate funds.

180.    Douglas Swenson made the key cash management decisions and received certain special reports on the cash status not shared even with other Insiders.

181.    The DBSI Companies' cash position worsened in 2007.  In October 2007, TIC sales through the Real Estate Channel were terminated due to pressure from the SEC.  That created a cash crunch because TIC sales through the Real Estate Channel comprised the majority of all TIC sales revenues for the DBSI Companies.

182.    Consequently, the DBSI Companies increased their efforts to identify properties and assets within their control to use as "collateral" in order to "borrow" against the bonds and notes in order to meet operational expenses.

183.    In November 2007, the DBSI Companies' revenue was insufficient to cover its operating needs without borrowing from the Bond Corps. and Note Corps.

184.    But, in February 2008, the 2008 Notes Corp. began selling notes, raising over $89 million from Investors who were unaware that this sale of the 2008 Notes was little better than an outright theft.  The investment was doomed from inception, and the Insiders knew it.

185.    Despite this precarious financial condition, the DBSI Companies, at the direction of the Insiders, continued to make irresponsible and self-serving spending decisions.

**I.      The Insiders Efforts to Raise Capital**

186.    In order to loot the DBSI Companies, the Insiders needed funds to loot. Accordingly, the Insiders endeavored to secure funding from outside Investors through two primary avenues:  (1) the Internal Funding Programs; and (2) TIC offerings.

187.    However, and unbeknownst to the Investors, in order to cover up the DBSI Companies substantial cash flow problems and to assure Investors of the soundness of the DBSI Companies and the investment opportunities it offered, the Insiders knowingly made a series of material, false misrepresentations and omissions.  Accordingly, the public statements made by the DBSI Companies and approved by Douglas Swenson and the Insiders with respect to the investment opportunities catalogued herein were replete with material, knowingly false misrepresentations and material omissions.

**(1)    Internal Funding Programs**

188.    A major source of cash for the DBSI Companies was the sale of bonds, notes, and funds under SEC Regulation D, which exempts certain securities offerings from the registration requirements of the Securities Act.

189.    Investors purchased interest in the Funding Entities through specifically formed limited liability companies.

190.    The terms of these offerings were set forth in PPMs.

191.    These PPMs, as well as any offering circulars, property services, other offering materials, and/or any materials used to market funds, notes, and/or bonds by the DBSI Companies, were disseminated to Investors by and through the mail and/or wires, and affected interstate commerce.

192.    These investments offered above-average rates of returns for these types of investments.  The DBSI Companies typically guaranteed the loans of Investor money made to entities by these funding programs, making them deceptively appear to be attractive investment opportunities for Investors, but resulting in tremendous long-term financial obligations for the DBSI Companies.

193.    Beginning in 2004, at the behest of the Insiders and to quench their Ponzi scheme's growing thirst for other people's money, the size and frequency of the Funding Entities offerings began to increase.

194.    The stated purpose of most of the Funding Entities' offerings was to raise money that could be loaned or otherwise provided to the DBSI Companies for investment purposes.

195.    But, in reality, the funds were used to prop up the failing DBSI Companies by making cash available to support current operations and obligations, and for misappropriation by the Insiders.

196.    The Internal Funding Programs' offerings had restrictions on how Investor proceeds were to be used.  These restrictions generally related to permissible uses of the money and, if the money was to be loaned, on what terms and with what security.

197.    The DBSI Companies offered the Funding Entities' instruments through securities broker/dealers.  The primary source of the information about these offerings were the accompanying PPMs.

198.    The offering materials supplied to Investors were materially misleading and undertakings were made with no realistic expectation of complying with them.

199.    On August 9, 2005, through a Confidential PPM, 2005 Secured Notes Corp. made an offering of $20 million in 8.15 percent notes.

200.    The 2005 Secured Notes Corp. PPM was disseminated to Investors by and through the mail and/or wires, and affected interstate commerce.

201.    Each prospective purchaser was required to represent in writing that he or she "has received, read and fully understands" the PPM and relied on the information set forth therein.

202.    The 2005 Secured Notes Corp PPM stated that

> [p]roceeds from the sale of the Notes will provide monies to make
> loans to [DBSI Inc.], and certain other subsidiary entities
> controlled by [DBSI Inc.] . . .  The proceeds of any Loans to
> Entities will be used only to acquire, develop and finance real
> estate properties prior to their sale, resale, third-party financing or
> syndication.

203.    At the time the 2005 Secured Notes Corp. PPM was issued, there was no
reasonable likelihood that loans made by the 2005 Secured Note Corp. to various DBSI entities
would ever be repaid.  The DBSI Companies as a whole had severe cash flow problems and
operating losses such that the entities, most of which were insolvent, would never generate
sufficient revenue to satisfy DBSI's obligations to the 2005 Secured Notes Corp. nor to the
Investors who invested in these entities.

204.    It was never the intent of the Insiders to use the proceeds from the 2005 Secured
Notes Corp. offering only for the acquisition, development, or financing of real estate properties.

205.    Despite the representations in the 2005 Secured Notes Corp. PPM, the funds were
used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment,
including servicing the debt of earlier Investors and making distributions to Insiders.

206.    The 2005 Secured Notes Corp. PPM further provided that the proceeds from the
sale of the notes would be held in a separate account and would not be commingled with DBSI's
financial and business accounts nor the accounts of any DBSI affiliates.

207.    That too was a knowing, material, false misrepresentation.

208.    The Insiders intended to use and did use proceeds to prop up the failing DBSI
Companies by commingling the cash with that of other DBSI entities and using the cash
available to support current operations and obligations of the DBSI enterprise, and to line the
pockets of the Insiders.

209.    The 2005 Secured Notes Corp. PPM also stated that to qualify for an intercompany loan pursuant to the offering, "the aggregate Loan to Value Ratio of the Loans must not exceed 85% based on fair market values of the properties of each borrower securing Loans as collateral."

210.    But, this 85% LTV was not adhered to, because the collateral used to support the LTV was knowingly overvalued at the behest of the Insiders.

211.    Real estate valuations were placed on properties which were not reflective of actual value, but with the objective of causing ostensible compliance with LTV requirements of the respective Funding Entities.

212.    The Insiders intentionally and fraudulently set the value of the collateral at whatever figure was necessary to support the need for internal borrowing.

213.    On October 27, 2005, through a Confidential PPM, DBSI Denton Court LLC ("Denton Court LLC"), a wholly-owned subsidiary of DBSI Inc., made an offering of $2.82 million in 9 percent notes.

214.    The Denton Court PPM was disseminated to Investors by and through the mail and/or wires, and affected interstate commerce.

215.    The Denton Court LLC PPM stated that "[p]roceeds from the sale of the Notes will provide monies for use in the development of the Denton Court Retail Center Project."

216.    But, the Insiders never intended to use the proceeds from the Denton Court LLC offering only for the development of the Denton Court Retail Center Project.

217.    Rather, the proceeds were used to prop up the failing DBSI Companies by making cash available to support current operations and obligations, and were misappropriated by the Insiders.

218.    On October 4, 2006, through a Confidential PPM, 2006 Secured Notes Corp., made an offering of $50 million in 8.41 percent notes.

219.    The 2006 Secured Notes Corp. PPM was disseminated to Investors by and through the mail and/or wires, and affected interstate commerce.

220.    As with the 2005 Secured Notes, Investors were required to represent that they had reviewed and relied on the information set forth in the PPM and that the decision to invest in the 2006 Secured Notes was based on the representations in the PPM.

221.    The 2006 Secured Notes Corp. PPM stated that

> [p]roceeds from the sale of the Notes will provide monies to make loans to [DBSI Inc.]. The proceeds from the sale of the Notes will provide monies to make loans to [DBSI Inc.], and certain other subsidiary entities controlled by [DBSI Inc.]. . . . The proceeds of any Loans to Entities will be used only to acquire, develop and/or finance real estate properties prior to their sale, resale, third-party financing or syndication.

222.    At the time the 2006 Secured Notes Corp. PPM was issued, there was no reasonable likelihood that loans made by the 2006 Secured Note Corp. to various DBSI entities would ever be repaid. The DBSI Companies as a whole had severe cash flow problems and operating losses such that the entities, most of which were insolvent, would never generate sufficient revenue to satisfy DBSI's obligations to the 2006 Secured Notes Corp. or to the Investors who invested in these entities.

223.    The Insiders never intended to use proceeds from the 2006 Secured Notes Corp offering only to acquire, develop and/or finance real estate properties.

224.    Despite the representations in the 2006 Secured Notes Corp. PPM, the funds were used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to Insiders.

225.    The 2006 Secured Notes Corp. PPM further provided that the funds raised would be maintained in a separate account and would not be commingled with the funds of DBSI and its affiliates.

226.    That too was a knowing, material, false misrepresentation.

227.    Rather, the proceeds were used to prop up the failing DBSI Companies by making cash available to support current operations and obligations, and were misappropriated by the Insiders.

228.    The 2006 Secured Notes Corp. PPM also stated "[t]o receive a Loan in accordance with the Loan requirements, an Entity must meet certain Loan requirements including a maximum overall 85% Loan to Value Ratio."

229.    But, this 85% LTV was not adhered to because the collateral used to support the ratio was intentionally and fraudulently overvalued.

230.    On February 6, 2008, through a Confidential PPM, 2008 Notes Corp. made an offering of $50 million (with the ability to increase to $90 million) in 9.5 percent notes.

231.    The 2008 Notes Corp. PPM was disseminated to Investors by and through the mail and/or wires, and affected interstate commerce.

232.    The 2008 Notes Corp. offering raised $89.3 million.

233.    The 2008 Notes Corp. PPM stated that:

> [p]roceeds from the sale of the Notes will be used to lend monies (the "loans") to current and future Entities wholly owned by [DBSI Inc.] (the "Guarantor") and certain of its subsidiaries that are controlled entities (together, the "Entities").  The proceeds of the Offering will be used to make Loans to Entities to (i) acquire, rehabilitate, entitle, develop and/or finance real estate assets prior to their sale, resale, third-party financing or syndication and (ii) to finance or refinance non-real estate Entities.

234.     At the time the 2008 Notes Corp. PPM was issued, there was no reasonable likelihood that loans made by the 2008 Notes Corp. to various DBSI entities would ever be repaid.  The DBSI Companies as a whole had severe cash flow problems and operating losses such that the entities, most of which were insolvent, would never generate sufficient revenue to satisfy DBSI's obligations to the 2008 Notes Corp. or to the Investors who invested in these entities.

235.     The Insiders never intended to use the proceeds from the 2008 Notes Corp offering solely to acquire, rehabilitate, entitle, develop or finance real estate nor to finance or refinance non-real estate entities.

236.     Despite the representations in the 2008 Notes Corp. PPM, the funds were used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to Insiders.

237.     By way of example, over $27 million in proceeds from the 2008 Notes Corp. offering was loaned to Stellar.  However, more than $18 million of that money was promptly transferred to DBSI Inc.'s checking and operating accounts, at which point it was used for general operating expenses, payroll taxes and personal state income taxes owed by the Insiders. The $18 million transfer from Stellar to DBSI was obscured by a series of misleading journal entries, often using DRR as an intermediary.

238.     Moreover, Stellar never had the means to repay the $27 million loan in that it was hopelessly insolvent as far back as 2004 and had no hope of repaying even a small portion of this loan.

239.     In addition, in late October 2008, more than $452,000 from the 2008 Notes Corp. offering was used to make interest payments to the 2008 Notes Corp. noteholders.

240.     The 2008 Notes Corp. PPM further provided that the funds raised would be maintained in a separate account and would not be commingled with the funds of DBSI and its affiliates.

241.     That too was a knowing, material, false misrepresentation.

242.     Rather, the proceeds were used to prop up the failing DBSI Companies by making cash available to support current operations and obligations, and were misappropriated by the Insiders.

243.     The 2008 Notes Corp. PPM also stated that "[t]o receive a Loan in accordance with the Loan requirements, an Entity must meet certain Loan requirements including a maximum overall 85% Loan to Value Ratio."

244.     But, this 85% LTV was not adhered to because the collateral used to support the ratio was intentionally and fraudulently overvalued.

245.     Finally, the 2008 Notes Corp. PPM stated that DBSI Inc., the offering's guarantor, had "a net worth of more than $105 million," a deliberately gross exaggeration.

246.     That too was a knowing, material, false misrepresentation.

**(2)     TIC Offerings**

247.     In 2002, the sales of TIC interests in improved real estate by the DBSI Companies increased.

248.     The syndication, marketability and sale to Investors of TIC interests in commercial real estate rested on (i) their qualification under Internal Revenue Code § 1031 as a tax minimization device for sheltering capital gains in commercial real estate, and (ii) on rent proceeds from the properties themselves, which were backed by a guarantee from DBSI Inc.

249.     The terms of TIC offerings were set forth in PPMs.

250. The TIC PPMs were disseminated to Investors by and through the mail and/or wires, and affected interstate commerce.

251. Douglas Swenson reviewed and signed off on each and every TIC PPM before it went to print.

252. The DBSI Companies misrepresented to Investors that the TIC investments would generate a generous and steady stream of revenue through rental income.

253. Such guarantees of investment returns created a heavy drain on the funds of the DBSI Companies, because few of the properties generated sufficient cash flow to meet all obligations to Investors. Accordingly, TIC properties did not generate sufficient cash flow to cover the operation's long-term obligations to the Investors.

254. The DBSI Companies also made the purchase of TIC interests attractive to Investors by implementing a Master Lease Structure in connection with the real estate assets.

255. Pursuant to the Master Lease Structure, improved TIC projects were leased by Investor owners to a DBSI or FOR 1031-related subsidiary pursuant to a long-term master lease agreement. The master tenant received and retained all income from the property. In exchange, the master tenant paid the master landlord pre-set master lease payments throughout the period of the master lease. Accordingly, all profits generated by the assets, if any, were retained by the master tenant, a DBSI-related entity. Conversely, the DBSI Companies absorbed the loss for any assets generating income that was not sufficient to cover the master lease payments and other property related expenses.

256. The Master Lease Structure was attractive to Investors because of the false financial assurances they were provided by the DBSI Companies regarding the ability of the DBSI Companies and its affiliates to satisfy all master lease obligations.

257.     Investors were falsely assured of the financial strength of the master leasee.

258.     DBSI Inc. also guaranteed the master lease payment obligations to the TIC Investors in connection with most master leases.  Investors were continuously falsely assured of the financial ability of DBSI Inc. to make the master lease obligations of both FOR 1031 and DBSI-related master leasees should it be necessary.

259.     At Douglas Swenson's behest, and to assure Investors that Master Leaseco could satisfy its financial obligations under the many master leases, the Insiders represented that Master Leaseco would maintain certain capitalization requirements.

260.     Provisions were included in the master leases that touted this purported capitalization.

261.     For example, a March 14, 2008 Confidential PPM for TIC Interests in North Stafford ("North Stafford PPM"), DBSI North Stafford LLC, an entity wholly owned and operated by DBSI Inc., stated that "DBSI Master Leaseco, Inc. is capitalized with $15,4000,000 in cash or otherwise immediately available funds."

262.     That was a knowing, material, false misrepresentation.  Despite those assurances, Master Leaseco did not consistently maintain the required capitalization.

263.     Statements made to Investors also deliberately and falsely inflated DBSI Inc.'s net worth.

264.     For example, the North Stafford PPM stated that "DBSI Housing [Inc.] has a net worth of more than $105 million," a gross exaggeration

265.     This too was a knowing, material, false misrepresentation.

266.     FOR 1031 made similar fraudulent misrepresentations in its confidential memoranda used to sell TIC interests through the Real Estate Channel.

267.    For example, in a 2006 Executive Property Summary regarding the Dacula Medical Center, FOR 1031 stated that "DBSI Housing Inc. had an unaudited estimated historical cost net worth available to support its various guarantees of approximately $89 million."

268.    This was a knowing, material, false misrepresentation.

269.    A booklet published and distributed by Spectrus entitled "Not All Cash Flows are Created Equal, A Basic Guide to Analyzing Cash Flow Projections for Investment Real Estate" ("Not All Cash Flows") emphasized the importance of a heavily capitalized master lease company backed by a corporate guarantee from a high net worth entity.

270.    Specifically the "Not All Cash Flows" document encouraged Investors to "[i]dentify a master tenant with larger capitalization (ideally in the form of cash or other hard assets rather than a letter of credit) and a portfolio of properties" and to "[l]ook for a corporation that has real and substantial assets (seen in a balance sheet)" to provide the corporate guarantee.

271.    DBSI's Master Lease Structure was made even more attractive to Investors because it guaranteed Investors that they would not be required to make additional capital contributions to support and maintain their assets during their period of ownership.

272.    At first, capital improvements, repairs, tenant and leasing costs, and other expenses in connection with the investment assets were paid by the DBSI Companies which would set up a receivable from the property to be collected at the sale of the property.

273.    Investors relied on the financial strength of DBSI to be able to pay those costs over the term of the master lease.

274.    However, revenue generated from the sale of new TIC interests had to be applied to cover the continually increasing obligations in connection with the master leases.

275.    In 2005, the DBSI Companies began routinely designating no less than five percent of the funds from Investors at closing to be set aside to pay costs and expenses in connection with the asset over the term of the master lease.  The specified, authorized uses of the Accountable Reserves included tenant improvements, leasing commission, capital improvements for improved real estate, management fees, taxes, insurance and other related fees for unimproved real estate.

276.    On information and belief, the term "Accountable Reserves" was created for or by the DBSI Companies.

277.    Thirty-three PPMs include as exhibits financial statements of DBSI that contain a definition of the term Accountable Reserves.  In a section entitled "Significant Accounting Policies," Accountable Reserves are defined as follows:

> Accountable reserves represent funds paid to the Company by tenant in common buyers for future building improvements and leasing commissions related to the real estate properties they buy. As the Company incurs costs related to building improvements and leasing commissions for the specific properties, [the costs are capitalized and[1]] the reserves are reduced.  Any reserves remaining at the time the properties are sold are payable to the respective owners.

278.    The PPMs were disseminated to Investors by and through the mail and/or wires, and affected interstate commerce.

279.    Indeed, after August 15, 2005, Accountable Reserves were collected in connection with almost every real estate project sold by the DBSI Companies.  Accountable Reserves were collected based on Investors' *pro rata* share of ownership in the property as part of the purchase price for a TIC interest.

---

[1] The bracketed language appears in some of the definitions.

280.     Investors were falsely assured that the collection of such Accountable Reserves would ensure that the investment would be properly maintained over the course of the master lease without the risk of Investors being required to invest additional funds for improvement or maintenance of the asset.

281.     For example in the "Not All Cash Flows" document, Spectrus stated, that

> [Accountable R]eserves should also be allowed to only cover actual capital and leasing costs.  This ensures that the master tenant has the incentive to use the reserves to add value to the property.  The master tenant should not be able to use these reserves to supplement its master lease rent obligations as this creates a significant conflict of interest.

282.     Identical language was used in a booklet entitled "How to Analyze Cash Flow Projections in a PPM, A Basic Guide to Analyzing Tenant-In-Common Real Estate Securities Investments" distributed by DBSI Securities Corporation.

283.     Such assurances were not limited to marketing materials.  Rather, assurances regarding the proper use of Accountable Reserves were also in PPMs and other offering materials distributed by the DBSI Companies.

284.     Although the exact language used in these representations varied slightly from one set of offering materials to another, the substance was the same.  For example, in twenty-seven PPMs that include an "Estimated Use of Proceeds," the most common statement concerning Accountable Reserves is as follows:

> Accountable reserves for tenant improvements and leasing commissions [and Capital Expenses] will be repaid to the Purchasers to the extent not used in the operation of the Property.  A portion of the Reserves may be allocated to the Lender to cover reserves required by the Lender

285.     In all, there are 44 PPMs that similarly represent that Accountable Reserves will be used for only certain purposes.

286.     The PPMs were disseminated to Investors by and through the mail and/or wires, and affected interstate commerce.

287.     Likewise in a Confidential PPM concerning TIC interests in Lakeview and Sojourn Centers ("Lakeview Sojourn PPM"), DBSI Lakeview Sojourn LLC, an entity wholly owned and managed by DBSI Inc., stated that Accountable Reserves were "for tenant improvements and leasing commissions" and would "be repaid to the Purchasers to the extent not used in the operation of the Property."

288.     The foregoing statement in the Lakeview Sojourn PPM was a knowing, material, false misrepresentation.

289.     The Lakeview Sojourn PPM was disseminated to Investors by and through the mail and/or wires, and affected interstate commerce.

290.     In a Confidential PPM concerning TIC interests in Loop 1604 ("Loop 1604 PPM"), DBSI Loop 1604 LLC, an entity wholly owned and managed by DBSI Inc., stated that "Accountable [R]eserves represent funds paid to the Company by tenant in common buyers for future building improvements and leasing commissions related to the real estate properties they buy. . . .  Any reserves remaining at the time the properties as sold are payable to the respective owners."

291.     It was never the intent of the Insiders to use the Accountable Reserves from the Loop 1604 PPM offering only for future building improvements and leasing commissions.

292.     Despite the representations in the Loop 1604 PPM, the funds were used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to the Insiders.

293.    The Loop 1604 PPM stated that DBSI Inc. "has a net worth of more than $84 million," a gross exaggeration.

294.    The foregoing statements in the Loop 1604 PPM were knowing, material, false misrepresentations.

295.    On or about July 6, 2007, the Loop 1604 PPM was disseminated to Investors over the wires, and affected interstate commerce.

296.    In a Confidential PPM concerning TIC interests in Goshen Village ("Goshen Village PPM"), DBSI Goshen Village, an entity wholly owned and managed by DBSI Inc., stated that "Accountable [R]eserves for tenant improvements and leasing commissions will be repaid to the Purchasers to the extent not used in the operation of the Property."

297.    The Goshen Village PPM further stated that "Accountable Reserves represent funds . . . for future building improvements and leasing commissions related to the real estate properties . . . . and that "[a]ny reserves remaining at the time the properties are sold are payable to the respective owners."

298.    It was never the intent of the Insiders to use the Accountable Reserves from the Goshen Village PPM offering only for future building improvements and leasing commissions.

299.    Despite the representations in the Goshen Village PPM, the funds were used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to the Insiders.

300.    The Goshen Village PPM further stated that Master Leaseco's "initial capitalization was $15,400,000 in cash," a gross exaggeration.

301.    Finally, the Goshen Village PPM stated that DBSI Inc. "has a net worth of more than $84 million," a gross exaggeration.

302.    The foregoing statements in the Goshen Village PPM were knowing, material, false misrepresentations.

303.    On or about November 10, 2008, the Goshen Village PPM was disseminated to Investors over the wires, and affected interstate commerce.

304.    Similarly, the North Stafford PPM stated that "Accountable [R]eserves for tenant improvements, leasing commissions and capital improvements cannot be used for operations and will be repaid to the Purchasers to the extent not used."

305.    The North Strafford PPM was disseminated to Investors by and through the mail and/or wires, and affected interstate commerce.

306.    In a January 2, 2008 Confidential PPM concerning TIC interests in Landmark Towers ("Landmark Towers PPM"), DBSI Landmark Towers LLC, an entity wholly owned and managed by DBSI Inc., stated that "Accountable [R]eserves for tenant improvements, leasing commissions and [c]apital [e]xpenses . . . will be repaid to the Purchasers to the extent not used in the operation of the Property."

307.    The Landmark Towers PPM continued:  "Accountable reserves represent funds paid to the Company for future building improvements and leasing commissions related to the real estate they buy. . . .  Any reserves remaining at the time the properties are sold are payable to the respective owners."

308.    It was never the intent of the Insiders to use the Accountable Reserves from the Landmark Towers PPM offering only for future building improvements and leasing commissions.

309.    Despite the representations in the Landmark Towers PPM, the funds were used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to the Insiders.

310.    The Landmark Towers PPM also stated that "DBSI [Inc.] has a net worth of more than $105 million," a gross exaggeration.

311.    Finally, the Landmark Towers PPM stated that Master Leaseco "is capitalized with $15,4000,000 in cash or otherwise immediately available funds," a gross exaggeration.

312.    The foregoing statements in the Landmark Towers PPM were knowing, material, false misrepresentations.

313.    On or about January 4, 2008, the Landmark Towers PPM was disseminated to Investors by the mails and/or private or commercial interstate carrier, and affected interstate commerce.

314.    In a February 12, 2008 Confidential PPM concerning TIC interests in Cavanaugh III ("Cavanaugh III PPM"), DBSI Cavanaugh III LLC, an entity wholly owned and managed by DBSI Inc., stated that "Accountable reserves represents funds paid to the Company by tenant in common buyers for future building improvements and leasing commissions related to the real estate properties they buy" and that "[a]ny reserves remaining at the time the properties are sold are payable to the respective owners."

315.    Identical language to that quoted above in the Cavanaugh III PPM appeared in a February 28, 2008 Confidential PPM concerning TIC interests in Boise Foothills ("Boise Foothills PPM"), disseminated by DBSI Boise Foothills LLC, an entity wholly owned and managed by DBSI Inc.

316.    Identical language to that quoted above in Cavanaugh III PPM appeared in a April 14, 2008 Confidential PPM concerning TIC interests in West Boise ("West Boise PPM"), disseminated by DBSI West Boise LLC, an entity wholly owned and managed by DBSI Inc.

317.    It was never the intent of the Insiders to use the Accountable Reserves from the Cavanaugh III PPM, Boise Foothills PPM, or West Boise PPM offerings only for future building improvements and leasing commissions.

318.    Despite the representations in the Cavanaugh III PPM, Boise Foothills PPM, or West Boise PPM , the funds were used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to the Insiders.

319.    The Cavanaugh III PPM and the West Boise PPM also stated that "DBSI Inc. has a net worth of more than $105 million," a gross exaggeration.

320.    The Cavanaugh III PPM also stated that Master Leaseco "is capitalized with $15,400,000 in cash or otherwise immediately available funds," another gross exaggeration.

321.    The foregoing statements in the Cavanaugh III PPM, Boise Foothills PPM, and West Boise PPM were knowing, materially false misrepresentations.

322.    On or about February 14, 2008, the Cavanaugh III PPM was disseminated to Investors by the mails and/or private or commercial interstate carrier, and affected interstate commerce.

323.    On or about March 3, 2008, the Boise Foothills PPM was disseminated to Investors by the mails and/or private or commercial interstate carrier, and affected interstate commerce.

324.    On or about April 16, 2008, the West Boise PPM was disseminated to Investors by the mails and/or private or commercial interstate carrier, and affected interstate commerce.

325.    In a July 2, 2008 Confidential PPM concerning TIC interests in Florissant Market Place ("Florissant Market Place PPM"), Florissant Market Place Acquisition LLC, an entity wholly owned and managed by DBSI Inc., stated that "Accountable [R]eserves for tenant improvements, leasing commissions and capital improvements cannot be used for operations and will be repaid to the Purchasers to the extent not used."

326.    Identical language to that quoted from the Florissant Market Place PPM was used in a August 12, 2008 Confidential PPM concerning TIC interests in Belton Town Center ("Belton Town Center PPM"), disseminated by Belton Town Center Acquisition LLC, an entity wholly owned and managed by DBSI Inc.

327.    It was never the intent of the Insiders to use the Accountable Reserves from the Florissant Market Place PPM or Belton Town Center PPM offerings only for tenant improvements, leasing commissions and capital improvements.

328.    Despite the representations in the Florissant Market Place PPM and Belton Town Center PPM , the funds were used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to the Insiders.

329.    Both the Florissant Market Place PPM and Belton Town Center PPM stated that "DBSI has an un-audited net worth of more than $105 million," a gross exaggeration.

330.    Both the Florissant Market Place PPM and Belton Town Center PPM also stated that Master Leaseco "is capitalized with $15,400,000 in cash or otherwise immediately available funds," another gross exaggeration.

331.    The foregoing statements in the Florissant Market Place PPM and Belton Town Center PPM were knowing, material, false misrepresentations.

332.    On or about September 3, 2008, the Belton Tower PPM was disseminated to Investors by and through the use of wires, affecting interstate commerce.

333.    On or about, September 5, 2008, the Florissant Market Place PPM was disseminated to Investors by and through the use of wires, affecting interstate commerce.

334.    In a June 11, 2008 Confidential PPM concerning TIC interests in Wingfield Village ("Wingfield Village PPM"), DBSI Wingfield Village LLC, an entity wholly owned and managed by DBSI Inc. stated that "Any unused Accountable Reserves will be returned to the Purchasers."

335.    Identical language to that quoted above in the Wingfield Village PPM appeared in a July 28, 2008 Confidential PPM concerning TIC Interests in E-470 East ("E-470 East PPM"), disseminated by DBSI E-470 East LLC, an entity wholly owned and managed by DBSI Inc.

336.    Both the Wingfield Village PPM and E-470 East PPM also stated that "DBSI [Inc.] has an un-audited net worth of more than $105 million."

337.    The foregoing, statements in the Wingfield Village PPM and the E-470 East Complete PPM were knowing, materially false misrepresentations.

338.    On or about June 13, 2008, the Wingfield Village PPM was disseminated to Investors by the mails and/or private or commercial interstate carrier, affecting interstate commerce.

339.    On or about September 5, 2008, the E-470 East PPM was disseminated to Investors by and through the use of wires, affecting interstate commerce.

340.     Similar knowing, material, false misrepresentations were made in numerous other communications with Investors regarding Accountable Reserves.

341.     Similar to many of the PPMs, there are 45 due diligence binders ("DDBs") that describe Accountable Reserves.   The following, which appears in 43 of those DDBs, is the most common language:

> Accountable Reserves are amounts included in the Purchase Price
> that are conveyed by the Seller for the Tenants-in-Common to the
> NNN Lessee for leasing commissions, tenant improvements, and
> capital expenditures during the term of the NNN PLUS® Lease.
> To the extent these Accountable Reserve amounts are not used
> during the term of the NNN PLUS Lease they shall be returned to
> the Tenants-in-Common.

342.     DBSI also made representations regarding Accountable Reserves in general marketing materials distributed to TIC Investors.   For example, the following language appears in at least two different publications provided by DBSI to help Investors understand how TIC investments work:

> Accountable Reserves:  All $750,000 of reserves should be made
> accountable, meaning that the reserves will be returned to the
> owner to the extent that they are not used in the operation of the
> property.  The reserve should also be allowed to only cover actual
> capital and leasing costs.  This ensures that the master tenant has
> the incentive to use the reserves to add value to the property.  The
> master tenant should not be able to use these reserves to
> supplement its master lease rent obligations as this creates a
> significant conflict of interest.

343.     There are no marketing or promotional materials that represented that DBSI could use Accountable Reserves without restrictions.

344.     In an April 24, 2008 email to an Investor, DBSI stated that Accountable Reserves "are your monies, not DBSI's, so you would get them back if they are not spent."  In fact, the Insiders never intended to hold the money separate and to give it back.

345.    Numerous Investors have also represented to the Court that substantively similar representations were made by DBSI.  [*See, e.g.*, Dckt. No. 2079 ("DBSI, through their field representatives, private placement memorandums and their home office personnel have represented to myself and investors across the country that the accountable reserves for each property are to be used for tenant improvements .  .  .  ."); *see also* Dckt. Nos.  1558, 2077, 1892, 2079.]

346.    In communications with Investors, the Insiders through the DBSI Companies communicated that Accountable Reserves were not part of the purchase price, but rather were separate and apart from the purchase price.

347.    For example, in a Master Lease Tax Report Letter, Dave Howe, Client Services Manager, wrote that an Investor "should reduce the total purchase price by your share of the reserve to determine your depreciable basis in the property."

348.    Finally, in the "NNN Plus" lease agreements used in connection with the improved properties sold by FOR 1031 and its related entities, a provision stated that Accountable Reserves "shall be available to LESSEE for the purposes of funding the construction of required tenant improvements, payment of leasing commissions incurred in the leasing of the Property pursuant to Section 19 hereof, and any capital improvements. . . .  [A]ll Accountable Reserves shall remain the property of Purchasers."

349.    These material misrepresentations were knowingly false, as the Insiders intended to commingle and did commingle the Accountable Reserves funds with the funds of other DBSI Companies and used to pay general, non-TIC-related operating expenses and the acquisition of new properties by the DBSI Companies.

350.    Sixty-five TIC PPMs stated that the funds would not be commingled.

351.     For example, the Boise Foothills PPM, the West Boise PPM, the Cavanaugh III PPM, the Wingfield Village PPM, and the E-470 East PPM all stated that "[t]he funds of the Company will not be commingled with the funds of any other person or entity except for operating revenues from the Interest owned by the Company."

352.     Similarly, the Landmark Towers PPM, the Goshen Village PPM, and the Florissant Market Place PPM all stated that "the funds of the Company will not be commingled with the funds of any other person or entity except for operating revenues from the Property."

353.     Likewise, the Loop 1604 PPM stated "[t]he funds of DBSI Units will not be commingled with the funds of any other person or entity except for operating revenues from the Interest owned by DBSI Units."

354.     The Boise Foothills PPM further stated that "DBSI [Inc.] has a net worth of more than $105 million," a gross exaggeration.

355.     The foregoing material representations in the Boise Foothills PPM, the West Boise PPM, the Cavanaugh III PPM, the Wingfield Village PPM, the E-470 East PPM, the Landmark Towers PPM, the Goshen Village PPM, the Florissant Market Place PPM, and the Loop 1604 PPM, and numerous other, identical or substantively similar offering documents, which were relied on by Investors, were knowingly false.  The Insiders never intended to segregate and preserve the Accountable Reserves, but instead intended to commingle, use and misappropriate, and did commingle, use and misappropriate the Accountable Reserves in ways contrary to their false representations.

356.     The Accountable Reserve funds were commingled with other DBSI funds and were swept up by DBSI and other DBSI entities for general corporate and non-TIC related purposes.

357.    Accountable Reserves eventually found their way into every corner of the DBSI Companies.

358.    The DBSI Companies collected a total of nearly $100 million in Accountable Reserves funds.

359.    Only approximately $18 million of the Accountable Reserves funds were used by the DBSI Companies to pay authorized expenses related to the stated use for the funds.

360.    Accordingly, approximately $82 million of Accountable Reserves funds were spent for unauthorized purposes.  These funds were commingled with all other funds of the DBSI Companies and used by various DBSI Companies for non-TIC related purposes and were misappropriated by the Insiders.

### (3)    Kastera

361.    In addition to the Internal Funding Program and the TIC offerings, the DBSI Companies endeavored to raise funds through other means.

362.    One such effort was Kastera, which was established by Douglas Swenson and Var Reeve for the purpose of acquiring, owning, developing and selling unimproved residential real estate.

363.    Although organized to operate independent from the DBSI Companies, Kastera was not self-sufficient and the DBSI Companies provided Kastera with financial support using, among other sources, Bond Corps. and Note Corps. funds.

364.    Kastera subsidiaries borrowed money from the DBSI Companies and never made any payments on that debt.  The subsidiaries owe DBSI more than $12.9 million.

**J.     The Insiders' Efforts to Conceal the True Nature of the DBSI Companies' <u>Financial Health</u>**

365.    To lure Investors, the Insiders presented a false picture of sound financial health of the DBSI Companies.  The gimmicks used by the Insiders provided little to no economic benefit to DBSI.  They principally benefited the Insiders who used the transactions to disguise the fact that DBSI was hemorrhaging money as a result of the Insiders' misappropriation of corporate funds and mounting operational losses.

366.    Keeping DBSI's actual financial condition secret was crucial to the ability of the Insiders to conceal their scheme and continue to line their own pockets.  By hiding DBSI's deteriorating financial condition, the Insiders were able to continue their looting.

**(1)     Commingling of Funds and Intercompany Loans**

367.    One way in which the Insiders concealed the financial status of the DBSI Companies was to treat all of the ostensibly separate entities as one.  Thus, the DBSI Companies commingled and accumulated the funds raised through the Funding Entities, TIC offerings, and other business lines.

368.    Once funds were commingled they were then disbursed for general corporate purposes, the immediate cash demands of the DBSI Companies and Insider looting.

369.    In addition, to meet its severe cash shortages and address the cash demands of the business and to meet the Insider's thirst for loot, the DBSI Companies used funds raised from Investors and created records purporting to reflect that this money was "loaned" to related entities using assets as "collateral."  Intercompany cash transfers were typically treated as "loans" on the books and records of the DBSI Companies.

370.    These intercompany loans were not made with adequate documentation, were routinely not at arm's length, and no attempt was made to make exchanges for equivalent value.

371.     These intercompany loans often violated the lending terms set forth in the lending entities controlling documents, including applicable LTVs, as well as basic lending industry lending requirements.

372.     In order to give the appearance of compliance with applicable LTV ratios, DBSI would (i) knowingly assign inflated and wholly unjustified values to collateral "securing" the loans, and (ii) reallocate collateral at year-end through after-the-fact bookkeeping entries based on these inflated internal valuations.

373.     To further manipulate the LTVs, in January 2007, DBSI Inc. established a loan committee to oversee the disbursement of loans by the various internal funding programs ("Loan Committee").  The real purpose was to provide cover to the Insiders' fraudulent scheme.

374.     The Loan Committee met irregularly and, as a practical matter, exercised little oversight.  Instead, its members became willful, knowing aiders and abettors of the overall scheme to defraud.

375.     Members of the Loan Committee were selected by Douglas Swenson and included, but were not limited to, Paris Cole, Mark Ellison, and Jeremy Swenson.

376.     Matt Duckett provided the requests for funding to Douglas Swenson on a weekly basis.  Thereafter, Douglas Swenson reviewed the funding needs and decided which source of funds would be used for the acquisitions.

377.     Douglas Swenson almost always signed documents on behalf of the entity requesting the loan.

378.     In sum, when the DBSI Companies needed to extract additional cash from one of its entities, the DBSI Companies, at the behest of the Insiders, manipulated the LTV, by

fraudulently increasing the stated value of real estate or other assets to knowingly false levels to permit the withdrawal of additional funds.

### (2)    Loans to Stellar, the Technology Companies, and Western Technologies

379.    From 1999 through 2008, the DBSI Companies transferred or made loans totaling more than $200 million to Stellar, the Technology Companies, and Western Technologies.

380.    The decision to fund and to continue funding Stellar, the Technology Companies, and Western Technologies was made by the Insiders.

381.    The transfer of substantial sums of money to Stellar, the Technology Companies, and Western Technologies continued despite the fact that (i) the DBSI Companies were suffering significant cash flow problems, (ii) certain of the Technology Companies failed, resulting in losses of tens of millions of dollars, (iii) the operation of Stellar, the Technology Companies, and Western Technologies continued to require substantial cash infusions, and (iv) virtually no cash flowed upstream from Stellar, the Technology Companies, and Western Technologies back to the DBSI Companies even though the DBSI Companies badly needed cash.

382.    The funds provided by the DBSI Companies to Stellar, the Technology Companies, and Western Technologies were used for routine business operations.

383.    From its inception, Stellar received and pledged its assets for funds that were booked as loans and capital contributions from four DBSI Companies -- DBSI Investments, GCC, DRR, and 2008 Notes Corp.

384.    From 2000 to 2008, Stellar received a total of more than $186 million from GCC, DBSI Investments, DRR, and 2008 Notes Corp.  A substantial portion of these funds came from misappropriated Accountable Reserves funds.

385.    The funds transferred to Stellar and the Technology Companies by DBSI Investments are particularly noteworthy.

386.    Because DBSI Investments was structured as a partnership, the beneficial result of the massive losses suffered by Stellar and the Technology Companies was the creation of a handsome tax shelter for the Insiders.

387.    The Insiders, accordingly, enjoyed the benefit of being able to offset such losses against the taxable income that was being generated and was also flowing to them from the DBSI Companies' TIC sales activity.

388.    In other words, in an extraordinarily bold racketeering enterprise, the Insiders lured Investors to deposit the Accountable Reserves via multiple false representations, then they stole the Accountable Reserves, then transferred much of the Accountable Reserves to themselves and squandered the rest on the Technology Companies, and then used these Technology Company losses (of other people's money) to escape federal income tax on the millions of misappropriated dollars they had put in their own pockets.

389.    There was no beneficial business purpose to the DBSI Companies for the "loans" made by DBSI Investments to Stellar and the Technology Companies.

390.    Rather, any benefit of DBSI Investments' "loans" to Stellar and the Technology Companies inured solely to the Insiders in the form of a drastic reduction in their personal tax obligations.

391.    Almost none of Stellar's borrowings were properly documented at the time the funds were loaned and a significant portion of Stellar's debt remains completely undocumented. Furthermore, the majority of the funds Stellar borrowed were not secured by any perfected pledge of collateral from Stellar.

392.     Where Stellar pledged collateral, namely its ownership interests in other Technology Companies, the valuation was based on highly subjective valuations prepared by Douglas Swenson.  These valuations were knowingly highly inflated because they were based on knowingly false and unrealistic projections as to the future profitability of the Technology Companies owned by Stellar, all of which had a long history of losing money and owed significant debt to Stellar.

393.     All existing notes for Stellar's debt to GCC, DRR, and 2008 Notes Corp. are past due.

394.     Stellar frequently used portions of loans from GCC, DRR, and 2008 Notes Corp. to make interest or principal payments to one of the other lending entities.  The decision to use loans in such a manner was made by, among others, Douglas Swenson, Var Reeve, Bringhurst, Matt Duckett and Paris Cole, at weekly cash meetings.

395.     Importantly, certain of the Insiders, including Douglas Swenson, Var Reeve and Bringhurst, controlled all transfers to Stellar.  Those Insiders decided which lending entity would be the source of funds requested by Stellar and its subsidiary Technology Companies.

396.     Borrowings from DBSI Investments, GCC, and DRR that were provided to the Technology Companies were recorded on Stellar's and the Technology Companies' books as loans from Stellar to the Technology Companies and a corresponding loan from the lending entity to Stellar.  This was so even though, in most instances, the cash did not flow through Stellar, but rather went directly from DBSI Investments, GCC, or DRR to the Technology Companies' bank accounts.

397.     Throughout its existence, Stellar's liabilities have greatly exceeded its assets.

398.    Western Technologies is a company that had no operations but existed solely for the purpose of holding majority ownership interests in and providing funding to numerous subsidiary entities.

399.    Western Technologies was owned primarily by DBSI Investments.

400.    Numerous Insiders served on Western Technologies' board of directors, including Douglas Swenson, Foster, Hassard, Mott and Mayeron.

401.    From August 2000 through 2008, Western Technologies received more than $32 million in funds from GCC, DRR and 2008 Notes Corp.

402.    Notes signed by Western Technologies for funds received from GCC, DRR and 2008 Notes Corp. are all past due.

403.    Some of the security interests granted by Western Technologies to GCC and 2008 Notes Corp. were not perfected.

404.    Western Technologies pledged insufficient collateral and overpledged collateral.

405.    Portions of the loans made to Western Technologies were used to make interest and principal payments on its preexisting debt.  Thus, starting in 2005, Western Technologies borrowed funds from DRR and 2008 Notes Corp. to make interest or principal payments to either GCC or DRR.

**(3)    Year-End Cash and Capitalization Manipulations**

406.    DBSI engaged in year-end cash and capitalization manipulations to create the false impression that certain DBSI Companies were well-capitalized to meet their financial obligations, as represented to Investors in numerous offering documents.

407.    In order to create the illusion of financial health to garner Investors and obscure the significant losses incurred by many of its properties, the DBSI Companies manipulated the

cash position of certain entities involved in its TIC investments, using temporary year-end cash infusions which were "repaid" days after the end of audited periods.

408.    In some instances certain Funding Entities received gratuitous reductions of their debt without actually paying for such reductions, and other Funding Entities were charged with additional debt for which they received no cash. The purpose of these debt reallocations was to create the false impression, in time for the year-end audit, that loans complied with the 85% LTV required under the respective PPMs.

### (4)    Manipulation of Financial and Accounting Records

409.    The Insiders created a misleading financial picture of the DBSI Companies by manipulating financial and accounting records and by concealing the sources and uses of funds that flowed among the DBSI Companies.

410.    DRR acted as an internal bank for DBSI and was used as a conduit through which the DBSI Companies transferred monies from other sources.

411.    The use of DRR helped obfuscate the true source and use of funds that were transferred between the DBSI Companies. Any money that flowed through DRR was always obtained from other sources.

412.    DBSI Investments served as a holding company for partnership interests in several older limited partnerships, as well as Stellar and Western Technologies.

413.    DBSI Investments had little or no independently derived revenue of its own. Rather, it served as a conduit to (i) transfer cash to Stellar and Western Technologies, and (ii) make substantial distributions to the Insiders.

414. Typically, as cash was needed to fund these companies, DRR transferred cash to DBSI Investments which transferred it to Stellar, the Technology Companies, and Western Technologies.

**(5) Funds Were Used for Non-Specified Purposes**

415. The DBSI Companies regularly used Investor funds for purposes not specified and/or prohibited by the terms of the investment.

416. Rather, the proceeds were used to prop up the failing DBSI Companies by making cash available to support current operations and obligations, and were misappropriated by the Insiders.

417. Possibly the best example of the DBSI Companies' misappropriation of investment funds was the DBSI Companies' use of the Accountable Reserves.

418. These Accountable Reserves funds were to be set aside to pay such costs and expenses in connection with the asset over the term of the master lease.

419. They were not. Rather, the Accountable Reserves funds were commingled with all other cash of the DBSI Companies and used for the general operations of all DBSI Companies and for non-TIC-related purposes, including, servicing the debt of earlier Investors.

420. The treatment of Accountable Reserves funds demonstrates a general pattern of diverting such funds to supply cash needs, including but not limited to general overhead expenses, payrolls, third-party debt obligations and debt service payments to Investors, not to mention the Insiders' misappropriation of such funds.

421. In addition, the DBSI Companies reported Accountable Reserves funds as liabilities on the financial statements and tax returns of DBSI Companies. Those liabilities were

then reduced over time as monies were spent on leasing commissions, tenant improvements and/or capital expenses.

422.    The DBSI Companies did not report the Accountable Reserves funds as income of the DBSI Companies.  Accordingly, the DBSI Companies did not report the Accountable Reserves funds as revenue on tax returns.

### (6)    Misleading Financial Statements

423.    DBSI Inc. regularly touted its ability to perform under its corporate guarantees. For example, DBSI Inc. regularly stated that it had a net worth in excess of $100 million.

424.    These financial statements, however, were knowingly false and grossly misleading.

425.    The financial statements used by DBSI Inc. to support those statements were unaudited and did not conform to Generally Accepted Accounting Principles ("GAAP").

426.    These financial statements were prepared by Paris Cole and his accounting staff with review and oversight by Bringhurst, Hassard and Douglas Swenson.

427.    Douglas Swenson had the ultimate say in the presentation of financial statements.

428.    DBSI was able to mask its insolvency on its consolidated balance sheet for the years 2004 through 2008 by failing to follow GAAP, particularly Financial Accounting Standards Board rules or standards applicable to real property accounting.

429.    In his Final Report, the Examiner found that DBSI's unaudited financial statements were not compliant with GAAP.

430.    The Debtors' failure to follow GAAP accounting standards resulted in the issuance of materially inaccurate financial statements that permitted DBSI to conceal its insolvency from the investing public.

431.     For example, DBSI and its affiliated companies and subsidiaries sold Investors

TIC interests as well as various bond and note offerings, all of which provided guaranteed

returns to Investors.  DBSI failed to record on its books and records any liability for several

hundreds of millions of dollars in guarantee liabilities.  Because many of those guarantees were

made on behalf of insolvent entities, Statement 5 of the Financial Accounting Standards Board

("SFAS 5") would require that a loss should be accrued at the time information became available

that a liability had been incurred.  In DBSI's case, it was clear that a liability had been incurred,

because every month DBSI was disbursing funds to support TIC entities that were failing to

generate sufficient operating income to pay their TIC rent and loan obligations.  In short, DBSI's

guarantee obligations were no longer contingent.  DBSI was covering all of the TIC entities cash

shortfalls.

432.     The guaranty liability on the TIC portfolio alone was in excess of in excess of

several hundred million dollars. DBSI had also guaranteed approximately $300,000,000 on

account of the bond and note investments. This liability was never fully recognized, recorded or

fully disclosed by DBSI in its financial statements, despite contributing greatly to the collapse of

the DBSI Enterprise.

433.     DBSI's treatment of receivables due from affiliates provides another example of

how DBSI's accounting practices were designed to mask its insolvency.  At all times during the

Relevant Period, SFAS 5 governed the reporting of contingent losses and gains.  Under SFAS 5,

when information is available indicating that it is probable that as asset is impaired or a liability

has been incurred, a loss should be accrued by a charge to income.

434.     DBSI, however, posted receivables due from affiliates at full value without testing

those receivables for impairment despite the fact that many of the borrowing affiliates were

known to be insolvent and unable to repay the amounts due.  DBSI should have--but failed to--

establish offsetting reserves for the value of the impaired receivables due from affiliates.  DBSI

made no effort to accurately reflect the near total impairment of its investments in affiliated

entities such as Stellar and the Technology Companies, which as recently as June 30, 2008,

DBSI carried on its book and records at $235,000,000.

 435. Similarly, the Examiner found that DBSI's financial statements were misleading

because they netted as a single line item receivables due from, and payables due to, affiliated

entities, including the bond and note entities.  According to the Examiner:

> DBSI Inc.'s balance sheet for the period ended December 31, 2007
> presented, under current assets, a "Net receivable from affiliates"
> of $1.4 million and nothing for liabilities owed to the bond and
> note holders.  Yet, the amount due at that time to the bond and note
> holders was approximately $194 million.

> The netting of receivables and payables was misleading because
> the payables and receivables being netted were two very different
> things.  The payables consisted of hard debt owed to bond and note
> holders with a defined maturity date.  On the other hand, the
> receivables from the Technology Companies were likely
> uncollectible debts that neither Stellar nor the Technology
> Companies could pay off.

 436. DBSI also carried long-term assets and inventory (real property) at cost, without

regard to realizable market value and without establishing offsetting reserves to account for the

difference between cost and market value.  Notably, this was done at a time when real estate

values were declining.

 437. Statement 66 of the Financial Accounting Standards Board ("SFAS 66"),

Accounting for Sales of Real Estate, provides that if a seller has "continuing involvement" with

the property and does not transfer substantially all of the risks and rewards of ownership, profit

shall be recognized by a method determined by the nature and extent of the seller's continuing

involvement.  Profit recognized shall be reduced by the maximum exposure to loss.

438.    Some common forms of continuing involvement include instances where (i) the "seller is a general partner in a limited partnership that acquires an interest in the property sold, or has an extended, non-cancelable management contract . . . and holds a receivable from the buyer for a significant part of the sales price," (ii) the seller guarantees the return of the buyer's investment or a return on that investment for a limited or extended period, such as the guaranty of cash flows, subsidies, or net tax benefits.  In these situations the transaction should have been accounted for as a financing, leasing, or profit-sharing arrangement.[2]

439.    DBSI was involved in many property "sales" where it had continuing involvement in property,  including the Master Lease Structure, but nevertheless recorded the transaction as a "sale" and failed to account for the transaction as a financing, leasing or profit-sharing arrangement.  If those transactions had been properly recorded, DBSI's revenue from the sale of real estate would have been significantly lower.

440.    While the foregoing is not intended to be an exhaustive set of examples, it amply demonstrates that DBSI's unaudited financial statements had numerous material inaccuracies that permitted DBSI to mask its insolvency from the investing public.  If DBSI had regularly tested assets for impairment and maintained its books and records in accordance with GAAP, through a combination of the write-down of assets, coupled with the recognition of the unrecorded guarantee liability and restatement of "sales," DBSI's published financial statements would have shown that it had been insolvent for years.

### (7)    Manipulation of Capitalization Coinciding with Audit Periods

441.    The DBSI entities regularly manipulated their capitalization to coincide with audit periods.

---

[2]  Other possibly applicable situations of continuing involvement are defined in  SFAS 66.

442.    This manipulation also coalesced with the DBSI Companies' repeated manipulation of LTVs.

443.    In order to balance the amount of debt various entities nominally were carrying and to achieve compliance with LTVs, the Insiders simply reallocated debt among different DBSI Companies.

444.    The purpose of these debt reallocations was to create the false impression, in time for the year-end audit, that Master Leaseco and various DBSI Notes Corp. loans complied with the 85 percent LTV requirement to which they were subject.

**K.    The Insiders' Continued Looting of the DBSI Group**

445.    The foregoing raising of capital and accompanying scheme to defraud was designed for one purpose:  the Insiders' looting of the DBSI Companies.

446.    The Insiders misappropriated significant amounts of money to themselves.  Thus, when the DBSI Companies collapsed and countless individuals suffered crushing losses, the Insiders walked way with millions of dollars.

447.    Beginning in 2000 and continuing up to and through the Petition Date, tens of millions of dollars in distributions flowed to the Insiders via DRR and DBSI Investments in the form of tax payments, bonuses, salary, interest on and liquidation of personal bond investments, and redemption of ownership interests.

448.    The monies paid to the Insiders came from accounts containing commingled funds.

449.    In total, the Insiders looted approximately $75 million in illicit payments from the DBSI entities, including net cash payments of approximately $31.7 million to Douglas Swenson alone from 2004 to 2008.  See Exhibit C.

450. The bulk of distributions to Douglas Swenson were in the form of cash distributions and payments made to state and federal tax authorities on his behalf.

451. In the four years prior to the Petition Date, Swenson received at least $31.7 million in Insider distributions.

452. From 2000 through 2008, Hassard received insider payments totaling more than $3.8 million.

453. From 2000 through 2008, Mayeron received insider payments totaling more than $4.6 million.

454. From 2000 through 2008, Mott received insider payments totaling more than $5.7 million.

455. From 2000 through 2008, Bennett received insider payments totaling more than $1.1 million.

456. From 2000 through 2008, Foster received insider payments totaling more than $4.9 million.

457. From 2000 through 2008, Var Reeve received insider payments totaling more than $7 million, including profits made by selling property on Pearson Lane, McCall, Idaho to Kastera despite Douglas Swenson's previous rejection of that property.

458. From 2001 through 2008, Bringhurst received insider payments totaling nearly $3 million.

459. From 2001 through 2008, Jeremy Swenson received insider payments totaling more than $763,000.

460. From 2003 through 2008, David Swenson received insider payments totaling more than $513,000.

L.     **Manipulation of Due Diligence Reports and Appraisals**

461.     Mick and his law firm Mick & Associates wrote numerous due diligence reports provided to broker/dealers on approximately 140 DBSI projects.

462.     Mick's typical base fee for preparation of a due diligence report on any TIC offerings was fixed at $8,500 with possible additional amounts charged depending on the number of broker/dealers provided with the report.

463.     Although the reports were ostensibly prepared for use by broker/dealers, all fees were paid by the DBSI Companies and this arrangement netted Mick approximately $1.4 million since 2005.

464.     A significant portion of the due diligence reports prepared by Mick consists of factual information, including descriptive and background information related to various aspects of the particular project or DBSI's business operations in general.

465.     The reports also identify the types of information reviewed prior to completion of the report.  Common documents reviewed include the relevant PPM, company formation documents and financial statements.

466.     In addition to factual statements, the reports include assessments and opinions about various aspects of the offerings and provide generally favorable recommendations and conclusions as to their viability.

467.     Mick breached the professional standard of care applicable to due diligence providers and aided and abetted in the massive fraud alleged herein by reaching many conclusions which were insufficiently informed, objectively unreasonable or both.

468.     A DBSI entity often served as guarantor of many of the offerings reviewed by Mick.  As guarantor of the investments, the companies' financial viability would in all

circumstances be highly relevant.  While Mick's reports would reference the guarantor's financial viability, the reports would often not be independently audited or otherwise verified. Nonetheless, Mick would often issue a favorable opinion despite the unreliability of the underlying data and without having endeavored to investigate the accuracy of that data.

469.    Keeping with the theme of Mick's penchant for unreasonably relying upon unaudited and unverified information provided by DBSI financials, Mick also allowed his conclusions to be directly influenced by DBSI personnel.  And this is so despite statements in each report describing what follows as an "independent due diligence review."

470.    Mick undertook actions that compromised the independence of the reports as DBSI employees were given the opportunity to review and comment on the reports prior to their distribution to broker/dealers.

471.    On numerous occasions, email correspondence reveal that Mick accepted substantive comments on the DBSI offerings from DBSI personnel and that those comments actually influenced changes in the reports.

472.    More specifically, and by way of example, a copy of Mick's due diligence report related to the 2008 Notes Corp., dated February 1, 2008, was submitted to DBSI and included the concluding statement that Mick "cannot unqualifiedly recommend approval" of the offering. Handwritten notes on a copy of this report bracketed that statement and wrote the word "Negative."  Subsequently, Mick issued a revised report on February 14, 2008 which changed the previous language to the much more favorable "qualified recommendation."

## COUNT ONE
### (By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)
### (RICO, 18 U.S.C. § 1962(C))

473.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

### **THE ENTERPRISE**

474.    Two RICO enterprises are pled in the alternative in this Complaint for the RICO violation under 18 U.S.C. § 1962(c).  The first is the enterprise comprised of the Insiders together (the "RICO Insider Enterprise").  The second is the enterprise comprised of the DBSI Companies together (the "RICO DBSI Enterprise").  Where the allegations are equally applicable to either enterprise pled in the alternative, they are referred to by the single term "RICO Enterprise" although either of the enterprises is intended.

### A.    **The RICO Insiders Enterprise**

475.    At all times relevant hereto, the Insiders, individually, were "persons" within the meaning of 18 U.S.C. §§ 1961(3).

476.    At all relevant times hereto, the Insiders were members of and/or were associated-in-fact with an "enterprise" consisting of all of them engaged in or the activities of which affected interstate or foreign commerce within the meaning of 18 U.S.C. § 1961(4).

477.    The RICO Insider Enterprise included all of the Insiders who were associated-in-fact in the creation, acquisition and operation of the DBSI Companies.  The members of the RICO Insiders Enterprise included each of the Insiders.

478.    The RICO Insider Enterprise had an ascertainable structure, and a continuity of structure and personnel.  In particular, the Insider Enterprise was formed by Douglas Swenson

and the other Insiders for the purpose of influencing, operating and dominating the DBSI Companies.

479.    As previously alleged, the Insiders were directors, officers, partners, members and/or employees of the DBSI Companies.  Douglas Swenson held a direct or indirect controlling interest in substantially all of the DBSI Companies and others of the Insiders had ownership interests and served as board members, managers or officers of each of them.

480.    The RICO Insider Enterprise had an existence separate and apart from the particular instances of racketeering activity described below.  In particular, the DBSI Companies existed as corporate entities and the Insiders controlled them in their roles as owners, directors, officers and/or employees of them.

**B.    The RICO DBSI Enterprise**

481.    At all times relevant hereto, the Insiders, individually, were "persons" within the meaning of 18 U.S.C. §§ 1961(3).

482.    In the alternative to the foregoing allegations at paragraphs 476 through 480, at all relevant times hereto, the DBSI Companies constituted, were members of and/or were associated-in-fact as an "enterprise" consisting of all of them engaged in or the activities of which affected interstate or foreign commerce within the meaning of 18 U.S.C. § 1961(4).

483.    The RICO DBSI Enterprise included all of the DBSI Companies who were corporate affiliates and/or associated-in-fact in the perpetration of the ongoing fraud and Ponzi scheme by which the Insiders bilked Investors in the DBSI real estate empire.

484.    The RICO DBSI Enterprise had an ascertainable structure, and a continuity of structure and personnel.  In particular, the RICO DBSI Enterprise was formed by Douglas

Swenson and the other Insiders for the purpose of carrying on their fraudulent Ponzi scheme and to cheat Investors and misappropriate funds Investors entrusted to them.

485.    As previously alleged the Insiders were directors, officers, partners, members and/or employees of the DBSI Companies.  Douglas Swenson held a direct or indirect controlling interest in substantially all of the DBSI Companies and others of the Insiders had ownership interests and served as board members, managers or officers of each of them.

486.    The RICO DBSI Enterprise had an existence separate and apart from the particular instances of racketeering activity described below.  In particular, the DBSI Companies that comprised the RICO DBSI Enterprise existed as corporate entities and the Insiders controlled them in their roles as owners, directors, officers and/or employees of them.

## THE PATTERN OF RACKETEERING ACTIVITY

487.    Beginning no later than 2004, the Insiders were members of and were employed by or associated-in-fact with the RICO Enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(1).

488.    The Insiders were able to commit and aid and abet the racketeering activity described below by virtue of their control over the affairs of the RICO Enterprise.  These offenses were committed as part of racketeering activity in that they had the same or similar purposes, results, participants, victims and/or methods of commission, and include two or more related individual offenses which were separate in time and committed with the express intention and common design and purpose of fraudulently marketing securities and real estate, obtaining money by false representations that it would be kept in trust and misappropriating substantial corporate funds and other corporate opportunities at a time the DBSI Companies were not able to

meet their obligations to their Investors.  This series of related offenses extended over a substantial period of time and posed a threat of continuing activity.

489.     The above-alleged pattern of racketeering offenses included, among others, the separate acts and episodes of racketeering activity set forth below.

490.     The acts of mail fraud and wire fraud detailed elsewhere in the Complaint occurred in a continuous pattern, beginning no later than 2004 and continuing until the Petition Date.

## MAIL FRAUD

491.     Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein.  These acts formed a pattern of fraud on Investors that continued from at least 2004 to November 2008 in which the Insiders, their conspirators and agents, unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice for inducing TIC purchasers and purchasers of instruments issued by the Funding Entities to invest in the DBSI Companies and their real estate offerings even though the Insiders knew that the DBSI Companies were failing, that the representations and undertakings they were making were false and could not be complied with and that the only way the Investors could ever get any of their money back was by inducing yet more Investors to purchase the fraudulently marketed instruments and properties.  Thus, the Insiders obtained funds and tax advantages from Investors and from the DBSI Companies which they diverted to themselves by means of false and fraudulent pretenses, representations and promises, and through the concealment of material facts.

492.     The Insiders and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing and attempting to execute, the scheme and artifice to

defraud, and for obtaining money and property from the Investors and the DBSI Companies, did place and cause to be placed in post offices and authorized depositories for mail matter certain mail matter to be sent or delivered by the U.S. Postal Service and/or did deposit or cause to be deposited certain mail matter to be sent or delivered by any private or commercial interstate carrier, and did cause to be delivered by mail and/or private or commercial interstate carrier, according to the directions thereof, certain mail matter, in violation of 18 U.S.C. § 1341, including as examples, and without limitation, the following:

| Approximate Date of Mailing | Description of Item Mailed |
|---|---|
| January 4, 2008 | Landmark Towers PPM |
| February 14, 2008 | Cavanaugh III PPM |
| March 3, 2008 | Boise Foothills PPM |
| April 16, 2008 | West Boise PPM |
| June 13, 2008 | Wingfield Village PPM |

493.    Each of the aforesaid mailings, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  The Insiders knew of and/or authorized such mailings and knew that such mailings were in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  Each of these mailings furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors and in their business and property.

## WIRE FRAUD

494.    From at least 2004 to in or about November 2008, the Insiders and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of further executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and DBSI Companies, did use interstate wire services to place interstate telephone calls, and send interstate emails and telefaxes in violation of 18 U.S.C. § 1343, including as examples, and without limitation, the following:

| Approximate Date of Call, Email or Telefax | Description of Call, Email or Telefax |
| --- | --- |
| July 6, 2007 | Email forwarding Loop 1604 PPM |
| September 2, 2008 | Email forwarding Florissant Marketplace PPM |
| September 3, 2008 | Email forwarding Belton Town Center PPM |
| September 5, 2008 | Email forwarding E-470 East PPM |
| November 10, 2008 | Email forwarding Goshen Village PPM |

495.    Each of the aforesaid telephone calls, emails and telefaxes, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  The Insiders knew of and/or authorized the use of interstate and transatlantic wire services to place such telephone calls and send such emails and telefaxes, and knew that such telephone calls, emails and telefaxes were being made in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  The use of interstate wire services to place such telephone calls and send such emails and telefaxes furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

## DAMAGES CAUSED BY THE RICO VIOLATION

496.    By engaging in the conduct set forth above, and conducting or participating in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, the Insiders, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

497.    By reason of the foregoing, the Trustee is entitled to recover from the Insiders threefold such actual damages as the Court finds the Debtor Entities and Assigning Investors have sustained, together with the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against the Insiders for threefold such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and

Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

**COUNT TWO**
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(RICO, 18 U.S.C. § 1962(b))**

498.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

**<u>THE ENTERPRISE</u>**

499.    At all times relevant hereto, the Insiders, individually, were "persons" within the meaning of 18 U.S.C. §§ 1961(3).

500.    Two RICO enterprises are pled in the alternative in this Complaint for the RICO violation under 18 U.S.C. § 1962(b).  The first is the RICO Insider Enterprise, as discussed in more detail in paragraphs 476 through 480.  The second is the RICO DBSI Enterprise, as discussed in more detail in paragraphs 482 through 486.  Where the allegations are equally applicable to either enterprise pled in the alternative, they are referred to by the single term "RICO Enterprise" although either of the enterprises is intended.

501.    As previously alleged, at all relevant times hereto, the RICO Enterprise was an "enterprise" engaged in or the activities of which affected interstate or foreign commerce within the meaning of 18 U.S.C. § 1961(4).

502.    The RICO Enterprise had an existence separate and apart from the particular instances of racketeering activity described below.  In particular, the Insiders were members of and/or were associated-in-fact with an "enterprise" consisting of all of them or, in the alternative,

82

the DBSI Companies existed as corporate entities and Insiders controlled them as directors

and/or shareholders of those entities.

## THE PATTERN OF RACKETEERING ACTIVITY

503.  Beginning no later than 2004, the Insiders did acquire and maintain, directly or

indirectly, an interest in or control of the RICO Enterprise through a "pattern of racketeering

activity," within the meaning of 18 U.S.C. § 1961(1).

504.  The Insiders were able to commit and aid and abet the racketeering activity

described below by virtue of their acquisition, maintenance and control over the RICO

Enterprise.  These offenses were committed as part of racketeering activity in that they had the

same or similar purposes, results, participants, victims and/or methods of commission, and

include two or more related individual offenses which were separate in time and committed with

the express intention and common design and purpose of fraudulently marketing securities and

real estate, obtaining money by false representations that it would be kept in trust and

misappropriating substantial corporate funds and other corporate opportunities at a time the

DBSI Companies were not able to meet their obligations to their Investors.  This series of related

offenses extended over a substantial period of time and posed a threat of continuing activity.

505.  The above-alleged pattern of racketeering offenses included, among others, the

separate acts and episodes of racketeering activity set forth below.

506.  The acts of mail fraud and wire fraud detailed elsewhere in the Complaint

occurred in a continuous pattern, beginning no later than 2004 and continuing until the Petition

Date.

## MAIL FRAUD

507.  Specific acts of fraud previously alleged in this Complaint are incorporated here

by reference as if fully set forth herein.  These acts formed a pattern of fraud on Investors that

continued from at least 2004 to November 2008 in which the Insiders, and their conspirators and agents, unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice for acquiring and maintaining the RICO Enterprise, inducing TIC purchasers and purchasers of instruments issued by the Funding Entities to invest in the DBSI Companies and their real estate offerings even though the Insiders knew that the DBSI Companies were failing, that the representations and undertakings they were making were false and could not be complied with and that the only way the Investors could ever get any of their money back was by inducing yet more Investors to purchase the fraudulently marketed instruments and properties.  Thus, the Insiders obtained funds and tax advantages from Investors and from the DBSI Companies which they diverted to themselves by means of false and fraudulent pretenses, representations and promises, and through the concealment of material facts.

508.    The Insiders and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and the DBSI Companies, did place and cause to be placed in post offices and authorized depositories for mail matter certain mail matter to be sent or delivered by the U.S. Postal Service and/or did deposit or cause to be deposited certain mail matter to be sent or delivered by any private or commercial interstate carrier, and did cause to be delivered by mail and/or private or commercial interstate carrier, according to the directions thereof, certain mail matter, in violation of 18 U.S.C. § 1341, including as examples, and without limitation, the following:

| Approximate Date of Mailing | Description of Item Mailed |
| --- | --- |
| January 4, 2008 | Landmark Towers PPM |
| February 14, 2008 | Cavanaugh III PPM |
| March 3, 2008 | Boise Foothills PPM |
| April 16, 2008 | West Boise PPM |
| June 13, 2008 | Wingfield Village PPM |

509.    Each of the aforesaid mailings, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  The Insiders knew of and/or authorized such mailings and knew that such mailings were in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  Each of these mailings furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

## **WIRE FRAUD**

510.    From at least 2004 to in or about November 2008, the Insiders and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of further executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and DBSI Companies, did use interstate wire services to place interstate telephone calls, and send interstate emails and telefaxes in violation of 18 U.S.C. § 1343, including as examples, and without limitation, the following:

| Approximate Date of Call, Email or Telefax | Description of Call, Email or Telefax |
|---|---|
| July 6, 2007 | Email forwarding Loop 1604 PPM |
| September 2, 2008 | Email forwarding Florissant Marketplace PPM |
| September 3, 2008 | Email forwarding Belton Town Center PPM |
| September 5, 2008 | Email forwarding E-470 East PPM |
| November 10, 2008 | Email forwarding Goshen Village PPM |

511.    Each of the aforesaid telephone calls, emails and telefaxes, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  The Insiders knew of and/or authorized the use of interstate and transatlantic wire services to place such telephone calls and send such emails and telefaxes, and knew that such telephone calls, emails and telefaxes were being made in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  The use of interstate wire services to place such telephone calls

and send such emails and telefaxes furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

## DAMAGES CAUSED BY THE RICO VIOLATION

512.   By engaging in the conduct set forth above, and conducting or participating in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, the Insiders, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

513.   By reason of the foregoing, the Trustee is entitled to recover from the Insiders threefold such actual damages as the Court finds the Debtor Entities and Assigning Investors have sustained, together with the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against the Insiders for threefold such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

**COUNT THREE**
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(RICO Conspiracy, 18 U.S.C. § 1962(d))**

514.   Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

515.    Beginning no later than 2004, the Insiders combined, conspired and agreed together and with each other to commit the aforementioned violations of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

516.    Beginning no later than 2004, the Insiders conspired and agreed together and with each other to commit the aforementioned violations of 18 U.S.C. § 1962(b), in violation of 18 U.S.C. § 1962(d).

517.    In furtherance of the aforementioned conspiracy and to effect the objects thereof, the conspirators committed the overt acts described above, among others.

518.    By engaging in the conduct set forth above, and conspiring to conduct or participate in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, the Insiders both indirectly and directly, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

519.    By reason of the foregoing, the Trustee is entitled to recover from the Insiders threefold such actual damages as the Court finds the Debtor Entities and Assigning Investors have sustained, together with Plaintiff's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against the Insiders for threefold such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

## COUNT FOUR
### (By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)
### (Idaho Racketeering Act, Idaho Code § 18-7804(c))

520.     Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

### THE ENTERPRISE

521.     Two racketeering enterprises are pled in the alternative in this Complaint for the Idaho Racketeering Act violation under Idaho Code § 18-7804(c).  The first is the enterprise comprised of the Insiders together (the "Racketeering Insider Enterprise").  The second is the enterprise comprised of the DBSI Companies together (the "Racketeering DBSI Enterprise").  Where the allegations are equally applicable to either enterprise pled in the alternative, they are referred to by the single term "Racketeering Enterprise" although either of the enterprises is intended.

### A.      The Racketeering Insider Enterprise

522.     At all times relevant hereto, the Insiders, individually, were "persons" within the meaning of Idaho Code § 18-7803(b).

523.     At all relevant times hereto, the Insiders were members of and/or were associated-in-fact with an "enterprise" consisting of all of them, within the meaning of Idaho Code § 18-7803(c).

524.     The Racketeering Insider Enterprise included all of the Insiders who were associated-in-fact in the creation, acquisition and operation of the DBSI Companies.  The members of the Racketeering Insider Enterprise included each of the Insiders.

525.     The Racketeering Insider Enterprise had an ascertainable structure, and a continuity of structure and personnel.  In particular, the Racketeering Insider Enterprise was

formed by Douglas Swenson and the other Insiders for the purpose of influencing, operating and dominating the DBSI Companies.

526.     As previously alleged, the Insiders were directors, officers, partners, members and/or employees of the DBSI Companies.  Douglas Swenson held a direct or indirect controlling interest in substantially all of the DBSI Companies and others of the Insiders had ownership interests and served as board members, managers or officers of each of them.

527.     The Racketeering Insider Enterprise had an existence separate and apart from the particular instances of racketeering activity described below.  In particular, the DBSI Companies existed as corporate entities and the Insiders controlled them in their roles as owners, directors, officers and/or employees of them.

**B.**     **The Racketeering DBSI Enterprise (in the alternative)**

528.     At all times relevant hereto, the Insiders, individually, were "persons" within the meaning of Idaho Code § 18-7803(b).

529.     In the alternative to the foregoing allegations at paragraphs 523 through 527, at all relevant times hereto, the DBSI Companies constituted, were members of and/or were associated-in-fact as an "enterprise" consisting of all of them within the meaning of Idaho Code § 18-7803(c).

530.     The Racketeering DBSI Enterprise included all of the DBSI Companies who were corporate affiliates and/or associated-in-fact in the perpetration of the ongoing fraud and Ponzi scheme by which the Insiders bilked Investors in the DBSI real estate empire.

531.     The Racketeering DBSI Enterprise had an ascertainable structure, and a continuity of structure and personnel.  In particular, the Racketeering DBSI Enterprise was formed by Douglas Swenson and the other Insiders for the purpose of carrying on their

fraudulent Ponzi scheme and to cheat Investors and misappropriate funds Investors entrusted to them.

532.   As previously alleged the Insiders were directors, officers, partners, members and/or employees of the DBSI Companies.  Douglas Swenson held a direct or indirect controlling interest in substantially all of the DBSI Companies and others of the Insiders had ownership interests and served as board members, managers or officers of each of them.

533.   The Racketeering DBSI Enterprise had an existence separate and apart from the particular instances of racketeering activity described below. In particular, the DBSI Companies that comprised the Racketeering DBSI Enterprise existed as corporate entities and the Insiders controlled them in their roles as owners, directors, officers and/or employees of them.

## THE PATTERN OF RACKETEERING ACTIVITY

534.   Beginning no later than 2004, the Insiders were members of and were employed by or associated-in-fact with the Racketeering Enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of racketeering activity," within the meaning of Idaho Code § 18-7803(d).

535.   The Insiders were able to commit and aid and abet the racketeering activity described below by virtue of their control over the affairs of the Racketeering Enterprise.  These offenses were committed as part of racketeering activity in that they had the same or similar purposes, results, participants, victims and/or methods of commission, and include two or more related individual offenses which were separate in time and committed with the express intention and common design and purpose of fraudulently marketing securities and real estate, obtaining money by false representations that it would be kept in trust and misappropriating substantial corporate funds and other corporate opportunities at a time the DBSI Companies were not able to

meet their obligations to their Investors.  This series of related offenses extended over a substantial period of time and posed a threat of continuing activity.

536.    The above-alleged pattern of racketeering offenses included, among others, the separate acts and episodes of racketeering activity set forth below.

537.    The acts of mail fraud and wire fraud detailed elsewhere in the Complaint occurred in a continuous pattern, beginning no later than 2004 and continuing until the Petition Date.

## MAIL FRAUD

538.    Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein.  These acts formed a pattern of fraud on Investors that continued from at least 2004 to November 2008 in which the Insiders, their conspirators and agents, unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice for inducing TIC purchasers and purchasers of instruments issued by the Funding Entities to invest in the DBSI Companies and their real estate offerings even though the Insiders knew that the DBSI Companies were failing, that the representations and undertakings they were making were false and could not be complied with and that the only way the Investors could ever get any of their money back was by inducing yet more Investors to purchase the fraudulently marketed instruments and properties.  Thus, the Insiders obtained funds and tax advantages from Investors and from the DBSI Companies which they diverted to themselves by means of false and fraudulent pretenses, representations and promises, and through the concealment of material facts.

539.    The Insiders and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing and attempting to execute, the scheme and artifice to

defraud, and for obtaining money and property from the Investors and the DBSI Companies, did

place and cause to be placed in post offices and authorized depositories for mail matter certain

mail matter to be sent or delivered by the U.S. Postal Service and/or did deposit or cause to be

deposited certain mail matter to be sent or delivered by any private or commercial interstate

carrier, and did cause to be delivered by mail and/or private or commercial interstate carrier,

according to the directions thereof, certain mail matter, in violation of 18 U.S.C. § 1341,

including as examples, and without limitation, the following:

| Approximate Date of Mailing | Description of Item Mailed |
|---|---|
| January 4, 2008 | Landmark Towers PPM |
| February 14, 2008 | Cavanaugh III PPM |
| March 3, 2008 | Boise Foothills PPM |
| April 16, 2008 | West Boise PPM |
| June 13, 2008 | Wingfield Village PPM |

540.    Each of the aforesaid mailings, as well as others, was in furtherance of the scheme

to defraud alleged in this Complaint. The Insiders knew of and/or authorized such mailings, and

knew that such mailings were in furtherance of and for the purpose of executing the scheme or

were incidental to an essential part of the scheme. Each of these mailings furthered the scheme to

defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning

Investors in their business and property.

## **WIRE FRAUD**

541.    From at least 2004 to in or about November 2008, the Insiders and their co-

conspirators and agents unlawfully, willfully and knowingly, and for purposes of further

executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money

and property from the Investors and DBSI Companies, did use interstate wire services to place

interstate telephone calls, and send interstate emails and telefaxes in violation of 18 U.S.C. §

1343, including as examples, and without limitation, the following:

| Approximate Date of Call, Email or Telefax | Description of Call, Email or Telefax |
|---|---|
| July 6, 2007 | Email forwarding Loop 1604 PPM |
| September 2, 2008 | Email forwarding Florissant Marketplace PPM |
| September 3, 2008 | Email forwarding Belton Town Center PPM |
| September 5, 2008 | Email forwarding E-470 East PPM |
| November 10, 2008 | Email forwarding Goshen Village PPM |

542. Each of the aforesaid telephone calls, emails and telefaxes, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint. The Insiders knew of and/or authorized the use of interstate and transatlantic wire services to place such telephone calls and send such emails and telefaxes, and knew that such telephone calls, emails and telefaxes were being made in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme. The use of interstate wire services to place such telephone calls and send such emails and telefaxes furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

**SECURITIES FRAUD**

543. Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein.

544. The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above.

545. The material misrepresentations identified above were contained in PPMs and financial statements that were, upon information and belief, derived from knowledgeable persons from DBSI, routinely circulated among the Insiders for their review prior to their dissemination and could not have been released without their approval and/or over their objection. Upon information and belief, the Insiders saw the false PPMs and financial statements, knew that they were false, and allowed them to be issued anyway.

546.     In addition, the conduct set forth in detail above was a device, artifice and scheme to defraud the Investors, as well as acts, practices and a course of dealing which operated as a fraud or deceit upon the Investors in connection with the purchase and sale of the above identified securities.

547.     The conduct of each of the Insiders set forth above evidenced an intent to deceive, manipulate and defraud.  By way of example, and not limitation, the behavior of the Insiders in moving cash among the DBSI Companies in an elaborate shell game and at the same time preparing financial statements that dramatically overstated DBSI's financial strength amply demonstrates the Insiders' desire to prevent Investors from learning the truth.  Similarly, the repeated assurances to the Investors that Accountable Reserves would be reserved for specific uses, when nothing of the kind was in fact happening, is consistent only with a clear intent to deceive.

548.     The conduct of each of the Insiders set forth above was deliberately reckless and was an extreme departure from the standards of ordinary care that presented a danger of misleading the Investors that was either known to the Insiders or so obvious that it must have been known.

549.     Each of the Investors were ignorant of each material misrepresentation's falsity and justifiably relied upon the material misrepresentations to their detriment and each of the Assigning Investors suffered economic loss as a direct and proximate result of the material misrepresentations and their reliance thereon.

550.     As such, the Control Group Defendants violated Idaho Code Ann. § 30-14-501, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5, and in so doing, intended to and did, in fact, injure the Debtor Entities and Assigning Investors in their business and property.

## DAMAGES CAUSED BY THE RACKETEERING ACT VIOLATION

551.     By engaging in the conduct set forth above, and conducting or participating in the conduct of the affairs of the Racketeering Enterprise through a pattern of racketeering activity, the Insiders, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

552.     By reason of the foregoing, the Trustee is entitled to recover from the Insiders threefold such actual damages as the Court finds the Debtor Entities and Assigning Investors have sustained, together with the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against the Insiders for threefold such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

## COUNT FIVE
### (By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)
### (Idaho Racketeering Act, Idaho Code § 18-7804(b))

553.     Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

## THE ENTERPRISE

554.     At all times relevant hereto, the Insiders, individually, were "persons" within the meaning of Idaho Code § 18-7803(b).

555.    Two Racketeering enterprises are pled in the alternative in this Complaint for the

Racketeering Act violation under Idaho Code § 18-7804(b).  The first is the Racketeering Insider

Enterprise, as discussed in greater detail in paragraphs 523 through 527.  The second is the

Racketeering DBSI Enterprise, as discussed in greater detail in paragraphs 529 through 533.

Where the allegations are equally applicable to either enterprise pled in the alternative, they are

referred to by the single term "Racketeering Enterprise" although either of the enterprises is

intended.

556.    As previously alleged, at all relevant times hereto, the Racketeering Enterprise

was an "enterprise" within the meaning of Idaho Code § 18-7803(c).

557.    The Racketeering Enterprise had an existence separate and apart from the

particular instances of racketeering activity described below.  In particular, the Insiders were

members of and/or were associated-in-fact with an "enterprise" consisting of all of them or, in

the alternative, the DBSI Companies existed as corporate entities and Insiders controlled them as

directors and/or shareholders of those entities.

## THE PATTERN OF RACKETEERING ACTIVITY

558.    Beginning no later than 2004, the Insiders did acquire and maintain, directly or

indirectly, an interest in or control of the RICO Enterprise through a "pattern of racketeering

activity," within the meaning of Idaho Code § 18-7804(b).

559.    The Insiders were able to commit and aid and abet the racketeering activity

described below by virtue of their acquisition, maintenance and control over the Racketeering

Enterprise.  These offenses were committed as part of racketeering activity in that they had the

same or similar purposes, results, participants, victims and/or methods of commission, and

include two or more related individual offenses which were separate in time and committed with

the express intention and common design and purpose of fraudulently marketing securities and real estate, obtaining money by false representations that it would be kept in trust and misappropriating substantial corporate funds and other corporate opportunities at a time the DBSI Companies were not able to meet their obligations to their Investors.  This series of related offenses extended over a substantial period of time and posed a threat of continuing activity.

560.    The above-alleged pattern of racketeering offenses included, among others, the separate acts and episodes of racketeering activity set forth below.

561.    The acts of mail fraud and wire fraud detailed elsewhere in the Complaint occurred in a continuous pattern, beginning no later than 2004 and continuing until the Petition Date.

## MAIL FRAUD

562.    Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein.  These acts formed a pattern of fraud on Investors that continued from at least 2004 to November 2008 in which the Insiders, and their conspirators and agents, unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice for acquiring and maintaining the Racketeering Enterprise, inducing TIC purchasers and purchasers of instruments issued by the Funding Entities to invest in the DBSI Companies and their real estate offerings even though the Insiders knew that the DBSI Companies were failing, that the representations and undertakings they were making were false and could not be complied with and that the only way the Investors could ever get any of their money back was by inducing yet more Investors to purchase the fraudulently marketed instruments and properties.  Thus, the Insiders obtained funds and tax advantages from Investors and from the DBSI Companies which

they diverted to themselves by means of false and fraudulent pretenses, representations and promises, and through the concealment of material facts.

563. The Insiders and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and the DBSI Companies, did place and cause to be placed in post offices and authorized depositories for mail matter certain mail matter to be sent or delivered by the U.S. Postal Service and/or did deposit or cause to be deposited certain mail matter to be sent or delivered by any private or commercial interstate carrier, and did cause to be delivered by mail and/or private or commercial interstate carrier, according to the directions thereof, certain mail matter, in violation of 18 U.S.C. § 1341, including as examples, and without limitation, the following:

| Approximate Date of Mailing | Description of Item Mailed |
| --- | --- |
| January 4, 2008 | Landmark Towers PPM |
| February 14, 2008 | Cavanaugh III PPM |
| March 3, 2008 | Boise Foothills PPM |
| April 16, 2008 | West Boise PPM |
| June 13, 2008 | Wingfield Village PPM |

564. Each of the aforesaid mailings, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint. The Insiders knew of and/or authorized such mailings. and knew that such mailings were in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme. Each of these mailings furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

## **WIRE FRAUD**

565. From at least 2004 to in or about November 2008, the Insiders and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of further

executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and DBSI Companies, did use interstate wire services to place interstate telephone calls, and send interstate emails and telefaxes in violation of 18 U.S.C. § 1343, including as examples, and without limitation, the following:

| Approximate Date of Call, Email or Telefax | Description of Call, Email or Telefax |
| --- | --- |
| July 6, 2007 | Email forwarding Loop 1604 PPM |
| September 2, 2008 | Email forwarding Florissant Marketplace PPM |
| September 3, 2008 | Email forwarding Belton Town Center PPM |
| September 5, 2008 | Email forwarding E-470 East PPM |
| November 10, 2008 | Email forwarding Goshen Village PPM |

566.    Each of the aforesaid telephone calls, emails and telefaxes, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  The Insiders knew of and/or authorized the use of interstate and transatlantic wire services to place such telephone calls and send such emails and telefaxes, and knew that such telephone calls, emails and telefaxes were being made in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  The use of interstate wire services to place such telephone calls and send such emails and telefaxes furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

## SECURITIES FRAUD

567.    Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein.

568.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above.

569.    The material misrepresentations identified above were contained in PPMs and financial statements that were, upon information and belief, derived from knowledgeable persons from DBSI, routinely circulated among the Insiders for their review prior to their dissemination

and could not have been released without their approval and/or over their objection.  Upon information and belief, the Insiders saw the false PPMs and financial statements, knew that they were false, and allowed them to be issued anyway.

570.   In addition, the conduct set forth in detail above was a device, artifice and scheme to defraud the Investors, as well as acts, practices and a course of dealing which operated as a fraud or deceit upon the Investors in connection with the purchase and sale of the above identified securities.

571.   The conduct of each of the Insiders set forth above evidenced an intent to deceive, manipulate and defraud.  By way of example, and not limitation, the behavior of the Insiders in moving cash among the DBSI Companies in an elaborate shell game and at the same time preparing financial statements that dramatically overstated DBSI's financial strength amply demonstrates the Insiders' desire to prevent Investors from learning the truth.  Similarly, the repeated assurances to the Investors that Accountable Reserves would be reserved for specific uses, when nothing of the kind was in fact happening, is consistent only with a clear intent to deceive.

572.   The conduct of each of the Insiders set forth above was deliberately reckless and was an extreme departure from the standards of ordinary care that presented a danger of misleading the Investors that was either known to the Insiders or so obvious that it must have been known.

573.   Each of the Investors were ignorant of each material misrepresentation's falsity and justifiably relied upon the material misrepresentations to their detriment and each of the Assigning Investors suffered economic loss as a direct and proximate result of the material misrepresentations and their reliance thereon.

574.   As such, the Control Group Defendants violated Idaho Code Ann. § 30-14-501, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5, and in so doing, intended to and did, in fact, injure the Debtor Entities and Assigning Investors in their business and property.

### DAMAGES CAUSED BY THE RACKETEERING ACT VIOLATION

575.   By engaging in the conduct set forth above, and conducting or participating in the conduct of the affairs of the Racketeering Enterprise through a pattern of racketeering activity, the Insiders, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

576.   By reason of the foregoing, the Trustee is entitled to recover from the Insiders threefold such actual damages as the Court finds the Debtor Entities and Assigning Investors have sustained, together with the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against the Insiders for threefold such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

### COUNT SIX
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(Idaho Racketeering Act Conspiracy, Idaho Code § 18-7804(d))**

577.   Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

578.   Beginning no later than 2004, the Insiders combined, conspired and agreed together and with each other to commit the aforementioned violations of Idaho Code § 18-7804(c), in violation of Idaho Code § 18-7804(d).

579.   Beginning no later than 2004, the Insiders conspired and agreed together and with each other to commit the aforementioned violations of Idaho Code § 18-7804(b), in violation of Idaho Code § 18-7804(d).

580.   In furtherance of the aforementioned conspiracy and to effect the objects thereof, the conspirators committed the overt acts described above, among others.

581.   By engaging in the conduct set forth above, and conspiring to conduct or participate in the conduct of the affairs of the Racketeering Enterprise through a pattern of racketeering activity, the Insiders both indirectly and directly, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

582.   By reason of the foregoing, the Trustee is entitled to recover from the Insiders threefold such actual damages as the Court finds the Debtor Entities and Assigning Investors have sustained, together with Plaintiff's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against the Insiders for threefold such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

## COUNT SEVEN
### (By James Zazzali as Trustee of the Estate Litigation Trust)
### (Loans Payable/Book Account)

583.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

584.    DRR is owed repayment of unpaid and past due loans in the amount of $101,144,847 as of December 31, 2008, from DBSI Investments as reflected in a book account.

585.    DBSI Real Estate Funding Corp. is owed repayment of unpaid and past due loans in the amount of $6,536,378 as of December 31, 2008 from DBSI Investments as reflected in a book account.

586.    DBSI Investments is a partnership organized under the laws of the State of Idaho.

587.    Douglas Swenson, Hassard, Mayeron and Mott were at all relevant times general partners in DBSI Investments.

588.    As general partners in DBSI Investments, Douglas Swenson, Hassard, Mayeron, and Mott are personally liable for the partnership's debts and obligations.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against Douglas Swenson, Hassard, Mayeron and Mott, jointly and severally, for the sum of $107,681,225, plus interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT EIGHT
### (By James Zazzali as Trustee of the Estate Litigation Trust)
### (Loans Payable/Book Account)

589.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

590.    DBSI Inc. is owed repayment of unpaid and past due loans in the amount of $196,689,254 as of December 31, 2008, from DRR as reflected in a book account.

591.    DRR is a general partnership organized under the laws of the State of Idaho.

592.    DBSI Investors IX and DBSI Investors XI were at all relevant times general partners in DRR.

593.    As general partners in DRR, DBSI Investors IX and DBSI Investors XI are liable for DRR's debts and obligations.

594.    DBSI Investors IX and DBSI Investors XI are limited partnerships organized under the laws of the State of Idaho.

595.    DBSI Investments was at all relevant times a general partner in both DBSI Investors IX and DBSI Investors XI.

596.    As a general partner in both DBSI Investors IX and DBSI Investors XI, DBSI Investments is liable for the debts and obligations of those two partnerships, including those partnerships' obligations as general partners in DRR.

597.    DBSI Investments is a partnership organized under the laws of the State of Idaho.

598.    Douglas Swenson, Hassard, Mayeron and Mott were at all relevant times general partners of DBSI Investments.

599.    As general partners of DBSI Investments, Douglas Swenson, Hassard, Mayeron and Mott are personally liable for its debts and obligations, including DBSI Investments' obligations as a general partner in DBSI Investors IX and DBSI Investors XI, which obligations, in turn, include the debts and obligations of DRR.

600.    Accordingly, Douglas Swenson, Hassard, Mayeron and Mott are ultimately personally responsible for the unpaid $196,689,254 debt owed by DRR to DBSI Inc.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against Douglas Swenson, Hassard and Mayeron and Mott, jointly and severally, for the sum of $196,689,254, plus interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT NINE
### (By James Zazzali as Trustee of the Estate Litigation Trust)
### (Breach of Fiduciary Duty)

601.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

602.    As directors and officers of the Debtor Entities, each of the Control Group Defendants owed the Debtor Entities fiduciary duties of due care, good faith and loyalty.

603.    The above described actions and omissions by the Control Group Defendants were grossly negligent, a gross abuse of discretion, and recklessly indifferent to or in deliberate disregard of the interests of the Debtor Entities and were outside the bounds of reason.

604.    The above described actions and omissions by the Control Group Defendants also constituted unfair self-dealing, the unfair elevation of their personal interests above those of the Debtor Entities, and the unfair pursuit and receipt of personal benefits not enjoyed by the Debtor Entities as a whole.

605.    The above described actions and omissions were also part of a sustained and systematic failure by the Control Group Defendants to exercise proper oversight for the benefit of the Debtor Entities.

606.    The above described actions and omissions also constituted a gross dereliction of duty and a conscious disregard for the Control Group Defendants' duties as officers and directors.

607.    Accordingly, the Control Group Defendants have breached their fiduciary duties to the Debtor Entities, and, as a direct and proximate result, the Debtor Entities have been damaged.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against the Control Group Defendants, jointly and severally, imposing a constructive trust over all monies, property and other assets in the possession of the Insiders acquired directly or indirectly with the gains they achieved through their breaches of fiduciary duty, and for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TEN
### (By James Zazzali as Trustee of the Estate Litigation Trust)
### (Aiding and Abetting Breach of Fiduciary Duty)

608.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

609.    Each of the Insider Defendants knowingly participated in the aforementioned breaches of fiduciary duty by the Control Group Defendants.

610.    As a direct and proximate result, the Debtor Entities have been damaged.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against the Insider Defendants, jointly and severally, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

**COUNT ELEVEN**
**(By James Zazzali as Trustee of the Estate Litigation Trust)**
**(Civil Conspiracy)**

611.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

612.    The wrongs alleged herein were the product of agreements among or a confederation among the Insiders during a period beginning no later than 2004 through in or about 2008 with the common objective of accomplishing the wrongs alleged, including, but not limited to, the looting of the DBSI Companies.

613.    As detailed above, these collaborating Insiders used unlawful means to accomplish their wrongful objectives.

614.    The Debtor Entities were injured thereby.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against the Insider Defendants, jointly and severally, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

**COUNT TWELVE**
**(By James Zazzali as Trustee of the Estate Litigation Trust)**
**(Misappropriation/Unjust Enrichment)**

615.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

616.    As set forth in greater detail above, the DBSI Companies received Accountable Reserves from Investors under circumstances in which the DBSI Companies were de facto trustees for money that should have been segregated as an identifiable fund (the "Accountable Reserves Trust Funds").

617.    The Control Group Defendants intentionally and wrongfully caused the Accountable Reserves Trust Funds to be commingled with the DBSI Companies' operating accounts, and, from those same accounts, disbursed millions of dollars to themselves, leaving the Accountable Reserves Trust Funds depleted.

618.    Thus, the Control Group Defendants wrongfully obtained and maintained dominion over the money absconded from the Accountable Reserves Trust Funds, and have been unjustly enriched thereby.

619.    The Debtor Entities were injured thereby.

620.    Accordingly, as a de facto trustee of the funds in question, the Debtor Entities are entitled to recover their possession.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against the Control Group Defendants, jointly and severally, ordering the Insider Defendants to make restitution for the wrongfully diverted Accountable Reserves Trust Funds, imposing a constructive trust over all monies, property and other assets in the possession of the Control Group acquired directly or indirectly with the wrongfully diverted Accountable Reserves Trust Funds, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT THIRTEEN
### (By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)
### (Negligence)

621.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

622.    Mick and Mick & Associates owed professional duties of care to the DBSI Companies and to the Investors.

623.    The above described conduct of Mick and Mick & Associates fell below the acceptable standard of care and was negligent.

624.    By reason of the above described negligence, both the Debtor Entities and Assigning Investors were injured.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Actions Trust, and against Mick and Mick & Associates for compensatory damages, plus interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT FOURTEEN
### (By James Zazzali as Trustee of the Estate Litigation Trust)
### (Aiding & Abetting Breach of Fiduciary Duty)

625.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

626.    Through their above described course of conduct, Mick and Mick & Associates knowingly participated in the aforementioned breaches of fiduciary duty by the Control Group Defendants.

627.    As a direct and proximate result, the Debtor Entities have been damaged.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against Mick and Mick & Associates for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT FIFTEEN
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Contract--Notes and Bonds Payable)

628.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

629.    The Investors listed in Exhibit B are owned at least the sums set forth therein, for interest and/or principal on promissory notes, bonds and other loans that are past due and owing.

630.    As set forth in greater detail above, the DBSI Companies operated as a single operation.

631.    In addition, the DBSI Companies operated at all relevant times as the alter ego of Douglas Swenson and were used by him as an instrument to defraud Investors and seize for himself money that was rightfully theirs.  As set forth above in greater detail,

      A.    There was such a unity of interest between the DBSI Companies and Douglas Swenson that the separate identity of the entities ceased to exist or never existed;

      B.    Observance of the fiction of a separate existence between the DBSI Companies and Douglas Swenson would sanction a fraud and promote injustice;

      C.    Many of the DBSI Companies individually, and the DBSI Companies as a whole, were undercapitalized;

      D.    The DBSI entities routinely ignored corporate formalities and failed to keep appropriate corporate records;

      E.    Douglas Swenson dominated and controlled the DBSI Companies;

      F.    Douglas Swenson created and managed the DBSI Companies to perpetrate fraud;

      G.    Douglas Swenson siphoned funds away from the DBSI Companies that were needed to pay creditors, leaving the DBSI Companies without sufficient cash to meet their obligations; and

      H.    The DBSI Companies' officers and directors often failed to function properly.

632.     As a result, the interests of justice dictate that any corporate veil between the DBSI Companies and Douglas Swenson be disregarded, and that Douglas Swenson be held individually liable for all debts owed by the DBSI Companies.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, for a sum equal to all past due and owing principal and interest on the aforementioned notes, bonds and other loans, plus interest, costs of suit and such other relief as the Court deems just and equitable.

### COUNT SIXTEEN
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Contract--Accountable Reserves)

633.     Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

634.     As set forth in greater detail above, as consideration for the TIC Investors agreement to deposit the Accountable Reserves with the DBSI Companies, the DBSI Companies agreed to hold the Accountable Reserves for the benefit of the TIC Investors, expending those Accountable Reserves only for the purposes set forth above.

635.     Those contracts were valid and enforceable.

636.     The TIC Investors fully complied with all of their contractual obligations.

637.     The DBSI Companies breached this agreement, and the TIC Assigning Investors were injured thereby.

638.     The DBSI Companies' acts also constitute a breach of the covenant of good faith and fair dealing implied in every contract.

639.     For the reasons set forth above, the interests of justice dictate that any corporate veil between the DBSI Companies and Douglas Swenson be disregarded, and that Douglas Swenson be held individually liable for all debts owed by the DBSI Companies.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson for compensatory damages, plus interest, costs of suit and such other relief as the Court deems just and equitable.

### COUNT SEVENTEEN
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Contract--Lease Termination)

640.     Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

641.     As set forth in greater detail above, each of the TIC Investors were entitled by contract with the DBSI Companies to receive the benefits of rental payments for the duration of the respective lease terms of the lease agreements entered into by Master Leaseco or other DBSI Companies.

642.     Those contracts were valid and enforceable.

643.     The TIC Investors fully complied with all of their contractual obligations.

644.     Master Leaseco and the other DBSI Companies breached the aforementioned leases and failed to honor the rental payment obligations.

645.     The TIC Assigning Investors have been injured by these breaches.[3]

646.     The DBSI Companies' acts also constitute a breach of the covenant of good faith and fair dealing implied in every contract.

---

[3] Certain of the TIC Investors previously settled and released their claims for breaches of the lease agreements.  This Count is brought by the Trustee to recover amounts due to non-settling TIC Assigning Investors.

647.   For the reasons set forth above, the interests of justice dictate that any corporate veil between the DBSI Companies and Douglas Swenson be disregarded, and that Douglas Swenson be held individually liable for all debts owed by the DBSI Companies.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson for compensatory damages, plus interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT EIGHTEEN
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Contract)

648.   Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

649.   Plaintiff repeats the allegations of the prior three Counts regarding DBSI's breaches of contract concerning notes, bonds and loans payable, Accountable Reserves and lease terminations.

650.   As set forth in greater detail above, the DBSI Companies operated as a single entity, with no meaningful separate corporate identities.

651.   As set forth in greater detail above, DBSI Investments acted as the hub through which Investor funds loaned or deposited with the other DBSI entities were diverted both into the pockets of the Insiders, including especially the Investments General Partners, and into the losing Technology Companies investments.

652.   Accordingly, as no true or enforceable corporate wall existed between DBSI Investments and the remainder of the DBSI Companies, and as DBSI Investments was a principal instrument in the Insiders' scheme to unlawfully and unjustly enrich themselves, DBSI

Investments is liable for the entirety of the debts owed by the DBSI Companies, including debt by reason of the aforementioned breaches of contract.

653.     As general partners of DBSI Investments, Douglas Swenson, Hassard, Mayeron and Mott are personally liable for its debts and obligations, and thus personally liable fro the entirety of the damages caused by the aforementioned breaches of contract.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron and Mott for compensatory damages, plus interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT NINETEEN
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Fraud)

654.     Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

655.     As set forth above in detail, each of the material misstatements identified above made, authorized and/or directed by the Insiders was (i) a statement or representation of material fact, (ii) knowingly false when made, and (iii) made with the intention that the Investors would rely upon the statement.

656.     Each of the Assigning Investors were ignorant of each material misstatements' falsity and justifiably relied upon the material misstatements to their detriment and were injured thereby.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Insiders, jointly and severally, imposing a constructive trust over all monies, property and other assets in the possession of the Insiders acquired directly or indirectly

with the proceeds of their fraud, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Aiding & Abetting Fraud)

657.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

658.    As set forth in greater detail above, Mick and Mick & Associates had knowledge of the material misstatements by the DBSI Companies, and Mick and Mick & Associates knowingly and substantially participated in the frauds committed by others.

659.    As a direct and proximate result, the Assigning Investors were harmed.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Mick and Mick & Associates for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-ONE
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Negligent Misrepresentation)

660.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

661.    In connection with the material misstatements set forth above, the Insiders had a pecuniary duty to provide accurate information to the Investors.

662.    The information supplied was false, and the Insiders failed to exercise reasonable care in obtaining and providing the information.

663.    The Investors suffered pecuniary loss as a result of their justifiable reliance on the material misstatements.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Insiders, jointly and severally, imposing a constructive trust over all monies, property and other assets in the possession of the Insiders acquired directly or indirectly with the proceeds of their misrepresentations, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-TWO
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Aiding & Abetting Fraud)

664.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

665.    As set forth in greater detail above, each of the Insiders had knowledge of the material misstatements by the DBSI Companies, the Control Group and the other Insiders, and each Insider knowingly and substantially participated in the frauds committed by others.

666.    As a direct and proximate result, the Assigning Investors were harmed.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Insiders, jointly and severally, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-THREE
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Misappropriation/Unjust Enrichment)

667.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

668.    As set forth in greater detail above, the DBSI Companies received Accountable Reserves from TIC Investors under circumstances in which the Control Group Defendants were

de facto trustees for money that should have been segregated as an identifiable fund, the Accountable Reserves Trust Funds.

669.     The Control Group Defendants intentionally and wrongfully caused the Accountable Reserves Trust Funds to be commingled with the DBSI Companies' operating accounts, and, from those same accounts, disbursed millions of dollars to themselves, leaving the Accountable Reserves Trust Funds depleted.

670.     Thus, the Control Group Defendants wrongfully obtained and maintained dominion over the money absconded from the Accountable Reserves Trust Funds, and have been unjustly enriched thereby.

671.     The TIC Assigning Investors were injured thereby.

672.     Accordingly, the TIC Investors are entitled to recover their possession.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Control Group Defendants, jointly and severally, ordering the Insider Defendants to make restitution for the wrongfully diverted Accountable Reserves Trust Funds, imposing a constructive trust over all monies, property and other assets in the possession of the Control Group acquired directly or indirectly with the wrongfully diverted Accountable Reserves Trust Funds, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-FOUR
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Fiduciary Duty)

673.     Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

674.     The Control Group Defendants were de facto trustees of the Accountable Reserve funds deposited with the DBSI Companies by the TIC Investors.

675.     As trustees, the Control Group Defendants owed fiduciary duties of care, good faith and loyalty to the TIC Investors.

676.     The above described actions and omissions by the Control Group Defendants were grossly negligent, a gross abuse of discretion, and recklessly indifferent to or in deliberate disregard of the interests of the TIC Investors and were outside the bounds of reason.

677.     The above described actions and omissions by the Control Group Defendants also constituted unfair self-dealing, the unfair elevation of their personal interests above those of the TIC Investors, and the unfair pursuit and receipt of personal benefits as the expense of the TIC Investors.

678.     The above described actions and omissions were also part of a sustained and systematic failure by the Control Group Defendants to exercise proper oversight over the Accountable Reserves for the benefit of the TIC Investors.

679.     The above described actions and omissions also constituted a gross dereliction of duty and a conscious disregard for the Control Group Defendants' duties as Trustees.

680.     Accordingly, the Control Group Defendants have breached their fiduciary duties to the TIC Investors, and, as a direct and proximate result, the TIC Assigning Investors have been damaged.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Control Group Defendants, jointly and severally, imposing a constructive trust over all monies, property and other assets in the possession of the Insiders acquired directly

or indirectly as a result of their breaches of fiduciary duty, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-FIVE
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Aiding and Abetting Breach of Fiduciary Duty)

681.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

682.    Each of the Insider Defendants knowingly participated in the aforementioned breaches of fiduciary duty by the Control Group Defendants.

683.    As a direct and proximate result, the TIC Assigning Investors have been damaged.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Insider Defendants, jointly and severally, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-SIX
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Civil Conspiracy)

684.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

685.    The wrongs alleged herein were the product of agreements among or a confederation among the Insiders during a period beginning no later than 2004 through in or about 2008 with the common objective of accomplishing the wrongs alleged, including, but not limited to, the looting of the DBSI Companies.

686.    As detailed above, these collaborating Insiders used unlawful means to accomplish their wrongful objectives.

687.    The Assigning Investors were injured thereby.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Insider Defendants, jointly and severally, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-SEVEN
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Securities Fraud 15 U.S.C § 78j(b), 17 C.F.R. § 240.10b-5, Idaho Code § 30-14-501, Idaho Code § 30-14-509(g))

688.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

689.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above.

690.    The material misrepresentations identified above were contained in PPMs and financial statements that were, upon information and belief, derived from knowledgeable persons from DBSI, routinely circulated among the Insiders for their review prior to dissemination and could not have been released without their approval and/or over their objection.  Upon information and belief, the Insiders saw the false PPMs and financial statements, knew that they were false, and allowed them to be issued anyway.

691.    In addition, the conduct set forth in detail above was a device, artifice and scheme to defraud the Investors, as well as acts, practices and a course of dealing which operated as a fraud or deceit upon the Investors in connection with the purchase and sale of the above identified securities.

692.    The conduct of each of the Insiders set forth above evidenced an intent to deceive, manipulate and defraud.  By way of example, and not limitation, the behavior of the Insiders in moving cash among the DBSI Companies in an elaborate shell game and at the same time preparing financial statements that dramatically overstated DBSI's financial strength amply

demonstrates the Insiders' desire to prevent Investors from learning the truth.  Similarly, the repeated assurances to Investors that Accountable Reserves would be reserved for specific uses, when nothing of the kind was in fact happening, is consistent only with a clear intent to deceive.

693.    The conduct of each of the Insiders set forth above was deliberately reckless and was an extreme departure from the standards or ordinary care that presented a danger of misleading the Investors that was either known to the Insiders or so obvious that it must have been known.

694.    Each of the Investors was ignorant of each material misstatements' falsity and justifiably relied upon the material misstatements to their detriment and the Assigning Investors suffered economic loss as a proximate result of the material misstatements and their reliance thereon.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Insiders, jointly and severally, for compensatory damages, attorneys' fees, costs of suit and such other relief as the Court deems just and equitable.

### COUNT TWENTY-EIGHT
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Securities Fraud--Control Person Liability -15 U.S.C. § 77o, Idaho Code § 30-14-509(g))

695.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

696.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above, and were made by the DBSI Companies.

697.    In addition, the conduct set forth in detail above was a device, artifice and scheme to defraud the Investors, as well as acts, practices and a course of dealing which operated as a

fraud or deceit upon the Investors in connection with the purchase and sale of the above identified securities.

698.    The conduct of the DBSI Companies set forth above evidenced an intent to deceive, manipulate and defraud.

699.    The conduct of the DBSI Companies set forth above was deliberately reckless and was an extreme departure from the standards or ordinary care that presented a danger of misleading the Investors that was either known to the DBSI Companies or so obvious that it must have been known.

700.    As set forth in greater detail above, each of the DBSI Companies was controlled by the Control Group Defendants.

701.    Each of the Control Group Defendants actively participated in the above described fraudulent scheme, as set for in greater detail above, and each was a culpable participant in the above described securities fraud by the issuer entities.

702.    Each of the Investors was ignorant of each material misstatements' falsity and justifiably relied upon the material misstatements to their detriment and the Assigning Investors suffered economic loss as a proximate result of the material misstatements and their reliance thereon.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Control Group Defendants, jointly and severally, for compensatory damages, attorneys' fees, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-NINE
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Fraudulent Concealment)

703.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

704.    As set forth above in detail, the actions of Defendants collectively had both the purpose and effect of concealing the fraudulent behavior and other wrongs alleged herein.  By way of example, and not limitation, the above described fraudulent efforts to make the DBSI Companies appear financially sound, long after they were not, and the above detailed use of newly bilked Investor money to make payments due to previously bilked Investors, had the purpose and effect of hiding the existence of Defendants' wrongdoing from Investors.

705.    Defendants' conduct succeeded in preventing reasonably diligent Investors from discovering Defendants' misconduct until well after the Petition Date.  Indeed, the majority of Defendants' conduct was neither known nor knowable by Investors until the issuance of at least the Interim Report of the Examiner on August 3, 2009.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against all Defendants, tolling all applicable statutes of limitations during all periods prior to August 3, 2009.

## COUNT THIRTY
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Securities Fraud -- Idaho Code § 301-14-509(b))

706.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

707.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above.

708.    Each of the Insiders either sold the above identified securities directly to the Assigning Investors or solicited Assigning Investors to buy the above identified securities and in so acting were motivated by a desire to serve their own financial interests or the financial interests of the other Insiders.

709.    The conduct of each of the Insiders set forth above was deliberately reckless and was an extreme departure from the standards of ordinary care that presented a danger of misleading the Investors that was either known to the Insiders or so obvious that it must have been known or, in the exercise of reasonable care, could have been known.

710.    The Assigning Investors were ignorant and did not know of the untruth of each material misstatements' falsity and justifiably relied upon the material misstatements to their detriment and the Assigning Investors suffered economic loss as a direct and proximate result of the material misstatements and their reliance thereon.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Insiders, jointly and severally, for compensatory damages, attorneys' fees, costs of suit and such other relief as the Court deems just and equitable.

**COUNT THIRTY-ONE**
**(By James Zazzali as Trustee of the Private Actions Trust)**
**(Securities Fraud -- Idaho Code § 301-14-509(b))**

711.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

712.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above, were made by the DBSI Companies.

713. The DBSI Companies either sold the above identified securities directly to Assigning Investors or solicited Assigning Investors to buy the above identified securities, and in so acting were motivated by a desire to serve their own financial interests or the financial interests of the other Insiders.

714. The conduct of the DBSI Companies set forth above was deliberately reckless and was an extreme departure from the standards of ordinary care that presented a danger of misleading the Investors that was either known to the DBSI Companies or so obvious that it must have been known or, in the exercise of reasonable care, could have been known.

715. As set forth in greater detail above, each of the DBSI Companies was controlled by the Control Group Defendants.

716. The Control Group Defendants also served as managing partners and/or directors of the DBSI Companies, or were employed by or associated with the DBSI Companies and materially aided the conduct giving rise to the liability.

717. Each of the Control Group Defendants actively participated in the above described selling of securities, as set forth in greater detail above, and each was a culpable participant in the above described securities fraud by the issuer entities.

718. The Assigning Investors were ignorant and did not know of the untruth of each material misstatements' falsity and justifiably relied upon the material misstatements to their detriment and the Assigning Investors suffered economic loss as a direct and proximate result of the material misstatements and their reliance thereon.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Control Group Defendants, jointly and severally, for compensatory damages, attorney's fees, costs of suit and such other relief as the Court deems just and equitable.

### COUNT THIRTY-TWO
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Trust)

719.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

720.    The actions of the Insiders and the DBSI Companies with respect to the TIC PPMs and the representations therein created trusts (the "TIC Trusts").

721.    Pursuant to the TIC Trusts, money paid by Investors, including without limitation Accountable Reserves, were to be held in trust by the DBSI Companies and distributed only for the benefit of the Investors in accordance with the terms of the TIC Trusts.

722.    Actions of the Insiders with respect to Investor funds received through offerings by the Funding Entities and the representations related to them created trusts (the "Funding Entities Trusts," collectively with the TIC Trusts, the "Trusts").

723.    Pursuant to the Funding Entities Trusts, money paid by Investors were to be held in trust by the DBSI Companies and distributed only for the benefit of the Investors in accordance with the terms of the TIC Trusts.

724.    The trustees of the Trusts included the Insiders, DBSI Inc., the respective TIC-related affiliates, including without limitation, the master lessor entities, the respective Funding Entities and various affiliates that held the funds held in Trust (the "Breaching Trustees").

725.    The Insiders by their own actions, including without limitation through representations and undertakings to Investors, manifested their agreement to act as trustees.

726.    The Insiders caused the corporate entities to manifest their agreement to act as trustees.

727.    TIC Investors and Funding Entity Investors understood and relied upon the Trusts when they paid the Trusts funds to the DBSI Companies.

728.    The Breaching Trustees jointly and severally owed to the beneficiaries of the Trusts the highest duties of loyalty and good faith with respect to their execution of their duties as trustees, including without limitation the duty to account for the funds held in the Trusts.

729.    The Breaching Trustees breached the Trusts by diverting the funds to their own uses, failing to account for the funds held in trust and wasting the res of the Trusts.

730.    The Insiders themselves individually breached their trust and they caused the corporate entities that are trustees to breach their trust.

731.    For reasons already alleged in this Complaint, Douglas Swenson so dominated the DBSI Companies and treated the DBSI Companies as his alter ego such that the corporate veil should be disregarded as to him, and, therefore, he is personally liable for any breach of trust committed by corporate Breaching Trustees as set forth in this Complaint.

732.    As a result of the breach of trust by the Breaching Trustees, the funds held in Trust have been lost and the Breaching Trustees have failed to account for them.

733.    The Insiders and each of them are jointly and severally liable for the breach of trust by themselves and by the corporate trustees.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against the Insiders, jointly and severally, for compensatory damages, punitive

damages, for an accounting, for attorneys' fees, costs of suit and such other relief as the Court

deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands trial by jury as to all issues so triable.


Dated:  November 5, 2010
       Wilmington, DE


**GIBBONS P.C.**

By:   /s/ Natasha M. Songonuga
Natasha M. Songonuga, Esq.
(Bar No. 5391)
1000 N. West Street, Suite 1200
Wilmington, DE  19801-1058
Telephone:  (302) 295-4875
Facsimile:  (302) 295-4876
E-mail:  nsongonuga@gibbonslaw.com

Of Counsel:

Brian J. McMahon, Esq.
Guy V. Amoresano, Esq.
E. Evans Wohlforth, Jr., Esq.
Debra A. Clifford, Esq.
Gregory L. Acquaviva, Esq.

*Counsel to James R. Zazzali, Trustee*