## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES R. ZAZZALI, as Trustee for the DBSI Estate Litigation Trust and as Trustee for the DBSI Private Actions Trust,<br><br>     Plaintiff,<br><br>  v.<br><br>DOUGLAS L. SWENSON; CHARLES HASSARD; JOHN M. MAYERON; WALTER E. MOTT; FARRELL BENNETT; JOHN D. FOSTER; THOMAS VAR REEVE; GARY BRINGHURST; JEREMY SWENSON; DAVID SWENSON; MICK & ASSOCIATES PC LLO; BRYAN S. MICK; JOHN DOE 1-50; and XYZ CORPORATION 1-50.<br><br>     Defendants. | Civil Action No. 1:10-cv-00950 (LPS)<br><br><br>**FIRST AMENDED COMPLAINT**<br><br><br>**Demand for Jury Trial** |

## INTRODUCTION

This action is brought by James R. Zazzali (the "Trustee"), the Court-approved trustee for the DBSI Estate Litigation Trust ("Estate Litigation Trust") and the DBSI Private Actions Trust ("Private Actions Trust"), in his own name as the duly authorized representative to hold, manage and dispose of: (a) all claims and causes of action formerly owned by the bankruptcy estate of DBSI Inc. (formerly DBSI Housing Inc., and hereinafter "DBSI Inc.") and its direct and indirect debtor and non-debtor subsidiaries (the "Debtor Entities"), including, but not limited to, DBSI Investments Limited Partnership ("DBSI Investments") and DBSI Redemption Reserve ("DRR"); and (b) all claims and causes of action formerly owned by creditors and equity interest holders of the DBSI Companies. The Trustee brings this action against Douglas L. Swenson, Charles Hassard ("Hassard"), John M. Mayeron ("Mayeron"), Walter E. Mott ("Mott"), Farrell

Bennett ("Bennett"), John D. Foster ("Foster"), Thomas Var Reeve ("Var Reeve"), Gary Bringhurst ("Bringhurst"), Jeremy Swenson and David Swenson (collectively the "Insiders"), Mick & Associates PC LLO ("Mick & Associates"), and Bryan S. Mick ("Mick"), for their roles in a massive scheme of corporate looting and financial fraud that provided little to no benefit to DBSI Inc. nor its direct and indirect subsidiaries (collectively the "DBSI Companies" or "DBSI"), but rather benefited the Insiders.

For purposes of this Complaint, the following terms shall have the meaning ascribed to them below:

a.      "Accountable Reserves" shall mean the funds routinely designated by the DBSI Companies to be set aside to pay costs and expenses in connection with property over the terms of a master lease.  The specified, authorized uses of Accountable Reserves funds included, *inter alia*, tenant improvements, leasing commissions, capital improvements for improved real estate, management fees, taxes, insurance, and other related fees for unimproved real estate.

b.      "Assigning Investors" shall mean Investors who, pursuant to the Plan, assigned or will assign their claims against the Insiders to the Private Actions Trust.

c.      "Bond Corps." shall refer to DBSI entities that issued bonds.  Among these entities were Guaranteed Capital Corporation ("GCC") and DBSI Real Estate Funding Corporation ("REF Corp.").

d.      "Control Group" or "Control Group Defendants" shall mean Defendants Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst.

e.      "DBSI Investments" shall mean DBSI Investments Limited Partnership, an Idaho limited partnership a/k/a DBSI Properties Limited Partnership.

f.      "DBSI Realty" shall mean DBSI Realty Inc., an Idaho corporation.

g.      "DBSI" or "DBSI Companies" shall mean, among others, the Consolidated

Debtor and Non-Debtor Entities identified in the Plan, including exhibits thereto, which include,

among many others, DBSI Inc., DRR, FOR 1031, DBSI Investments, DBSI Realty, Master

Leaseco, Kastera, Stellar, and Project Subsidiaries.

h.      "Debtor Entities" shall refer to DBSI Inc. and its direct and indirect debtor and

non-debtor subsidiaries whose claims were assigned to the Estate Litigation Trust.  A list of

Debtor Entities is attached as Exhibit A.

i.      "Development Funds" shall refer to DBSI entities that were organized as limited

liability companies and issued debt units and sharing units via private placements.  The stated

purpose of raising funds through the Development Funds was to raise capital to invest in real

estate development projects.  Each Development Fund specialized in a different stage of the

development process.  The Development Fund was to invest the proceeds through affiliated

special purpose entities.

j.      "DRR Partners" shall refer to the numerous, dormant, legacy, real estate limited

partnerships that were the general partners of DRR.

k.      "DRR" shall mean DBSI Redemption Reserve, an Idaho general partnership.

l.      "Estate Litigation Trust" shall mean the trust created by the Plan to hold all causes

of action belonging to the Debtor Entities, including, without limitation, claims against the

Insiders.

m.      "FOR 1031" shall mean FOR 1031 LLC, an Idaho Limited Liability Company.

n.      "Funding Entities" shall refer to collectively, the Notes Corps., Bond Corps., and

Development Funds.

o.      "Insiders" or "Insider Defendants" shall mean the Control Group Defendants, plus

Defendants Jeremy Swenson and David Swenson.

        p.      "Internal Funding Programs" shall refer to the offerings in bonds, notes, and fund programs.

        q.      "Investments General Partners" shall mean Douglas Swenson, Hassard, Mayeron and Mott.

        r.      "Investor(s)" shall mean anyone who invested funds in any of the securities or real estate products sold by DBSI.

        s.      "Kastera" shall mean Kastera LLC, Kastera Development LLC, Kastera Homes, LLC and all subsidiaries of these entities.

        t.      "LTV" shall refer to loan-to-value ratio.

        u.      "Master Leaseco" shall mean DBSI Master Leaseco, an Idaho Corporation.

        v.      "Note Corps." shall refer to certain DBSI entities that issued notes to Investors; among these entities were DBSI 2005 Secured Notes Corporation ("2005 Secured Notes Corp."), DBSI 2006 Secured Notes Corporation ("2006 Secured Notes Corp."), DBSI 2008 Notes Corporation ("2008 Notes Corp.").

        w.      "Plaintiff" or "Trustee" shall mean James R. Zazzali, the Court-appointed trustee of both the Estate Litigation Trust and the Private Actions Trust.

        x.      "Plan" shall mean the Second Amended Joint Chapter 11 Plan of Liquidation for DBSI confirmed by Order of the United States Bankruptcy Court for the District of Delaware, dated October 26, 2010.

        y.      "PPM" shall mean private placement memorandum, offering circulars, other offering materials, and/or any materials used to market funds, notes, and/or bonds by the DBSI Companies.

z.      "Private Actions Trust" shall mean the trust created by the Plan to hold all non-estate causes of action assigned to that trust by creditors and equity holders of DBSI, including, without limitation, claims against Insiders.

aa.     "Project Subsidiaries" shall mean the DBSI entities created in connection with the acquisition, ownership, management, leasing or sale of particular real estate projects or used in connection with particular note or bond investment projects.

bb.     "Property Portfolio" shall mean real property managed by the DBSI Companies pursuant to a master lease or other obligation to provide a guaranteed return to Investors.

cc.     "Real Estate Channel" shall refer to the marketing and sale of assets by DBSI as real estate.

dd.     "Securities Channel" shall refer to the marketing and sale of assets by DBSI as securities.

ee.     "Spectrus" shall mean Spectrus Real Estate Inc., an entity wholly owned by DBSI Inc.

ff.     "Stellar" shall mean Stellar Technologies LLC, an Idaho limited liability company.

gg.     "Technology Companies" shall mean all companies in which Stellar or Western Technologies own or previously owned any ownership interest.

hh.     "TIC Investor" shall mean anyone who purchased a TIC interest from DBSI.

ii.     "TIC" shall mean tenant in common.

jj.     "Western Technologies" shall mean DBSI/Western Technologies LLC, an Idaho limited liability company.

## NATURE OF THIS ACTION

1.     This Complaint commences the process of recovering at least a portion of the hundreds of millions of dollars defrauded from Investors in the debacle of the DBSI Companies from those who bilked them.  The DBSI Companies presented to the world the illusion of a monolith of wealth, competence and power.  Investors were told of substantial commercial real estate holdings throughout the country, of a history of successful and sophisticated real estate ventures, of assets into nine figures, and that no Investor had ever lost money on a DBSI investment.  DBSI invited Investors, mostly owners of small, commercial real estate, to share in complex tax avoidance transactions, and to purchase bonds, notes and interests in entities engaged in major real estate development projects.

2.     The world later learned, however, that this monolith was rotten to the core. Obligations to Investors had outstripped receipts for years.  The edifice was supported by hundreds of empty or half-formed entities that passed assets back and forth to create the impression that it could keep its promises to Investors.  Assets were not as represented.  Positive cash flow came only from new Investor money, which was used to pay off old Investors, a classic Ponzi scheme.  Investor funds that were supposed to be reserved for specific purposes, the Accountable Reserves, were immediately commingled with other funds and the Accountable Reserves alone represent over $80 million in missing funds.

3.     At its center was Douglas Swenson and a cabal of Insiders who moved cash among the entities though transactions of labyrinthine complexity, trying with increasing desperation to maintain the deception of a viable business enterprise.  Meanwhile, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson paid themselves millions of dollars from Investor funds, including from the Accountable Reserves.  Other funds were channeled into losing investments

in technology start-up companies, generating tax losses that Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson took for themselves.  Thus, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson avoided even paying taxes on the funds they misappropriated.  Indeed, these defendants treated the entire DBSI operation as their own alter ego, hiding behind a complex screen of corporate entities to perpetrate their fraud.

4.     Finally, in November 2008, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the DBSI Companies to file for bankruptcy.  The Examiner and later the Trustee were appointed, and the entire tale of deception, venality and self-dealing came to light.  Tens of thousands of Investors learned that they had lost everything.  The docket of the Bankruptcy Court is crowded with letters from individual Investors telling of lost savings accumulated in some cases through the effort of generations.  In October of 2010, the Plan was confirmed, providing for the creation of the two litigation trusts to prosecute the claims of the DBSI Companies and the defrauded Investors against the Insiders and those who aided them.  Alleged below are claims for federal and state racketeering act violations, securities fraud, common-law fraud, breach of fiduciary duty, conspiracy and other causes of action.  With this Complaint, the Trustee represents the victims of this fraudulent scheme -- to prevent the Insiders and their facilitators from enjoying the fruits of their wrongdoing and to force a reckoning with them to make good the harm that they caused.

**NATURE OF PROCEEDING**

5.      This action is brought to remedy Defendants' conduct, which resulted in, *inter alia*, (i) failure to repay nearly $200 million owed to DBSI by the DBSI Investments General Partners, (ii) multiple breaches of fiduciary duty owed to DBSI and to TIC Investors, and aiding & abetting breaches of fiduciary duty, (iii) civil conspiracy, (iv) racketeering in violation of 18 U.S.C. §1961, *et seq.*, (v) fraud and aiding & abetting fraud, (vi) federal securities fraud, and (vii) misappropriation of hundreds of millions of dollars.

**PROCEDURAL HISTORY**

6.      On November 6, 2008 (the "Petition Date"), Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused One Executive Tower LLC, a DBSI entity and Delaware limited liability company, to file a voluntary petition for relief under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").   On various dates thereafter, multiple other Debtor Entities, including but not limited to DBSI Inc., similarly filed parallel bankruptcy petitions in the Bankruptcy Court.  The managing member of One Executive Tower LLC was FOR 1031, whose Board of Managers was Douglas Swenson, Var Reeve and Bringhurst. Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson chose the District of Delaware as the forum for all the Debtor Entity bankruptcy petitions.  Since the Petition Date, certain of the Debtor Entities' cases have been converted to chapter 7.  The Debtor Entities' cases that are currently administered under chapter 11 are jointly administered pursuant to Orders of the Bankruptcy Court.

7.      On November 21, 2008, the Office of the United States Trustee for Region Three (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").

8.      On April 3, 2009, the U.S. Trustee filed her Notice of Appointment of Examiner wherein she notified Joshua R. Hochberg (the "Examiner") of his appointment to serve as Examiner, pending approval of the Court.  On April 14, 2009, the Bankruptcy Court entered its Order Approving Appointment of Examiner [Docket No. 3308].  The Examiner issued his First Interim Report on August 3, 2009 [Docket No. 4159] ("Interim Report") and his Final Report on October 19, 2009 [Docket No. 4544] ("Final Report").

9.      By Order dated August 14, 2009, the Bankruptcy Court directed the U.S. Trustee to appoint a chapter 11 trustee in the Debtor Entities' jointly-administered chapter 11 cases.  By Notice of Appointment dated August 31, 2009 (the "Appointment Date"), the U.S. Trustee appointed the Trustee as trustee in the Debtors' chapter 11 cases [Docket No. 4327].  By Order dated September 11, 2009, the Bankruptcy Court approved the U.S. Trustee's appointment of the Trustee [Docket No. 4375].

10.     By Order dated October 26, 2010, the Bankruptcy Court entered an Order of Confirmation ("Confirmation Order"), confirming the Plan, in the Chapter 11 cases and proceedings of the Debtor Entities (the "Bankruptcy Proceedings").  The Plan substantively consolidated the estates of the Plan Debtors and certain Consolidated Non-Debtors.  The Plan also creates two trusts: the Estate Litigation Trust and Private Actions Trust.  Upon the substantial consummation and effectiveness of the Plan, on October 29, 2010, the claims and causes of action asserted herein were transferred from the consolidated bankruptcy estate of the

Debtor Entities to the Estate Litigation Trust and from the creditors and equity interest holders of DBSI to the Private Actions Trust in exchange for beneficial interests therein.

**PARTIES**

**A.**     **The Plaintiff**

11.    Plaintiff James R. Zazzali is the court-approved Trustee of the Estate Litigation Trust and the Private Actions Trust.  Plaintiff is an individual who is a citizen and domiciliary of the State of New Jersey.

**B.**     **The Insider Defendants**

12.    Defendant Douglas Swenson is an individual who is a citizen and domiciliary of the State of Idaho.

13.    Defendant Hassard is an individual who is a citizen and domiciliary of the State of Idaho.  At times relevant to this Complaint, Hassard was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Asset Management LLC, DBSI Realty, DBSI Securities Corp., Western Technologies, DCJ Inc., DBSI 2001A Funding Corporation, DBSI 2001B Funding Corporation, DBSI 2001C Funding Corporation, 2005 Secured Notes Corp., 2006 Secured Notes Corp., 2008 Notes Corp., GCC, REF Corp., DBSI Funding Corporation, DBSI Investments and Stellar.

14.    Defendant Mayeron is an individual who is a citizen and domiciliary of the State of Texas.  At times relevant to this Complaint, Mayeron was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Asset Management LLC, DBSI Development Services LLC, DBSI Discovery Real Estate Services LLC, DBSI Realty, Inc., DBSI Securities Corp., Western Technologies, DCJ Inc., DBSI 2001A Funding Corporation, DBSI 2001B Funding Corporation, DBSI 2001C Funding Corporation, 2005 Secured Notes

Corp., 2006 Secured Notes Corp., 2008 Notes Corp., GCC, REF Corp., DBSI Funding

Corporation and DBSI Investments.

15.     Defendant Mott is an individual who is a citizen and domiciliary of the State of

Idaho.  At times relevant to this Complaint, Mott was an officer and/or director of various DBSI

Companies, including, but not limited to, DBSI Development Services LLC, DBSI 2001A

Funding Corporation, DBSI 2001B Funding Corporation, DBSI 2001C Funding Corporation,

2005 Secured Notes Corp., GCC, REF Corp., DBSI Funding Corporation, Stellar and DBSI

Investments.

16.     Defendant Bennett is an individual who is a citizen and domiciliary of the State of

Utah.  At times relevant to this Complaint, Bennett was an officer and/or director of various

DBSI Companies, including, but not limited to, DBSI Funding Corp. and DBSI Investments.

17.     Defendant Foster is an individual who is a citizen and domiciliary of the State of

Idaho.  At times relevant to this Complaint, Foster was an officer and/or director of various DBSI

Companies, including, but not limited to, DBSI Development Services LLC, DBSI 2001A

Funding Corporation, DBSI 2001B Funding Corporation, DBSI 2001C Funding Corporation,

DBSI Funding Corporation, Stellar and DBSI Investments.

18.     Defendant Var Reeve is an individual who is a citizen and domiciliary of the State

of Idaho.  At times relevant to this Complaint, Var Reeve was an officer and/or director of

various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Asset Management

LLC, DBSI Discovery Real Estate Services LLC, DBSI Properties Inc., FOR 1031 and Stellar.

19.     Defendant Bringhurst is an individual who is a citizen and domiciliary of the State

of Idaho.  At times relevant to this Complaint, Bringhurst was an officer and/or director of

various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Discovery Real Estate Services LLC, FOR 1031, Spectrus and Stellar.

20.     Defendant Jeremy Swenson is an individual who is a citizen and domiciliary of the State of Idaho.  At times relevant to this Complaint, Jeremy Swenson was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Development Services LLC, DBSI Discovery Real Estate Services LLC, DBSI Land Development LLC, DBSI Properties Inc., DBSI Realty Inc., DJC Inc. and Spectrus.

21.     Defendant David Swenson is an individual who is a citizen and domiciliary of the State of Idaho.  At times relevant to this Complaint, David Swenson was an officer and/or director of various DBSI Companies, including, but not limited to, DBSI Inc., DBSI Development Services LLC, DBSI Discovery Real Estate Services LLC, DBSI Properties Inc., DBSI Realty Inc., DJC Inc., FOR 1031 and Spectrus.

22.     Defendants John Doe 1-50 are fictitious names representing one or more persons who were associated with or acted in concert with Defendants in connection with the allegations contained herein, and whose identities are presently unknown to Plaintiff.

**C.     The Professional Defendants**

23.     Defendant Mick & Associates is a Nebraska corporation with its principal place of business in Nebraska.

24.     Defendant Mick is an individual who is a citizen and domiciliary of the State of Nebraska.

25.     Defendant XYZ Corporation 1-50 are fictitious names representing one or more persons who are associated with or acting in concert with Defendants in connection with the allegations contained herein, and whose identities are presently unknown to Plaintiff.

D.      **Jurisdiction and Venue**

26.     By Order dated October 26, 2010, confirming the Plan, the Bankruptcy Court expressly retained jurisdiction over "all matters arising under, arising out of, or related to, [DBSI's] Chapter 11 Cases and the Plan, to the fullest extent permitted by law," including jurisdiction "to hear and determine all Causes of Action by or on behalf of . . . the DBSI Litigation Trustee, and the Private Actions Trustee."  This Court thus has original jurisdiction over these bankruptcy matters pursuant to 28 U.S.C. § 1334(b).

27.     No Insider objected to the foregoing provisions of the Confirmation Order.

28.     No Insider filed an appeal regarding the foregoing provisions of the Confirmation Order.

29.     Nevertheless, despite the general order of reference to the Bankruptcy Court, because there are additional bases for this Court's jurisdiction, as set forth below, and because Plaintiff seeks trial by jury, in an abundance of caution, Plaintiff brings this action in the District Court in the first instance.

30.     This Court also has jurisdiction pursuant to 18 U.S.C. §§ 1331 and 1337.

31.     This Court also has jurisdiction over the Trustee's claims for violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, under 18 U.S.C. § 1964.

32.     This Court has jurisdiction over the Trustee's claims for violations of federal securities laws under 15 U.S.C. §§ 77o, 78aa and 78j.

33.     This Court has supplemental jurisdiction over the Trustee's state law claims under 28 U.S.C. § 1367(a).

34.     This Court also has jurisdiction under 28 U.S.C. § 1332.  There is complete diversity of citizenship and the amount in controversy exceeds $75,000.

35.     Venue is proper in this Court under 15 U.S.C. 78aa, 18 U.S.C. § 1965, 28 U.S.C. § 1391, and 28 U.S.C. § 1409(a).

36.     As demonstrated in Paragraphs 39 through 64 *infra*, the Insiders have substantial contacts with Delaware and have purposefully availed themselves of the laws, rights, privileges, and protections of Delaware.

## FACTUAL BACKGROUND

### A.     DBSI Overview - A Business Doomed to Fail

37.     The DBSI operation was a sprawling, fraudulent real estate investment empire, involving hundreds of corporations and properties, but dominated and controlled by Douglas Swenson, with the substantial aid of Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson .  Whatever the original business plan may have been, for many years -- and no later than 2004 -- DBSI had come loose from and operated unattached from any rational economic moorings, and ultimately became nothing more than the instrument of the Insiders' elaborate pyramid or "Ponzi" scheme to defraud Investors. For as many as six years before its Chapter 11 filings took place, DBSI had been rapidly losing vast sums of money.  Very substantial obligations to Investors were met by raising new money bilked from new Investors, who were repaid with money from yet newer Investors.  New real estate inventory was constantly needed to create vehicles for these new investments.  Money was poured into highly speculative technology ventures, realizing zero return.  Defendants, meanwhile, paid themselves handsomely with other people's money and appropriated valuable tax advantages to themselves.  The corporate entities were routinely disregarded; cash, assets and liabilities were shifted among them without regard for actual ownership or equivalent value; funds were commingled with impunity.  The entire organization was a fraud on Investors and

operated as the alter ego of Douglas Swenson.  Eventually, the edifice and artifice came crashing

down, with billions of dollars lost over the entire episode.  As the Court-appointed Examiner,

among other damning findings, found:

- "The DBSI Group businesses were in continuous need of new investor funds to fund pre-existing obligations at least as early as 2005.  In particular, the DBSI Group of companies was burdened by high interest debt and master lease payment obligations, excessive insider distributions, and unrestrained losing investments in the Technology Companies and the Kastera Companies."

- "A small group of management personnel, including Douglas Swenson, regularly tracked cash on a global basis and directed that investor funds be used to meet pre-existing obligations and operating expenses by evading restrictions governing the use of the investor funds.  At times, in an elaborate shell game, loans were made from investor funds that were not backed by adequate security, debt was reallocated through after-the-fact bookkeeping entries in an effort to make it appear that loans were adequately secured, and inflated values were arbitrarily assigned to the assets "securing" loans."

- "The DBSI Group consistently operated at a loss, except for certain time periods when sales to TIC investors created booked profits.  The Non-Debtor Kastera Companies and the Technology Companies also all consistently lost money and required substantial loans and capital contributions by DBSI or its affiliates to keep operating."

- "DBSI Group entities booked profits from inflated markups of real estate for sale to outside investors.  Most of these profits were consumed by the costs of such sales.  The inflated sales prices included arrangements obligating DBSI Inc. to make guaranteed payments to investors.  But the operations of the underlying properties could not support these guaranteed investor payments."

- "DBSI Inc.'s guarantees of investments were illusory and were based on the cultivated false appearance that DBSI Inc. had substantial value.  Similarly, the marketing claim that "no investors had ever lost money" was also illusory and reflected that newly raised investor funds were being used to pay off existing investors."

- "The Debtors used tenant-in-common ("TIC") investor and bond and note money interchangeably and pooled such money to make required payments when they came due.  Investor funds from all sources were commingled and treated as fungible funds.  The Debtors transferred debt obligations and infused cash to different entities as the need arose.  The same funds were transferred and retransferred between numerous entities often on a daily basis."

- "Douglas Swenson and others played a critical role in preparing the DBSI financial statements and other documents that were vital to the Debtors' ability to continue to raise new funds from new investors.  Most of these financial statements were not independently audited or certified.  Swenson and others created a misleading financial

picture of the DBSI Group by, among other devices:

- o using inflated values for entities and assets included in financial statements;
- o not fully and adequately disclosing the nature of intercompany accounts receivable in the Debtors' financial statements;
- o failing to make inter-company interest payments on loans and concealing this failure by converting accrued interest into additional principal;
- o concealing mounting loan receivable amounts by converting loans into equity; and
- o engaging in year-end cash manipulations which made it appear that certain entities were well capitalized when, in fact, they were not."

- "DBSI Inc. and its related companies went to great lengths to market investment properties by stressing that the uses of "Accountable Reserves" were restricted to property improvements. In reality, DBSI treated Accountable Reserves as a source of cash for its cash strapped operating companies."

- "DBSI Inc., Douglas Swenson, and others managed and operated the DBSI Group businesses without regard for the separate identities of the companies within the DBSI Group. Transactions among companies in the DBSI Group were rarely documented properly. Accounting functions were mostly centralized."

- "Douglas Swenson and others continuously failed or refused to obtain appropriate outside, independent accounting or legal advice with respect to matters for which they had serious conflicts of interest. They used investor funds under their control for purposes not intended by the investors in order to continue operations, pay themselves distributions, and fund investments in Non-Debtor companies such as the Kastera Companies and the Technology Companies."

- "The Debtors' financial and accounting records and those of the DBSI Group as a whole, particularly the general ledgers, are unreliable, unorganized, inconsistent and often unintelligible. In addition, accounting personnel often modified entries explaining transactions well after the transactions occurred."

- "Douglas Swenson and other insiders distributed significant amounts of money to themselves."

[Examiner's Final Report at 7-10.]

38. Vastly simplified, DBSI can be separated into three general spheres of activity, although, as will be seen, the entire business was operated as a single, integrated entity. For the purposes of these allegations, these spheres of activity were (i) the syndication of commercial real estate properties as allegedly qualified investments under Section 1031 of the Internal

Revenue Code, (ii) raising money by issuing debt and equity interests in various DBSI entities, and (iii) siphoning off very large sums for distribution to the Insiders themselves and for investment in new, technology-oriented ventures through the use of a complex system of related partnerships and other entities.

**B.**    **The Insiders Substantial Contact with Delaware**

39.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson, and David Swenson caused more than 300 DBSI entities to be formed in Delaware.  Attached hereto as Exhibit B, and incorporated by reference herein, is a chart listing all DBSI entities formed in Delaware.

40.    In addition, 93 of the DBSI entities that have filed for bankruptcy in this matter were formed in Delaware.  Attached hereto as Exhibit B, and incorporated by reference herein, is a chart listing all DBSI entities formed in Delaware that have filed for bankruptcy in Delaware.

41.    In addition, on information and belief, DBSI required approximately 90% of their TIC investors to make their investments in TIC offerings through a newly-formed special purpose entity ("SPE").  On information and belief, approximately 98% of these SPEs were formed in Delaware.  Thus, the sales of TIC offerings -- i.e., the bread and butter business of DBSI -- were made, near universally, in the first instance to or through a Delaware SPE.

42.    Importantly, DBSI handled all the paperwork internally for the those TIC Investors required to make their investments through SPEs, and DBSI registered each of such Investor's newly-formed SPEs in Delaware.  On information and belief, DBSI formed over 2,500 SPEs for investors to use to invest in DBSI TIC offerings.

43.    Such a high percentage of SPEs were formed in Delaware because the majority of the banks that DBSI worked with required that TIC Investors make their investments through Delaware LLCs.  Thus, the structure of the scheme to defraud -- a scheme masterminded by

Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson, and David Swenson -- necessarily required DBSI and Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson, and David Swenson to avail themselves of the rights, privileges, and protections of Delaware in order to finance the vast majority of the TICs and perpetuate the fraudulent scheme.

44.     For example, in conjunction with John R. Coleman's investment in the Trinity Ridge Business Center LLC, DBSI registered a Delaware SPE on Mr. Coleman's behalf, Coleman Trinity Ridge Business Center LLC, which acted as the financial vehicle for Mr. Coleman's investment.

45.     The Coleman Trinity Ridge Business Center LLC is but one, representative illustration of how the scheme operated.  Indeed, DBSI, at the behest of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson, and David Swenson, registered no less than 2,500 Delaware-based SPEs -- substantially similar to Coleman Trinity Ridge Business Center LLC -- all of which served as financial vehicles for TIC investors.

46.     In addition to the thousands of Delaware SPEs referenced above, DBSI also had no less than 10 individual Investors who were residents of Delaware.  Six of these Investors have assigned their claims to the PAT.

47.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson, and David Swenson caused DBSI to direct fraudulent communications into Delaware.  At least one Investor communicated extensively (from her home in Delaware) with DBSI, and DBSI reached out to her by phone on many occasions and sent voluminous amounts of investment information to her at her Delaware address.  DBSI employees even assured her (over her concerns) that she qualified for the investment, and walked

her step-by-step through the investment process. Those communications were at the direction and behest of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson, and David Swenson and in furtherance of their scheme to defraud.

48.     On information and belief, this investor's communications with DBSI were typical of many Investors', including the other Investors from Delaware.

49.     In short, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the fraudulent communications that serve as the basis of many claims of this Complaint to be purposefully and intentionally transmitted into Delaware.

50.     On the Petition Date, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused One Executive Tower LLC, a DBSI entity and Delaware limited liability company, to file a voluntary petition in the Bankruptcy Court.

51.     The managing member of One Executive Tower was FOR 1031, whose Board of Managers was Douglas Swenson, Var Reeve, and Bringhurst.

52.     On November 8, 2008, the Board of Directors of DBSI Inc. unanimously approved a resolution providing that "in the judgment of the Board, it is desirable and in the best interests of the Company, its creditors, stockholders and other interested parties, that a voluntary petition . . . be filed by [DBSI Inc.] under the provisions of Chapter 11 of Title 11 of the United States Code," and that Douglas Swenson was "authorized, directed and empowered, on behalf of and in the name of the Company . . . to execute and verify the Petition as well as all other ancillary documents and to cause the Petition to be filed with the Bankruptcy Court for the District of Delaware."

53.     All directors of DBSI, Inc. attended the November 8, 2008 meeting, namely: Douglas Swenson, Hassard, Mayeron (via teleconference), Bringhurst, and Var Reeve.  They all voted in favor of the resolution directing DBSI Inc.'s bankruptcy petition be filed in the United States Bankruptcy Court for the District of Delaware.

54.     The decision to file the bankruptcy petition in Delaware was motivated, primarily, by two reasons.  First, Douglas Swenson, Hassard, Mayeron, Bringhurst, and Var Reeve, as well as Jeremy Swenson, an officer of DBSI Inc. who was heavily involved in the strategic discussions surrounding the filing of the bankruptcy petition in Delaware, were all concerned that, given the anticipated size of the bankruptcy proceeding, no local Idaho counsel would be sufficiently capable of handling the proceeding.

55.     Second, Douglas Swenson, Hassard, Mayeron, Bringhurst, and Var Reeve were concerned that, given the anticipated size of the bankruptcy proceeding -- the likes of which the United States Bankruptcy Court for the District of Idaho had never seen -- that the Idaho Bankruptcy court would be administratively overwhelmed.

56.     Thereafter, on February 3, 2009, Douglas Swenson, Hassard, Mayeron, and Bringhurst, as directors of DBSI Inc. unanimously resolved "that all prior actions of the officers [of DBSI Inc.] thru December 31, 2008, taken in the name of and on behalf of the Corporation in the ordinary course of business and in accordance with the Corporation's policies and procedures, and where applicable, consistent with bankruptcy law and procedure . . . are hereby approved, ratified and confirmed as acts of the Corporation."

57.     Also in early November 2008, the Board of Directors of DBSI Securities Corporation enacted a resolution stating that "in the judgment of the Board, it is desirable and in the best interests of the Company, its creditors, stockholders and other interested parties, that a

voluntary petition be filed by the Company under the provisions of Chapter 11 of Title 11 of the United States Code" and that such petition "be filed with the United States Bankruptcy Court for the District of Delaware." Hassard, in his capacity as Secretary of DBSI Securities, signed the resolution.

58. Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson, and David Swenson caused the Debtor Entities to file for bankruptcy in Delaware.

59. Several of the Insiders have also filed proofs of claim in the Bankruptcy Proceedings. Douglas Swenson alone filed 26 proofs of claim.

60. Hassard, Mayeron, Mott, and Foster also filed proofs of claim.

61. Several of the Insiders filed objections in the Bankruptcy Proceeding. Specifically, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, and Bringhurst all filed objections.

62. Several of the Insiders appeared through counsel in the bankruptcy proceeding. Specifically, Swenson, Hassard, and Mott all filed notices of appearance.

63. A full list of the proofs of claim, objections, and notices of appearance filed by the Insiders with the Bankruptcy Court is attached hereto as Exhibit C and incorporated by reference herein.

64. In addition, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson are all parties to *Federal Insurance Co. v. DBSI, Inc., et al.*, Adv. Proc. No. 09-52031 (PJW), an interpleader adversary action venued in the Bankruptcy Court. None of the Insiders contested personal jurisdiction and, in fact, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison,

Bringhurst, David Swenson, and Jeremy Swenson all moved for summary judgment in that action.

**C.**      **The TIC Syndication Business**

65.      Section 1031 of the Internal Revenue Code permits owners of real estate to shelter gain they might have in their property when it is sold if the proceeds are used to purchase a similar or "like-kind" property within a certain time.  In 2002, the I.R.S. ruled that the like-kind property may be a tenant-in-common interest in the new property, provided the tenant-in-common interest is of equivalent value.  This permitted 1031 exchange syndicators to sell numerous TIC interests in large real estate properties to Investors with gains in smaller properties.

66.      Following the I.R.S. ruling in 2002, DBSI became a major syndicator of 1031 exchange properties.

67.      To lure purchasers, DBSI guaranteed rent proceeds through a master lease structure ("Master Lease Structure").  The TIC owners leased the property to a DBSI affiliate-master lessor.  The master lessor sublet the property with DBSI guaranteeing the rent stream to the TIC Investors.

68.      The master leases were held by a number of master lessor entities, including Master Leaseco.

69.      The TIC business did not generate a profit for a number of reasons, including that (i) rents received from sublessees did not cover both the guaranteed return to the TIC Investors under the master lease agreements and the debt service payments, (ii) DBSI paid sums greater than market value for the properties to be syndicated and (iii) profits were eroded by transaction costs and overhead.

70.     As the TIC syndication business failed, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson tried to prop it up with cash raised from, *inter alia*, new TIC syndications.  This led to their increasingly desperate search for new properties for which DBSI paid sums well in excess of what a prudent investor would have paid--all to perpetuate the rapidly imploding Ponzi scheme.  The increased volume of TIC syndication projects led to additional overhead and financing costs.

71.     In sum, the TIC syndication business was losing money from 2004 onward and, by and after 2006, cash shortages became chronic and severe.

72.     The TIC syndication/Master Lease Structure exposed DBSI to very significant obligations under the master leases and for reserves paid in by TIC Investors that were supposed to be used for improvements on the properties.

73.     The unprofitability of the TIC business caused chronic cash shortfalls that had to be funded by additional TIC syndications.  This led to a permanent scramble to find new properties to purchase and syndicate, which in turn required financing.

**D.     The Funding Entities**

74.     Not surprisingly, conventional financing was not available to fund the TIC syndication business on the terms DBSI required.

75.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused DBSI to use three types of entities and offerings to gain money from Investors -- the Notes Corps., Bond Corps. and Development Funds.

76.     The offerings made by DBSI through the Funding Entities were through private placements to qualified individuals pursuant to Regulation D of the Securities Act of 1933.

77.     The stated purpose of raising funds through the Funding Entities was to loan the proceeds to other DBSI entities.  In some instances, the proceeds were to be used to purchase properties for TIC syndication.  In other cases, the funds were ostensibly intended to re-finance existing obligations.  In still other instances, no purpose beyond lending the funds to DBSI-related entities was specified.

78.     The Funding Entities were bound by the terms of the offerings to pay high rates of interest return to Investors -- typically between 8 and 11 percent.  The interest obligation was in excess of the realistic rate of return on real estate investments at the time.

79.     The interest rate obligation in conjunction with other financing costs produced a cost of funds borrowed in excess of what DBSI could hope to generate from its TIC syndication business to repay Investors.

80.     With respect to the Note Corps., the stated purpose of issuing the notes was to loan funds to affiliated special purpose entities to purchase real estate for TIC syndication.

81.     The stated purpose of the Bond Corps. was simply to raise money to loan to other DBSI entities.

82.     Douglas Swenson's, Hassard's, Mayeron's, Mott's, Bennett's, Foster's, Var Reeve's, Bringhurst's, Jeremy Swenson's, and David Swenson's real purpose behind all of the Funding Entities, however, was the perpetuation of their fraudulent scheme to line their pockets with money from Investors.

83.     As a condition of investing, Investors were required to certify that they had read and relied upon the PPM for the issue.

84.     Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the Funding Entities' PPMs to contain

numerous representations to induce Investors to purchase the investment on offer, including representations regarding the financial strength of the DBSI Companies, its history and experience in managing successful real estate ventures, and the intended use of funds.

85.     Douglas Swenson was very much involved in the preparation of the PPMs, and he reviewed and signed off on each and every PPM before it went to print.

86.     On information and belief, David Swenson approved every PPM. A document entitled "PPM Signoff Sheet" indicates that David Swenson, along with his father Douglas Swenson, were required to approve and sign off on every PPM. Emails also reveal that David Swenson received "draft" PPMs prior to their finalization.

87.     On information and belief, Jeremy Swenson approved every PPM. Emails reveal that Jeremy Swenson received "draft" PPMs prior to their finalization and that he was required to sign off on PPMs prior to their finalization.

88.     On information and belief, Mayeron approved every PPM. Emails reveal that Mayeron received "draft" PPMs prior to their finalization and that he was required to sign off on PPMs prior to their finalization.

89.     The notes issued by the Note Corps. and the bonds issued by the Bond Corps. were guaranteed by DBSI Inc. Thus, representations regarding the financial strength and competence of DBSI, its track record and competence were directly relevant to the perceived value of these guarantees.

90.     In all of the PPMs for the Funding Entities, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the issuer to make specific representations that the amount of loans to related entities

would not exceed a certain percentage of the value of assets held by the recipient affiliate, also known as an LTV.

91.    The frequency and size of the DBSI Companies' fundraising efforts -- all of which increased dramatically beginning in 2004 -- and the uses of the resulting cash illustrate that the DBSI Companies relied on a steady, increasing flow of new Investor money in order to fund its operations, to line the Insiders' pockets and to repay prior Investors.

92.    Approximately $500 million was raised from the Internal Funding Programs. Even as the Petition Date approached, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were planning to raise up to $30 million more in additional debt, to rob yet another Peter to pay Paul.

93.    DBSI has defaulted on past due principal and interest obligations to Assigning Investors holding the aforementioned notes, bonds, debt and sharing unit interests in at least the amounts set forth in Exhibit D.

**E.    Stellar, DBSI Investments and the Technology Company Investment**

94.    A third area of activity of the DBSI Companies involved a very large and completely unproductive investment of money into emerging technology-oriented companies.

95.    Although the Technology Company investments were neither productive for the DBSI Companies as a whole nor for the Investors whose cash was diverted to pay for them, they were structured in such a way that they facilitated the siphoning off of substantial distributions to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and the appropriation of significant tax advantages for them that otherwise would have belonged to the DBSI Companies.

96.    The Technology Companies included BioReaction Industries LLC ("BioReaction"), Wavetronix LLC ("Wavetronix"), iTerra Communications ("iTerra"),

26

GigOptix, Inc. ("GigOptix"), EmergeCore Networks LLC ("EmergeCore"), UltraDesign LLC ("UltraDesign"), BioMatrix Solutions LLC ("BioMatrix"), and Western Electronics LLC ("Western Electronics,").

97.     DBSI funds were channeled to them in the form of loans by Stellar, in which DBSI Inc. had a majority interest.

98.     Stellar received those funds as loans from DBSI Investments, a limited partnership in which Douglas Swenson, Bennett, Foster, Hassard, Mayeron, Mott, and DBSI Inc. were general partners.

99.     DBSI Investments received funds as loans from DRR and from other Funding Entities.

100.     In addition to serving as a conduit of funds to Stellar and the Technology Companies, DBSI Investments also made distributions to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

101.     Douglas Swenson, Bennett, Foster, Hassard, Mayeron, and Mott structured DBSI Investments as a partnership so that they could make disproportionate distributions to themselves.

102.     In addition, losses that DBSI Investments incurred due to its investment in the Technology Companies accrued to the general partners of DBSI Investments so that Douglas Swenson, Bennett, Foster, Hassard, Mayeron, and Mott could use these losses on their personal tax returns.

103.     Thus, the purpose and effect of this scheme was that Douglas Swenson, Bennett, Foster, Hassard, Mayeron, and Mott were taking other people's money and simultaneously managing to avoid or evade taxation on their ill-gotten gain.

F.   **DBSI Redemption Reserve**

104.   An additional entity must be discussed to understand the allegations that follow. DRR was a general partnership.  Its general partners were the DRR Partners.  DBSI Inc. and DBSI Investments were, in turn, general partners of these DRR Partners.

105.   During the time relevant to this Complaint, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused DRR to act as a funds transfer bank between the various DBSI entities.  As funds were moved from one branch of the DBSI operation to another, or concentrated from several branches or entities to meet a need of some other entity, those transfers were frequently recorded as payments to DRR and then out to the receiving entity.

106.   Cash was managed among the DBSI entities without regard for corporate separateness and the increasingly urgent demands for cash were frequently met by using DRR as a bank for the movement of cash.

107.   DRR was also used to transfer substantial funds from other DBSI entities to DBSI Investments for distribution to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and to Stellar and the Technology Companies.

108.   DRR had no source of funds other than advances from affiliates and no assets of its own.  Many of the transactions recorded did not reflect actual movements of cash through DRR's account.

109.   Little or no formalities were followed with respect to the establishment of DRR.

110.   On the instructions of Douglas Swenson, no written partnership agreement was ever created for DRR.

111.    Although DRR borrowed from and lent money to entities that were not part of DBSI Inc., Douglas Swenson personally held a controlling interest in all such entities.

112.    Douglas Swenson is the only person that consistently had signature authority for DRR's bank account.

113.    No corporate minute book or similar records existed for DRR.

114.    Earlier in the relevant period, DBSI drew up loan documents between DRR and the other entities to which it funneled money.  However, in later years there was no loan documentation, only book accounts.

115.    As of December 31, 2008, DBSI records show that DRR owed DBSI Inc. $196,689,254.

116.    DBSI Investments owes DRR $101,144,847.  Stellar owes DRR $127,869,385. Neither DBSI Investments nor Stellar ever had the means to repay these substantial loans.

117.    Notably, as will be discussed *infra*, much of the money "loaned" by DBSI Inc. and other DBSI Companies to DRR, and then loaned by DRR to DBSI Investments, and then from there disbursed to the Insiders, was brazenly misappropriated from cash deposited by TIC Investors as Accountable Reserves.  In short, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson took money that was not theirs, moved it among entities until it was hopelessly commingled, and then simply paid it to themselves.

## G.    The Failing Business of DBSI

118.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson touted that the DBSI Companies had a long history during which no Investor had ever lost money, and that DBSI had provided significant annual returns even during poor real estate markets.  For many years, Douglas Swenson,

29

Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David

Swenson knowingly fostered a materially false impression of robust financial strength.

119.    But, in recent years, DBSI did not accomplish this track record through successful

business efforts.  Rather, it did so by generating a consistent influx of cash from new Investors

through serial bond, note, and fund offerings, and the sales of TIC interests in property at prices

that exceeded, in some cases significantly, the fair market value of that property.  These offerings

and sales resulted in long-term payment obligations to these new Investors, creating a substantial

drain on the DBSI Companies cash flow.

120.    Even at the large mark-up the DBSI Companies charged TIC Investors for the

properties, the TIC business generated little real profit.  As a result, the DBSI Companies were

forced to move increasingly large volumes of real estate through its TIC syndication and Master

Lease Structure, saddling the DBSI Companies with ever-growing and recurring liabilities.

121.    With the increased volume of sales came an increasing number of Investors who

needed to be paid a guaranteed rate of return on their investment.

122.    Also during this time, the DBSI Companies overhead increased to accommodate

the increased workload from these sales, and at the same time, the Technology Companies and

Kastera further drained cash from the DBSI Companies.

123.    Other than the continuing sale of TIC interests on which the DBSI Companies

booked a nominal profit, there was no significant source of income to the DBSI Companies.

124.    The profit margin the DBSI Companies could realize even with regard to TIC

sales was impaired by the cost of those offerings.

125.    Accordingly, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var

Reeve, Bringhurst, Jeremy Swenson and David Swenson became so desperate for "product"

(commercial real estate) that they were willing to have DBSI purchase unprofitable real estate at unjustified prices just to continue the cash stream generated by constant buying and selling, in order to prop up their pyramid scheme.

126.    As early as 2004, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew that the company was failing because of severe cash shortages.

127.    To address the substantial cash needs of perpetuating their pyramid scheme, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the DBSI Companies to use funds raised from Investors through note offerings to generate operating cash.  The DBSI Companies created records purporting to reflect that this money was "loaned" to related entities using assets as "collateral."

128.    In general, offering documentation for the Funding Entities provided that loans to other DBSI entities would be limited to 85% of the borrowing entities assets, *i.e*, the LTV ratio.

129.    By 2004, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson had plainly transformed the DBSI Companies into a Ponzi scheme, in which the guaranteed returns to older deceived Investors could only be satisfied by the flow of funds from the newly deceived Investors.

130.    By 2005, the DBSI Companies were largely dependent on new Investor money to provide cash for operations and to fund payments to prior Investors.

131.    By 2007, the cash demands of operations and required payments to Investors had become even more significant:  the Property Portfolio was losing approximately $3 million per month.

132.    The largest expenses contributing to these losses were TIC Investor payments, which by fourth quarter 2008 totaled $25 million per quarter.

133.    Throughout this period, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson misappropriated the funds of the DBSI Companies and the Investors by taking substantial insider payments -- totaling approximately $75 million -- while also using loans to the Technology Companies as a handsome tax shelter.  Exhibit E attached to this Complaint, and incorporated by reference herein, summarizes these substantial Insider distributions.

**H.    The DBSI Companies Were the Alter Ego of Douglas Swenson and Were Directed and Operated with the Complicity of the Control Group**

134.    Douglas Swenson admitted in his June 28, 2005 sworn testimony to the Securities and Exchange Commission that he was the principal in every DBSI Company.  In his own words:  "I'm the major principal in DBSI.  There would be hundreds of entities that I wouldn't even want to hazard a guess as to what my official position is in each one of those.  There's so many of them."

135.    Douglas Swenson's control over the DBSI Companies was profound.  When asked whether Douglas Swenson had the authority to convey a security interest in a lease between DBSI Inc. and FOR 1031, Mott, in a December 11, 2009 interview with the Examiner, stated that he assumed that Douglas Swenson "ha[d] the authority to do anything like that between the companies."

136.    Douglas Swenson regularly took action without proper corporate approval.

137.    Beginning no later than 2004, Douglas Swenson regularly began tracking the DBSI Companies' cash flow on a global basis and directed that Investor funds be used to meet pre-existing obligations and operating expenses.

138.     Douglas Swenson oversaw the preparation of and approved DBSI's financial statements and other documents that created a materially false and misleading financial picture of the DBSI Companies and were vital to the Insiders' fraudulent conduct.  Douglas Swenson had the final say in the presentation of financial statements.

139.     Douglas Swenson also prepared numerous highly subjective, not independently analyzed, and grossly inaccurate valuations that served to circumvent true compliance with LTVs.

140.     After reviewing the funding needs of various DBSI Companies, Douglas Swenson decided how proceeds from various Internal Funding Programs would be used.

141.     Douglas Swenson managed and operated the DBSI Companies without regard for the separate identities of the ostensibly separate companies.

142.     Employees of the DBSI Companies, including Matthew Duckett, admitted in their testimony to the Examiner that Douglas Swenson was the ultimate decision maker in most significant aspects of the operations of the DBSI Companies.

143.     Moreover, Douglas Swenson reviewed, approved and signed off on every PPM, DDB, as hereinafter defined, and other offering material distributed by the DBSI Companies in their continuing search for influxes of new Investor money.

144.     As the DBSI Companies financial straits continued to worsen, in 2008, Douglas Swenson continued to authorize ill-advised and irresponsible spending decisions, including, but not limited to:  continued funding of Kastera and Stellar; Insider payments in the form of a bonus to Mayeron and the purchase of land from Var Reeve -- at profit to Var Reeve; and the payment of his own, personal tax liabilities.

145.     Some portion of the Control Group has owned, directly or indirectly, 100 percent of the interests of the various DBSI Companies throughout their existence.

146.     In short, the DBSI Companies were owned, controlled, operated and managed by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst.

147.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst employed control over the DBSI Companies to raise cash, commingle it and then distribute it as needs presented -- both to the DBSI Companies and to themselves -- without regard for the source of the money, ownership of the money or any restrictions on its use.

148.     These efforts were designed to principally benefit Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, not the DBSI Companies.

**(1)     DBSI Inc.**

149.     DBSI Inc. was the parent entity that owned, directly or indirectly, the DBSI Companies.

150.     Douglas Swenson owned 91.38 percent of DBSI Inc.

151.     Other owners of DBSI Inc. included Hassard, Mayeron and Bringhurst.

152.     Former owners of DBSI Inc. include Mott, Bennett, Foster and Var Reeve.

153.     The Board of Directors of DBSI Inc. has included Douglas Swenson, Hassard, Mayeron, Var Reeve and Bringhurst.

154.     Executive officers of DBSI Inc. included Douglas Swenson, Hassard, Mayeron, David Swenson and Jeremy Swenson.

155.     Although there have been some changes in the management of DBSI Inc., the involvement and influence of Douglas Swenson, Hassard and Mayeron have been consistent and extensive.

(2)      **Subsidiaries**

156.     The business, operations and management of DBSI Inc. were directed through numerous DBSI Companies.  Each of these subsidiaries served a particular function in facilitating the underlying business of DBSI Inc. and, more important, the Insiders' scheme to defraud.

157.     Each of these subsidiaries is wholly owned, directly or indirectly, by DBSI Inc.

158.     The control and management of these entities has tracked, fairly consistently, the control and management of DBSI Inc.

159.     Douglas Swenson has served without interruption on the board of directors or board of managers of each of these subsidiaries since their formation.

160.     With a few inconsequential exceptions, Douglas Swenson has also served as the most senior officer of each of the subsidiaries and, at one time or another, has served as the sole director or manager of each of these subsidiaries.

161.     With limited exception, Mayeron and Hassard have also been consistently involved with the management and operations of the subsidiaries.

(3)      **Master Leaseco**

162.     Master Leaseco has been owned by DBSI Inc. and, as such, its management has closely tracked the management of DBSI Inc.

163.     Douglas Swenson has served on the board of directors of Master Leaseco and has served as the most senior executive officer of Master Leaseco throughout its existence.

164.     Mayeron and Hassard consistently served on the board of directors of Master Leaseco from its formation in 2004 until February 2009, at which time Douglas Swenson became the sole director.

165.     Hassard served as senior executive officer of Master Leaseco until February 2009.

166. Master Leaseco's records were grossly inadequate and its corporate formalities unobserved. The board of directors did not conduct meetings regarding business management and operations nor did they consent to or authorize the majority of the actions of Master Leaseco with any formality.

167. No consents were granted in connection the Master Leaseco's business operations, including that no consents were granted with respect to the granting or receipt of loans from other DBSI Companies.

**(4)    FOR 1031 LLC**

168. FOR 1031 was formed for the purpose of acquiring and selling improved real estate to TIC Investors through the Real Estate Channel.

169. Since its formation, FOR 1031 has been managed and controlled by Douglas Swenson, Var Reeve and Bringhurst.

170. Effective January 1, 2004, Douglas Swenson became the majority shareholder of FOR 1031.

171. From January 1, 2004 until March 15, 2006, FOR 1031 was owned by Douglas Swenson and Var Reeve. But, on March 15, 2006, Douglas Swenson and Var Reeve contributed their interests in FOR 1031 to DBSI Properties Inc. ("DBSI Properties") in exchange for ownership interests in DBSI Properties.

172. From March 15, 2006 to April 1, 2008, DBSI Properties was owned by Douglas Swenson, Var Reeve and Bringhurst.

173. In 2008, Douglas Swenson, Var Reeve and Bringhurst exchanged their indirect ownership interests in FOR 1031 for additional interests in DBSI Inc. and all shares of FOR 1031 came to be owned by Spectrus.

174. FOR 1031 was intimately interwoven with DBSI Inc.

175.    For example, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused DBSI Inc. to often act as the guarantor of loans from third parties to FOR 1031.  DBSI Inc. established, funded and owned subsidiaries that acted as the master tenants in connection with each of the master leases placed on real estate projects sponsored by FOR 1031.  Master Leaseco made numerous loans to wholly owned subsidiaries of FOR 1031.  FOR 1031 made capital transfers to Master Leaseco.

176.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson did very little to maintain the separateness of FOR 1031.

177.    FOR 1031 company records are minimal and reflect only one meeting of the board of managers throughout its existence.

178.    There are no documented consents or authorizations by the board of managers regarding the acquisition or ownership of assets by FOR 1031 or its financing activities.

179.    The operations of FOR 1031 and any business decisions and undertakings were taken without any formal member or management consent.

180.    Due to their omnipresent power over FOR 1031, Douglas Swenson, Var Reeve, and Bringhurst controlled and/or were generally aware of the fraudulent misrepresentations and omissions made by FOR 1031 in various DDBs, as hereinafter defined.

181.    In his April 27, 2006 interview with the Securities and Exchange Commission, Douglas Swenson noted that "top management from all various members of the DBSI Group" had "regular meetings" to discuss major issues.  By "top management," Douglas Swenson meant management "not only of FOR 1031, but also some of the DBSI entities."

**(5)**     **Spectrus**

182.    Spectrus was created for the purpose of sponsoring whole property, single buyer real estate transactions.

183.    Spectrus was, throughout its existence, wholly owned by DBSI Inc.

184.    Throughout its existence, Douglas Swenson was Spectrus' sole director.

185.    From Spectrus' inception to February 3, 2009, Bringhurst acted as Spectrus' President and Secretary, at which point Douglas Swenson assumed those positions.

186.    Jeremy Swenson and David Swenson have been Spectrus' Assistant Secretaries since its inception.

187.    There are little to no documented consents or authorizations by the board of directors regarding any Spectrus activities.

188.    The operations of Spectrus and any business decisions and undertakings were taken with little to no formal member or management consent.

189.    Due to their omnipresent power over Spectrus, Douglas Swenson, Bringhurst, Jeremy Swenson, and David Swenson controlled and/or were generally aware of the fraudulent misrepresentations and omissions made by Spectrus in various DDBs, as hereinafter defined.

**(6)**     **DBSI Investments**

190.    DBSI Investments is a limited partnership that is a holding company for other DBSI Companies.

191.    The majority of the interests in DBSI Investments are owned by DBSI Inc., with other remaining interests owned by Douglas Swenson, Mayeron, Hassard and Mott.

192.    Foster and Bennett are former owners of DBSI Investments.

193.    Accordingly, DBSI Inc. controlled DBSI Investments, and Douglas Swenson controlled them both.

194.     Douglas Swenson was the managing partner of DBSI Investments with the management authority to control, manage and direct all activities of the partnership.

195.     DBSI Investments owns interests in Stellar and Western Technologies.

196.     DBSI Investments received substantial funding from other DBSI Companies.

197.     Nevertheless, DBSI Investments has been insolvent since at least 2001 due to the continued and growing losses of its interests in other entities, such as Stellar and the Technology Companies, and due to its unjustified distributions to DBSI Investments' General Partners.

198.     As of December 31, 2008, DBSI Investments owed over $101 million to DRR.

199.     There does not appear to be any corresponding benefit or offset for these monies advanced to DBSI Investments by DRR.

200.     Transfers made to and from DBSI Investments were made without regard for an equivalent exchange value.

201.     DBSI Investments was the primary conduit used to make distributions to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

202.     DBSI Investments also served as a pipeline of commingled funds from DRR and other DBSI Companies to Stellar and the Technology Companies.

203.     DBSI Investments maintained few corporate formalities.

**(7)     Stellar**

204.     Stellar is a non-operational holding company that owns interests in the Technology Companies.

205.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson directly or indirectly own the majority of Stellar.

206.    The control and management of Stellar closely tracks the management of DBSI Inc.

207.    Douglas Swenson, Hassard, Mayeron, Mott, Foster, Var Reeve and Bringhurst have served or continue to serve on Stellar's board.

208.    Stellar functioned as a conduit for the transfer of the commingled funds of the DBSI Companies to the Technology Companies.

209.    In total, Stellar received at least $194 million from various DBSI Companies and made loans of approximately $120 million to the Technology Companies.

210.    None of those funds were ever paid back to the loaning DBSI Companies.

211.    Stellar was never solvent, never received any return on its investments in the Technology Companies, and never repaid any of the funds it borrowed from the DBSI Companies.

212.    The foregoing organizational structure, confirms many of the numerous findings of the Bankruptcy Court which, after extensive review of the evidence, stated:

- "DBSI ran its businesses and entities as a unified enterprise under common ownership and control. A small group of insiders employed that control to raise cash, commingle it, and then distribute it as needs presented, without regard for source or restrictions on use. The practice of running DBSI as a unified enterprise caused investors to rely upon the purported financial strength and competence of the unified enterprise in deciding to invest in various DBSI projects. The Chapter 11 Trustee's factual investigation revealed transactions of fantastic and tortured complexity. . . . Moreover, a great many transfers of cash and properties between DBSI entities were either constructively or actually fraudulent or otherwise gave rise to claims between the DBSI entities."

- "Here, the funds of the DBSI enterprise are commingled and inter-entity claims and obligations are a hopeless tangle. The ledgers maintained by the various DBSI entities reflect transactions of staggering complexity. Yet, those ledgers do not provide a reliable guide, because the actual movement of funds was frequently quite different than what was recorded. Assets and liabilities were moved between the DBSI enterprise without regard for arms-

length exchanges of value.  Entities loaned money based upon collateral of dubious value.  Funds were commingled and paid out without regard to source.  Important transactions were insufficiently documented."

- "Accountable Reserves, proceeds from the sale of notes and bonds to the Note/Bond/Fund Investors and other revenues were pooled and disbursed based upon the needs of the Debtors at the moment . . . ."

- "Important corporate formalities were frequently ignored."

- "DBSI clearly operated as the alter ego of its Insiders (as such term is defined under Section 101(31) of the Bankruptcy Code).  They operated the entities as a single economic enterprise.  All of the entities were housed in the central DBSI offices, and their boards, officers and/or general partners were mostly the same Insiders.  In addition to the commingling of funds and the use of shared offices, most of the entities shared the same "DBSI" acronym in their names and DBSI management frequently changed the names of various entities (sometimes switching the same name from one entity to another)."

## I.      The Cash Flow Problems of the DBSI Companies

213.    No later than 2004, the DBSI Companies began experiencing substantial cash flow problems.

214.    In 2004, the DBSI Companies began forecasting their anticipated sources and uses of cash.  The purpose of that coordinated forecasting was to provide Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson an overall picture of the cash flow across the DBSI Companies.  That picture was bleak.

215.    When "alarming" concerns regarding the DBSI Companies' cash flow were raised to Bringhurst by Chan (Parmer) Barrieau, DBSI Inc.'s then-accounting manager, Bringhurst transferred the cash forecasting responsibilities from Barrieau to Matthew Duckett.

216.    By no later than 2005, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were causing the DBSI Companies to use Accountable Reserves, a source of funding with limited, stated, permissible

uses, as described *infra*, to fund the DBSI Companies' on-going business operations and to fund distributions to themselves.

217.    And, by no later than November 2006, the DBSI Companies were able to meet their operating expenses only by using money raised from the Funding Entities.

218.    At about that time, as cash needs became more acute, Douglas Swenson, Bringhurst, Var Reeve, Matthew Duckett, David Swenson and Jeremy Swenson began holding weekly cash meetings to review the DBSI Companies' cash needs.  Matthew Duckett communicated the decisions made at the weekly cash meetings to the accounting staff so they could execute them.  These weekly meetings became a key instrument of the Insiders' ongoing conspiracy to defraud Investors and misappropriate funds.

219.    It was at these weekly cash meetings that Douglas Swenson, Bringhurst, Var Reeve, Matthew Duckett, David Swenson and Jeremy Swenson decided how to and implemented mechanisms to divert and distribute money among the DBSI Companies with complete disregard for corporate separateness.

220.    Douglas Swenson made the key cash management decisions and received certain special reports on the cash status not shared even with other Insiders.

221.    The DBSI Companies' cash position worsened in 2007.  In October 2007, TIC sales through the Real Estate Channel were terminated due to pressure from the SEC.  That created a cash crunch because TIC sales through the Real Estate Channel comprised the majority of all TIC sales revenues for the DBSI Companies.

222.    Consequently, the DBSI Companies increased their efforts to identify properties and assets within their control to use as "collateral" in order to "borrow" against the bonds and notes in order to meet operational expenses.

223.    In November 2007, the DBSI Companies' revenue was insufficient to cover its operating needs without borrowing from the Bond Corps. and Note Corps.

224.    But, in February 2008, the 2008 Notes Corp. began selling notes, raising over $89 million from Investors who were unaware that this sale of the 2008 Notes was little better than an outright theft.  The investment was doomed from inception, and Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew it.

225.    Despite this precarious financial condition, the DBSI Companies, at the direction of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, continued to make irresponsible and self-serving spending decisions.

## J.    The Insiders Efforts to Raise Capital

226.    In order to loot the DBSI Companies, the Insiders needed funds to loot. Accordingly, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson endeavored to secure funding from outside Investors through two primary avenues:  (1) the Internal Funding Programs; and (2) TIC offerings.

227.    However, and unbeknownst to the Investors, in order to cover up the DBSI Companies substantial cash flow problems and to assure Investors of the soundness of the DBSI Companies and the investment opportunities it offered, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knowingly made a series of material, false misrepresentations and omissions.  Accordingly, the public statements made by the DBSI Companies and approved by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson

43

with respect to the investment opportunities catalogued herein were replete with material, knowingly false misrepresentations and material omissions.

228.    Without those knowing, materially false misrepresentations and omissions -- and the continued funding at the expense of injured Investors that it engendered -- DBSI's downward spiral would have accelerated, thrusting DBSI into bankruptcy at a much earlier date and wresting control of DBSI from Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

**(8)    Internal Funding Programs**

229.    A major source of cash for the DBSI Companies was the sale of bonds, notes, and funds under SEC Regulation D, which exempts certain securities offerings from the registration requirements of the Securities Act.

230.    Investors purchased interest in the Funding Entities through specifically formed limited liability companies.

231.    The terms of these offerings were set forth in PPMs.

232.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused these PPMs, as well as any offering circulars, property services, other offering materials, and/or any materials used to market funds, notes, and/or bonds by the DBSI Companies, to be disseminated to Investors by and through the mail and/or wires, affecting interstate commerce.

233.    These investments offered above-average rates of returns for these types of investments.  The DBSI Companies typically guaranteed the loans of Investor money made to entities by these funding programs, making them deceptively appear to be attractive investment opportunities for Investors, but resulting in tremendous long-term financial obligations for the DBSI Companies.

234.     Beginning in 2004, at the behest of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and to quench their Ponzi scheme's growing thirst for other people's money, the size and frequency of the Funding Entities offerings began to increase.

235.     The stated purpose of most of the Funding Entities' offerings was to raise money that could be loaned or otherwise provided to the DBSI Companies for investment purposes.

236.     But, in reality, the funds were used to prop up the failing DBSI Companies by making cash available to support current operations and obligations, and for misappropriation by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

237.     The Internal Funding Programs' offerings had restrictions on how Investor proceeds were to be used.  These restrictions generally related to permissible uses of the money and, if the money was to be loaned, on what terms and with what security.

238.     The DBSI Companies offered the Funding Entities' instruments through securities broker/dealers.  The primary source of the information about these offerings were the accompanying PPMs.

239.     The offering materials that Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused to be supplied to Investors were materially misleading and undertakings were made with no realistic expectation of complying with them.

240.     On August 9, 2005, through a Confidential PPM, 2005 Secured Notes Corp. made an offering of $20 million in 8.15 percent notes.

45

241.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the 2005 Secured Notes Corp. PPM to be disseminated to Investors by and through the mail and/or wires, affecting interstate commerce.

242.    Each prospective purchaser was required to represent in writing that he or she "has received, read and fully understands" the PPM and relied on the information set forth therein.

243.    The 2005 Secured Notes Corp PPM stated that

> [P]roceeds from the sale of the Notes will provide monies to make loans to [DBSI Inc.], and certain other subsidiary entities controlled by [DBSI Inc.] . . .  The proceeds of any Loans to Entities will be used only to acquire, develop and finance real estate properties prior to their sale, resale, third-party financing or syndication.

244.    At the time the 2005 Secured Notes Corp. PPM was issued, there was no reasonable likelihood that loans made by the 2005 Secured Note Corp. to various DBSI entities would ever be repaid.  The DBSI Companies as a whole had severe cash flow problems and operating losses such that the entities, most of which were insolvent, would never generate sufficient revenue to satisfy DBSI's obligations to the 2005 Secured Notes Corp. nor to the Investors who invested in these entities.

245.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to use the proceeds from the 2005 Secured Notes Corp. offering only for the acquisition, development, or financing of real estate properties.

246.    Despite the representations in the 2005 Secured Notes Corp. PPM, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the funds raised by the 2005 Secured Notes Corp. PPM to

be used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

247.    The 2005 Secured Notes Corp. PPM further provided that the proceeds from the sale of the notes would be held in a separate account and would not be commingled with DBSI's financial and business accounts nor the accounts of any DBSI affiliates.

248.    That too was a knowing, material, false misrepresentation.

249.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson intended to use and did use proceeds to prop up the failing DBSI Companies by commingling the cash with that of other DBSI entities and using the cash available to support current operations and obligations of the DBSI enterprise, and to line the pockets of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

250.    The 2005 Secured Notes Corp. PPM also stated that to qualify for an intercompany loan pursuant to the offering, "the aggregate Loan to Value Ratio of the Loans must not exceed 85% based on fair market values of the properties of each borrower securing Loans as collateral."

251.    But, this 85% LTV was not adhered to because the collateral used to support the LTV was knowingly overvalued at the behest of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

252.    Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused real estate valuations to be placed on

properties which were not reflective of actual value, but with the objective of causing ostensible compliance with LTV requirements of the respective Funding Entities.

253.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson intentionally and fraudulently set the value of the collateral at whatever figure was necessary to support the need for internal borrowing.

254.    The use of the term "secured" was also a knowing, fraudulent misrepresentation because the notes that were the subject of 2005 Secured Notes Corp. PPM were not "secured" in any sense of the word.

255.    On October 27, 2005, through a Confidential PPM, DBSI Denton Court LLC ("Denton Court LLC"), a wholly-owned subsidiary of DBSI Inc., made an offering of $2.82 million in 9 percent notes.

256.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the Denton Court PPM to be disseminated to Investors by and through the mail and/or wires, affecting interstate commerce.

257.    The Denton Court LLC PPM stated that "[p]roceeds from the sale of the Notes will provide monies for use in the development of the Denton Court Retail Center Project."

258.    But, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson never intended to use the proceeds from the Denton Court LLC offering only for the development of the Denton Court Retail Center Project.

259.    Rather, the proceeds were used to prop up the failing DBSI Companies by making cash available to support current operations and obligations, and were misappropriated by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

260.    On October 4, 2006, through a Confidential PPM, 2006 Secured Notes Corp., made an offering of $50 million in 8.41 percent notes.

261.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the 2006 Secured Notes Corp. PPM to be disseminated to Investors by and through the mail and/or wires, affecting interstate commerce.

262.    As with the 2005 Secured Notes, Investors were required to represent that they had reviewed and relied on the information set forth in the PPM and that the decision to invest in the 2006 Secured Notes was based on the representations in the PPM.

263.    The 2006 Secured Notes Corp. PPM stated that

> [P]roceeds from the sale of the Notes will provide monies to make loans to [DBSI Inc.].  The proceeds from the sale of the Notes will provide monies to make loans to [DBSI Inc.], and certain other subsidiary entities controlled by [DBSI Inc.]. . . .  The proceeds of any Loans to Entities will be used only to acquire, develop and/or finance real estate properties prior to their sale, resale, third-party financing or syndication.

264.    At the time the 2006 Secured Notes Corp. PPM was issued, there was no reasonable likelihood that loans made by the 2006 Secured Note Corp. to various DBSI entities would ever be repaid.  The DBSI Companies as a whole had severe cash flow problems and operating losses such that the entities, most of which were insolvent, would never generate sufficient revenue to satisfy DBSI's obligations to the 2006 Secured Notes Corp. or to the Investors who invested in these entities.

265.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson never intended to use proceeds from the 2006 Secured Notes Corp offering only to acquire, develop and/or finance real estate properties.

266.    Despite the representations in the 2006 Secured Notes Corp. PPM, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the funds raised by the 2006 Secured Notes Corp. PPM to be used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

267.    The 2006 Secured Notes Corp. PPM further provided that the funds raised would be maintained in a separate account and would not be commingled with the funds of DBSI and its affiliates.

268.    That too was a knowing, material, false misrepresentation.

269.    Rather, the proceeds were used to prop up the failing DBSI Companies by making cash available to support current operations and obligations, and were misappropriated by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

270.    The 2006 Secured Notes Corp. PPM also stated "[t]o receive a Loan in accordance with the Loan requirements, an Entity must meet certain Loan requirements including a maximum overall 85% Loan to Value Ratio."

271.    But, this 85% LTV was not adhered to because the collateral used to support the ratio was intentionally and fraudulently overvalued.

272.    The use of the term "secured" was also a knowing, fraudulent misrepresentation because the notes that were the subject of 2006 Secured Notes Corp. PPM were not "secured" in any sense of the word.

273.     On February 6, 2008, through a Confidential PPM, 2008 Notes Corp. made an offering of $50 million (with the ability to increase to $90 million) in 9.5 percent notes.

274.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the 2008 Notes Corp. PPM to be disseminated to Investors by and through the mail and/or wires, affecting interstate commerce.

275.     The 2008 Notes Corp. offering raised $89.3 million.

276.     The 2008 Notes Corp. PPM stated that:

> [P]roceeds from the sale of the Notes will be used to lend monies (the "loans") to current and future Entities wholly owned by [DBSI Inc.] (the "Guarantor") and certain of its subsidiaries that are controlled entities (together, the "Entities"). The proceeds of the Offering will be used to make Loans to Entities to (i) acquire, rehabilitate, entitle, develop and/or finance real estate assets prior to their sale, resale, third-party financing or syndication and (ii) to finance or refinance non-real estate Entities.

277.     At the time the 2008 Notes Corp. PPM was issued, there was no reasonable likelihood that loans made by the 2008 Notes Corp. to various DBSI entities would ever be repaid. The DBSI Companies as a whole had severe cash flow problems and operating losses such that the entities, most of which were insolvent, would never generate sufficient revenue to satisfy DBSI's obligations to the 2008 Notes Corp. or to the Investors who invested in these entities.

278.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson never intended to use the proceeds from the 2008 Notes Corp offering solely to acquire, rehabilitate, entitle, develop or finance real estate nor to finance or refinance non-real estate entities.

279.     Despite the representations in the 2008 Notes Corp. PPM, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the funds raised by the 2008 Notes Corp. PPM to be used for DBSI's

general corporate purposes to satisfy the cash needs at a particular moment, including servicing

the debt of earlier Investors and making distributions to Douglas Swenson, Hassard, Mayeron,

Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

280.    By way of example, over $27 million in proceeds from the 2008 Notes Corp.

offering was loaned to Stellar.  However, more than $18 million of that money was promptly

transferred to DBSI Inc.'s checking and operating accounts, at which point it was used for

general operating expenses, payroll taxes and personal state income taxes owed by Douglas

Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and

David Swenson.  The $18 million transfer from Stellar to DBSI was obscured by a series of

misleading journal entries, often using DRR as an intermediary.

281.    Moreover, Stellar never had the means to repay the $27 million loan in that it was

hopelessly insolvent as far back as 2004 and had no hope of repaying even a small portion of this

loan.

282.    In addition, in late October 2008, more than $452,000 from the 2008 Notes Corp.

offering was used to make interest payments to the 2008 Notes Corp. noteholders.

283.    The 2008 Notes Corp. PPM further provided that the funds raised would be

maintained in a separate account and would not be commingled with the funds of DBSI and its

affiliates.

284.    That too was a knowing, material, false misrepresentation.

285.    Rather, the proceeds were used to prop up the failing DBSI Companies by making

cash available to support current operations and obligations, and were misappropriated by

Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy

Swenson and David Swenson.

286.    The 2008 Notes Corp. PPM also stated that "[t]o receive a Loan in accordance with the Loan requirements, an Entity must meet certain Loan requirements including a maximum overall 85% Loan to Value Ratio."

287.    But, this 85% LTV was not adhered to because the collateral used to support the ratio was intentionally and fraudulently overvalued.

288.    Finally, the 2008 Notes Corp. PPM stated that DBSI Inc., the offering's guarantor, had "a net worth of more than $105 million," a deliberately gross exaggeration.

289.    That too was a knowing, material, false misrepresentation.

290.    In addition, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson made various knowing, material, misstatements with respect to the purpose and use of proceeds raised in fund, note, and bond offerings that were contained in numerous other PPMs and offering documents ("Funding Entity PPMs").  A list identifying the Funding Entity PPMs and their respective misstatements with respect to the purpose and use of proceeds raised is attached hereto as Exhibit F and incorporated by reference herein.

291.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to use the proceeds of the Funding Entity PPMs for their stated purpose.

292.    Rather, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the funds raised by the Funding Entity PPMs to be used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment and to prop up the failing DBSI Companies by making cash available to support current operations and obligations, and for misappropriation by Douglas Swenson,

Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

293.   At the time the Funding Entity PPMs were issued, there was no reasonable likelihood that loans made pursuant to the Funding Entity PPMs to various DBSI entities would ever be repaid.  The DBSI Companies as a whole had severe cash flow problems and operating losses such that the entities, most of which were insolvent, would never generate sufficient revenue to satisfy DBSI's obligations to the Investors who purchased investments based on the representations in the Funding Entity PPMs.

294.   Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused various knowing, material misstatements with respect to the LTV to be included in the Funding Entity PPMs.  A list identifying the Funding Entity PPMs and their respective misstatements with respect to the purpose and use of proceeds raised is attached hereto as Exhibit F and incorporated by reference herein.

295.   It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to comply with the LTVs identified in the Funding Entity PPMs.

296.   Rather, the LTVs identified in the Funding Entity PPMs were not adhered to because the collateral used to support the ratio was intentionally and fraudulently overvalued at the behest of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

297.   Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused real estate valuations to be placed on

properties which were not reflective of actual value, but with the objective of causing ostensible compliance with LTV requirements of the respective Funding Entity PPMs.

298.   Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused many Funding Entity PPMs to include misstatements regarding the use of the offering's proceeds for operating expenses and/or commingling of funds.

299.   For example, in a PPM dated March 1, 2001, DBSI 2001A Funding Corp. stated that: "None of the proceeds [from the offering] will be used for the Company's operating expenses or expenses associated with this Offering."

300.   Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused similar material, knowing misstatements regarding the use of offering proceeds for operating expenses and/or commingling of funds to be included in other Funding Entity PPMs.  A list identifying such Funding Entity PPMs and their respective misstatements with respect to the use of proceeds for operating expenses and/or the commingling of funds is attached hereto as Exhibit F and incorporated by reference herein.

301.   It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to not use the proceeds from the Funding Entity PPMs for operating expenses and/or not to commingle the funds.

302.   Rather, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the funds raised by the Funding Entity PPMs to be used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment and to prop up the failing DBSI Companies by making cash available to

support current operations and obligations, and for misappropriation by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

303.   In addition, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the funds raised by the Funding Entity PPMs to be commingled with the funds of other DBSI Companies.

304.   Finally, Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the Funding Entity PPMs to contain misstatements regarding the net worth of DBSI Inc.

305.   A list identifying such Funding Entity PPMs and their respective misstatements with respect to the net worth of DBSI Inc. is attached hereto as Exhibit F and incorporated by reference herein.

306.   The stated net worths of DBSI Inc. identified in Exhibit F were knowing, material, gross exaggerations made or caused to be made by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

307.   The misstatements identified in the Funding Entity PPMs were relied on by Investors to their detriment.

308.   Douglas Swenson, Mayeron, Hassard, Mott, Var Reeve, Foster, Bennett, Ellison, Bringhurst, David Swenson, and Jeremy Swenson caused the misstatements identified in the Funding Entity PPMs to be disseminated to Investors by and through the mail and/or wires, affecting interstate commerce.

309.   In addition, with respect to at least one Funding Entity PPM, the DBSI Real Estate Funding Corp. 9.0% PPM, Douglas Swenson admitted in his June 28, 2005 testimony to

the Securities and Exchange Commission that that PPM was prepared internally and that he "would have had a big role in it . . . [and] would have been the one responsible for it."

310.     On previously identified information and belief, Jeremy Swenson and David Swenson reviewed, approved, and were generally aware of the contents, including the material misrepresentations and omissions, of the Funding Entity PPMs and other PPMs identified in this section.

311.     On previously identified information and belief, Mayeron was generally aware of the contents of the Funding Entity PPMs and other PPMs identified in this section. In addition, invoices of the law firms Moffatt Thomas Barrett Rock & Fields, CHTD and Hirschler Fleisher, , demonstrate that Mayeron was generally aware of the contents, including the material misrepresentations and omissions, contained in the DBSI Diversified Realty REIT, Inc. PPM.

312.     Douglas Swenson approved all Funding Entity PPMs and other PPMs identified in this section.

313.     Hassard, Mayeron, Mott, and Foster were specifically made aware of the contents of the Funding Entity PPMs.

**(9)     TIC Offerings-**

314.     The syndication, marketability and sale to Investors of TIC interests in commercial real estate rested on (i) their qualification under Internal Revenue Code § 1031 as a tax minimization device for sheltering capital gains in commercial real estate, and (ii) on rent proceeds from the properties themselves, which were backed by a guarantee from DBSI Inc.

315.     The terms of TIC offerings were set forth in PPMs (for securities offerings) and due diligence binders ("DDBs") (for real estate offerings).

316.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the TIC PPMs and DDBs to be disseminated to Investors by and through the mail and/or wires, affecting interstate commerce.

317.     Douglas Swenson reviewed and signed off on each and every TIC PPM and DDB before it went to print.

318.     The DBSI Companies misrepresented to Investors that the TIC investments would generate a generous and steady stream of revenue through rental income.

319.     Such guarantees of investment returns created a heavy drain on the funds of the DBSI Companies, because few of the properties generated sufficient cash flow to meet all obligations to Investors.  Accordingly, TIC properties did not generate sufficient cash flow to cover the operation's long-term obligations to the Investors.

320.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and the DBSI Companies made the purchase of TIC interests attractive to Investors by implementing a Master Lease Structure in connection with the real estate assets.

321.     Pursuant to the Master Lease Structure, improved TIC projects were leased by Investor owners to a DBSI or FOR 1031-related subsidiary pursuant to a long-term master lease agreement.  The master tenant received and retained all income from the property.  In exchange, the master tenant paid the master landlord pre-set master lease payments throughout the period of the master lease.  Accordingly, all profits generated by the assets, if any, were retained by the master tenant, a DBSI-related entity.  Conversely, the DBSI Companies absorbed the loss for any assets generating income that was not sufficient to cover the master lease payments and other property related expenses.

322.     The Master Lease Structure was attractive to Investors because of the false financial assurances they were provided by the DBSI Companies regarding the ability of the DBSI Companies and its affiliates to satisfy all master lease obligations.

323.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson falsely assured Investors of the financial strength of the master leasee.

324.     DBSI Inc. also guaranteed the master lease payment obligations to the TIC Investors in connection with most master leases.  Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson continuously falsely assured Investors of the financial ability of DBSI Inc. to make the master lease obligations of both FOR 1031 and DBSI-related master leasees should it be necessary.

325.     At Douglas Swenson's behest, and to assure Investors that Master Leaseco could satisfy its financial obligations under the many master leases, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson represented that Master Leaseco would maintain certain capitalization requirements.

326.     Provisions were included in the master leases that touted this purported capitalization.

327.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson made statements and caused statements to be made to Investors that deliberately and falsely inflated DBSI Inc.'s net worth.

328.     A booklet was published and distributed by Spectrus entitled "Not All Cash Flows are Created Equal, A Basic Guide to Analyzing Cash Flow Projections for Investment Real

Estate" ("Not All Cash Flows") emphasized the importance of a heavily capitalized master lease company backed by a corporate guarantee from a high net worth entity.

329.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused Not All Cash Flows, an ostensibly generic publication, to contain statements that were intended to be representations regarding the facts and attributes of DBSI and its related companies.

330.    In other words, Not All Cash Flows was a carefully crafted component of the overall scheme to defraud as it was designed to -- and did -- induce Investors to be assured regarding the soundness of their investment in DBSI related entities.

331.    Specifically Not All Cash Flows encouraged Investors to "[i]dentify a master tenant with larger capitalization (ideally in the form of cash or other hard assets rather than a letter of credit) and a portfolio of properties" and to "[l]ook for a corporation that has real and substantial assets (seen in a balance sheet)" to provide the corporate guarantee.

332.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused similar misrepresentations to be made in a document produced by DBSI Securities Corporation entitled "10 Reasons to Invest in a DBSI Master Lease Program" ("10 Reasons").

333.    Among numerous other reasons related to DBSI's financial soundness, 10 Reasons stated that "[t]he DBSI Master LeaseCo is asset backed by $15.4 million in unaudited assets and is guaranteed by DBSI [Inc.] which has an annual unaudited net worth of $84.7 million."

334.    The foregoing statements regarding MasterLeaseco's "unaudited assets" and DBSI Inc.'s net worth were gross exaggerations.  Those knowing, materially false statements

included in 10 Reasons, were relied on by Investors and disseminated through the mails and wires, affecting interstate commerce.

335.    Upon information and belief, namely invoices from the law firm of Hirschler Fleischer, Mayeron was aware of the contents of 10 Reasons, including its knowing, material, fraudulent misrepresentations.

336.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson made DBSI's Master Lease Structure even more attractive to Investors by assuaging Investor concerns regarding the necessity for additional capital contributions to support and maintain their assets during their period of ownership.

337.    At first, capital improvements, repairs, tenant and leasing costs, and other expenses in connection with the investment assets were paid by the DBSI Companies which would set up a receivable from the property to be collected at the sale of the property.

338.    Investors relied on the financial strength of DBSI to be able to pay those costs over the term of the master lease.

339.    However, revenue generated from the sale of new TIC interests had to be applied to cover the continually increasing obligations in connection with the master leases.

340.    In 2005, the DBSI Companies, at the behest and direction of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, began routinely designating no less than five percent of the funds from Investors at closing to be set aside to pay costs and expenses in connection with the asset over the term of the master lease.  The specified, authorized uses of the Accountable Reserves included tenant improvements, leasing commission, capital improvements for improved real estate, management fees, taxes, insurance and other related fees for unimproved real estate.

341.    The term "Accountable Reserves" was created for and/or by the DBSI Companies by Mick.

342.    The concept of "Accountable Reserves" was designed by Mick and the DBSI Companies to assuage the concerns of broker/dealers.

343.    More specifically, by using the Accountable Reserves concept and excluding any Accountable Reserves from the purchase price paid by Investors, DBSI was able to lower the purchase price paid by Investors in an attempt to make DBSI's mark-up appear smaller.

344.    After no later than August 15, 2005, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused Accountable Reserves to be collected in connection with almost every real estate project sold by the DBSI Companies.

345.    Accountable Reserves were collected based on Investors' *pro rata* share of ownership in the property as part of the purchase price for a TIC interest.

346.    With respect to the amount of Accountable Reserves collected on a given offering, Jeremy Swenson acknowledged in his June 19, 2009 interview with the Examiner, that Douglas Swenson "would typically determine what percentage of the property purchase price was [A]ccountable [R]eserve."

347.    Brian Olsen confirmed this in his September 21, 2009 interview with the Examiner, adding that Douglas Swenson consulted with Jeremy Swenson in determining how much in Accountable Reserves to collect.

348.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson falsely assured Investors that the collection of such Accountable Reserves would ensure that the investment would be properly maintained over

the course of the master lease with a reduced risk of being required to invest additional funds for improvement or maintenance of the asset.

349.    Moreover, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson falsely assured Investors that Accountable Reserves would provide an incentive for the master tenant to improve the property.

350.    For example in the "Not All Cash Flows" document, Spectrus stated, that

> Accountable Reserves:   All $750,000 of reserves should be made accountable, meaning that the reserves will be returned to the owner to the extent that they are not used in the operation of the property.   The reserve should also be allowed to only cover actual capital and leasing costs.   This ensures that the master tenant has the incentive to use the reserves to add value to the property.   The master tenant should not be able to use these reserves to supplement its master lease rent obligations as this creates a significant conflict of interest.

351.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical language to be used in a booklet entitled "How to Analyze Cash Flow Projections in a PPM, A Basic Guide to Analyzing Tenant-In-Common Real Estate Securities Investments" ("How to Analyze Cash Flows") distributed by DBSI Securities Corporation.

352.    Like Not All Cash Flows, although ostensibly a generic publication, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused How to Analyze Cash Flows to contain statements that were intended to be representations regarding the facts and attributes of DBSI and its related companies.

353.    In other words, How to Analyze Cash Flows was a carefully crafted component of the overall scheme to defraud as it was designed to -- and did -- induce Investors to be assured regarding the soundness of their investment in DBSI related entities.

354.    Those knowing, materially false statements that, at the behest of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were included in Not All Cash Flows and How to Analyze Cash Flows, were relied on by Investors and disseminated through the mails and wires, and affected interstate commerce.

355.    Douglas Swenson's, Hassard's, Mayeron's, Mott's, Bennett's, Foster's, Var Reeve's, Bringhurst's, Jeremy Swenson's and David Swenson's false assurances to Investors were not limited to marketing materials.  Rather, assurances regarding the proper use of Accountable Reserves were also in PPMs and other offering materials distributed by the DBSI Companies.

356.    Douglas Swenson approved every PPM, DDB, and other offering materials.

357.    On information and belief, David Swenson approved every PPM and DDB.  A document entitled "PPM Signoff Sheet" indicates that David Swenson, along with Douglas Swenson, were required to approve and sign off on every PPM.  David Swenson also received "draft" PPMs prior to their finalization, asking him to sign off on such PPMs prior to their finalization.

358.    On information and belief, Jeremy Swenson approved every PPM and DDB.  Emails reveal that Jeremy Swenson received "draft" PPMs prior to their finalization and that he was required to sign off on PPMs prior to their finalization.

359.    On information and belief, Mayeron approved every PPM and DDB.  Emails reveal that Mayeron received "draft" PPMs prior to their finalization and that he was required to sign off on PPMs prior to their finalization.

360.    Although the exact language used in these representations varied slightly from one set of offering materials to another, the substance was the same.

361.    For example, a May 29, 2007 Confidential PPM concerning TIC interests in Goshen Village ("Goshen Village PPM"), DBSI Goshen Village LLC, an entity wholly owned and managed by DBSI Inc., stated that:

>   Accountable reserves for tenant improvements and leasing commissions [and Capital Expenses] will be repaid to the Purchasers to the extent not used in the operation of the Property.  A portion of the Reserves may be allocated to the Lender to cover reserves required by the Lender.

362.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to that quoted from the Goshen Village PPM to be used in other PPMs (collectively with the Goshen Village PPM, the "Category 1 PPMs").  A list identifying the Category 1 PPMs is attached hereto as Exhibit G and incorporated by reference herein.

363.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to use the Accountable Reserves from the Category 1 PPMs only for tenant improvements and leasing commissions.

364.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to return any unused Accountable Reserves from the Category 1 PPMs to the TIC Investors.

365.    Rather, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were aware of DBSI's extraordinary cash needs, as detailed above, and deliberately misled Investors into believing that Accountable Reserves would be "accountable" and "reserved" when, in fact, each of them knew and intended

from the outset that Investors' Accountable Reserves would be commingled with company funds, used to pay pre-existing debts, and used to pay themselves.

366.    Despite stating that the reserves would be "[a]ccountable" and leading Investors to believe that the funds would be segregated, it was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to segregate the Accountable Reserves from the Category 1 PPMs.

367.    In addition, in an October 5, 2005 Confidential PPM concerning TIC interests in Lakeview and Sojourn Centers ("Lakeview Sojourn PPM"), DBSI Lakeview Sojourn LLC, an entity wholly owned and managed by DBSI, Inc., stated:

> Accountable reserves for tenant improvements and leasing commissions will be repaid to the Purchasers to the extent not used in the operation of the Property.

368.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to that quoted from the Lakeview Sojourn PPM to be used in other PPMs (collectively with the Lakeview Sojourn PPM, the "Category 2 PPMs").  A list identifying the Category 2 PPMs is attached hereto as Exhibit G and incorporated by reference herein.

369.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to use the Accountable Reserves from the Category 2 PPMs only for tenant improvements and leasing commissions.

370.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to repay any unused Accountable Reserves from the Category 2 PPMs to the TIC Investors.

371.    Rather, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were aware of DBSI's extraordinary cash

needs, as detailed above, and deliberately misled Investors into believing that Accountable

Reserves would be "accountable" and "reserved" when, in fact, each of them knew and intended

from the outset that Investors' Accountable Reserves would be commingled with company

funds, used to pay pre-existing debts, and used to pay themselves.

372.    Despite stating that the reserves would be "[a]ccountable" and leading Investors

to believe that the funds would be segregated, it was never the intent of Douglas Swenson,

Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David

Swenson to segregate the Accountable Reserves from the Category 2 PPMs.

373.    In addition, a August 12, 2008 Confidential PPM concerning TIC interests in

Belton Town Center ("Belton Town Center PPM"), disseminated by Belton Town Center

Acquisition LLC, an entity wholly owned and managed by DBSI, stated that:

> Accountable Reserves for tenant improvements, leasing commissions and
> capital improvements cannot be used for operations, and will be repaid to
> the Purchasers to the extent not used [in the operation of the Property].  A
> portion of the Reserves may be allocated to the lender to cover reserves
> required by the Lender.

374.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve,

Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to

that quoted from the Belton Town Center to be used in other PPMs (collectively with the Belton

Town Center PPM, the "Category 3 PPMs").  A list identifying the Category 3 PPMs is attached

hereto as Exhibit G and incorporated by reference herein.

375.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett,

Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to use the Accountable

Reserves from the Category 3 PPMs only for tenant improvements, leasing commissions, and

capital improvements.

376.     It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to not use the Account Reserves from the Category 3 PPMs for operations.

377.     Rather, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were aware of DBSI's extraordinary cash needs, as detailed above, and deliberately misled Investors into believing that Accountable Reserves would be "accountable" and "reserved" when, in fact, each of them knew and intended from the outset that Investors' Accountable Reserves would be commingled with company funds, used to pay pre-existing debts, and used to pay themselves.

378.     Despite stating that the reserves would be "[a]ccountable" and leading Investors to believe that the funds would be segregated, it was never the intent of the Insiders to segregate the Accountable Reserves from the Category 3 PPMs.

379.     It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to repay any unused Accountable Reserves from the Category 3 PPMs to the TIC Investors.

380.     A June 20, 2007 Confidential PPM concerning TIC interests in Loop 1604 ("Loop 1604 PPM"), DBSI Loop 1604 LLC, an entity wholly owned and managed by DBSI Inc., stated that:

> Accountable reserves represent funds paid to the Company by tenant in common buyers for future building improvements and leasing commissions related to the real estate properties they buy.  As the Company incurs costs related to building improvements and leasing commissions for the specific properties, [the costs are capitalized and][1] the reserves are reduced.  Any reserves remaining at the time the properties are sold are payable to the respective owners.

---

[1] The bracketed language appears in some of the Category 4 PPMs.

381.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to that quoted from the Loop 1604 PPM to be used in other PPMs (collectively with the Loop 1604 PPM, the "Category 4 PPMs").  A list identifying the Category 4 PPMs is attached hereto as Exhibit G and incorporated by reference herein.

382.     It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to use the Accountable Reserves from the Category 4 PPMs only for future building improvements and leasing commissions.

383.     It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to repay any unused Accountable Reserves from the Category 4 PPMs to the TIC Investors.

384.     Rather, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were aware of DBSI's extraordinary cash needs, as detailed above, and deliberately misled Investors into believing that Accountable Reserves would be "accountable" and "reserved" when, in fact, each of them knew and intended from the outset that Investors' Accountable Reserves would be commingled with company funds, used to pay pre-existing debts, and used to pay themselves.

385.     Despite stating that the reserves would be "[a]ccountable," stating that the specific funds would be "reduced," and leading Investors to believe that the funds would be segregated, it was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to segregate the Accountable Reserves from the Category 4 PPMs.

386.    Also, in a June 11, 2008 Confidential PPM concerning TIC interests in Wingfield Village ("Wingfield Village PPM"), DBSI Wingfield Village LLC, an entity wholly owned and managed by DBSI Inc., stated that "Any unused Accountable Reserves will be returned to the Purchasers."

387.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to that quoted above in the Wingfield Village PPM to be used in other PPMs (collectively with the Wingfield Village PPM, the "Category 5 PPMs").  A list identifying the Category 5 PPMs is attached hereto as Exhibit G and incorporated by reference herein.

388.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to return any used Accountable Reserves from the Category 5 PPMs to the TIC Investors.

389.    Rather, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were aware of DBSI's extraordinary cash needs, as detailed above, and deliberately misled Investors into believing that Accountable Reserves would be "accountable" and "reserved" when, in fact, each of them knew and intended from the outset that Investors' Accountable Reserves would be commingled with company funds, used to pay pre-existing debts, and used to pay themselves.

390.    Despite stating that the reserves would be "[a]ccountable" and leading Investors to believe that the funds would be segregated, it was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to segregate the Accountable Reserves from the Category 5 PPMs.

391.    Similar to the Category 1 PPMs, Category 2 PPMs, Category 3 PPMs, Category 4 PPMs, and Category 5 PPMs many due diligence binders ("DDBs") described accountable reserves.

392.    For example, in a 2006 Executive Property Summary regarding the Dacula Medical Center ("Dacula Medical Center DDB"), FOR 1031 stated that:

> Accountable Reserves are amounts included in the Purchase Price that are conveyed by the Seller for the Tenants-in-Common to the NNN Lessee for leasing commissions, tenant improvements, and capital expenditures during the term of the NNN Plus® Lease.   To the extent these Accountable Reserve amounts are not used during the term of the NNN Plus Lease they shall be returned to the Tenants-in-Common.

393.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to that quoted from the Dacula Medical Center DDB to be used in other PPMs and DDBs (collectively with the Dacula Medical Center DDB, the "Category 6 DDBs").  Lists identifying the Category 6 DDBs are attached hereto as Exhibits G and H and incorporated by reference herein.

394.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to use the Accountable Reserves from the Category 6 DDBs only for leasing commissions, tenant improvements, and capital expenditures.

395.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to return any unused Accountable Reserves from the Category 6 DDBs to the TIC Investors.

396.    Rather, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were aware of DBSI's extraordinary cash

needs, as detailed above, and deliberately misled Investors into believing that Accountable

Reserves would be "accountable" and "reserved" when, in fact, each of them knew and intended

from the outset that Investors' Accountable Reserves would be commingled with company

funds, used to pay pre-existing debts, and used to pay themselves.

397.    Despite stating that the reserves would be "[a]ccountable" and leading Investors

to believe that the funds would be segregated, it was never the intent of Douglas Swenson,

Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David

Swenson to segregate the Accountable Reserves from the Category 6 DDBs.

398.    Finally, in the "NNN Plus" lease agreements ("NNN Plus Lease Agreements")

used in connection with improved properties sold by FOR 1031 and its related entities, a

provision stated:

> [A]ny Accountable Reserves . . . shall be available to LESSEE for the
> purposes of funding the construction of required tenant improvements,
> payments of leasing commissions . . . Upon termination of this Lease, all
> Accountable Reserves shall remain the property of the Purchasers in
> accordance with their individual pro rata ownership share in the Property,
> but shall be available to LESSOR or any Successor LESSEE solely for the
> purposes set forth in this Section.

399.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve,

Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to

that quoted from the NNN Plus Lease Agreement to be used in other DDBs (collectively with the

NNN Plus Lease Agreement, the "Category 7 DDBs").  A list identifying the Category 7 DDBs

is attached hereto as Exhibit H and incorporated by reference herein.

400.    It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett,

Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to use the Accountable

Reserves from the Category 7 DDBs only for tenant improvements and leasing commissions.

401.     Rather, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were aware of DBSI's extraordinary cash needs, as detailed above, and deliberately misled Investors into believing that Accountable Reserves would be "accountable" and "reserved" when, in fact, each of them knew and intended from the outset that Investors' Accountable Reserves would be commingled with company funds, used to pay pre-existing debts, and used to pay themselves.

402.     Despite stating that the reserves would be "[a]ccountable," and that the funds "shall be available," and leading Investors to believe that the funds would be segregated, it was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to segregate the Accountable Reserves from the Category 7 DDBs.

403.     It was never the intent of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to have the Accountable Reserves remain the property of the TIC Investors.

404.     Rather, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were aware of DBSI's extraordinary cash needs, as detailed above, and deliberately misled Investors into believing that Accountable Reserves would be "accountable" and "reserved" when, in fact, each of them knew and intended from the outset that Investors' Accountable Reserves would be commingled with company funds, used to pay pre-existing debts, and used to pay themselves.

405.     Despite the knowing, material misrepresentations made and caused to be made by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson that were included in the Category 1 PPMs, Category 2 PPMs,

73

Category 3 PPMs, Category 4 PPMs, Category 5 PPMs, Category 6 DDBs, and Category 7

DDBs, (collectively the "Accountable Reserve PPMs"), Douglas Swenson, Hassard, Mayeron,

Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the

Accountable Reserve funds to be used for DBSI's general corporate purposes to satisfy the cash

needs at a particular moment, including servicing the debt of earlier Investors and making

distributions to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve,

Bringhurst, Jeremy Swenson and David Swenson.

406.    Despite the representations in the Accountable Reserve PPMs, DBSI, Douglas

Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and

David Swenson never intended to return unused funds to the TIC Investors nor limit their use to

those specified in the PPMs and DDBs.

407.    The foregoing statements with respect to the treatment of Accountable Reserves

in the Accountable Reserve PPMs were knowing, material, false misrepresentations relied on by

Investors.

408.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve,

Bringhurst, Jeremy Swenson and David Swenson caused the Accountable Reserve PPMs to be

disseminated to Investors by and through the mail and/or wires, affecting interstate commerce.

409.    DBSI also made representations regarding Accountable Reserves in general

marketing materials distributed to TIC Investors.  For example, the following language appears

in Not All Cash Flows and How to Analyze Cash Flows:

> Accountable Reserves:    All $750,000 of reserves should be made
> accountable, meaning that the reserves will be returned to the owner to the
> extent that they are not used in the operation of the property.  The reserve
> should also be allowed to only cover actual capital and leasing costs.  This
> ensures that the master tenant has the incentive to use the reserves to add
> value to the property.  The master tenant should not be able to use these

reserves to supplement its master lease rent obligations as this creates a significant conflict of interest.

410.    There are no marketing or promotional materials that represented that DBSI could use Accountable Reserves without restrictions.

411.    In an April 24, 2008 email to an Investor, DBSI stated that Accountable Reserves "are your monies, not DBSI's, so you would get them back if they are not spent."

412.    In fact, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson never intended to hold the money separate and to give it back.

413.    Numerous Investors have also represented to the Court that substantively similar representations were made by DBSI.  [*See, e.g.*, Dckt. No. 2079 ("DBSI, through their field representatives, private placement memorandums and their home office personnel have represented to myself and investors across the country that the accountable reserves for each property are to be used for tenant improvements . . . ."); *see also* Dckt. Nos. 1558, 2077, 1892, 2079.]

414.    In communications with Investors, made by the mail and wires, affecting interstate commerce, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, through the DBSI Companies, communicated that Accountable Reserves were not part of the purchase price, but rather were separate and apart from the purchase price.

415.    For example, in a Master Lease Tax Report Letter, Dave Howe, Client Services Manager, wrote that an Investor "should reduce the total purchase price by your share of the reserve to determine your depreciable basis in the property."

416.    The foregoing statements regarding Accountable Reserves were knowing, materially false misrepresentations relied on by Investors.

417.    Moreover, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused numerous PPMs to state that the funds would not be commingled.

418.    For example, the Goshen Village PPM stated that "the funds of the Company will not be commingled with the funds of any other person or entity except for operating revenues from the Property."

419.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to that quoted from the Goshen Village PPM to be used in other PPMs (collectively with the Goshen Village PPM, the "Category A PPMs").  A list identifying the Category A PPMs is attached hereto as Exhibit G and incorporated by reference herein.

420.    Similarly, in a July 28, 2008 Confidential PPM concerning TIC interests in E-470 East ("E-470 East PPM"), DBSI E-470 East LLC, an entity wholly owned and managed by DBSI Inc., stated that "[t]he funds of the Company will not be commingled with the funds of any other person or entity except for operating revenues from the Interest owned by the Company."

421.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to that quoted from the E-470 East PPM to be used in numerous PPMs (collectively with the E-470 East PPM, the "Category B PPMs").  A list identifying the Category B PPMs is attached hereto as Exhibit G and incorporated by reference herein.

422.    The Wingfield Village PPM stated that:  "Except as otherwise authorized herein, neither the Manager nor any of its Affiliates shall have authority to . . . [c]ommingle the Company funds with those of any other person or entity" subject to certain exceptions.

423.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to that quoted from the Wingfield Village PPM to be used in other PPMs (collectively with the Wingfield Village PPM, the "Category C PPMs").  A list identifying the Category C PPMs is attached hereto as Exhibit G and incorporated by reference herein.

424.    Likewise, the Loop 1604 PPM stated "[t]he funds of DBSI Units will not be commingled with the funds of any other person or entity except for operating revenues from the Interest owned by DBSI Units."

425.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to that quoted from the Loop 1604 PPM to be used in other PPMs (collectively with the Loop 1604 PPM, the "Category D PPMs").  A list identifying the Category D PPMs is attached hereto as Exhibit G and incorporated by reference herein.

426.    In a September 5, 2008 Confidential PPM concerning TIC interests in the Villages of Riverview ("Villages of Riverview PPM"), DBSI Villages of Riverview LLC, an entity wholly owned and managed by DBSI Inc. stated that:  "The funds of the Company will not be commingled with the funds of any other person or entity except for operating revenues from the Land."

427.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to

that quoted from the Villages of Riverview PPM to be used in other PPMs (collectively with the Villages of Riverview PPM, the "Category E PPMs").  A list identifying the Category E PPMs is attached hereto as Exhibit G and incorporated by reference herein.

428.     Finally, in a May 4, 2005 Confidential PPM concerning TIC interests in the Trinity Place ("Trinity Place PPM"), DBSI Trinity Place LLC, an entity wholly owned and managed by DBSI Inc. stated that:  "The funds of the Company will not be commingled with the funds of any other person or entity."

429.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused identical or near-identical language to that quoted from the Trinity Place PPM to be used in other PPMs (collectively with the Trinity Place PPM, the "Category F PPMs").  A list identifying the Category F PPMs is attached hereto as Exhibit G and incorporated by reference herein.

430.     The foregoing material representations that Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson made or caused to be made with respect to the commingling of funds in the Category A PPMs, the Category B PPMs, the Category C PPMs, the Category D PPMs, the Category E PPMs, and the Category F PPMs (collectively the "No Commingling PPMs") were relied on by Investors, were material, and were knowingly false.

431.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the No Commingling PPMs to be disseminated to Investors by and through the mail and/or wires, affecting interstate commerce.

432.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson never intended to segregate and preserve the

Accountable Reserves, but instead intended to commingle, use and misappropriate, and did commingle, use and misappropriate the Accountable Reserves in ways contrary to their false representations in the No Commingling PPMs.

433.    In his August 28, 2009 interview with the Examiner, Mark Ellison admitted that Accountable Reserves were "not segregated."

434.    Mark Griffin, Director of Tax and Vice President of Tax and Internal Audit at DBSI, Inc. made similar comments to the Examiner in his September 16, 2009, interview. Specifically, Mark Griffin stated:  "My understanding is that cash was collected into -- basically funneled into one account.  And so [Accountable Reserves funds] were not separately held in account, but they were available for use by the business."

435.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the Accountable Reserve funds to be commingled with other DBSI funds and were swept up by DBSI and other DBSI entities for general corporate and non-TIC related purposes.

436.    Indeed, Mark Griffin stated in his September 16, 2009 interview with the Examiner that:  "[T]he cash received by DBSI [Inc.], which would include the [A]ccountable [R]eserves, would have been available to use throughout the business.  And it would have been funneled through DRR."

437.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused Accountable Reserves to eventually find their way into every corner of the DBSI Companies.

438.    The DBSI Companies collected a total of nearly $100 million in Accountable Reserves funds.

439.     Only approximately $18 million of the Accountable Reserves funds were used by the DBSI Companies to pay authorized expenses related to the stated use for the funds.

440.     Accordingly, approximately $82 million of Accountable Reserves funds were spent for unauthorized purposes.  Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused these funds to be commingled with all other funds of the DBSI Companies and used by various DBSI Companies for non-TIC related purposes and were misappropriated by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

441.     The PPMs and DDBs disseminated through the mail and/or by the wires, affecting interstate commerce, also set forth grossly exaggerated net worths of DBSI Inc.

442.     For example, numerous PPMs and DDBs stated that DBSI Inc. had an unaudited net worth of "more than $105 million," a gross exaggeration.  Lists identifying such PPMs and DDBs are attached hereto as Exhibit G and H and incorporated by reference herein.

443.     Other PPMs and DDBs identified DBSI Inc.'s "unaudited net worth" as being in excess of varying amounts, ranging from $50 million to $130 million.  All of these statements that were made and caused to be made by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson regarding the unaudited net worth of DBSI Inc. were knowing, material, gross exaggerations.  Lists identifying such DDBs and PPMs and the purported "unaudited net worth" of DBSI Inc. are attached hereto as Exhibits G and H and incorporated by reference herein.

444.     Similarly, in a September 2, 2003, PPM concerning TIC interests in property located in Fresno California ("State Offices PPM"), DBSI State Offices LLC, an entity wholly

owned and managed by DBSI Inc. stated that DBSI Inc. "will represent that it has a net worth available on an estimated fair market value basis of approximately $100,000,000."

445.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused Identical or near-identical language to that quoted from the State Offices PPM to be used in other DDBs and PPMs.  A list identifying such PPMs is attached hereto as Exhibit G and H incorporated by reference herein.

446.    The foregoing representations made and caused to be made by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson regarding DBSI Inc.'s unaudited net worth and DBSI Inc.'s net worth available on an estimated fair market value were all knowing, material, false misrepresentations, relied on by Investors, and, at the behest and control of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were disseminated through the mails and/or wires, affecting interstate commerce.

447.    The foregoing misrepresentations regarding DBSI Inc.'s unaudited net worth and DBSI Inc.'s net worth available on an estimated fair market value were caused, created by, and perpetuated by misleading financial statements, as discussed *infra*, that were prepared by, reviewed by, and overseen by, among others, Bringhurst, Hassard, and Douglas Swenson.

448.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson also caused numerous PPMs to contain knowing, material, false misstatements with respect to the initial capitalization of Master Leaseco.

449.    For example, various PPMs stated that Master Leaseco's initial capitalization was either $10,000,000 or $15,400,000, both gross exaggeration.  A list identifying such PPMs is attached hereto as Exhibit G and incorporated by reference herein.

450.    The foregoing misrepresentations regarding the capitalization of Master Leaseco were all knowing, material, false misrepresentations, relied on by Investors, and disseminated at the behest and control of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson through the mails and/or wires, affecting interstate commerce.

451.    The foregoing misrepresentations regarding DBSI Inc.'s unaudited net worth , DBSI Inc.'s net worth available on an estimated fair market value, and the initial capitalization of Master Leaseco were particularly important to Investors in light of the structure of the TIC offerings, including the guaranty DBSI Inc. provided on TIC offerings.

452.    In his September 17, 2009 interview with the Examiner, Hassard stated that broker/dealers selling TIC interests had "some desire for an entity that was capitalized."

453.    Mark Ellison concurred, stating in his August 28, 2009 interview with the Examiner that "the capitalization was put in to give comfort to the broker-dealers."

454.    The fraudulent nature of the PPMs and DDBs was not limited to misrepresentations, however.  Rather, every PPM and DDB disseminated by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson through the mail and/or by the wires, affecting interstate commerce, knowingly contained material omissions which were relied on by Investors.  Lists identifying such PPMs and DDBs are attached hereto as Exhibits G and H and incorporated by reference herein.

455.    For example, no PPM or DDB disclosed the material fact that the funds of the DBSI Companies would be commingled and ultimately used for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.  Such omissions were knowing, material, and relied on by Investors to their detriment.

456.    In addition, no PPM or DDB disclosed the material fact that the DBSI Companies would not maintain their corporate identifies, but would rather disregard all corporate separateness, by, among other things, ignoring corporate formalities, making inter-company transactions not at arms-length and without any attempt to transfer equivalent value, and moving assets among the DBSI Companies for the convenience of the moment and to prop up the entities.  Such omissions were knowing, material, and relied on by Investors to their detriment.

457.    No PPM or DDB disclosed the material fact that the DBSI Companies would not hold separately any reserves -- Accountable Reserves or otherwise -- but rather would commingle all proceeds from TIC offerings, ultimately using such funds for DBSI's general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.  Such omissions were knowing, material, and relied on by Investors to their detriment.

458.    Finally, and with respect to the DDBs only, no DDB disclosed the fact that, as detailed *infra* at Paragraphs 526 - 553, the financial status of FOR 1031 was fraudulently manipulated by foisting all of its toxic assets onto DBSI, Inc.  Such omissions were knowing, material, and relied on by Investors to their detriment.

459.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused all of the foregoing omissions to be omitted from every PPM and/or DDB.

460.    Douglas Swenson knew of and approved the general contents of every PPM, DDB, and other offering document.

461.    On previously identified information and belief, Mayeron knew of and approved the general contents of every PPM, DDB, and other offering document.

462.    On previously identified information and belief, Jeremy Swenson knew of and approved the general contents of every PPM, DDB, and other offering document.

463.    On previously identified information and belief, David Swenson knew of and approved the general contents of every PPM, DDB, and other offering document.

464.    DBSI was, ostensibly, in the business of selling real estate investments.

465.    The PPMs, DDBs, and other offering documents that Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused to be circulated to Investors were widely circulated within DBSI's numerous departments.

466.    Such PPMs, DDBs, and other offering documents were critical to the fraudulent scheme masterminded by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.  Indeed, without the continuous flow of revenue generated by new TIC investment offerings, DBSI would not have had the cash streams to stay afloat.  To be sure, numerous revenue streams were the lifeblood of the scheme to defraud, as evidenced by the weekly cash meetings attended by Douglas Swenson, Bringhurst, Var Reeve, David Swenson, and Jeremy Swenson.

467.     As DBSI's officers and directors, it is inconceivable that Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson would not have been aware of the terms of sale of the TIC investments that were at the heart of DBSI's business model.

468.     Indeed, if Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were not aware of the contents of the PPMs, DDBs, and other offering materials, such willful ignorance would be a gross derelictions of their fiduciary duties owed to the DBSI Companies by virtue of their various positions as directors and officers of innumerable DBSI Companies.

469.     Accordingly, in addition to the other specifically alleged basis, on information and belief, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson all knew of and approved the general contents of every PPM, DDB, and other offering document.

**(10)    Kastera**

470.     In addition to the Internal Funding Program and the TIC offerings, the DBSI Companies endeavored to raise funds through other means.

471.     One such effort was Kastera, which was established by Douglas Swenson and Var Reeve for the purpose of acquiring, owning, developing and selling unimproved residential real estate.

472.     Although organized to operate independent from the DBSI Companies, Kastera was not self-sufficient and the DBSI Companies provided Kastera with financial support using, among other sources, Bond Corps. and Note Corps. funds.

473.     Kastera subsidiaries borrowed money from the DBSI Companies and never made any payments on that debt.  The subsidiaries owe DBSI more than $12.9 million.

K.    **The Insiders' Efforts to Conceal the True Nature of the DBSI Companies'**
      **Financial Health**

474.    To lure Investors, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson presented a false picture of sound financial health of the DBSI Companies.  The gimmicks used by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson provided little to no economic benefit to DBSI.  They principally benefited Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson who used the transactions to disguise the fact that DBSI was hemorrhaging money as a result of the Insiders' misappropriation of corporate funds and mounting operational losses.

475.    Keeping DBSI's actual financial condition secret was crucial to the ability of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to conceal their scheme and continue to line their own pockets.  By hiding DBSI's deteriorating financial condition, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were able to continue their looting.

### (11)    Commingling of Funds and Intercompany Loans

476.    One way in which Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson concealed the financial status of the DBSI Companies was to treat all of the ostensibly separate entities as one.  Thus, the DBSI Companies commingled and accumulated the funds raised through the Funding Entities, TIC offerings, and other business lines.

477.    Once funds were commingled they were then disbursed for general corporate purposes, the immediate cash demands of the DBSI Companies and Insider looting.

86

478.     In addition, to meet its severe cash shortages and address the cash demands of the business and to meet the Insider's need for funds, the DBSI Companies used funds raised from Investors and created records purporting to reflect that this money was "loaned" to related entities using assets as "collateral."  Intercompany cash transfers were typically treated as "loans" on the books and records of the DBSI Companies.

479.     These intercompany loans were not made with adequate documentation, were routinely not at arm's length, and no attempt was made to make exchanges for equivalent value.

480.     These intercompany loans often violated the lending terms set forth in the lending entities controlling documents, including applicable LTVs, as well as basic lending industry lending requirements.

481.     In order to give the appearance of compliance with applicable LTV ratios, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson would (i) knowingly assign inflated and wholly unjustified values to collateral "securing" the loans, and (ii) reallocate collateral at year-end through after-the-fact bookkeeping entries based on these inflated internal valuations.

482.     To further manipulate the LTVs, in January 2007, DBSI Inc. established a loan committee to oversee the disbursement of loans by the various internal funding programs ("Loan Committee").  The real purpose was to provide cover to the Insiders' fraudulent scheme.

483.     The Loan Committee met irregularly and, as a practical matter, exercised little oversight.  Instead, its members became willful, knowing aiders and abettors of the overall scheme to defraud.

484.     Members of the Loan Committee were selected by Douglas Swenson and included, but were not limited to, Paris Cole, Mark Ellison, and Jeremy Swenson.

485.    Matt Duckett provided the requests for funding to Douglas Swenson on a weekly basis.  Thereafter, Douglas Swenson reviewed the funding needs and decided which source of funds would be used for the acquisitions.

486.    Douglas Swenson almost always signed documents on behalf of the entity requesting the loan.

487.    In sum, when the DBSI Companies needed to extract additional cash from one of its entities, the DBSI Companies, at the behest of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, manipulated the LTV, by fraudulently increasing the stated value of real estate or other assets to knowingly false levels to permit the withdrawal of additional funds.

488.    The actions taken by the Loan Committee, including Douglas Swenson and Jeremy Swenson, at least in part, led to the knowing, material, fraudulent misrepresentations and omissions relied on by Investors with respect to, *inter alia*, DBSI's financial well-being and the net worth of DBSI, Inc.

**(12)    Loans to Stellar, the Technology Companies, and Western Technologies**

489.    From 1999 through 2008, the DBSI Companies transferred or made loans totaling more than $200 million to Stellar, the Technology Companies, and Western Technologies.

490.    The decision to fund and to continue funding Stellar, the Technology Companies, and Western Technologies was made by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

491.    The transfer of substantial sums of money to Stellar, the Technology Companies, and Western Technologies continued despite the fact that (i) the DBSI Companies were suffering significant cash flow problems, (ii) certain of the Technology Companies failed, resulting in losses of tens of millions of dollars, (iii) the operation of Stellar, the Technology Companies, and

Western Technologies continued to require substantial cash infusions, and (iv) virtually no cash flowed upstream from Stellar, the Technology Companies, and Western Technologies back to the DBSI Companies even though the DBSI Companies badly needed cash.

492.    The funds provided by the DBSI Companies to Stellar, the Technology Companies, and Western Technologies were used for routine business operations.

493.    From its inception, Stellar received and pledged its assets for funds that were booked as loans and capital contributions from four DBSI Companies -- DBSI Investments, GCC, DRR, and 2008 Notes Corp.

494.    From 2000 to 2008, Stellar received a total of more than $186 million from GCC, DBSI Investments, DRR, and 2008 Notes Corp.  A substantial portion of these funds came from misappropriated Accountable Reserves funds.

495.    The funds transferred to Stellar and the Technology Companies by DBSI Investments are particularly noteworthy.

496.    Because DBSI Investments was structured as a partnership, the beneficial result of the massive losses suffered by Stellar and the Technology Companies was the creation of a handsome tax shelter for Douglas Swenson, Hassard, Mayeron, Mott, Bennett, and Foster.

497.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, and Foster, accordingly, enjoyed the benefit of being able to offset such losses against the taxable income that was being generated and was also flowing to them from the DBSI Companies' TIC sales activity.

498.    In other words, in an extraordinarily bold fraud, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, and Foster lured Investors to deposit the Accountable Reserves via multiple false representations, then they stole the Accountable Reserves, then transferred much of the Accountable Reserves to themselves and squandered the rest on the Technology

Companies, and then used these Technology Company losses (of other people's money) to escape federal income tax on the millions of misappropriated dollars they had put in their own pockets.

499.    There was no beneficial business purpose to the DBSI Companies for the "loans" made by DBSI Investments to Stellar and the Technology Companies.

500.    Rather, any benefit of DBSI Investments' "loans" to Stellar and the Technology Companies inured solely to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, and Foster in the form of a drastic reduction in their personal tax obligations.

501.    Almost none of Stellar's borrowings were properly documented at the time the funds were loaned and a significant portion of Stellar's debt remains completely undocumented. Furthermore, the majority of the funds Stellar borrowed were not secured by any perfected pledge of collateral from Stellar.

502.    Where Stellar pledged collateral, namely its ownership interests in other Technology Companies, the valuation was based on highly subjective valuations prepared by Douglas Swenson.  These valuations were knowingly highly inflated because they were based on knowingly false and unrealistic projections as to the future profitability of the Technology Companies owned by Stellar, all of which had a long history of losing money and owed significant debt to Stellar.

503.    All existing notes for Stellar's debt to GCC, DRR, and 2008 Notes Corp. are past due.

504.    Stellar frequently used portions of loans from GCC, DRR, and 2008 Notes Corp. to make interest or principal payments to one of the other lending entities.  The decision to use

loans in such a manner was made by, among others, Douglas Swenson, Var Reeve, Bringhurst, Matt Duckett and Paris Cole, at weekly cash meetings.

505.    Importantly, certain of the Insiders, including Douglas Swenson, Var Reeve and Bringhurst, controlled all transfers to Stellar.  Those Insiders decided which lending entity would be the source of funds requested by Stellar and its subsidiary Technology Companies.

506.    Borrowings from DBSI Investments, GCC, and DRR that were provided to the Technology Companies were recorded on Stellar's and the Technology Companies' books as loans from Stellar to the Technology Companies and a corresponding loan from the lending entity to Stellar.  This was so even though, in most instances, the cash did not flow through Stellar, but rather went directly from DBSI Investments, GCC, or DRR to the Technology Companies' bank accounts.

507.    Throughout its existence, Stellar's liabilities have greatly exceeded its assets.

508.    Western Technologies is a company that had no operations but existed solely for the purpose of holding majority ownership interests in and providing funding to numerous subsidiary entities.

509.    Western Technologies was owned primarily by DBSI Investments.

510.    Numerous Insiders served on Western Technologies' board of directors, including Douglas Swenson, Foster, Hassard, Mott and Mayeron.

511.    From August 2000 through 2008, Western Technologies received more than $32 million in funds from GCC, DRR and 2008 Notes Corp.

512.    Notes signed by Western Technologies for funds received from GCC, DRR and 2008 Notes Corp. are all past due.

513.    Some of the security interests granted by Western Technologies to GCC and 2008 Notes Corp. were not perfected.

514.    Western Technologies pledged insufficient collateral and overpledged collateral.

515.    Portions of the loans made to Western Technologies were used to make interest and principal payments on its preexisting debt.  Thus, starting in 2005, Western Technologies borrowed funds from DRR and 2008 Notes Corp. to make interest or principal payments to either GCC or DRR.

**(13)    Year-End Cash and Capitalization Manipulations**

516.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused DBSI to engage in year-end cash and capitalization manipulations to create the false impression that certain DBSI Companies were well-capitalized to meet their financial obligations, as represented to Investors in numerous offering documents.

517.    In order to create the illusion of financial health to garner Investors and obscure the significant losses incurred by many of its properties, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson manipulated the cash position of certain entities involved in its TIC investments, using temporary year-end cash infusions which were "repaid" days after the end of audited periods.

518.    In some instances certain Funding Entities received gratuitous reductions of their debt without actually paying for such reductions, and other Funding Entities were charged with additional debt for which they received no cash.  The purpose of the debt reallocations caused by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson was to create the false impression, in time for the year-end audit, that loans complied with the 85% LTV required under the respective PPMs.

### (14)   Manipulation of Financial and Accounting Records

519.   Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson created a misleading financial picture of the DBSI Companies by manipulating financial and accounting records and by concealing the sources and uses of funds that flowed among the DBSI Companies.

520.   Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused DRR to act as an internal bank for DBSI and was used as a conduit through which the DBSI Companies transferred monies from other sources.

521.   The use of DRR helped obfuscate the true source and use of funds that were transferred between the DBSI Companies.  Any money that flowed through DRR was always obtained from other sources.

522.   DBSI Investments served as a holding company for partnership interests in several older limited partnerships, as well as Stellar and Western Technologies.

523.   DBSI Investments had little or no independently derived revenue of its own. Rather, it served as a conduit to (i) transfer cash to Stellar and Western Technologies, and (ii) make substantial distributions to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

524.   Typically, as cash was needed to fund these companies, DRR transferred cash to DBSI Investments which transferred it to Stellar, the Technology Companies, and Western Technologies.

525.   Another manipulation of financial and accounting records occurred through FOR 1031.

526.    FOR 1031 was formed in 2003 by Swenson and Reeve to acquire and syndicate real properties to TIC Investors.  In short, FOR 1031 was the arm of DBSI's Real Estate Channel.

527.    FOR 1031 would ordinarily form a wholly-owned, special purpose entity ("FOR 1031 SPE") to acquire a real property.  The FOR 1031 SPE would then market and sell tenant-in-common ownership interests in itself to the public.

528.    The syndicated sale of a FOR 1031 SPE usually involved an equity component and a debt component.  In 2004, TIC Investors ordinarily purchased ownership interests in the SPE by contributing cash and assuming pre-existing debt.  In 2005 and thereafter, as lenders gained greater understanding of TIC investments, most if not all of FOR 1031's syndications involved the incurrence of new mortgage debt to fund the TIC transaction.  The FOR 1031 SPE would execute a promissory note to the third-party lender memorializing its debt obligation, which was secured by an assignment of rents, a deed of trust, and a guaranty from DBSI.

529.    FOR 1031—*i.e.*, Swenson and Reeve—attracted investors to the FOR 1031 SPE by offering a guaranteed return on investment for 20 years.  But this guaranty was not provided by FOR 1031.  Instead, the guaranty was provided by a DBSI Master Leaseco entity formed for the specific purpose of serving as master tenant for a fully-syndicated, FOR 1031 property.  The DBSI master tenant was obligated to collect rents and bear the expenses associated with capital improvements and tenant improvements on the TIC property.  It was also obligated to bear the loss associated with rent shortfalls due to vacancy or price shifts in the market.  In short, the DBSI master tenant assumed full responsibility to sublet and operate the property for a 20-year period and bear in full whatever losses it may suffer under the lease agreement.

530.    The DBSI master tenant ordinarily agreed to pay rent to the FOR 1031 SPE at a specified rate of return on the TIC Investors' equity contribution (*i.e.*, cash-in) to the purchase price of the SPE.  The annual rent payment, which was effectively no different than a guaranteed annual yield on cash investment, then grew at specified rate each year over the remaining 19-year term of the lease agreement.

531.    The TIC owners of the FOR 1031 SPE had the unilateral right to terminate the master lease at any time for any reason.  So if the property was generating cash flow that exceeded "rent," the TIC owners could terminate the lease and take for themselves the upside benefit where the investment generated cash in excess of the amount promised and guaranteed by DBSI under the master lease agreement.

532.    DBSI guaranteed the FOR 1031 SPE's obligation to repay the debt owed to the third-party lender that funded part of the purchase price.  Moreover, DBSI provided to the FOR 1031 SPE a guaranty of the DBSI master tenant's obligations under the lease, including its obligation to pay the agreed-upon "rent" over the 20-year period of the lease.

533.    This structure was part and parcel of the Ponzi-like fraudulent scheme perpetrated by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson on an unknowing public.  The agreements between the DBSI master tenant and DBSI were not arm's length and were not market-based.  In other words, no reasonable third-party would agree to assume the guaranty liability and other obligations that DBSI assumed for the benefit of FOR 1031's TIC syndication business.

534.    During the 2004-2005 time period, the properties acquired and sold to TIC Investors by FOR 1031 were commercial properties that were generally old, small, and located in

tertiary markets.  The properties were populated with high-credit-risk tenants that rolled over with great frequency.

535.    Yet, for many of the programs, DBSI guaranteed a 6% or 7% yield on investments with a 2% to 3% annual growth rate over a 20-year period.  But, the investment quality of the FOR 1031 SPE's property did not justify such a guarantee.  In some deals, DBSI was also guaranteeing the master tenant's obligations in properties that experienced 100% tenant turnover in a two-year period.  The risks associated with such a guaranteed return on investment were enormous and effectively unmarketable.

536.    FOR 1031's 2004 financial statement reflects revenue from property sales of more than $534.6 million, costs of property sold of more than $473.3 million, and a gross profit of more than $61.3 million.

537.    FOR 1031's 2005 financial statement reflects revenue from property sales of more than $421.4 million, costs of property sold of more than $392.9 million, and a gross profit of more than $28.5 million.

538.    FOR 1031 valued its members' equity at $50.5 million at year end 2004 and at $29.7 million at year end 2005.

539.    These figures were a fiction and illusory.

540.    When a FOR 1031 SPE syndicated its ownership to TIC Investors, the full amount of the sale proceeds—which was comprised of cash contributed by TIC Investors and cash borrowed by the FOR 1031 SPE from a third-party lender—was ultimately received by FOR 1031 as sole owner of the individual FOR 1031 SPEs created for the acquisition of property and TIC syndication.

541.    Yet, because of the way Swenson and Var Reeve structured the Real Estate Channel syndications, FOR 1031 was not assuming any of the enormous future liabilities owed to TIC Investors under the terms of a master lease.  As a result, FOR 1031 was enjoying all of the profits from its TIC syndications while at the same time transferring all of the future risks, liabilities and obligations created by such syndications to DBSI as guarantor of the master tenant's "rent" obligations and the FOR 1031 SPE's debt obligations.

542.    FOR 1031 paid DBSI a "fee" for its role as master lessee and guarantor, but that fee was woefully inadequate in relation to the scope of the liabilities being transferred.  In 2004, DBSI received $38.7 million from FOR 1031 for its role as guarantor in FOR 1031's TIC syndications that year, an amount that was presumably included on FOR 1031's financial statement as a cost of property sold.  In 2005, FOR 1031 paid $17.4 million to DBSI in "fees."

543.    Under a conservative estimate of the economics of FOR 1031's TIC syndication business, a reserve should have been established in the amount of at least 16.5% of FOR 1031's 2004 revenues to cover the future risks, liabilities and obligations that were guaranteed to be paid to, or for the benefit of, FOR 1031's 2004 TIC Investors.  In an arm's length transaction, just to break even, DBSI, in its role as master lessee, should have been paid "fees" equal to or greater than the 16.5% reserve against revenue.  Accordingly, for 2004, "fees" should have equaled or exceeded $88.2 million, or $49.5 million more than DBSI was purportedly paid for assuming all of FOR 1031's syndicated properties' future risks, liabilities and guaranty obligations.

544.    Because the guaranteed return to FOR 1031's TIC Investors was generally lowered to 6% in 2005 and the growth rate was reduced to 2% or less, in order to cover these future liabilities, in 2005 a reserve should have been established in the amount of at least 11% of FOR 1031's 2005 revenues.  An appropriate reserve for 2005 thus would have been $46.4

million, or $29 million more than the $17.4 million that DBSI was purportedly paid to assume all of FOR 1031's future risks, liabilities and obligations under the 2005 master leases.

545.    By the end of 2005, FOR 1031 purportedly paid DBSI a total of approximately $55 million in "fees," which was approximately $78.5 million less than the amount that should have been paid under a conservative valuation of the future risks, liabilities and obligations that DBSI assumed for the benefit of FOR 1031.

546.    Swenson and Reeve could not have cared less whether the "fees" paid by FOR 1031 to DBSI were adequate to cover DBSI's risk, nor could they have cared less that DBSI did not reserve those "fees" to cover its liabilities.  They needed to raise cash to satisfy obligations owed to TIC Investors in prior syndications, to acquire more real property so that more cash could be raised through more syndications, and, of course, to fund distributions to themselves. Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson could continue to perpetrate their fraud so long as they could continue to raise cash.

547.    By flowing all of the profits of Real Estate Channel syndications through FOR 1031, while at the same time dumping all of the attendant liabilities on DBSI for insufficient consideration, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were able to portray FOR 1031 on paper as an immensely profitable company.  In reality, it was anything but.

548.    DBSI did not receive reasonably equivalent value in exchange for the liabilities it assumed under the FOR 1031 master leases.  The transfer of those liabilities was a fraudulent transfer by FOR 1031 to DBSI without reasonably equivalent value.

549.    When FOR 1031's financial statements are adjusted conservatively to account for the payment of adequate transaction fees to DBSI, or to reserve for the master tenant's obligations as if they were not transferred to DBSI, the insolvency of FOR 1031 is revealed.

550.    The transfers made by FOR 1031 to or for the benefit of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, as described below, were made while FOR 1031 was insolvent or rendered FOR 1031 insolvent as a result.

551.    At the end of 2004, FOR 1031's equity was at least $49.5 million less than stated on its financial statement when the required reserved is properly recognized as a liability.  And whatever equity there was in FOR 1031 should have been further diminished by properly recognizing the likely impairment of a related-party note receivable of approximately $3.1 million—which effectively constituted nothing more than a distribution to the related-party's members, which in turn were Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson themselves.

552.    As of the beginning of 2005 and going forward, FOR 1031 was plainly engaged, or about to engage, in a business and in transactions for which its remaining assets were unreasonably small in light of the future liabilities, risks and obligations that it would assume, and hoped to assume, in the ordinary course of its "business."  FOR 1031 additionally intended to incur, and hoped to incur, debts that were beyond its ability to pay as the debts became due as a result of the DBSI Enterprise.

553.    Indeed, insolvency was part of FOR 1031's business plan.  For every dollar of gross profit received through the sale of TIC interests, DBSI assumed, through its guaranties of the master lease obligations, liabilities that far exceeded the front-end gross profits.  It was an

untenable model that did not change in 2006, 2007, and 2008 when FOR 1031's insolvency deepened, as it chased new TIC investment dollars in a declining real estate market.  Eventually, the well of cash that Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson had pumped for years ran dry, and their Ponzi-scheme crashed down upon them.

**(15)   Funds Were Used for Non-Specified Purposes**

554.   Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the DBSI Companies to regularly use Investor funds for purposes not specified and/or prohibited by the terms of the investment.

555.   Indeed, the proceeds were used to prop up the failing DBSI Companies by making cash available to support current operations and obligations, and were misappropriated by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

556.   Possibly the best example of the DBSI Companies' misappropriation of investment funds was the DBSI Companies' use of the Accountable Reserves.

557.   These Accountable Reserves funds were to be set aside to pay such costs and expenses in connection with the asset over the term of the master lease.

558.   They were not.  Rather, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson commingled the Accountable Reserves funds with all other cash of the DBSI Companies and caused them to be used for the general operations of all DBSI Companies and for non-TIC-related purposes, including, servicing the debt of earlier Investors.

559.   The treatment of Accountable Reserves funds demonstrates a general pattern of diverting such funds to supply cash needs, including but not limited to general overhead

expenses, payrolls, third-party debt obligations and debt service payments to Investors, not to mention the Insiders' misappropriation of such funds.

560.     In addition, the DBSI Companies reported Accountable Reserves funds as liabilities on the financial statements and tax returns of DBSI Companies.  Those liabilities were then reduced over time as monies were spent on leasing commissions, tenant improvements and/or capital expenses.

561.     The DBSI Companies did not report the Accountable Reserves funds as income of the DBSI Companies.  Accordingly, the DBSI Companies did not report the Accountable Reserves funds as revenue on tax returns.

### (16)     Misleading Financial Statements

562.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and DBSI Inc. regularly touted DBSI Inc.'s ability to perform under its corporate guarantees.  For example, DBSI Inc. regularly stated that it had a net worth in excess of $100 million.

563.     These financial statements, however, were knowingly false and grossly misleading.

564.     The financial statements used by DBSI Inc. to support those statements were unaudited and did not conform to Generally Accepted Accounting Principles ("GAAP").

565.     These financial statements were prepared by Paris Cole and his accounting staff with review and oversight by Bringhurst, Hassard and Douglas Swenson.

566.     Douglas Swenson had the ultimate say in the presentation of financial statements.

567.     These financial statements, prepared, reviewed, and overseen by Bringhurst, Hassard, and Douglas Swenson led to numerous knowing, material, fraudulent

misrepresentations and omissions relied on by Investors with respect to, *inter alia*, DBSI's financial well-being and the net worth of DBSI, Inc.

568.    DBSI was able to mask its insolvency on its consolidated balance sheet for the years 2004 through 2008 by failing to follow GAAP, particularly Financial Accounting Standards Board rules or standards applicable to real property accounting.

569.    In his Final Report, the Examiner found that DBSI's unaudited financial statements were not compliant with GAAP.

570.    The Debtors' failure to follow GAAP accounting standards resulted in the issuance of materially inaccurate financial statements that permitted DBSI to conceal its insolvency from the investing public.

571.    For example, DBSI and its affiliated companies and subsidiaries sold Investors TIC interests as well as various bond and note offerings, all of which provided guaranteed returns to Investors.  DBSI failed to record on its books and records any liability for several hundreds of millions of dollars in guarantee liabilities.  Because many of those guarantees were made on behalf of insolvent entities, Statement 5 of the Financial Accounting Standards Board ("SFAS 5") would require that a loss should be accrued at the time information became available that a liability had been incurred.  In DBSI's case, it was clear that a liability had been incurred, because every month DBSI was disbursing funds to support TIC entities that were failing to generate sufficient operating income to pay their TIC rent and loan obligations.  In short, DBSI's guarantee obligations were no longer contingent.  DBSI was covering all of the TIC entities cash shortfalls.

572.    The guaranty liability on the TIC portfolio alone was in excess of several hundred million dollars. DBSI had also guaranteed approximately $300,000,000 on account of the bond

and note investments. This liability was never fully recognized, recorded or fully disclosed by DBSI in its financial statements, despite contributing greatly to the collapse of the DBSI Enterprise.

573.   DBSI's treatment of receivables due from affiliates provides another example of how DBSI's accounting practices were designed to mask its insolvency.  At all times during the Relevant Period, SFAS 5 governed the reporting of contingent losses and gains.  Under SFAS 5, when information is available indicating that it is probable that an asset is impaired or a liability has been incurred, a loss should be accrued by a charge to income.

574.   DBSI, however, posted receivables due from affiliates at full value without testing those receivables for impairment despite the fact that many of the borrowing affiliates were known to be insolvent and unable to repay the amounts due.  DBSI should have--but failed to--establish offsetting reserves for the value of the impaired receivables due from affiliates. Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and DBSI made no effort to accurately reflect the near total impairment of its investments in affiliated entities such as Stellar and the Technology Companies, which as recently as June 30, 2008, DBSI carried on its book and records at $235,000,000.

575.   Similarly, the Examiner found that DBSI's financial statements were misleading because they netted as a single line item receivables due from, and payables due to, affiliated entities, including the bond and note entities.  According to the Examiner:

> DBSI Inc.'s balance sheet for the period ended December 31, 2007 presented, under current assets, a "Net receivable from affiliates" of $1.4 million and nothing for liabilities owed to the bond and note holders.  Yet, the amount due at that time to the bond and note holders was approximately $194 million.

> The netting of receivables and payables was misleading because the

payables and receivables being netted were two very different things.  The payables consisted of hard debt owed to bond and note holders with a defined maturity date.  On the other hand, the receivables from the Technology Companies were likely uncollectible debts that neither Stellar nor the Technology Companies could pay off.

576.    DBSI also carried long-term assets and inventory (real property) at cost, without regard to realizable market value and without establishing offsetting reserves to account for the difference between cost and market value.  Notably, this was done at a time when real estate values were declining.

577.    Statement 66 of the Financial Accounting Standards Board ("SFAS 66"), Accounting for Sales of Real Estate, provides that if a seller has "continuing involvement" with the property and does not transfer substantially all of the risks and rewards of ownership, profit shall be recognized by a method determined by the nature and extent of the seller's continuing involvement.  Profit recognized shall be reduced by the maximum exposure to loss.

578.    Some common forms of continuing involvement include instances where (i) the "seller is a general partner in a limited partnership that acquires an interest in the property sold, or has an extended, non-cancelable management contract . . . and holds a receivable from the buyer for a significant part of the sales price," (ii) the seller guarantees the return of the buyer's investment or a return on that investment for a limited or extended period, such as the guaranty of cash flows, subsidies, or net tax benefits.  In these situations the transaction should have been accounted for as a financing, leasing, or profit-sharing arrangement.[2]

579.    DBSI was involved in many property "sales" where it had continuing involvement in property, including the Master Lease Structure, but nevertheless recorded the transaction as a "sale" and failed to account for the transaction as a financing, leasing or profit-

---

[2] Other possibly applicable situations of continuing involvement are defined in SFAS 66.

104

sharing arrangement.  If those transactions had been properly recorded, DBSI's revenue from the sale of real estate would have been significantly lower.

580.     While the foregoing is not intended to be an exhaustive set of examples, it amply demonstrates that DBSI's unaudited financial statements had numerous material inaccuracies that permitted DBSI to mask its insolvency from the investing public.  If DBSI had regularly tested assets for impairment and maintained its books and records in accordance with GAAP, through a combination of the write-down of assets, coupled with the recognition of the unrecorded guarantee liability and restatement of "sales," DBSI's published financial statements would have shown that it had been insolvent for years.

### (17)     Manipulation of Capitalization Coinciding with Audit Periods

581.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson regularly manipulated their capitalization to coincide with audit periods.

582.     This manipulation also coalesced with the DBSI Companies' repeated manipulation of LTVs.

583.     In order to balance the amount of debt various entities nominally were carrying and to achieve compliance with LTVs, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson simply reallocated debt among different DBSI Companies.

584.     The purpose of these debt reallocations was to create the false impression, in time for the year-end audit, that Master Leaseco and various DBSI Notes Corp. loans complied with the 85 percent LTV requirement to which they were subject.

**L.**     **The Insiders' Continued Looting of the DBSI Group**

585.     The foregoing raising of capital and accompanying scheme to defraud was designed for one purpose:  the Insiders' looting of the DBSI Companies.

586.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson misappropriated significant amounts of money to themselves.  Thus, when the DBSI Companies collapsed and countless individuals suffered crushing losses, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson walked away with millions of dollars.

587.     Beginning in 2000 and continuing up to and through the Petition Date, tens of millions of dollars in distributions flowed to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson via DRR and DBSI Investments in the form of tax payments, bonuses, salary, interest on and liquidation of personal bond investments, redemption of ownership interests, and payment of legal fees.

588.     The monies paid to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson came from accounts containing commingled funds.

589.     In total, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson looted approximately $75 million in illicit payments from the DBSI entities, including net cash payments of approximately $31.7 million to Douglas Swenson alone from 2004 to 2008.  *See* Exhibit E.

590.     The bulk of distributions to Douglas Swenson were in the form of cash distributions and payments made to state and federal tax authorities on his behalf.

591.     In the four years prior to the Petition Date, Swenson received at least $31.7 million in Insider distributions.

592. From 2000 through 2008, Hassard received insider payments totaling more than $3.8 million.

593. From 2000 through 2008, Mayeron received insider payments totaling more than $4.6 million.

594. From 2000 through 2008, Mott received insider payments totaling more than $5.7 million.

595. From 2000 through 2008, Bennett received insider payments totaling more than $1.1 million.

596. From 2000 through 2008, Foster received insider payments totaling more than $4.9 million.

597. From 2000 through 2008, Var Reeve received insider payments totaling more than $7 million, including profits made by selling property on Pearson Lane, McCall, Idaho to Kastera despite Douglas Swenson's previous rejection of that property.

598. Var Reeve also operated a farming business on DBSI property.

599. From 2001 through 2008, Bringhurst received insider payments totaling nearly $3 million.

600. From 2001 through 2008, Jeremy Swenson received insider payments totaling more than $763,000.

601. From 2003 through 2008, David Swenson received insider payments totaling more than $513,000.

## M.   Manipulation of Due Diligence Reports and Appraisals

602. Mick and his law firm Mick & Associates wrote numerous due diligence reports provided to broker/dealers on approximately 140 DBSI projects.

603.    Mick's and Mick & Associates' typical base fee for preparation of a due diligence report on any TIC offerings was fixed at $8,500 with possible additional amounts charged depending on the number of broker/dealers provided with the report.  Mick and Mick & Associates received additional compensation to the extent the broker/dealers who received the report numbered in excess of eight.

604.    Although the reports were ostensibly prepared for use by broker/dealers, all fees were paid by the DBSI Companies and this arrangement resulted in Mick and Mick & Associates receiving from the DBSI Companies approximately $1.4 million since 2005.

605.    A significant portion of the due diligence reports prepared by Mick and Mick & Associates consist of factual information, including descriptive and background information related to various aspects of the particular project or DBSI's business operations in general.

606.    The reports also identify the types of information reviewed prior to completion of the report.  Common documents reviewed include the relevant PPM, company formation documents and financial statements.

607.    In addition to factual statements, the reports include assessments and opinions about various aspects of the offerings and provide generally favorable recommendations and conclusions as to their viability.

608.    Mick breached the professional standard of care applicable to due diligence providers and aided and abetted in the massive fraud alleged herein by reaching many conclusions which were insufficiently informed, objectively unreasonable or both.

609.    A DBSI entity often served as guarantor of many of the offerings reviewed by Mick.  As guarantor of the investments, the companies' financial viability would in all circumstances be highly relevant.  While Mick's reports would reference the guarantor's

financial viability, the reports would often not be independently audited or otherwise verified.
Nonetheless, Mick would often issue a favorable opinion despite the unreliability of the
underlying data and without having endeavored to investigate the accuracy of that data.

610.    Keeping with the theme of Mick's penchant for unreasonably relying upon
unaudited and unverified information provided by DBSI financials, Mick also allowed his
conclusions to be directly influenced by DBSI personnel.  And this is so despite statements in
each report describing what follows as an "independent due diligence review."

611.    Mick undertook actions that compromised the independence of the reports as
DBSI employees were given the opportunity to review and comment on the reports prior to their
distribution to broker/dealers.

612.    On numerous occasions, email correspondence reveal that Mick accepted
substantive comments on the DBSI offerings from DBSI personnel and that those comments
actually influenced changes in the reports.

613.    More specifically, and by way of example, a copy of Mick's due diligence report
related to the 2008 Notes Corp., dated February 1, 2008, was submitted to DBSI and included the
concluding statement that Mick "cannot unqualifiedly recommend approval" of the offering.
Handwritten notes on a copy of this report bracketed that statement and wrote the word
"Negative."  Subsequently, Mick issued a revised report on February 14, 2008 which changed
the previous language to the much more favorable "qualified recommendation."

614.    Numerous emails between Mick and DBSI employees demonstrate an unusually
familiar and personal relationship.

**COUNT ONE**
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(Rico, 18 U.S.C. § 1962(C))**

615.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

## THE ENTERPRISE

616.    Two RICO enterprises are pled in the alternative in this Complaint for the RICO violation under 18 U.S.C. § 1962(c).  The first is the enterprise comprised of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson together (the "RICO Insider Enterprise").  The second is the enterprise comprised of the DBSI Companies together (the "RICO DBSI Enterprise").  Where the allegations are equally applicable to either enterprise pled in the alternative, they are referred to by the single term "RICO Enterprise" although either of the enterprises is intended.

## A.    The RICO Insiders Enterprise

617.    At all times relevant hereto, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, individually, were "persons" within the meaning of 18 U.S.C. §§ 1961(3).

618.    At all relevant times hereto, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were members of and/or were associated-in-fact with an "enterprise" consisting of all of them engaged in or the activities of which affected interstate or foreign commerce within the meaning of 18 U.S.C. § 1961(4).

619.    The RICO Insider Enterprise included Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, all of whom

were associated-in-fact in the creation, acquisition and operation of the DBSI Companies.  The members of the RICO Insiders Enterprise included each of the Insiders.

620.    The RICO Insider Enterprise had an ascertainable structure, and a continuity of structure and personnel.  In particular, the Insider Enterprise was formed by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for the purpose of influencing, operating and dominating the DBSI Companies.

621.    As previously alleged, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were directors, officers, partners, members and/or employees of the DBSI Companies.  Douglas Swenson held a direct or indirect controlling interest in substantially all of the DBSI Companies and others of the Insiders had ownership interests and served as board members, managers or officers of each of them.

622.    The RICO Insider Enterprise had an existence separate and apart from the particular instances of racketeering activity described below.  In particular, the DBSI Companies existed as corporate entities and the Insiders controlled them in their roles as owners, directors, officers and/or employees of them.

**B.      The RICO DBSI Enterprise**

623.    At all times relevant hereto, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, individually, were "persons" within the meaning of 18 U.S.C. §§ 1961(3).

624.    In the alternative to the foregoing allegations at paragraphs 618 through 622, at all relevant times hereto, the DBSI Companies constituted, were members of and/or were associated-in-fact as an "enterprise" consisting of all of them engaged in or the activities of which affected interstate or foreign commerce within the meaning of 18 U.S.C. § 1961(4).

625.    The RICO DBSI Enterprise included all of the DBSI Companies who were corporate affiliates and/or associated-in-fact in the perpetration of the ongoing fraud and Ponzi scheme by which Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson injured Investors in the DBSI real estate empire.

626.    The RICO DBSI Enterprise had an ascertainable structure, and a continuity of structure and personnel.  In particular, the RICO DBSI Enterprise was formed by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for the purpose of carrying on their fraudulent Ponzi scheme and to cheat Investors and misappropriate funds Investors entrusted to them.

627.    As previously alleged Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were directors, officers, partners, members and/or employees of the DBSI Companies.  Douglas Swenson held a direct or indirect controlling interest in substantially all of the DBSI Companies and others of the Insiders had ownership interests and served as board members, managers or officers of each of them.

628.    The RICO DBSI Enterprise had an existence separate and apart from the particular instances of racketeering activity described below.  In particular, the DBSI Companies that comprised the RICO DBSI Enterprise existed as corporate entities and Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson controlled them in their roles as owners, directors, officers and/or employees of them.

## THE PATTERN OF RACKETEERING ACTIVITY

629.    Beginning no later than 2004, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were members of and were employed by or associated-in-fact with the RICO Enterprise, and did conduct or

participate, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(1).

630.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were able to commit and aid and abet the racketeering activity described below by virtue of their control over the affairs of the RICO Enterprise.  These offenses were committed as part of racketeering activity in that they had the same or similar purposes, results, participants, victims and/or methods of commission, and include two or more related individual offenses which were separate in time and committed with the express intention and common design and purpose of fraudulently marketing securities and real estate, obtaining money by false representations that it would be kept in trust and misappropriating substantial corporate funds and other corporate opportunities at a time the DBSI Companies were not able to meet their obligations to their Investors.  This series of related offenses extended over a substantial period of time and posed a threat of continuing activity.

631.    The above-alleged pattern of racketeering offenses included, among others, the separate acts and episodes of racketeering activity set forth below.

632.    The acts of mail fraud and wire fraud detailed elsewhere in the Complaint occurred in a continuous pattern, beginning no later than 2004 and continuing until the Petition Date.

## MAIL FRAUD

633.    Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein.  These acts formed a pattern of fraud on Investors that continued from at least 2004 to November 2008 in which Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, their

conspirators and agents, unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice for inducing TIC purchasers and purchasers of instruments issued by the Funding Entities to invest in the DBSI Companies and their real estate offerings even though Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew that the DBSI Companies were failing, that the representations and undertakings they were making were false and could not be complied with and that the only way the Investors could ever get any of their money back was by inducing yet more Investors to purchase the fraudulently marketed instruments and properties.  Thus, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson obtained funds and tax advantages from Investors and from the DBSI Companies which they diverted to themselves by means of false and fraudulent pretenses, representations and promises, and through the concealment of material facts.

634.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and the DBSI Companies, did place and cause to be placed in post offices and authorized depositories for mail matter certain mail matter to be sent or delivered by the U.S. Postal Service and/or did deposit or cause to be deposited certain mail matter to be sent or delivered by any private or commercial interstate carrier, and did cause to be delivered by mail and/or private or commercial interstate carrier, according to the directions thereof, certain mail matter, in violation of 18 U.S.C. § 1341, including as examples, and without limitation, the following:

| Table 1 Representative Examples of Mail Fraud | |
|---|---|
| **Date of Mailing (On or About)** | **Description of Item Mailed** |
| January 6, 2004 | DBSI Regents Park LLC PPM |
| January 6, 2004 | DBSI Rowesix Offices LLC PPM |
| April 2, 2004 | DBSI Vineyard Center I & II LLC PPM |
| April 12, 2004 | DBSI Overland Park LLC PPM |
| April 15, 2004 | DBSI Covington LLC PPM |
| April 21, 2004 | DBSI Metropolitan Business Center LLC PPM |
| May 10, 2004 | DBSI Quorum LLC PPM |
| May 19, 2004 | DBSI Fireman's Fund LLC PPM |
| May 31, 2004 | DBSI Sapphire Pointe LLC PPM |
| June 8, 2004 | DBSI Riverside Corp Center LLC PPM |
| June 17, 2004 | DBSI Oakhollow West LLC PPM |
| June 18, 2004 | DBSI Centre Plaza LLC PPM |
| June 18, 2004 | DBSI Corporate Center III LLC PPM |
| June 18, 2004 | DBSI Parkhill Office Building LLC PPM |
| June 23, 2004 | DBSI Lamar Offices (Arbors at Brookhollow) LLC PPM |
| July 6, 2004 | DBSI Morningside Forest (Alpharetta) LLC PPM |
| July 8, 2004 | DBSI Plaquemine LLC PPM |
| July 9, 2004 | DBSI Gladstone (2900 Business) LLC PPM |
| July 13, 2004 | DBSI Shawnee Mission LLC PPM |
| July 16, 2004 | DBSI Woodlands LLC PPM |
| July 23, 2004 | DBSI 7275 Johnson LLC PPM |
| August 2, 2004 | DBSI DEA Building (Peacock) LLC PPM |
| August 4, 2004 | DBSI 1881 Valley View LLC PPM |
| August 4, 2004 | DBSI ACI Building LLC PPM |
| August 4, 2004 | DBSI Fairway Center LLC PPM |
| August 12, 2004 | DBSI Signature Place v |
| August 20, 2004 | DBSI Tower Park LLC PPM |
| September 7, 2004 | DBSI Farrow Business Center LLC PPM |
| September 7, 2004 | DBSI Summit Woods I LLC PPM |
| September 9, 2004 | DBSI Heritage Park II LLC PPM |
| September 10, 2004 | DBSI Offices at Brookhollow OAB LLC PPM |
| September 15, 2004 | DBSI Brookhill (88th Avenue Offices) LLC PPM |
| September 15, 2004 | DBSI Sprague & Hatch LLC PPM |
| September 16, 2004 | DBSI Motor Coach (MCII) LLC PPM |
| September 28, 2004 | DBSI Appleton LLC PPM |
| October 5, 2004 | DBSI Executive Plaza II LLC PPM |
| October 13, 2004 | DBSI CP Clearwater LLC PPM |

| Table 1<br>Representative Examples of Mail Fraud | |
| --- | --- |
| October 18, 2004 | DBSI Republic Insurance LLC PPM |
| October 19, 2004 | DBSI Metcalf LLC PPM |
| October 19, 2004 | DBSI University Park Tech Center V LLC PPM |
| October 21, 2004 | DBSI Venture Tech LLC PPM |
| October 25, 2004 | DBSI Nuvell Building LLC PPM |
| November 2, 2004 | DBSI 48 Perimeter LLC PPM |
| November 10, 2004 | DBSI Corporate Woods LLC PPM |
| November 15, 2004 | DBSI Vatterott LLC PPM |
| November 16, 2004 | DBSI University Tower LLC PPM |
| November 23, 2004 | DBSI McCormick (Daniel Burnham) LLC PPM |
| November 29, 2004 | DBSI Decatur (Lindbergh) LLC PPM |
| December 3, 2004 | DBSI Missouri Falls LLC PPM |
| December 9, 2004 | DBSI Watkins LLC PPM |
| December 30, 2004 | DBSI Executive Tower LLC PPM |
| January 7, 2005 | DBSI Northridge LLC PPM |
| January 10, 2005 | DBSI Executive Park (Financial Building) LLC PPM |
| January 17, 2005 | DBSI Progress Center LLC PPM |
| January 31, 2005 | DBSI Cedar East and Cypress LLC PPM |
| February 7, 2005 | DBSI Plano Tech Center LLC PPM |
| February 14, 2005 | DBSI Kenwood LLC PPM |
| February 16, 2005 | DBSI Wilson Estates LLC PPM |
| February 21, 2005 | DBSI Lake Natoma LLC PPM |
| February 23, 2005 | DBSI Crosstown Woods LLC PPM |
| March 8, 2005 | DBSI Ghent Road LLC PPM |
| March 9, 2005 | DBSI South 75 Center LLC PPM |
| March 14, 2005 | DBSI Tolllview Buildings LLC PPM |
| March 30, 2005 | DBSI Torrey Chase LLC PPM |
| April 18, 2005 | DBSI Eagle Ridge Apartments LLC PPM |
| April 25, 2005 | DBSI Eagle's Landing LLC PPM |
| May 9, 2005 | DBSI Holly Hill LLC PPM |
| May 11, 2005 | DBSI Friar's Branch Crossing LLC PPM |
| May 11, 2005 | DBSI Windcom Court LLC PPM |
| May 20, 2005 | DBSI Lincoln Park 10 LLC PPM |
| June 8, 2005 | DBSI Academy Park Loop LLC PPM |
| June 14, 2005 | DBSI Baysmeadows LLC PPM |
| June 15, 2005 | DBSI Chattahoochee Corners LLC PPM |
| June 16, 2005 | DBSI Lake Ellenor LLC PPM |
| July 23, 2005 | DBSI Mansell Forest LLC PPM |
| July 28, 2005 | DBSI Hampton LLC PPM |
| July 29, 2005 | DBSI Embassy Tower LLC PPM |

| Table 1 | |
|---|---|
| **Representative Examples of Mail Fraud** | |
| August 1, 2005 | DBSI Arrowhead LLC PPM |
| August 18, 2005 | DBSI Draper Tech LLC PPM |
| September 16, 2005 | DBSI Wistar Center LLC PPM |
| September 21, 2005 | DBSI Village Townhomes LLC PPM |
| September 29, 2005 | DBSI Sherwood Plaza LLC PPM |
| October 5, 2005 | DBSI Spalding Triangle LLC PPM |
| October 12, 2005 | DBSI Legacy Main & High LLC PPM |
| October 17, 2005 | DBSI Lakeview Sojourn LLC PPM |
| November 14, 2005 | DBSI Legacy Country LLC PPM |
| November 16, 2005 | DBSI Brendan Way LLC PPM |
| December 22, 2005 | DBSI Cranberry LLC PPM |
| December 28, 2005 | DBSI Brookfield Pelham LLC PPM |
| January 19, 2006 | DBSI University Park Tech VI LLC PPM |
| January 20, 2006 | DBSI Breckinridge LLC PPM |
| March 2, 2006 | DBSI Keystone Commerce LLC PPM |
| March 22, 2006 | DBSI Northpointe Tower LLC PPM |
| April 7, 2006 | DBSI East 21st Street LLC PPM |
| April 10, 2006 | DBSI Silver Lakes LLC PPM |
| May 4, 2006 | DBSI East 37th Street (Vatterott II) LLC PPM |
| May 4, 2006 | DBSI Woodside Center LLC PPM |
| May 8, 2006 | DBSI Allison Pointe LLC PPM |
| June 15, 2006 | DBSI 12 Sough Place LLC PPM |
| June 22, 2006 | DBSI Hillcrest South LLC PPM |
| July 3, 2006 | DBSI Dacula Medical Center LLC PPM |
| July 20, 2006 | DBSI Avenues North LLC PPM |
| August 23, 2006 | DBSI Battlefield Station LLC PPM |
| August 24, 2006 | DBSI Colony East LLC PPM |
| September 22, 2006 | DBSI Arbors at Mallard Creek LLC PPM |
| September 22, 2006 | DBSI Camden Village LLC PPM |
| September 26, 2006 | DBSI Carrollton East LLC PPM |
| October 17, 2006 | DBSI Colonnade West Lake LLC PPM |
| October 17, 2006 | DBSI Eau Claire LLC PPM |
| October 30, 2006 | DBSI Royal Montreal LLC PPM |
| November 15, 2006 | DBSI Grant Street Portfolio LLC PPM |
| November 17, 2006 | DBSI Chambers & Hess LLC PPM |
| November 21, 2006 | DBSI Horseshoe Bend Hills LLC PPM |
| December 20, 2006 | DBSI Cambridge Place LLC PPM |
| December 20, 2006 | DBSI Riverstone Medical LLC PPM |
| January 4, 2007 | DBSI Shops at East West Connector LLC PPM |
| January 18, 2007 | DBSI Woodlands Medical Office I LLC PPM |
| January 19, 2007 | DBSI North Park II LLC PPM |
| January 24, 2007 | DBSI West Oaks Square LLC PPM |
| January 26, 2007 | DBSI Bandera Trails LLC PPM |

| Table 1<br>Representative Examples of Mail Fraud | |
|---|---|
| February 2, 2007 | DBSI Arlington Town Square LLC PPM |
| February 6, 2007 | DBSI Ridgeview Drive LLC PPM |
| February 13, 2007 | DBSI Charlotte I-485 LLC PPM |
| February 22, 2007 | DBSI Thornton Road LLC PPM LLC PPM |
| February 28, 2007 | DBSI Mercy Medical LLC PPM |
| March 1, 2007 | DBSI Cross Creek LLC PPM |
| March 9, 2007 | DBSI Sherwood Village LLC PPM |
| March 14, 2007 | DBSI North Park III LLC PPM |
| March 22, 2007 | DBSI Kemper Pointe LLC PPM |
| March 23, 2007 | DBSI Kings Highway North LLC PPM |
| March 23, 2007 | DBSI Kings Highway South LLC PPM |
| April 4, 2007 | DBSI Trinity Ridge Business Center LLC PPM |
| April 27, 2007 | DBSI Currell Centre LLC PPM |
| May 8, 2007 | DBSI Gadd Crossing LLC PPM |
| May 15, 2007 | DBSI Park Plaza LLC PPM |
| May 30, 2007 | DBSI Colony Commons LLC PPM |
| June 7, 2007 | DBSI Goshen Village LLC PPM |
| June 8, 2007 | DBSI Meadow Chase Apartments LLC PPM |
| June 14, 2007 | DBSI Streetside at Towne Lake LLC PPM |
| June 25, 2007 | DBSI Loop 1604 LLC PPM |
| June 29, 2007 | DBSI Road 68 Retail Center LLC PPM |
| July 3, 2007 | DBSI Copenhaver Road LLC PPM |
| July 15, 2007 | DBSI Mansell Plaza LLC PPM |
| July 18, 2007 | DBSI Buckley & 120th LLC PPM |
| July 23, 2007 | DBSI Winchester Office Building LLC PPM |
| July 24, 2007 | DBSI Beacon Point LLC PPM |
| July 31, 2007 | DBSI Stony Brook South LLC PPM |
| August 3, 2007 | DBSI Willow Bend LLC PPM |
| August 9, 2007 | DBSI Chinden Road LLC PPM |
| August 9, 2007 | DBSI Shops @ Katy LLC PPM |
| August 9, 2007 | DBSI McMillan Road LLC PPM |
| August 14, 2007 | DBSI Carolina Commons LLC PPM |
| August 21, 2007 | DBSI Village at Old Trace LLC PPM |
| August 24, 2007 | DBSI North Austin II LLC PPM |
| August 24, 2007 | DBSI North Austin III LLC PPM |
| August 24, 2007 | DBSI North Austin LLC PPM |
| August 28, 2007 | DBSI Kettering Road LLC PPM |
| August 28, 2007 | DBSI Snake River Valley LLC Units LLC PPM |
| August 31, 2007 | DBSI Fayette Town Center LLC PPM |
| September 17, 2007 | DBSI Haverford Place LLC PPM |
| September 20, 2007 | DBSI Stone Oak Crossing LLC PPM |

| Table 1 Representative Examples of Mail Fraud | |
| --- | --- |
| September 21, 2007 | DBSI Cavanaugh II LLC PPM |
| September 26, 2007 | DBSI Cavanaugh LLC PPM |
| October 19, 2007 | DBSI Shops of Turkey Creek LLC v |
| October 24, 2007 | DBSI Hernando South LLC PPM |
| October 24, 2007 | DBSI Hernando South II LLC PPM |
| November 2, 2007 | DBSI Cavanaugh IV LLC PPM |
| November 14, 2007 | DBSI Green Street Commons LLC PPM |
| December 4, 2007 | DBSI Springville Corner LLC PPM |
| December 5, 2007 | DBSI New Hampstead II LLC PPM |
| December 5, 2007 | DBSI New Hampstead LLC PPM |
| January 2, 2008 | DBSI Highway 60 LLC PPM |
| January 4, 2008 | DBSI Landmark Towers LLC PPM |
| January 15, 2008 | DBSI 2008 Development Opportunity Fund LLC - Notes PPM |
| January 15, 2008 | DBSI Houston Levee Galleria LLC PPM |
| January 21, 2008 | DBSI 2008 Development Opportunity Fund LLC- Sharing Units PPM |
| January 21, 2008 | DBSI Ash Avenue LLC PPM |
| January 21, 2008 | DBSI Wisdom Pointe LLC PPM |
| January 22, 2008 | DBSI Landmark Towers LLC PPM |
| February 14, 2008 | DBSI Cavanaugh III LLC PPM |
| February 21, 2008 | DBSI Cavanaugh III LLC PPM |
| March 3, 2008 | DBSI Boise Foothills LLC PPM |
| March 4, 2008 | DBSI North Medford LLC PPM |
| March 10, 2008 | DBSI Boise Foothills LLC PPM |
| March 26, 2008 | DBSI Village North LLC PPM |
| March 27, 2008 | DBSI Oakwood Plaza Acquisition LLC PPM |
| April 16, 2008 | DBSI West Boise LLC PPM |
| April 23, 2008 | DBSI West Boise LLC PPM |
| April 28, 2008 | DBSI Pinehurst Square East Acquisition LLC PPM |
| April 29, 2008 | DBSI Wisdom Pointe LLC PPM |
| May 6, 2008 | DBSI Pinehurst Square West Acquisition LLC PPM |
| May 15, 2008 | DBSI Peachtree Corners Pavilion LLC PPM |
| May 22, 2008 | DBSI Shoppes at Trammel LLC PPM |
| June 3, 2008 | DBSI Trekell & I-8 LLC PPM |
| June 11, 2008 | DBSI North Jarrell I-35 LLC PPM |
| June 13, 2008 | DBSI Wingfield Village LLC PPM |
| June 20, 2008 | DBSI Wingfield Village LLC PPM |
| August 7, 2008 | DBSI E-470 East LLC PPM |
| August 21, 2008 | DBSI Belton Town Center Acquisition LLC PPM |

| Table 1 Representative Examples of Mail Fraud | |
|---|---|
| August 25, 2008 | DBSI Florissant Market Place Acquisition LLC PPM |
| September 16, 2008 | DBSI Villages of Riverview LLC PPM |

635.    Each of the aforesaid mailings, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew of and/or authorized such mailings and knew that such mailings were in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  Each of these mailings furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors and in their business and property.

## WIRE FRAUD

636.    From at least 2004 to in or about November 2008, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of further executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and DBSI Companies, did use interstate wire services to place interstate telephone calls, and send interstate emails and telefaxes in violation of 18 U.S.C. § 1343, including as examples, and without limitation, the following:

| Table 2 Representative Examples of Wire Fraud | |
|---|---|
| **Approximate Date of Call, Email or Telefax** | **Description of Call, Email or Telefax** |
| July 6, 2007 | Email forwarding DBSI Loop 1604 LLC PPM |
| August 13, 2007 | Email forwarding DBSI Chinden Road LLC PPM |
| August 14, 2007 | Email forwarding DBSI Buckley & 120th LLC PPM |
| August 29, 2007 | Email forwarding DBSI Hernando South II LLC PPM |

| Table 2 Representative Examples of Wire Fraud | |
|---|---|
| October 16, 2007 | Email forwarding DBSI Cavanaugh IV LLC PPM |
| October 17, 2007 | Email forwarding DBSI Old Trace LLC PPM |
| October 29, 2007 | Email forwarding DBSI Hernando South II LLC PPM |
| November 5, 2007 | Email forwarding DBSI Kings Highway North LLC PPM |
| November 8, 2007 | Email forwarding DBSI McMillan Road LLC PPM |
| January 17, 2008 | Email forwarding DBSI Ash Avenue LLC PPM |
| February 1, 2008 | Email forwarding DBSI 2008 Notes Corp. PPM |
| May 12, 2008 | Email forwarding DBSI North Stafford LLC PPM |
| May 12, 2008 | Email forwarding DBSI Goshen Village LLC PPM |
| July 1, 2008 | Email forwarding DBSI Diversified Realty REIT PPM |
| August 27, 2008 | Email forwarding DBSI Belton Town Center LLC PPM |
| August 28, 2008 | Email forwarding DBSI Belton Town Center PPM |
| August 28, 2008 | Email forwarding DBSI Florissant Marketplace LLC PPM |
| August 28, 2008 | Email forwarding DBSI North Jarrell I-35 LLC PPM |
| August 28, 2008 | Email forwarding DBSI E-470 East LLC PPM |
| September 2, 2008 | Email forwarding DBSI Florissant Marketplace LLC PPM |
| September 3, 2008 | Email forwarding DBSI Belton Town Center LLC PPM |
| September 5, 2008 | Email forwarding DBSI E-470 East LLC PPM |
| September 5, 2008 | Email forwarding DBSI Ocotillo Heights LLC PPM |
| September 5, 2008 | Email forwarding DBSI North Jarrell LLC PPM |
| September 5, 2008 | Email forwarding DBSI Florissant Marketplace LLC PPM |
| September 23, 2007 | Email forwarding DBSI Chinden Road LLC PPM |
| November 10, 2008 | Email forwarding DBSI Goshen Village LLC PPM |

637.     Each of the aforesaid telephone calls, emails and telefaxes, as well as others, was
in furtherance of the scheme to defraud alleged in this Complaint.  Douglas Swenson, Hassard,
Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson
knew of and/or authorized the use of interstate and transatlantic wire services to place such
telephone calls and send such emails and telefaxes, and knew that such telephone calls, emails
and telefaxes were being made in furtherance of and for the purpose of executing the scheme or
were incidental to an essential part of the scheme.  The use of interstate wire services to place
such telephone calls and send such emails and telefaxes furthered the scheme to defraud which
was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their
business and property.

## DAMAGES CAUSED BY THE RICO VIOLATION

638.     By engaging in the conduct set forth above, and conducting or participating in the
conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, Douglas
Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and
David Swenson, caused the Debtor Entities and Assigning Investors to be injured in their
business and property.

639.     By reason of the foregoing, the Trustee is entitled to recover from Douglas
Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and
David Swenson threefold such actual damages as the Court finds the Debtor Entities and
Assigning Investors have sustained, together with the Trustee's cost of suit, including reasonable
attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate
Litigation Trust and the Private Action Trust and against Douglas Swenson, Hassard, Mayeron,
Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for threefold

such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

### COUNT TWO
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(Rico, 18 U.S.C. § 1962(b))**

640.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

### THE ENTERPRISE

641.    At all times relevant hereto, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, individually, were "persons" within the meaning of 18 U.S.C. §§ 1961(3).

642.    Two RICO enterprises are pled in the alternative in this Complaint for the RICO violation under 18 U.S.C. § 1962(b).  The first is the RICO Insider Enterprise, as discussed in more detail in paragraphs 618 through 622.  The second is the RICO DBSI Enterprise, as discussed in more detail in paragraphs 624 through 628.  Where the allegations are equally applicable to either enterprise pled in the alternative, they are referred to by the single term "RICO Enterprise" although either of the enterprises is intended.

643.    As previously alleged, at all relevant times hereto, the RICO Enterprise was an "enterprise" engaged in or the activities of which affected interstate or foreign commerce within the meaning of 18 U.S.C. § 1961(4).

644.    The RICO Enterprise had an existence separate and apart from the particular
instances of racketeering activity described below.  In particular, Douglas Swenson, Hassard,
Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson
were members of and/or were associated-in-fact with an "enterprise" consisting of all of them or,
in the alternative, the DBSI Companies existed as corporate entities and Douglas Swenson,
Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David
Swenson controlled them as directors and/or shareholders of those entities.

## THE PATTERN OF RACKETEERING ACTIVITY

645.    Beginning no later than 2004, Douglas Swenson, Hassard, Mayeron, Mott,
Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson did acquire and
maintain, directly or indirectly, an interest in or control of the RICO Enterprise through a
"pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(1).

646.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve,
Bringhurst, Jeremy Swenson and David Swenson were able to commit and aid and abet the
racketeering activity described below by virtue of their acquisition, maintenance and control over
the RICO Enterprise.  These offenses were committed as part of racketeering activity in that they
had the same or similar purposes, results, participants, victims and/or methods of commission,
and include two or more related individual offenses which were separate in time and committed
with the express intention and common design and purpose of fraudulently marketing securities
and real estate, obtaining money by false representations that it would be kept in trust and
misappropriating substantial corporate funds and other corporate opportunities at a time the
DBSI Companies were not able to meet their obligations to their Investors.  This series of related
offenses extended over a substantial period of time and posed a threat of continuing activity.

647. The above-alleged pattern of racketeering offenses included, among others, the separate acts and episodes of racketeering activity set forth below.

648. The acts of mail fraud and wire fraud detailed elsewhere in the Complaint occurred in a continuous pattern, beginning no later than 2004 and continuing until the Petition Date.

## MAIL FRAUD

649. Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein. These acts formed a pattern of fraud on Investors that continued from at least 2004 to November 2008 in which Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, and their conspirators and agents, unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice for acquiring and maintaining the RICO Enterprise, inducing TIC purchasers and purchasers of instruments issued by the Funding Entities to invest in the DBSI Companies and their real estate offerings even though Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew that the DBSI Companies were failing, that the representations and undertakings they were making were false and could not be complied with and that the only way the Investors could ever get any of their money back was by inducing yet more Investors to purchase the fraudulently marketed instruments and properties. Thus, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson obtained funds and tax advantages from Investors and from the DBSI Companies which they diverted to themselves by means of false and fraudulent pretenses, representations and promises, and through the concealment of material facts.

650.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and the DBSI Companies, did place and cause to be placed in post offices and authorized depositories for mail matter certain mail matter to be sent or delivered by the U.S. Postal Service and/or did deposit or cause to be deposited certain mail matter to be sent or delivered by any private or commercial interstate carrier, and did cause to be delivered by mail and/or private or commercial interstate carrier, according to the directions thereof, certain mail matter, in violation of 18 U.S.C. § 1341, including as examples, and without limitation, the representative examples of mail fraud identified in Table 1 at Paragraph 634.

651.     Each of the aforesaid mailings, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew of and/or authorized such mailings and knew that such mailings were in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  Each of these mailings furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

## WIRE FRAUD

652.     From at least 2004 to in or about November 2008, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of further executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and DBSI Companies, did use interstate wire services to

place interstate telephone calls, and send interstate emails and telefaxes in violation of 18 U.S.C. § 1343, including as examples, and without limitation, the representative examples of wire fraud identified in Table 2 at Paragraph 636:

653.  Each of the aforesaid telephone calls, emails and telefaxes, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew of and/or authorized the use of interstate and transatlantic wire services to place such telephone calls and send such emails and telefaxes, and knew that such telephone calls, emails and telefaxes were being made in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  The use of interstate wire services to place such telephone calls and send such emails and telefaxes furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

## DAMAGES CAUSED BY THE RICO VIOLATION

654.  By engaging in the conduct set forth above, and conducting or participating in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

655.  By reason of the foregoing, the Trustee is entitled to recover from Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson threefold such actual damages as the Court finds the Debtor Entities and

Assigning Investors have sustained, together with the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for threefold such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

## COUNT THREE
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(Rico Conspiracy, 18 U.S.C. § 1962(d))**

656.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

657.    Beginning no later than 2004, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson combined, conspired and agreed together and with each other to commit the aforementioned violations of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

658.    Beginning no later than 2004, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson conspired and agreed together and with each other to commit the aforementioned violations of 18 U.S.C. § 1962(b), in violation of 18 U.S.C. § 1962(d).

659.    In furtherance of the aforementioned conspiracy and to effect the objects thereof, the conspirators committed the overt acts described above, among others.

660. By engaging in the conduct set forth above, and conspiring to conduct or participate in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson both indirectly and directly, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

661. By reason of the foregoing, the Trustee is entitled to recover from Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson threefold such actual damages as the Court finds the Debtor Entities and Assigning Investors have sustained, together with Plaintiff's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for threefold such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

## COUNT FOUR
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(Idaho Racketeering Act, Idaho Code § 18-7804(c))**

662. Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

## THE ENTERPRISE

663.     Two racketeering enterprises are pled in the alternative in this Complaint for the Idaho Racketeering Act violation under Idaho Code § 18-7804(c).  The first is the enterprise comprised of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson together (the "Racketeering Insider Enterprise").  The second is the enterprise comprised of the DBSI Companies together (the "Racketeering DBSI Enterprise").  Where the allegations are equally applicable to either enterprise pled in the alternative, they are referred to by the single term "Racketeering Enterprise" although either of the enterprises is intended.

**B.      The Racketeering Insider Enterprise**

664.     At all times relevant hereto, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, individually, were "persons" within the meaning of Idaho Code § 18-7803(b).

665.     At all relevant times hereto, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were members of and/or were associated-in-fact with an "enterprise" consisting of all of them, within the meaning of Idaho Code § 18-7803(c).

666.     The Racketeering Insider Enterprise included Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, all of whom were associated-in-fact in the creation, acquisition and operation of the DBSI Companies.  The members of the Racketeering Insider Enterprise included Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson.

667.     The Racketeering Insider Enterprise had an ascertainable structure, and a continuity of structure and personnel.  In particular, the Racketeering Insider Enterprise was

formed by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for the purpose of influencing, operating and dominating the DBSI Companies.

668.     As previously alleged, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were directors, officers, partners, members and/or employees of the DBSI Companies.  Douglas Swenson held a direct or indirect controlling interest in substantially all of the DBSI Companies and others of the Insiders had ownership interests and served as board members, managers or officers of each of them.

669.     The Racketeering Insider Enterprise had an existence separate and apart from the particular instances of racketeering activity described below.  In particular, the DBSI Companies existed as corporate entities and Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson controlled them in their roles as owners, directors, officers and/or employees of them.

**C.     The Racketeering DBSI Enterprise (in the alternative)**

670.     At all times relevant hereto, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, individually, were "persons" within the meaning of Idaho Code § 18-7803(b).

671.     In the alternative to the foregoing allegations at paragraphs 665 through 669, at all relevant times hereto, the DBSI Companies constituted, were members of and/or were associated-in-fact as an "enterprise" consisting of all of them within the meaning of Idaho Code § 18-7803(c).

672.     The Racketeering DBSI Enterprise included all of the DBSI Companies who were corporate affiliates and/or associated-in-fact in the perpetration of the ongoing fraud and Ponzi scheme by which Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve,

Bringhurst, Jeremy Swenson and David Swenson injured Investors in the DBSI real estate empire.

673.    The Racketeering DBSI Enterprise had an ascertainable structure, and a continuity of structure and personnel.  In particular, the Racketeering DBSI Enterprise was formed by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for the purpose of carrying on their fraudulent Ponzi scheme and to cheat Investors and misappropriate funds Investors entrusted to them.

674.    As previously alleged Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were directors, officers, partners, members and/or employees of the DBSI Companies.  Douglas Swenson held a direct or indirect controlling interest in substantially all of the DBSI Companies and others of the Insiders had ownership interests and served as board members, managers or officers of each of them.

675.    The Racketeering DBSI Enterprise had an existence separate and apart from the particular instances of racketeering activity described below. In particular, the DBSI Companies that comprised the Racketeering DBSI Enterprise existed as corporate entities and Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson controlled them in their roles as owners, directors, officers and/or employees of them.

## THE PATTERN OF RACKETEERING ACTIVITY

676.    Beginning no later than 2004, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were members of and were employed by or associated-in-fact with the Racketeering Enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of racketeering activity," within the meaning of Idaho Code § 18-7803(d).

677.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were able to commit and aid and abet the racketeering activity described below by virtue of their control over the affairs of the Racketeering Enterprise.  These offenses were committed as part of racketeering activity in that they had the same or similar purposes, results, participants, victims and/or methods of commission, and include two or more related individual offenses which were separate in time and committed with the express intention and common design and purpose of fraudulently marketing securities and real estate, obtaining money by false representations that it would be kept in trust and misappropriating substantial corporate funds and other corporate opportunities at a time the DBSI Companies were not able to meet their obligations to their Investors.  This series of related offenses extended over a substantial period of time and posed a threat of continuing activity.

678.    The above-alleged pattern of racketeering offenses included, among others, the separate acts and episodes of racketeering activity set forth below.

679.    The acts of mail fraud and wire fraud detailed elsewhere in the Complaint occurred in a continuous pattern, beginning no later than 2004 and continuing until the Petition Date.

## MAIL FRAUD

680.    Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein.  These acts formed a pattern of fraud on Investors that continued from at least 2004 to November 2008 in which Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, their conspirators and agents, unlawfully, willfully and knowingly devised and intended to devise a

scheme and artifice for inducing TIC purchasers and purchasers of instruments issued by the

Funding Entities to invest in the DBSI Companies and their real estate offerings even though

Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy

Swenson and David Swenson knew that the DBSI Companies were failing, that the

representations and undertakings they were making were false and could not be complied with

and that the only way the Investors could ever get any of their money back was by inducing yet

more Investors to purchase the fraudulently marketed instruments and properties.  Thus, Douglas

Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and

David Swenson obtained funds and tax advantages from Investors and from the DBSI

Companies which they diverted to themselves by means of false and fraudulent pretenses,

representations and promises, and through the concealment of material facts.

681.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve,

Bringhurst, Jeremy Swenson and David Swenson and their co-conspirators and agents

unlawfully, willfully and knowingly, and for purposes of executing and attempting to execute,

the scheme and artifice to defraud, and for obtaining money and property from the Investors and

the DBSI Companies, did place and cause to be placed in post offices and authorized

depositories for mail matter certain mail matter to be sent or delivered by the U.S. Postal Service

and/or did deposit or cause to be deposited certain mail matter to be sent or delivered by any

private or commercial interstate carrier, and did cause to be delivered by mail and/or private or

commercial interstate carrier, according to the directions thereof, certain mail matter, in violation

of 18 U.S.C. § 1341, including as examples, and without limitation, the representative examples

of mail fraud identified in Table 1 at Paragraph 634.

682.    Each of the aforesaid mailings, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint. Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew of and/or authorized such mailings, and knew that such mailings were in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme. Each of these mailings furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

## WIRE FRAUD

683.    From at least 2004 to in or about November 2008, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of further executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and DBSI Companies, did use interstate wire services to place interstate telephone calls, and send interstate emails and telefaxes in violation of 18 U.S.C. § 1343, including as examples, and without limitation, the representative examples of wire fraud identified in Table 2 at Paragraph 636.

684.    Each of the aforesaid telephone calls, emails and telefaxes, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew of and/or authorized the use of interstate and transatlantic wire services to place such telephone calls and send such emails and telefaxes, and knew that such telephone calls, emails and telefaxes were being made in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  The use of interstate wire services to place such telephone calls and send such emails and telefaxes furthered the scheme to defraud which

was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their

business and property.

## SECURITIES FRAUD

685.    Specific acts of fraud previously alleged in this Complaint are incorporated here

by reference as if fully set forth herein.

686.    The material misrepresentations identified above occurred in connection with the

sale of securities, as identified in further detail above.

687.    The material misrepresentations identified above were contained in PPMs and

financial statements that were, upon information and belief, derived from knowledgeable persons

from DBSI, routinely circulated among Douglas Swenson, Hassard, Mayeron, Mott, Bennett,

Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for their review prior to

their dissemination and could not have been released without their approval and/or over their

objection.  Upon information and belief, Douglas Swenson, Hassard, Mayeron, Mott, Bennett,

Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson saw the false PPMs and

financial statements, knew that they were false, and allowed them to be issued anyway.

688.    In addition, the conduct set forth in detail above was a device, artifice and scheme

to defraud the Investors, as well as acts, practices and a course of dealing which operated as a

fraud or deceit upon the Investors in connection with the purchase and sale of the above

identified securities.

689.    The conduct of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var

Reeve, Bringhurst, Jeremy Swenson and David Swenson set forth above evidenced an intent to

deceive, manipulate and defraud.  By way of example, and not limitation, the behavior of

Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy

Swenson and David Swenson in moving cash among the DBSI Companies in an elaborate shell game and at the same time preparing financial statements that dramatically overstated DBSI's financial strength amply demonstrates the Insiders' desire to prevent Investors from learning the truth.  Similarly, the repeated assurances to the Investors that Accountable Reserves would be reserved for specific uses, when nothing of the kind was in fact happening, is consistent only with a clear intent to deceive.

690.    The conduct of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson set forth above was deliberately reckless and was an extreme departure from the standards of ordinary care that presented a danger of misleading the Investors that was either known to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson or so obvious that it must have been known.

691.    Each of the Investors were ignorant of each material misrepresentation's falsity and justifiably relied upon the material misrepresentations to their detriment and each of the Assigning Investors suffered economic loss as a direct and proximate result of the material misrepresentations and their reliance thereon.

692.    As such, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst violated Idaho Code Ann. § 30-14-501, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5, and in so doing, intended to and did, in fact, injure the Debtor Entities and Assigning Investors in their business and property.

## DAMAGES CAUSED BY THE RACKETEERING ACT VIOLATION

693.    By engaging in the conduct set forth above, and conducting or participating in the conduct of the affairs of the Racketeering Enterprise through a pattern of racketeering activity,

Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

694.    By reason of the foregoing, the Trustee is entitled to recover from Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson threefold such actual damages as the Court finds the Debtor Entities and Assigning Investors have sustained, together with the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for threefold such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

## COUNT FIVE
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(Idaho Racketeering Act, Idaho Code § 18-7804(b))**

695.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

## THE ENTERPRISE

696.    At all times relevant hereto, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, individually, were "persons" within the meaning of Idaho Code § 18-7803(b).

697.    Two Racketeering enterprises are pled in the alternative in this Complaint for the Racketeering Act violation under Idaho Code § 18-7804(b).  The first is the Racketeering Insider Enterprise, as discussed in greater detail in paragraphs 665 through 669.  The second is the Racketeering DBSI Enterprise, as discussed in greater detail in paragraphs 671 through 675. Where the allegations are equally applicable to either enterprise pled in the alternative, they are referred to by the single term "Racketeering Enterprise" although either of the enterprises is intended.

698.    As previously alleged, at all relevant times hereto, the Racketeering Enterprise was an "enterprise" within the meaning of Idaho Code § 18-7803(c).

699.    The Racketeering Enterprise had an existence separate and apart from the particular instances of racketeering activity described below.  In particular, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were members of and/or were associated-in-fact with an "enterprise" consisting of all of them or, in the alternative, the DBSI Companies existed as corporate entities and Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson controlled them as directors and/or shareholders of those entities.

## THE PATTERN OF RACKETEERING ACTIVITY

700.    Beginning no later than 2004, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson did acquire and

maintain, directly or indirectly, an interest in or control of the RICO Enterprise through a "pattern of racketeering activity," within the meaning of Idaho Code § 18-7804(b).

701.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson were able to commit and aid and abet the racketeering activity described below by virtue of their acquisition, maintenance and control over the Racketeering Enterprise.  These offenses were committed as part of racketeering activity in that they had the same or similar purposes, results, participants, victims and/or methods of commission, and include two or more related individual offenses which were separate in time and committed with the express intention and common design and purpose of fraudulently marketing securities and real estate, obtaining money by false representations that it would be kept in trust and misappropriating substantial corporate funds and other corporate opportunities at a time the DBSI Companies were not able to meet their obligations to their Investors.  This series of related offenses extended over a substantial period of time and posed a threat of continuing activity.

702.    The above-alleged pattern of racketeering offenses included, among others, the separate acts and episodes of racketeering activity set forth below.

703.    The acts of mail fraud and wire fraud detailed elsewhere in the Complaint occurred in a continuous pattern, beginning no later than 2004 and continuing until the Petition Date.

**MAIL FRAUD**

704.    Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein.  These acts formed a pattern of fraud on Investors that continued from at least 2004 to November 2008 in which Douglas Swenson, Hassard, Mayeron,

Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, and their conspirators and agents, unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice for acquiring and maintaining the Racketeering Enterprise, inducing TIC purchasers and purchasers of instruments issued by the Funding Entities to invest in the DBSI Companies and their real estate offerings even though Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew that the DBSI Companies were failing, that the representations and undertakings they were making were false and could not be complied with and that the only way the Investors could ever get any of their money back was by inducing yet more Investors to purchase the fraudulently marketed instruments and properties.  Thus, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson obtained funds and tax advantages from Investors and from the DBSI Companies which they diverted to themselves by means of false and fraudulent pretenses, representations and promises, and through the concealment of material facts.

705.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and the DBSI Companies, did place and cause to be placed in post offices and authorized depositories for mail matter certain mail matter to be sent or delivered by the U.S. Postal Service and/or did deposit or cause to be deposited certain mail matter to be sent or delivered by any private or commercial interstate carrier, and did cause to be delivered by mail and/or private or commercial interstate carrier, according to the directions thereof, certain mail matter, in violation

of 18 U.S.C. § 1341, including as examples, and without limitation, the representative acts of mail fraud identified in Table 1 at Paragraph 634.

706.    Each of the aforesaid mailings, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew of and/or authorized such mailings. and knew that such mailings were in furtherance of and for the purpose of executing the scheme or were incidental to an essential part of the scheme.  Each of these mailings furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

## WIRE FRAUD

707.    From at least 2004 to in or about November 2008, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of further executing and attempting to execute, the scheme and artifice to defraud, and for obtaining money and property from the Investors and DBSI Companies, did use interstate wire services to place interstate telephone calls, and send interstate emails and telefaxes in violation of 18 U.S.C. § 1343, including as examples, and without limitation, the representative acts of wire fraud identified in Table 2 at Paragraph 636.

708.    Each of the aforesaid telephone calls, emails and telefaxes, as well as others, was in furtherance of the scheme to defraud alleged in this Complaint.  Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knew of and/or authorized the use of interstate and transatlantic wire services to place such telephone calls and send such emails and telefaxes, and knew that such telephone calls, emails and telefaxes were being made in furtherance of and for the purpose of executing the scheme or

were incidental to an essential part of the scheme.  The use of interstate wire services to place such telephone calls and send such emails and telefaxes furthered the scheme to defraud which was intended to and did, in fact, injure the Debtor Entities and the Assigning Investors in their business and property.

## SECURITIES FRAUD

709.    Specific acts of fraud previously alleged in this Complaint are incorporated here by reference as if fully set forth herein.

710.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above.

711.    The material misrepresentations identified above were contained in PPMs and financial statements that were, upon information and belief, derived from knowledgeable persons from DBSI, routinely circulated among Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for their review prior to their dissemination and could not have been released without their approval and/or over their objection.  Upon information and belief, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson saw the false PPMs and financial statements, knew that they were false, and allowed them to be issued anyway.

712.    In addition, the conduct set forth in detail above was a device, artifice and scheme to defraud the Investors, as well as acts, practices and a course of dealing which operated as a fraud or deceit upon the Investors in connection with the purchase and sale of the above identified securities.

713.    The conduct of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson set forth above evidenced an intent to

deceive, manipulate and defraud.  By way of example, and not limitation, the behavior of
Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy
Swenson and David Swenson in moving cash among the DBSI Companies in an elaborate shell
game and at the same time preparing financial statements that dramatically overstated DBSI's
financial strength amply demonstrates the Insiders' desire to prevent Investors from learning the
truth.  Similarly, the repeated assurances to the Investors that Accountable Reserves would be
reserved for specific uses, when nothing of the kind was in fact happening, is consistent only
with a clear intent to deceive.

714.    The conduct of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var
Reeve, Bringhurst, Jeremy Swenson and David Swenson set forth above was deliberately
reckless and was an extreme departure from the standards of ordinary care that presented a
danger of misleading the Investors that was either known to Douglas Swenson, Hassard,
Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson or
so obvious that it must have been known.

715.    Each of the Investors were ignorant of each material misrepresentation's falsity
and justifiably relied upon the material misrepresentations to their detriment and each of the
Assigning Investors suffered economic loss as a direct and proximate result of the material
misrepresentations and their reliance thereon.

716.    As such, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve
and Bringhurst violated Idaho Code Ann. § 30-14-501, 15 U.S.C. § 78j(b), and 17 C.F.R. §
240.10b-5, and in so doing, intended to and did, in fact, injure the Debtor Entities and Assigning
Investors in their business and property.

## DAMAGES CAUSED BY THE RACKETEERING ACT VIOLATION

717.    By engaging in the conduct set forth above, and conducting or participating in the conduct of the affairs of the Racketeering Enterprise through a pattern of racketeering activity, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

718.    By reason of the foregoing, the Trustee is entitled to recover from Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson threefold such actual damages as the Court finds the Debtor Entities and Assigning Investors have sustained, together with the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for threefold such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a), and such additional compensatory damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

### COUNT SIX
### (By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)
### (Idaho Racketeering Act Conspiracy, Idaho Code § 18-7804(d))

719.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

720.    Beginning no later than 2004, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson combined, conspired and agreed together and with each other to commit the aforementioned violations of Idaho Code § 18-7804(c), in violation of Idaho Code § 18-7804(d).

721.    Beginning no later than 2004, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson conspired and agreed together and with each other to commit the aforementioned violations of Idaho Code § 18-7804(b), in violation of Idaho Code § 18-7804(d).

722.    In furtherance of the aforementioned conspiracy and to effect the objects thereof, the conspirators committed the overt acts described above, among others.

723.    By engaging in the conduct set forth above, and conspiring to conduct or participate in the conduct of the affairs of the Racketeering Enterprise through a pattern of racketeering activity, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson both indirectly and directly, caused the Debtor Entities and Assigning Investors to be injured in their business and property.

724.    By reason of the foregoing, the Trustee is entitled to recover from Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson threefold such actual damages as the Court finds the Debtor Entities and Assigning Investors have sustained, together with Plaintiff's cost of suit, including reasonable attorneys' fees, pursuant to Idaho Code § 18-7805(a).

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Action Trust and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for threefold

such actual damages as the Court finds the assignors and beneficiaries of the Estate Litigation

Trust and Private Action Trust have sustained, the Trustee's cost of suit, including reasonable

attorneys' fees, pursuant to Idaho Code § 18-7805(a), and such additional compensatory

damages, punitive damages, costs of suit and other relief as the Court deems just and equitable.

### COUNT SEVEN
### (By James Zazzali as Trustee of the Estate Litigation Trust)
### (Loans Payable/Book Account)

725.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set

forth herein at length.

726.    DRR is owed repayment of unpaid and past due loans in the amount of

$101,144,847 as of December 31, 2008, from DBSI Investments as reflected in a book account.

727.    DBSI Real Estate Funding Corp. is owed repayment of unpaid and past due loans

in the amount of $6,536,378 as of December 31, 2008 from DBSI Investments as reflected in a

book account.

728.    DBSI Investments is a partnership organized under the laws of the State of Idaho.

729.    Douglas Swenson, Hassard, Mayeron and Mott were at all relevant times general

partners in DBSI Investments.

730.    As general partners in DBSI Investments, Douglas Swenson, Hassard, Mayeron,

and Mott are personally liable for the partnership's debts and obligations.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate

Litigation Trust, and against Douglas Swenson, Hassard, Mayeron and Mott, jointly and

severally, for the sum of $107,681,225, plus interest, costs of suit and such other relief as the

Court deems just and equitable.

**COUNT EIGHT**
**(By James Zazzali as Trustee of the Estate Litigation Trust)**
**(Loans Payable/Book Account)**

731.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

732.    DBSI Inc. is owed repayment of unpaid and past due loans in the amount of $196,689,254 as of December 31, 2008, from DRR as reflected in a book account.

733.    DRR is a general partnership organized under the laws of the State of Idaho.

734.    DBSI Investors IX and DBSI Investors XI were at all relevant times general partners in DRR.

735.    As general partners in DRR, DBSI Investors IX and DBSI Investors XI are liable for DRR's debts and obligations.

736.    DBSI Investors IX and DBSI Investors XI are limited partnerships organized under the laws of the State of Idaho.

737.    DBSI Investments was at all relevant times a general partner in both DBSI Investors IX and DBSI Investors XI.

738.    As a general partner in both DBSI Investors IX and DBSI Investors XI, DBSI Investments is liable for the debts and obligations of those two partnerships, including those partnerships' obligations as general partners in DRR.

739.    DBSI Investments is a partnership organized under the laws of the State of Idaho.

740.    Douglas Swenson, Hassard, Mayeron and Mott were at all relevant times general partners of DBSI Investments.

741.    As general partners of DBSI Investments, Douglas Swenson, Hassard, Mayeron and Mott are personally liable for its debts and obligations, including DBSI Investments'

obligations as a general partner in DBSI Investors IX and DBSI Investors XI, which obligations, in turn, include the debts and obligations of DRR.

742.    Accordingly, Douglas Swenson, Hassard, Mayeron and Mott are ultimately personally responsible for the unpaid $196,689,254 debt owed by DRR to DBSI Inc.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against Douglas Swenson, Hassard and Mayeron and Mott, jointly and severally, for the sum of $196,689,254, plus interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT NINE
### (By James Zazzali as Trustee of the Estate Litigation Trust)
### (Breach of Fiduciary Duty)

743.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

744.    As directors and officers of the Debtor Entities, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst owed the Debtor Entities fiduciary duties of due care, good faith and loyalty.

745.    The above described actions and omissions by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst were grossly negligent, a gross abuse of discretion, and recklessly indifferent to or in deliberate disregard of the interests of the Debtor Entities and were outside the bounds of reason.

746.    The above described actions and omissions by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst also constituted unfair self-dealing, the unfair elevation of their personal interests above those of the Debtor Entities, and the unfair pursuit and receipt of personal benefits not enjoyed by the Debtor Entities as a whole.

747.    The above described actions and omissions were also part of a sustained and systematic failure by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst to exercise proper oversight for the benefit of the Debtor Entities.

748.    The above described actions and omissions also constituted a gross dereliction of duty and a conscious disregard for the Control Group Defendants' duties as officers and directors.

749.    Accordingly, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst have breached their fiduciary duties to the Debtor Entities, and, as a direct and proximate result, the Debtor Entities have been damaged.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst, jointly and severally, imposing a constructive trust over all monies, property and other assets in the possession of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson acquired directly or indirectly with the gains they achieved through their breaches of fiduciary duty, and for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TEN
### (By James Zazzali as Trustee of the Estate Litigation Trust)
### (Aiding and Abetting Breach of Fiduciary Duty)

750.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

751. Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knowingly participated in the aforementioned breaches of fiduciary duty by the Control Group Defendants.

752. As a direct and proximate result, the Debtor Entities have been damaged.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, jointly and severally, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT ELEVEN
### By James Zazzali as Trustee of the Estate Litigation Trust)
### (Civil Conspiracy)

753. Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

754. The wrongs alleged herein were the product of agreements among or a confederation among Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson during a period beginning no later than 2004 through in or about 2008 with the common objective of accomplishing the wrongs alleged, including, but not limited to, the looting of the DBSI Companies.

755. As detailed above, these collaborating Insiders used unlawful means to accomplish their wrongful objectives.

756. The Debtor Entities were injured thereby.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var

Reeve, Bringhurst, Jeremy Swenson and David Swenson, jointly and severally, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWELVE
### (By James Zazzali as Trustee of the Estate Litigation Trust)
### (Misappropriation/Unjust Enrichment)

757.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

758.    As set forth in greater detail above, the DBSI Companies received Accountable Reserves from Investors under circumstances in which the DBSI Companies were de facto trustees for money that should have been segregated as an identifiable fund (the "Accountable Reserves Trust Funds").

759.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst intentionally and wrongfully caused the Accountable Reserves Trust Funds to be commingled with the DBSI Companies' operating accounts, and, from those same accounts, disbursed millions of dollars to themselves, leaving the Accountable Reserves Trust Funds depleted.

760.    Thus, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst wrongfully obtained and maintained dominion over the money absconded from the Accountable Reserves Trust Funds, and have been unjustly enriched thereby.

761.    The Debtor Entities were injured thereby.

762.    Accordingly, as a de facto trustee of the funds in question, the Debtor Entities are entitled to recover their possession.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate

Litigation Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst, jointly and severally, ordering Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to make restitution for the wrongfully diverted Accountable Reserves Trust Funds, imposing a constructive trust over all monies, property and other assets in the possession of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst acquired directly or indirectly with the wrongfully diverted Accountable Reserves Trust Funds, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT THIRTEEN
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(Negligence)**

763.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

764.    Mick and Mick & Associates owed professional duties of care to the DBSI Companies and to the Investors.

765.    The above described conduct of Mick and Mick & Associates fell below the acceptable standard of care and was negligent.

766.    By reason of the above described negligence, both the Debtor Entities and Assigning Investors were injured.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust and the Private Actions Trust, and against Mick and Mick & Associates for compensatory damages, plus interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT FOURTEEN
### (By James Zazzali as Trustee of the Estate Litigation Trust)
### (Aiding & Abetting Breach of Fiduciary Duty)

767.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

768.    Through their above described course of conduct, Mick and Mick & Associates knowingly participated in the aforementioned breaches of fiduciary duty by the Control Group Defendants.

769.    As a direct and proximate result, the Debtor Entities have been damaged.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Estate Litigation Trust, and against Mick and Mick & Associates for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT FIFTEEN
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Contract--Notes and Bonds Payable)

770.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

771.    The Investors listed in Exhibit D are owned at least the sums set forth therein, for interest and/or principal on promissory notes, bonds and other loans that are past due and owing.

772.    As set forth in greater detail above, the DBSI Companies operated as a single operation.

773.    In addition, the DBSI Companies operated at all relevant times as the alter ego of Douglas Swenson and were used by him as an instrument to defraud Investors and seize for himself money that was rightfully theirs.  As set forth above in greater detail,

A.      There was such a unity of interest between the DBSI Companies and Douglas Swenson that the separate identity of the entities ceased to exist or never existed;

B.      Observance of the fiction of a separate existence between the DBSI Companies and Douglas Swenson would sanction a fraud and promote injustice;

A.      Many of the DBSI Companies individually, and the DBSI Companies as a whole, were undercapitalized;

B.      The DBSI entities routinely ignored corporate formalities and failed to keep appropriate corporate records;

C.      Douglas Swenson dominated and controlled the DBSI Companies;

D.      Douglas Swenson created and managed the DBSI Companies to perpetrate fraud;

E.      Douglas Swenson siphoned funds away from the DBSI Companies that were needed to pay creditors, leaving the DBSI Companies without sufficient cash to meet their obligations; and

F.      The DBSI Companies' officers and directors often failed to function properly.

774.    As a result, the interests of justice dictate that any corporate veil between the DBSI Companies and Douglas Swenson be disregarded, and that Douglas Swenson be held individually liable for all debts owed by the DBSI Companies.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, for a sum equal to all past due and owing principal and interest on the aforementioned notes, bonds and other loans, plus interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT SIXTEEN
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Contract--Accountable Reserves)

775.     Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

776.     As set forth in greater detail above, as consideration for the TIC Investors agreement to deposit the Accountable Reserves with the DBSI Companies, the DBSI Companies agreed to hold the Accountable Reserves for the benefit of the TIC Investors, expending those Accountable Reserves only for the purposes set forth above.

777.     Those contracts were valid and enforceable.

778.     The TIC Investors fully complied with all of their contractual obligations.

779.     The DBSI Companies breached this agreement, and the TIC Assigning Investors were injured thereby.

780.     The DBSI Companies' acts also constitute a breach of the covenant of good faith and fair dealing implied in every contract.

781.     For the reasons set forth above, the interests of justice dictate that any corporate veil between the DBSI Companies and Douglas Swenson be disregarded, and that Douglas Swenson be held individually liable for all debts owed by the DBSI Companies.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson for compensatory damages, plus interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT SEVENTEEN
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Contract--Lease Termination)

782.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

783.    As set forth in greater detail above, each of the TIC Investors were entitled by contract with the DBSI Companies to receive the benefits of rental payments for the duration of the respective lease terms of the lease agreements entered into by Master Leaseco or other DBSI Companies.

784.    Those contracts were valid and enforceable.

785.    The TIC Investors fully complied with all of their contractual obligations.

786.    Master Leaseco and the other DBSI Companies breached the aforementioned leases and failed to honor the rental payment obligations.

787.    The TIC Assigning Investors have been injured by these breaches.[3]

788.    The DBSI Companies' acts also constitute a breach of the covenant of good faith and fair dealing implied in every contract.

789.    For the reasons set forth above, the interests of justice dictate that any corporate veil between the DBSI Companies and Douglas Swenson be disregarded, and that Douglas Swenson be held individually liable for all debts owed by the DBSI Companies.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson for compensatory damages, plus interest, costs of suit and such other relief as the Court deems just and equitable.

---

[3] Certain of the TIC Investors previously settled and released their claims for breaches of the lease agreements. This Count is brought by the Trustee to recover amounts due to non-settling TIC Assigning Investors.

**COUNT EIGHTEEN**
**(By James Zazzali as Trustee of the Private Actions Trust)**
**(Breach of Contract)**

790.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

791.    Plaintiff repeats the allegations of the prior three Counts regarding DBSI's breaches of contract concerning notes, bonds and loans payable, Accountable Reserves and lease terminations.

792.    As set forth in greater detail above, the DBSI Companies operated as a single entity, with no meaningful separate corporate identities.

793.    As set forth in greater detail above, DBSI Investments acted as the hub through which Investor funds loaned or deposited with the other DBSI entities were diverted both into the pockets of the Insiders, including especially the Investments General Partners, and into the losing Technology Companies investments.

794.    Accordingly, as no true or enforceable corporate wall existed between DBSI Investments and the remainder of the DBSI Companies, and as DBSI Investments was a principal instrument in the Insiders' scheme to unlawfully and unjustly enrich themselves, DBSI Investments is liable for the entirety of the debts owed by the DBSI Companies, including debt by reason of the aforementioned breaches of contract.

795.    As general partners of DBSI Investments, Douglas Swenson, Hassard, Mayeron and Mott are personally liable for its debts and obligations, and thus personally liable fro the entirety of the damages caused by the aforementioned breaches of contract.

796.   Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron and Mott for compensatory damages, plus interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT NINETEEN
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Fraud)

797.   Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

798.   As set forth above in detail, each of the material misstatements identified above made, authorized and/or directed by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson was (i) a statement or representation of material fact, (ii) knowingly false when made, and (iii) made with the intention that the Investors would rely upon the statement.

799.   Each of the Assigning Investors were ignorant of each material misstatements' falsity and justifiably relied upon the material misstatements to their detriment and were injured thereby.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, jointly and severally, imposing a constructive trust over all monies, property and other assets in the possession of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson acquired directly or indirectly with the proceeds of their fraud, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

**COUNT TWENTY**
**(By James Zazzali as Trustee of the Private Actions Trust)**
**(Aiding & Abetting Fraud)**

800.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

801.    As set forth in greater detail above, Mick and Mick & Associates had knowledge of the material misstatements by the DBSI Companies, and Mick and Mick & Associates knowingly and substantially participated in the frauds committed by others.

802.    As a direct and proximate result, the Assigning Investors were harmed.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Mick and Mick & Associates for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

**COUNT TWENTY-ONE**
**(By James Zazzali as Trustee of the Private Actions Trust)**
**(Negligent Misrepresentation)**

803.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

804.    In connection with the material misstatements set forth above, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson had a pecuniary duty to provide accurate information to the Investors.

805.    The information supplied was false, and Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson failed to exercise reasonable care in obtaining and providing the information.

806.    The Investors suffered pecuniary loss as a result of their justifiable reliance on the material misstatements.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, jointly and severally, imposing a constructive trust over all monies, property and other assets in the possession of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson acquired directly or indirectly with the proceeds of their misrepresentations, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-TWO
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Aiding & Abetting Fraud)

807.     Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

808.     As set forth in greater detail above, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson had knowledge of the material misstatements by the DBSI Companies, the Control Group and the other Insiders, and Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knowingly and substantially participated in the frauds committed by others.

809.     As a direct and proximate result, the Assigning Investors were harmed.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, jointly and severally, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and

equitable.

## COUNT TWENTY-THREE
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Misappropriation/Unjust Enrichment)

810.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

811.    As set forth in greater detail above, the DBSI Companies received Accountable Reserves from TIC Investors under circumstances in which Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst were de facto trustees for money that should have been segregated as an identifiable fund, the Accountable Reserves Trust Funds.

812.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst intentionally and wrongfully caused the Accountable Reserves Trust Funds to be commingled with the DBSI Companies' operating accounts, and, from those same accounts, disbursed millions of dollars to themselves, leaving the Accountable Reserves Trust Funds depleted.

813.    Thus, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst wrongfully obtained and maintained dominion over the money absconded from the Accountable Reserves Trust Funds, and have been unjustly enriched thereby.

814.    The TIC Assigning Investors were injured thereby.

815.    Accordingly, the TIC Investors are entitled to recover their possession.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst, jointly and severally, ordering Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson to make restitution for the

162

wrongfully diverted Accountable Reserves Trust Funds, imposing a constructive trust over all monies, property and other assets in the possession of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst acquired directly or indirectly with the wrongfully diverted Accountable Reserves Trust Funds, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-FOUR
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Fiduciary Duty)

816.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

817.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst were de facto trustees of the Accountable Reserve funds deposited with the DBSI Companies by the TIC Investors.

818.    As trustees, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst owed fiduciary duties of care, good faith and loyalty to the TIC Investors.

819.    The above described actions and omissions by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst were grossly negligent, a gross abuse of discretion, and recklessly indifferent to or in deliberate disregard of the interests of the TIC Investors and were outside the bounds of reason.

820.    The above described actions and omissions by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst also constituted unfair self-dealing, the unfair elevation of their personal interests above those of the TIC Investors, and the unfair pursuit and receipt of personal benefits as the expense of the TIC Investors.

821.    The above described actions and omissions were also part of a sustained and systematic failure by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst to exercise proper oversight over the Accountable Reserves for the benefit of the TIC Investors.

822.    The above described actions and omissions also constituted a gross dereliction of duty and a conscious disregard for the Control Group Defendants' duties as Trustees.

823.    Accordingly, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst have breached their fiduciary duties to the TIC Investors, and, as a direct and proximate result, the TIC Assigning Investors have been damaged.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst, jointly and severally, imposing a constructive trust over all monies, property and other assets in the possession of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson acquired directly or indirectly as a result of their breaches of fiduciary duty, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-FIVE
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Aiding and Abetting Breach of Fiduciary Duty)

824.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

825.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson knowingly participated in the aforementioned breaches of fiduciary duty by the Control Group Defendants.

826.    As a direct and proximate result, the TIC Assigning Investors have been damaged.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, jointly and severally, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

## COUNT TWENTY-SIX
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Civil Conspiracy)

827.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

828.    The wrongs alleged herein were the product of agreements among or a confederation among Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson during a period beginning no later than 2004 through in or about 2008 with the common objective of accomplishing the wrongs alleged, including, but not limited to, the looting of the DBSI Companies.

829.    As detailed above, these collaborating Insiders used unlawful means to accomplish their wrongful objectives.

830.    The Assigning Investors were injured thereby.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, jointly and severally, for compensatory damages, punitive damages, costs of suit and such other relief as the Court deems just and equitable.

### COUNT TWENTY-SEVEN
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(Securities Fraud 15 U.S.C § 78j(b), 17 C.F.R. § 240.10b-5, Idaho Code § 30-14-501, Idaho Code § 30-14-509**

831.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

832.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above.

833.    The material misrepresentations identified above were contained in PPMs and financial statements that were, upon information and belief, derived from knowledgeable persons from DBSI, routinely circulated among Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson for their review prior to dissemination and could not have been released without their approval and/or over their objection.   Upon information and belief, Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson saw the false PPMs and financial statements, knew that they were false, and allowed them to be issued anyway.

834.    In addition, the conduct set forth in detail above was a device, artifice and scheme to defraud the Investors, as well as acts, practices and a course of dealing which operated as a fraud or deceit upon the Investors in connection with the purchase and sale of the above identified securities.

835.    The conduct of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson set forth above evidenced an intent to deceive, manipulate and defraud.  By way of example, and not limitation, the behavior of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson in moving cash among the DBSI Companies in an elaborate shell

game and at the same time preparing financial statements that dramatically overstated DBSI's financial strength amply demonstrates the Insiders' desire to prevent Investors from learning the truth.  Similarly, the repeated assurances to Investors that Accountable Reserves would be reserved for specific uses, when nothing of the kind was in fact happening, is consistent only with a clear intent to deceive.

836.    The conduct of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson set forth above was deliberately reckless and was an extreme departure from the standards or ordinary care that presented a danger of misleading the Investors that was either known to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson or so obvious that it must have been known.

837.    Each of the Investors was ignorant of each material misstatements' falsity and justifiably relied upon the material misstatements to their detriment and the Assigning Investors suffered economic loss as a proximate result of the material misstatements and their reliance thereon.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, jointly and severally, for compensatory damages, attorneys' fees, costs of suit and such other relief as the Court deems just and equitable.

**COUNT TWENTY-EIGHT**
**(By James Zazzali as Trustee of the Estate Litigation Trust and by James Zazzali as Trustee of the Private Actions Trust)**
**(Securities Fraud--Control Person Liability -15 U.S.C. § 77o, Idaho Code § 30-14-509(g))**

838.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

839.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above, and were made by the DBSI Companies.

840.    In addition, the conduct set forth in detail above was a device, artifice and scheme to defraud the Investors, as well as acts, practices and a course of dealing which operated as a fraud or deceit upon the Investors in connection with the purchase and sale of the above identified securities.

841.    The conduct of the DBSI Companies set forth above evidenced an intent to deceive, manipulate and defraud.

842.    The conduct of the DBSI Companies set forth above was deliberately reckless and was an extreme departure from the standards or ordinary care that presented a danger of misleading the Investors that was either known to the DBSI Companies or so obvious that it must have been known.

843.    As set forth in greater detail above, each of the DBSI Companies was controlled by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst.

844.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst actively participated in the above described fraudulent scheme, as set for in greater detail above, and each was a culpable participant in the above described securities fraud by the issuer entities.

845.    Each of the Investors was ignorant of each material misstatements' falsity and justifiably relied upon the material misstatements to their detriment and the Assigning Investors suffered economic loss as a proximate result of the material misstatements and their reliance thereon.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst, jointly and severally, for compensatory damages, attorneys' fees, costs of suit and such other relief as the Court deems just and equitable.

### COUNT TWENTY-NINE
**(By James Zazzali as Trustee of the Private Actions Trust)**
**(Fraudulent Concealment)**

846.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

847.    As set forth above in detail, the actions of Defendants collectively had both the purpose and effect of concealing the fraudulent behavior and other wrongs alleged herein.  By way of example, and not limitation, the above described fraudulent efforts to make the DBSI Companies appear financially sound, long after they were not, and the above detailed use of newly bilked Investor money to make payments due to previously bilked Investors, had the purpose and effect of hiding the existence of Defendants' wrongdoing from Investors.

848.    Defendants' conduct succeeded in preventing reasonably diligent Investors from discovering Defendants' misconduct until well after the Petition Date.  Indeed, the majority of Defendants' conduct was neither known nor knowable by Investors until the issuance of at least the Interim Report of the Examiner on August 3, 2009.

Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions

Trust, and against all Defendants, tolling all applicable statutes of limitations during all periods prior to August 3, 2009.

**COUNT THIRTY**
**(By James Zazzali as Trustee of the Private Actions Trust)**
**(Securities Fraud -- Idaho Code § 30-14-509(b))**

849.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

850.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above.

851.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson either sold the above identified securities directly to the Assigning Investors or solicited Assigning Investors to buy the above identified securities and in so acting were motivated by a desire to serve their own financial interests or the financial interests of the other Insiders.

852.    The conduct of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson set forth above was deliberately reckless and was an extreme departure from the standards of ordinary care that presented a danger of misleading the Investors that was either known to Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson or so obvious that it must have been known or, in the exercise of reasonable care, could have been known.

853.    The Assigning Investors were ignorant and did not know of the untruth of each material misstatements' falsity and justifiably relied upon the material misstatements to their

170

detriment and the Assigning Investors suffered economic loss as a direct and proximate result of the material misstatements and their reliance thereon.

854.    Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, jointly and severally, for compensatory damages, attorneys' fees, costs of suit and such other relief as the Court deems just and equitable.

**COUNT THIRTY-ONE**
**(By James Zazzali as Trustee of the Private Actions Trust)**
**(Securities Fraud -- Idaho Code § 30-14-509(b))**

855.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

856.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above, were made by the DBSI Companies.

857.    The DBSI Companies either sold the above identified securities directly to Assigning Investors or solicited Assigning Investors to buy the above identified securities, and in so acting were motivated by a desire to serve their own financial interests or the financial interests of the other Insiders.

858.    The conduct of the DBSI Companies set forth above was deliberately reckless and was an extreme departure from the standards of ordinary care that presented a danger of misleading the Investors that was either known to the DBSI Companies or so obvious that it must have been known or, in the exercise of reasonable care, could have been known.

859.    As set forth in greater detail above, each of the DBSI Companies was controlled by Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst.

171

860.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst also served as managing partners and/or directors of the DBSI Companies, or were employed by or associated with the DBSI Companies and materially aided the conduct giving rise to the liability.

861.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst actively participated in the above described selling of securities, as set forth in greater detail above, and each was a culpable participant in the above described securities fraud by the issuer entities.

862.    The Assigning Investors were ignorant and did not know of the untruth of each material misstatements' falsity and justifiably relied upon the material misstatements to their detriment and the Assigning Investors suffered economic loss as a direct and proximate result of the material misstatements and their reliance thereon.

863.    Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve and Bringhurst, jointly and severally, for compensatory damages, attorney's fees, costs of suit and such other relief as the Court deems just and equitable.

### COUNT THIRTY-TWO
### (By James Zazzali as Trustee of the Private Actions Trust)
### (Breach of Trust)

864.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

865.    The actions of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and the DBSI Companies with respect to the TIC PPMs and the representations therein created trusts (the "TIC Trusts").

172

866.     Pursuant to the TIC Trusts, money paid by Investors, including without limitation Accountable Reserves, were to be held in trust by the DBSI Companies and distributed only for the benefit of the Investors in accordance with the terms of the TIC Trusts.

867.     Actions of Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson with respect to Investor funds received through offerings by the Funding Entities and the representations related to them created trusts (the "Funding Entities Trusts," collectively with the TIC Trusts, the "Trusts").

868.     Pursuant to the Funding Entities Trusts, money paid by Investors were to be held in trust by the DBSI Companies and distributed only for the benefit of the Investors in accordance with the terms of the TIC Trusts.

869.     The trustees of the Trusts included Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, DBSI Inc., the respective TIC-related affiliates, including without limitation, the master lessor entities, the respective Funding Entities and various affiliates that held the funds held in Trust (the "Breaching Trustees").

870.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson by their own actions, including without limitation through representations and undertakings to Investors, manifested their agreement to act as trustees.

871.     Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson caused the corporate entities to manifest their agreement to act as trustees.

872.    TIC Investors and Funding Entity Investors understood and relied upon the Trusts when they paid the Trusts funds to the DBSI Companies.

873.    The Breaching Trustees jointly and severally owed to the beneficiaries of the Trusts the highest duties of loyalty and good faith with respect to their execution of their duties as trustees, including without limitation the duty to account for the funds held in the Trusts.

874.    The Breaching Trustees breached the Trusts by diverting the funds to their own uses, failing to account for the funds held in trust and wasting the res of the Trusts.

875.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson themselves individually breached their trust and they caused the corporate entities that are trustees to breach their trust.

876.    For reasons already alleged in this Complaint, Douglas Swenson so dominated the DBSI Companies and treated the DBSI Companies as his alter ego such that the corporate veil should be disregarded as to him, and, therefore, he is personally liable for any breach of trust committed by corporate Breaching Trustees as set forth in this Complaint.

877.    As a result of the breach of trust by the Breaching Trustees, the funds held in Trust have been lost and the Breaching Trustees have failed to account for them.

878.    Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson and each of them are jointly and severally liable for the breach of trust by themselves and by the corporate trustees.

879.    Wherefore, Plaintiff demands judgment in his favor, for the benefit of the Private Actions Trust, and against Douglas Swenson, Hassard, Mayeron, Mott, Bennett, Foster, Var Reeve, Bringhurst, Jeremy Swenson and David Swenson, jointly and severally, for compensatory

damages, punitive damages, for an accounting, for attorneys' fees, costs of suit and such other relief as the Court deems just and equitable.

## **DEMAND FOR TRIAL BY JURY**

880.    Plaintiff hereby demands trial by jury as to all issues so triable.


Dated:  March 17, 2011
          Wilmington, DE

**GIBBONS P.C.**

By:   /s/ Natasha M. Songonuga
Natasha M. Songonuga, Esq. (Bar No. 5391)
1000 N. West Street, Suite 1200
Wilmington, DE  19801-1058
Telephone:  (302) 295-4875
Facsimile:  (302) 295-4876
E-mail: nsongonuga@gibbonslaw.com

Of Counsel:

Brian J. McMahon, Esq.
Guy V. Amoresano, Esq.
E. Evans Wohlforth, Jr., Esq.
Debra A. Clifford, Esq.

*Counsel to James R. Zazzali, Trustee*