## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAMES R. ZAZZALI, as Trustee for the DBSI Estate Litigation Trust and as Trustee for the DBSI Private Actions Trust,<br><br>               Plaintiff,<br><br>v.<br><br>DOUGLAS L. SWENSON; CHARLES HASSARD; JOHN M. MAYERON; WALTER E. MOTT; FARRELL BENNETT; JOHN D. FOSTER; THOMAS VAR REEVE; GARY BRINGHURST; JEREMY SWENSON; DAVID SWENSON; MICK & ASSOCIATES PC LLO; BRYAN S. MICK; JOHN DOE 1-50; and XYZ CORPORATION 1-50.<br><br>               Defendants. | Case No. 1:12-CV-224-EJL-MHW<br><br>**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS** |

This case involves claims for violation of state and federal anti-racketeering statutes, securities fraud, as well as various common law contract and tort claims. It was filed in the District of Delaware and transferred to this Court on May 10, 2012, whereupon it was assigned to the Honorable Edward J. Lodge. (Dkt. 161). On October 17, 2012, the case was assigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) for all dispositive as well as non-dispositive matters. (Dkt. 217).

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  1**

Pending before the Court are two sets of motions to dismiss.  The first (Dkt. 188) is filed on behalf of Defendants Charles Hassard, John Mayeron, and Thomas Var Reeve, and seeks to dismiss various claims sounding in fraud on the basis that these claims have not been pled with the particularity required by Rule 9(b) and/or the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA").  The second motion (Dkt. 189), seeks to dismiss various other counts on the basis that they either fail to state a claim, or have not been pleaded so as to satisfy the standards articulated by the United States Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).  Each set of defendants has joined in the others' motions.  Douglas Swenson has also joined in the second set of motions.[1]

Having reviewed the Trustee's First Amended Complaint (hereafter "the FAC") and the briefing submitted by the parties with respect to these motions (Dkts. 63, 188, 189, 199, 201, and 202)  and having entertained oral argument on December 4, 2012, the Court concludes that, for the most part, the FAC states valid claims as to all Defendants.  Therefore, with a few exceptions discussed herein, it will recommend that the motions to dismiss be denied.

## BACKGROUND

This case stems from the collapse of DBSI, Inc., for many years a large and

---

[1]Defendants Mott, Foster, and Bennett were voluntarily dismissed from the litigation at an earlier stage.  (Dkt. 183, p. 2).  In addition, Bryan Mick and Mick and Associates have not joined in the present motions because the claims at issue were not filed against them.

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  2**

successful real-estate investment corporation located in Boise, Idaho. In 2008, during the midst of the economic downturn, the various DBSI entities filed for bankruptcy in the District of Delaware. A plan of reorganization was confirmed in October of 2010, which authorized the creation of two trusts–an Estate Litigation Trust and a Private Action Trust–to pursue claims on behalf of various creditors and investors. While the case was pending in Delaware District Court, the Defendants filed various motions to dismiss. In response, the Trustee filed the First Amended Complaint (the "FAC," Dkt. 62), which the Defendants now challenge.

At nearly two hundred pages, not counting Exhibits, the FAC is massive. It sets forth in painstaking detail the nature of the fraudulent scheme or schemes which the Trustee alleges began to infect DBSI beginning in about 2004.[2] Stated in the barest possible terms, the FAC alleges that, around this time, DBSI became "detached from rational economic moorings" and began to take on the characteristics of a Ponzi scheme, largely in response to cash flow issues that were then beginning to plague the company. (FAC ¶ 37). Accepting the allegations of the FAC as true, it does appear that aspects of DBSI's investment model did resemble a Ponzi scheme, in that it is alleged that the company could only fulfill its obligations to old investors by raising money from new ones.

For purposes of the present motion, however, whether there was a Ponzi scheme in

---

[2]DBSI was not one entity, but rather, vast agglomeration of entities related in ways that are sometimes quite complex. Because the analysis in this Report focuses on the actions of individuals, as opposed to the relationship between the various entities, the Court will simply refer to the various entities as "DBSI" or "the DBSI entities," unless the context calls for greater specificity.

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  3**

play is a background matter. Fraud is perpetrated by people, not by organizations.  Thus, simply because the FAC adequately describes the overall nature of the fraud, and simply because aspects of that fraud resemble a Ponzi scheme, does not mean that it states a claim as to any particular Defendant.  The present motions require the Court to take a detailed look at the facts alleged and determine whether each individual defendant's role in the overall scheme has been pled in sufficient detail to survive a motion to dismiss. In light of this, it would not be fruitful for the Court to engage in a detailed discussion of the FAC's hundreds of allegations, or to attempt to describe the various methods, often of mind-boggling complexity, by which the Trustee alleges the DBSI entities as a whole went about defrauding investors. Instead, the Court will focus only on those allegations that are critical to understanding the role of the six individual Defendants who have requested dismissal of the fraud-based claims.

The Trustee alleges that, by 2004, DBSI had begun to experience substantial cash flow problems.  (FAC ¶¶ 213, 214).  These problems became particularly acute in late 2006. The Trustee alleges that at this time, various DBSI Insiders, notably Douglas Swenson, Gary Bringhurst, Thomas Var Reeve, and David and Jeremy Swenson, began holding weekly "cash meetings" to review the DBSI entities' cash needs.  The FAC alleges that, at the cash meetings, these individuals "decided how to and implemented mechanisms to divert and distribute money among the DBSI Companies with complete disregard for corporate separateness." (*Id.,* ¶¶ 217-219).   According to the FAC, the cash flow problems grew so acute, that by 2006, DBSI was unable to meet its operating expenses except by raising new

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  4**

money from investors. (*Id.* ¶ 217). This was achieved by means of various "Funding Entities," which will be discussed more thoroughly below. (*Id.*, ¶ 217, 218). The Trustee further alleges that beginning in about 2005, DBSI began to use certain "Accountable Reserves," a source of funds with a limited permissible purpose, to meet ongoing operational expenses and to fund distributions to Insiders.[3] (*Id., ¶* 216).

The FAC describes in great detail the means by which the DBSI entities went about raising money from Investors to meet their acute cash needs. One primary method was known as the "Internal Funding Programs." (*Id.*, ¶ 229-313). Essentially, these programs were organized as a series of limited liability companies through which investors could purchase bonds, notes and other interests in DBSI under SEC Regulation D. (*Id.*, ¶ 229-230). The terms of these offerings were set forth in various circulars known as "Private Placement Memoranda" or "PPMs." (*Id.*, ¶ 229). The stated purpose of most of these offerings was to raise money which could then be loaned to various DBSI entities for investment purposes. However, according to the FAC, the funds were not always used for these purposes, but were often used to support current operations or to fulfill existing obligations. *(Id.)*. These investment vehicles offered above-average rates of returns for the types of investments at issue. (*Id.* ¶ 233). Further, DBSI typically guaranteed loans of funds obtained from investors to various affliated entities through the Internal Funding Programs. The Trustee alleges that

---

[3]Specifically, the Accountable Reserves were funds that DBSI represented to investors would be set aside and used for certain expenses incurred by the portfolio of real properties syndicated by DBSI. These expenses were to include tenant improvements, leasing commissions, capital improvements, management fees, taxes and insurance. (FAC, p. 2).

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  5**

the high rates paired with the guarantees made the Internal Funding Programs deceptively attractive as investment opportunities, but in actuality,  created tremendous long term obligations for the companies.  (*Id.*).

According to the FAC, the PPMs and other offering materials contained hundreds of material misrepresentations that lured investors to invest their money in DBSI, to their detriment.  The specific misrepresentations detailed in various Exhibits to the FAC are too numerous to list, but essentially, they fall into two categories: 1) misrepresentations about DBSI's net worth and/or financial strength; and 2) misrepresentations about the uses to which investor funds would be put.  To take just one example, the FAC alleges that an offering made in 2005 (the "2005 Secured Notes Corp. PPM") falsely stated that the proceeds from the sale of the notes would be used only "to acquire, develop, and finance real estate properties prior to their sale, resale, third-party financing, or syndication." (*Id.,* ¶ 243).  However, this money was allegedly used for general corporate purposes as well as for making distributions to the various Defendants.  (*Id.,* ¶ 246).  The offering materials also stated that the funds raised through the 2005 Secured Notes Loan PPM would be held in a separate account, and not commingled with DBSI's general financial and business accounts or those of any of its affiliates.  (*Id.* ¶ 247). However, the FAC alleges that such commingling did in fact occur. (*Id.,* ¶ 248-250).  The FAC also alleges that the 2005 Secured Notes Corp and other PPMs routinely and knowingly overstated the value of the collateral used to support inter-company loans, thus rendering meaningless the maximum loan-to-value ratios ("LTVs") mentioned in the PPMs. (*Id.* ¶¶ 250-252). These examples are representative of the kinds of

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  6**

misrepresentations the FAC identifies in the numerous PPMs and other offering materials issued from about 2005 up to DBSI's bankruptcy in 2008. (See generally, FAC ¶¶ 238-313 & Exhs., F, G, & H). The alleged misrepresentations in the PPMs and other offering documents form the basis of the racketeering claims, the securities fraud claims, and the common law fraud claims.[4] Critically, several of the Defendants, namely, David Swenson, Jeremy Swenson, and John Mayeron, are alleged to have received drafts of each PPM or DDB. In the words of the FAC, these individuals were required to "sign off on" the PPMs or DDBs prior to their finalization. (*Id.,* ¶ 357-359).

In addition to the misrepresentations about the uses to which investor money would be put, the Trustee alleges that numerous PPMs and DDBs also contained materially false statements about the net worth of the DBSI entities. According to the FAC, these documents typically represented the DBSI entities' "unaudited net worth," as being in excess of varying amounts ranging from $50 million to $130 million. (*Id.,* ¶¶ 442-443 & Exhs. G & H). The FAC alleges that these misrepresentations as to net worth were caused or perpetuated by a series of misleading financial statements, which were in turn prepared, reviewed, or overseen by Bringhurst, Hassard, and Douglas Swenson. (*Id.* at 447, 565).

The Trustee alleges that the financial statements masked DBSI's insolvency by means

---

[4] Besides the PPMs, the most common type of investment documents at DBSI were "Due Dilligence Binders" or "DDBs." These documents were similar to the PPMs, except that they were designed to be used in connection with DBSI's real estate ventures as opposed to the sales of bonds or notes. Though the DDBs concerned different ventures, the types of misrepresentations allegedly contained therein are more or less the same. (FAC ¶¶ 315 & 441-443.)

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS 7**

of various accounting devices that failed to conform to Generally Accepted Accounting Principles ("GAAP"). For example, the Trustee alleges that DBSI's books and records failed to take account of several hundred million dollars in guarantee liabilities. (*Id.,* ¶ 571). Because many of these guarantees had been made on behalf of entities that were themselves insolvent, and because DBSI was actually disbursing funds every month to support these entities, these liabilities could not have been considered "contingent." Essentially, the Trustee alleges that DBSI's financial statements simply ignored these massive, presently incurred liabilities. (*Id.*). The FAC also asserts that DBSI's financial statements listed at full value receivables from affiliates even though these affiliates were insolvent and incapable of paying the amounts due. (*Id.* ¶ 573). For example, the FAC states that DBSI's financial statements failed to account for the near insolvent state of various technology affiliates, which, as late as June of 2008, just months before DBSI filed for bankruptcy, were listed as having a value of $235,000,000.[5]   (*Id.* ¶ 574).

---

[5]Stellar and various other Technology Companies were organized as a series of Idaho limited liability companies that invested in various emerging technology-oriented startups. The Trustee alleges that these ventures were completely unprofitable. (*Id.,* at page 5 & ¶ 94). Though a discussion of Stellar is somewhat tangential to the strictly focused factual discussion the Court is attempting to present herein, the Trustee also alleges that Stellar operated as a tax shelter for Mayeron, Hassard, and Douglas Swenson, where they would declare Stellar's losses on their personal tax filings, when in fact the money for the investment had come, directly or indirectly, from investor funds. (*Id.,* ¶¶ 94-103).

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  8**

**LEGAL STANDARDS**

The present motions are governed by the standards of Rule 8(a) and Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) requires that, when fraud is alleged, "a party must state with particularity the circumstances constituting fraud."  *Gibson v. Credit Suisse AG,*  2012 WL 1253007 * 1 (D. Idaho 2012) (quoting *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir.2009).  "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong. Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged. A party alleging fraud must 'set forth more than the neutral facts necessary to identify the transaction.'" *Kearns,* 567 F.3d at 1124-25.  Fraud can be averred either directly, by specifically averring fraud, or indirectly, by alleging facts that, if true, would necessarily constitute fraud even if the word 'fraud' is not used.  *Id.,* 567 F.3d at 1124. Rule 9(b) serves three purposes: "(1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints as a pretext for the discovery of unknown wrongs; (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and (3) to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Id.,* 567 F.3d at 1124–25.

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  9**

Beyond that, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007). To survive a motion to dismiss, a complaint must contain sufficient factual matter, which, if accepted as true, would  "state a claim to relief that is plausible on its face." *Id.* at 570.  *See also, Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937 (2009).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly,* 550 U.S. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* at 557.[6]

In considering the present motions, the Court will apply the standards of both Rule 8(a)

---

[6] The parties spent significant chunks of their briefs arguing over whether the Trustee is, or is not, subject to less stringent pleading standards than ordinary plaintiffs.  This argument has its basis in a line of case law holding that, since bankruptcy trustees stand in the shoes of third parties and may not have knowledge of all the pertinent circumstances of the alleged fraud, that the usual standards should not apply.  It is questionable whether any kind of "relaxed" standard could apply after *Iqbal* and *Twombly*.  *See, e.g. In re Crescent Resources, LLC,* 2012 WL 195528 (Bankruptcy. W. D. Tex. 2012); *In re Walter,* 462 B.R. 698 (Bankruptcy N. D. Iowa 2011); *In re NE 40 Partners, Ltd. Partnership,* 440 B.R. 124, 127, n. 3 (S.D. Texas 2010).  The Trustee has also failed to specify exactly how he was at a disadvantage, relative to any other type of plaintiff, with respect to alleging fraud with particularity.  The Court therefore declines to apply a "relaxed" standard. However, as will be apparent from the conclusions herein, the Court agrees with the suggestion of the Trustee's counsel that this argument is a "red herring."

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  10**

and 9(b) apply to all fraud-based causes of action, and the standards of Rule 8(a) to everything else.

## DISCUSSION

### I.     The Rule 9(b) Motion--Hassard, Mayeron & Reeve (Counts 1 through 6, Count 19, & Counts 27 through 31)

The Court will first address the Rule 9(b) motion (Dkt. 188) filed by Hassard, Mayeron and Var Reeve, in which Bringhurst, Jeremy Swenson, and David Swenson have joined.  By this motion, Defendants seek to dismiss several categories of claims:  1) claims arising from the federal RICO statute or Idaho's equivalent (Counts 1-6); 2) claims arising under federal securities laws or parallel state laws (Counts 27, 28, 30 and 31); and 3) the claims for common law fraud and fraudulent concealment (Counts 19 & 29).   Because these claims all sound in fraud, Defendants argue they must be dismissed because they fail to satisfy the particularity requirements of Rule 9(b), *Iqbal* and *Twombly,* as well as the heightened pleading requirements for securities fraud and control person liability under the PLSRA.  The Court will discuss each set of claims in turn, in light of the pleading standards that apply to those particular claims.

### A.     Federal RICO Claims Arising Under Section 18 U.S.C. § 1962(b) and (c) (Counts 1 & 2).

The Trustee has pled two substantive RICO violations, one arising under 18 U.S.C. § 1962(b), and the other arising under 18 U.S.C. § 1962(c).  The Court will address these claims

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  11**

together, because they involve a similar analysis that is conceptually distinct from the conspiracy claims arising under 18 U.S.C. § 1962(d).

Title 18 U.S.C. section 1962(b) makes it unlawful for "any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Thus, in order to state a claim for a section 1962(b) violation, a plaintiff must plead facts tending to establish that a defendant 1) acquired or maintained 2) through a pattern of racketeering activity 3) an interest or control in an enterprise that 4) engaged in, or whose activities affect, interstate commerce. *See, e.g. Estate of Wyatt v. WAMU/JP Morgan Chase Bank,* 2012 WL 933289 (E.D. Mich. 2012). Similarly, 18 U.S.C. § 1962(c) makes it unlawful for "any person employed by or associated with [an] enterprise  .  .  . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." See U.S.C. § 1962(c). In order to state a claim for relief under this section, a plaintiff must plead the following elements: 1) conduct 2) of an enterprise 3) through a pattern  4) of racketeering activity. *See, e.g. Odom v. Microsoft Corp.,* 486 F.3d 541, 547 (9th Cir. 2007). Though these sections have some distinct elements, the touchstone of both is that each individual defendant must be shown to have personally participated in a pattern of racketeering activity.

"Racketeering activity," which is often referred to as the "predicate acts" requirement,

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  12**

may consist of "any act indictable under one of several provisions of Title 18 of the United States Code, including wire fraud (18 U.S.C. § 1343), and mail fraud (18 U.S.C. § 1961(1)(B)." *Savage v. MTF Relocation Inc.,* 2012 WL 822954 (N.D. Cal. 2012). "Wire or mail fraud consists of the following elements: (1) formation of a scheme or artifice to defraud, (2) use of the United States mails or wires, or causing such a use, in furtherance of the scheme, and (3) specific intent to deceive or defraud." *Sanford v. MemberWorks, Inc.,* 625 F.3d 550, 558 (9th Cir. 2010). "The defendant need not personally have mailed the letter or made the telephone call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen." *U.S. v. Lothian,* 976 F.2d 1257, 1262 (9th Cir. 1992) (*citing Pereira v. United States*, 374 U.S. 1, 9 (1954)).

Though the text of RICO itself does not impose a heightened pleading standard, "with respect to predicate crimes based on allegations of fraud, the factual circumstances of the fraud itself must be alleged with particularity," in conformance with the strictures of Rule 9(b). *Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1065–66 (9th Cir. 2004). "[C]ircumstances of the fraud refers to matters such as the time, place, and contents of the false representations or omissions, as well as to the identity of the person making the misrepresentation or omission and what the defendant gained thereby." *Gibson v. Credit Suisse,* 2011 WL 1299035 at *16 (D. Idaho 2011) (rev'd. other grounds, 787 F.Supp.2d 1123 (D. Idaho 2011)); *See also, Moore v. Kayport Package Exp. Inc.,* 885 F.2d 531, 541 (9th Cir.

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  13**

1989).   However, "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. Pro. 9(b); *Odom v. Microsoft Corp.*, 486 F.3d 541, 553–54 (9th Cir.2006).

Defendants do not challenge whether each and every one the elements of a RICO claim has been pled with particularity.  Instead, they argue that the FAC improperly engages in a "scattershot pleading" approach, alleging that the Insiders as a group and "in undifferentiated fashion did every bad thing alleged."  (Defense Brief, p. 5, Dkt. 188).  While the FAC does contain numerous allegations that treat the Defendants as a group, that does not, in and of itself, mean that the claims are not viable.  While Rule 9(b) does not allow a plaintiff to merely lump defendants together,  "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Swarz v. KPMG LLP,* 476 F.3d 746, 764 (9th Cir. 2007).  As long as a complaint "inform[s] each defendant separately of the allegations surrounding his alleged participation in the fraud," *Swarz,* 476 F.3d at 765, and "identifies the role of [each] defendant in the alleged fraudulent scheme," *Moore* 885 F.2d at 541, it is viable.

Further, "[w]here RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by *each defendant*." *In re WellPoint, Inc. Out-of-Network UCR Rates Litigation,* ___ F.Supp.2d ___, 2012 WL 5193815, at *21 (C.D.Cal., 2012) (emphasis in original).  Finally, the mailing or wire communication itself need not be fraudulent to

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  14**

constitute an act of mail or wire fraud, as long as the mailings or wire communications are in furtherance of the fraudulent scheme. *Burns v. MKB Partnership,* 2003 WL 23979014 (D.Or. 2003).

Given the way Defendants have framed this motion, there are three essential questions the Court must consider with respect to each individual defendant's potential RICO liability. Those questions are: 1) whether that individual's role in the overall scheme has been pled in sufficient detail; 2) whether that person has been tied to the commission of two or more "predicate acts" of mail or wire fraud so as to establish liability for a substantive violation of RICO under section 1962(b) or (c), and 3) whether the FAC establishes scienter for each defendant. With these standards in mind, the Court will now address whether the FAC sufficiently states substantive RICO claims as to each defendant.

### 1. Bringhurst, David Swenson, and Jeremy Swenson.

These questions are easily resolved with respect to the joining defendants. Both David Swenson and Jeremy Swenson are specifically alleged to have approved or signed off on each PPM before these documents were finalized. These allegations are sufficient to establish, for pleading purposes, that they participated in numerous predicate acts of mail fraud or wire fraud, thus tying them quite closely to the overall RICO scheme. David and Jeremy Swenson are also alleged to have been present at the weekly meetings during which various Insiders discussed the dire cash situation and made decisions to distribute money without regard for corporate separateness. (*supra,* pp. 4-5 & FAC, ¶¶ 213- 225). Because scienter under Rule

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  15**

9(b) and RICO need only be averred generally, these allegations are more than sufficient, for pleading purposes, to establish scienter on the part of the Swenson brothers.

For similar reasons, the FAC also states 1962(b) and (c) claims as to Gary Bringhurst. He was present at the weekly cash meetings, so it can be inferred for purposes of addressing this motion that he was also aware of DBSI's dire financial situation.  The FAC also alleges that when "alarming" concerns about the DBSI companies' cash flow issues were raised by an individual named Chan Barrieau, Bringhurst, who was then DBSI Inc.'s accounting manager, transferred Mr. Barrieau's responsibilities to another person. (FAC ¶ 215). Bringhurst is also alleged to have received nearly $3 million in inside distributions from 2004 to 2008. (*Id.,* ¶ 599). Though the FAC does not specifically state that Bringhurst approved the PPMS or DDBs, it does specifically tie him to the preparation of the financial statements, whose allegedly false estimations of net worth were incorporated into those documents.  (*Id.,* ¶ 447).  It is not necessary for a RICO plaintiff to prove that a defendant personally made the fraudulent mail or wire communication, only that he caused it to be done, or committed an act in furtherance of the scheme with the knowledge that the use of mails or wires would follow in the ordinary course.  *See, e.g., U.S. v. Lothian,* 976 F.2d at 1262; *Pereira v. U.S.,* 347 U.S. at 9. Therefore, these allegations are sufficient to state a claim as to Bringhurst.

### 2.      Mayeron, Hassard, and Var Reeve

Of the three moving defendants, Mayeron is the easiest to address, because the FAC alleges specifically that he signed off on every PPM.  Thus, the FAC clearly ties Mayeron to

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  16**

the commission of numerous predicate acts of mail or wire fraud, and to the overall scheme. The remaining question for Mayeron–whether he acted with the requisite scienter–is also straightforward in the context of RICO claims.   Again, scienter under RICO and Rule 9(b) may be pleaded generally.  The FAC does this, but beyond that, it also alleges that Mayeron was an officer or director of no less than sixteen separate DBSI entities. (FAC, Exh. A).  It also asserts that of all the Insider Defendants, Douglas Swenson, Mayeron and Hassard were the ones whose involvement and influence at DBSI was most consistent and extensive. (*Id.,* ¶ 155).   Mayeron also received payments of some $4.6 million during the relevant time period. (*Id.,* ¶ 593), and is alleged to have been a primary beneficiary, through tax write-offs, of the losses incurred by Stellar and the Technology Companies. (*Id.,* ¶¶ 94-103). Whether one focuses on the individual allegations as to Mayeron or reads the FAC as a whole, it is not possible to conclude that the allegations of scienter are "formulaic" or "conclusory." Therefore, the FAC states a substantive RICO claim as to him.

The same is true for Charles Hassard.  Hassard, unlike Mayeron, is not *specifically* alleged to have approved the contents of the PPMs and DDBs or other offering materials, but, like Bringhurst, he had a role in the preparation of the financial statements that are alleged to have grossly overstated DBSI's net worth.  Thus, he is linked to predicate acts of RICO mail or wire fraud in the same manner as Bringhurst.  As for scienter, Hassard is in a position roughly analogous to that of Mayeron, in that he is alleged to have been consistently involved in the management and operations of DBSI, Inc. and its numerous subsidiaries and affiliates.

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  17**

(FAC ¶ 155).  He is also alleged to have received inside payments of over $3.8 million (*Id.,* ¶ 592).  His role in preparing the financial statements also goes to scienter, since it is also fair to surmise, at the pleading stage, that an upper tier corporate officer involved in preparing financial statements would have been aware of the company's bleak cash picture.  For all these reasons, the FAC states substantive RICO claims as to Hassard.

As to Var Reeve, the FAC alleges that he was involved in the weekly cash meetings, but does not allege that he was involved in the preparation of the financial statements or the PPMs.  He does however, appear to have played a significant role in the formation of an entity known as  FOR 1031, a DBSI entity organized for the purpose of acquiring and syndicating real properties to tenant-in common ("TIC") investors.   (FAC ¶¶ 525 - 553).   The TIC investments consisted of a series of underperforming or unprofitable  real estate syndications that were at the heart of DBSI's business model.  (*Id.,*  ¶¶ 65- 73).  The Trustee alleges that the  under-profitable,  over-obligated  structure  of  the  TIC  investments  led  DBSI  into  a "permanent scramble to find new properties to purchase and syndicate, which in turn required financing."  (*Id.* ¶ 73).  FOR 1031 was the entity through which TIC properties were purchased and syndicated, and Var Reeve is alleged to have created FOR 1031 along with Douglas Swenson.  (*Id.,* ¶ 526).

The following allegations of FOR 1031's activities are critical to an understanding of Var Reeve's role in the overall scheme that is alleged in the FAC:

- First, Paragraph 541 of the FAC alleges that, because of the way Swenson and Var Reeve structured the TIC syndications, FOR 1031 was not assuming

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  18**

any of the enormous future liabilities owed to TIC Investors.  As a result, FOR 1031 was "enjoying all the profits from its TIC syndications while at the same time transferring all of the future liabilities and obligations created by such syndications to DBSI as guarantor of the master tenant's "rent" obligations . . . ." (*Id.,* ¶ 541).

•   Paragraph 545 alleges that, while FOR 1031 had purportedly paid DBSI a total of approximately $55 million in "fees" by the end of 2005, this was approximately **$78.5 million** less "than the amount that should have been paid under a conservative valuation of future risks, liabilities, and obligations that DBSI assumed for the benefit of FOR 1031."  (*Id.,* ¶ 545).

•   The FAC further alleges that FOR 1031's records are "minimal, and reflect only one meeting of the board of managers throughout its existence," and that all acquisitions, business decisions, and undertakings were taken without authorization or management consent.  (*Id., ¶¶* 177-179).

Based upon these allegations, it is clear enough for pleading purposes that FOR 1031, and the way it was structured so as to assume profits from the TIC syndication business while shunting  enormous liabilities onto DBSI, played a major role in the activities that are alleged to be at the heart of the fraudulent scheme.  It is equally clear, for pleading purposes, that Var Reeve played an integral role in forming and operating FOR 1031, and that he had a direct or indirect ownership interest in FOR 1031 during most of the relevant time period. (*Id.,* ¶¶ 169-173).  Therefore, the facts that have been specifically pleaded as to Var Reeve and FOR 1031 link him to the overall scheme described by the Trustee.

Critically, the FAC also ties Var Reeve to various acts of mail and/or wire fraud. Specifically, paragraph 180 of the FAC alleges that "due to their omnipresent power over FOR 1031, Douglas Swenson, Var Reeve and Bringhurst controlled and/or were generally aware of the fraudulent misrepresentations and omissions made by FOR 1031 in various

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  19**

DDBs." As explained above, the DDBs or "Due Dilligence Binders" were offering materials issued in connection with real estate transactions. The DDBs were sent through the mails and/or wires and contained the same types of misrepresentations as the PPMs. (*Id.,* ¶¶ 315, 441-443, 391-402, & Exhs. G & H). Though the link between Var Reeve and the DDBs may be somewhat less firm than the link between the other Defendants and the PPMs, the Court nonetheless concludes that it is sufficient to survive a motion to dismiss.

### C.   RICO Conspiracy--18 U.S.C. 1962(d) (Count 3).

In any event, the question of whether any particular defendant has been linked to two predicate acts of wire or mail fraud is somewhat academic in light of the Trustee's conspiracy claims. Read as a whole, the FAC allows for an inference that each of the individual Defendants were, to one degree or another, "players" in the overall scheme. The Court therefore concludes that the FAC states RICO conspiracy claims as to each of them.

Title 18 U.S.C. section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section." The essence of a RICO conspiracy claim is not an agreement to commit racketeering acts, but "an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering." *U.S. v. Blinder,* 10 F.3d 1468, 1477 (9th Cir. 1993). "The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat, Ass'n.,* 298 F.3d 768, 774-75 (9th Cir. 2002). If a RICO conspiracy is demonstrated, "all conspirators are liable for the acts of their co-conspirators." *Id.* Unlike

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  20**

liability under 1962(c), liability for RICO conspiracy "does not require proof that each defendant committed or agreed to commit the predicate acts required for a substantive RICO violation, but rather, proof that each defendant knowingly agreed to facilitate a scheme which includes the operation or management of a RICO enterprise." *Slade v. Gates,* 2004 WL 2745657 (C.D. Cal. 2004) (quoting *U.S. v. Fernandez,* 388 F.3d 1199 (9th Cir. 2004)); *Larsen v. Lauriel Investments,* 161 F.Supp.2d 1029, 1046 (D.Ariz. 2001) (quoting *Salinas v. United States,* 522 U.S. 52, 64, 118 S.Ct. 469 (1997)).

With this background in mind, the FAC adequately pleads a RICO conspiracy claim as to all six defendants.  All that a plaintiff  must plead in order to establish a violation of 18 U.S.C. § 1962(c) is that Defendants, though their words, deeds, or actions, manifested an intent to agree to violate the substantive provisions of RICO.   As discussed in Section, B, *supra, substantive* RICO violations have been pled against all six Defendants who seek dismissal.  Conspiracy claims logically follow from that.

**D.  Idaho Racketeering Act (Counts 4, 5 & 6).**

The Trustee has also brought claims under the Idaho Racketeering Act, I.C. § 18-7801 *et seq.*  The content and structure of Idaho's law closely parallels that of the federal act.  *See, State v. Nunez,* 133 Idaho 13, 16, 981 P.2d 738, 741 (1999), so these claims survive as well.

**E.   Common Law Fraud (Count 19) and Fraudulent Concealment (Count 29)**

In Idaho, fraud consists of "(1) a statement or a representation of fact, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity, (5) the speaker's intent that there be reliance, (6) the hearer's ignorance of the falsity of the statement, (7) reliance by the hearer,

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  21**

(8) justifiable reliance, and (9) resultant injury." *Washington Federal Sav. v. Van Engelen*, ___P.3d ___, 2012 WL 5665109 (Idaho 2012.)   Other than the requirements that the defendant must knowingly make a false statement with the intent that it be acted upon, there is no specific "scienter" requirement for fraud in Idaho. *See, e.g., Staff of Idaho Real Estate Comm'n. v. Nordling,* 135 Idaho 630, 635  (2001).

The FAC states a claim for common law fraud against all six defendants.  As the foregoing discussion demonstrates, the FAC links all six defendants, through allegations specific to them, to numerous allegedly false statements in the PPMs or DDBs.   As with RICO scienter, the knowledge element of common law fraud is a condition of mind that may be averred generally. *See, McCoy v. Lyons,* 120 Idaho 765, 820 P.2d 360 (1991).  Thus, the discussion of RICO scienter applies equally to the common law fraud claims. All other elements of fraud have also been adequately pled.

In Idaho, fraudulent concealment is not a separate tort, but rather, a species of fraud that arises when a party who has a duty to speak remains silent.  *Van Engelen,* 153 Idaho at 656,  289 P.3d at 58 (Idaho 2012).  Such a duty exists in the following circumstances: 1) where there is a fiduciary or other similar relationship of trust and confidence between the two parties; 2) in order to prevent a partial statement of facts from being misleading, and 3) if a fact known by one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows the other does *not* know it.  *See, e.g. James v. Mercea,* 152 Idaho 914, 277 P.3d 361 (Idaho 2012). Though the FAC adequately explains the basis for the express fraud claims, it does not adequately explain

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  22**

how each individual Defendant engaged in fraud by silence. Therefore, the Court recommends that the motion to dismiss Count 29 be granted.  Given the substantial overlap between this type of claim and the breach of fiduciary duty claims, the Court recommends that this dismissal be without leave to amend.

### F.  Securities Fraud–Rule 10b-5 & I.C. §§ 30-14-501 & 30-14-509 (Count 27)

The Court will now turn to the Claims for violations of the federal and Idaho securities acts. Trustee has also alleged two types of claims.  The first of these is a claim for securities fraud arising under 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, and parallel provisions of the Idaho Code (hereafter "the Rule 10b-5 claim").

A claim under Rule 10b-5 requires a demonstration of the following elements: 1) a misrepresentation or omission of material fact; 2) scienter 3) reliance; 4) causation and 5) damages, as well as a demonstration that the misrepresentations were made in connection with the sale of securities. *See, e.g., Livid Holdings, Inc. v. Solomon Smith Barney, Ltd.,* 416 F.3d 940, 946 (9th Cir. 2005) & 15 U.S.C. § 78j(b).  The Defendants do not challenge whether the Trustee has alleged facts supporting each one of these elements so much as argue that the FAC engages in improper "group pleading."  They also argue that scienter has not been pled in accordance with the heightened standards required by the PSLRA.  Once again, the elements the Court must focus on are 1) whether a false statement of material fact has been pled as to each defendant, and 2) scienter.

Leaving Var Reeve aside for the moment, the foregoing discussion establishes that the other five Defendants–Mayeron, Hassard, Bringhurst, Jeremy Swenson, and David

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  23**

Swenson–have all been linked to the allegedly false statements (the PPMs) issued in connection with the sale of securities.[7]  To recapitulate, Mayeron, Jeremy Swenson and David Swenson are alleged to have seen the PPMs prior to issuance and to have "signed off on them" prior to their finalization.  Bringhurst and Hassard are alleged to have been involved in the preparation of the financial statements whose false valuations of DBSI's net worth were incorporated into the PPMs. These allegations are sufficient, for pleading purposes, to link each of these defendants to misstatements of material fact.

However, the PSLRA establishes particularly stringent scienter requirements for plaintiffs in securities fraud cases.  The United States Supreme Court has instructed that, in order to survive a motion to dismiss, a plaintiff in such a case must establish a "strong inference" of scienter that is "cogent and at least as compelling as any opposing inference of non-fraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* 551 U.S. 308,  314 (2007). This standard poses a significantly higher hurdle for alleging scienter than is required for RICO or common-law fraud under Rule 9(b).

With respect to the joining defendants–Bringhurst, Jeremy Swenson, and David Swenson–the FAC meets these standards for establishing scienter, for all the reasons discussed above in the analysis of the RICO claims.  The question is somewhat closer for Mayeron and Hassard, because unlike the other Defendants, they are not alleged to have been

---

[7]Though the Court determined that Var Reeve was linked to allegedly false statements in the DDBs for purposes of the RICO and common law fraud claims, the DDBs were issued in connection with real estate transactions, and thus do not appear to involve sales of securities as required by 15 U.S.C. § 78j.

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  24**

involved in the weekly cash meetings.  Nevertheless, the Court concludes that the FAC is sufficient.  In the first place, *Tellabs* instructs courts passing on motions to dismiss to read complaints "holistically."  *Id.,* at 326.  "The inquiry. . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 323 (emphasis in original). *Tellabs* also instructs courts to take into account "plausible, non-culpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.,* at 324.

Read as a whole, the FAC creates a plausible, cogent inference of scienter as to Hassard and Mayeron. Unlike many securities fraud cases, the FAC does not allege a single, isolated instance of wrongdoing, or even a handful of instances.  Rather, it alleges that the entire structure of the various DBSI entities was fundamentally a sham.   Essentially, the Trustee asks the Court to infer that two of the most highly placed individuals within the company could not have been unaware of these problems.  The Court agrees that such an inference is reasonable and cogent under the circumstances.  *Cf, Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) (holding that in rare occasions, falsity alone may be indicative of scienter where a defendant's role in the company and nature of relevant facts are of such prominence that it would be "absurd" to suggest that management was without knowledge of matter.) The story told in the FAC–of fundamentally untenable business models, of chronic cash shortfalls, of obligations that could not be met except by raising money from new investors, of tax shelters created by diverting other people's money into unprofitable businesses, and of offering documents that hid or ignored massive liabilities–is

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  25**

compelling.  Defendants have also failed to offer any competing non-culpable inferences, despite case law instructing courts to take such inferences into account.  For all these reasons, the FAC states securities fraud claims as to Hassard and Mayeron.

Var Reeve, however, is a different matter.  The FAC does not specifically allege that he had any role in preparing the PPMs or any other document that was issued in connection with the sale of securities.  Prior to the passage of the PSLRA, it might have been possible to attribute authorship of the PPMs to him under the "group pleading doctrine."[8]  However, this practice has been questioned by an increasing number of courts, in this circuit and elsewhere. *See, e.g., In re American Apparel, Inc., Shareholder Litigation,* 855 F.Supp.2d 1043 (C.D.Cal. 2012) (collecting cases). Therefore, the Court recommends that Count Twenty-Seven be dismissed as to Var Reeve, subject to leave to amend.

### G.  Control Person Liability Under the Securities Act (Count 28).

Section 20(a) of the Exchange Act also provides for what is known as "control person liability" for underlying securities law violations. The relevant provision of the statute states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

---

[8]In this context, "group pleading" refers to a judicially created presumption that, for pleading purposes, "statements in group published documents such as prospectuses, registration statements, annual reports or press releases are the collective work of those individuals with direct involvement in the day to day affairs of the company."  *In re New Century,* 588 F.Supp.2d 1206 (C.D.Cal. 2008).

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  26**

15 U.S.C. § 78t(a).  To state a claim for control person liability, the Ninth Circuit requires the Plaintiff to plead that "(1)  the defendant had the power to influence or control the primary violator, and (2) the defendant actively used this influence or control so as to be a 'culpable participant' in the primary violation." *Knollenberg v. Harmonic, Inc.,* 152 Fed.Appx. 674 (9th Cir. 2005).

The Court will recommend that the motion be denied as to the five Defendants against whom the Rule 10b5 claims survive.  Though the concept of "control person liability" seems conceptually ill-fitted, considering the Trustee's claims that each Defendant was also guilty of primary security violations, alternative pleading is allowed under the Federal Rules. The Court also recommends that the motion be granted as to Var Reeve because the FAC does not specifically explain how he was in a position to stop the allegedly fraudulent statements in the PPMs.  Again, the Court recommends that this dismissal be subject to leave to amend if the Trustee can allege facts to support such a claim against Var Reeve.

**H.    Idaho Control Person Liability (Count 28).**

However, the FAC does state a claim as for control person liability under Idaho law as to all Defendants, <u>including</u> Var Reeve.  The Idaho Securities Act is somewhat different from the federal act, in that it provides for control person liability against any "individual who is a managing partner, executive officer, or director of a person . . . unless the controlling person sustains the burden of proof that the person did not know, and in the exercise of reasonable care, could not have known, of the existence of conduct by reason of which the liability is alleged to exist."  I.C. § 30-14-509(g)(2).  All Defendants, including Var Reeve,

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  27**

are alleged to have been officers, directors, or managers of DBSI, Inc., as well as numerous related entities. (FAC, Exh. A).  This portion of Count 28 therefore survives.

## II.  The 12(b)(6) Motion.

The Court will now address the various issues raised in the second motion to dismiss (Dkt. 189) filed by Bringhurst, Jeremy Swenson, and David Swenson, in which the other Defendants have joined.  By this motion, the Defendants ask the Court to dismiss various counts of the FAC, largely on the basis that they fail to state claims or have not alleged facts sufficient to meet the standards set forth in *Iqbal* and *Twombly,* and in certain cases, the strictures of Rule 9(b).

### A. Breach of fiduciary duty (Count 9).

The Defendants' argument that the Trustee has not adequately pled this claim has some merit.  As an initial matter, the Court agrees with Defendants that these claims sound in fraud even though fraud was not specifically averred.  Therefore, the specificity requirements of Rule 9(b) apply.

In order to establish a claim for breach of fiduciary duty, the Trustee must establish 1) that defendants owed the various claimants he represents a fiduciary duty; and 2) that the defendants breached this duty.  *Bushi v. Sage Health Care, PLLC,* 146 Idaho 764, 203 P.3d 684, 699 (Idaho 2009); *Jordan v. Hunter,* 124 Idaho 899, 905, 865 P.2d 990, 996 (Ct. App. 1993). The Defendants argue that the FAC fails to state a claim because it is devoid of details describing their roles with respect to the precise conduct that is challenged, as well as the precise dates that each Defendant served as an officer or director of each relevant entity.

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  28**

(Defense Brief, p. 4, Dkt. 189-1).

The Court agrees that the FAC falls short, though for somewhat different reasons. The Trustee has provided a chart (Exhibit A) listing the officers, directors, and managers of the various DBSI entities, so it is not quite accurate to say that the FAC lacks a description of the various Defendants' fiduciary roles. What is not clear, at least to the Court, is what transactions or kinds of transactions are alleged to have breached these fiduciary duties, or which specific Defendants would be liable for which breaches. The "in for a penny, in for a pound" approach may be appropriate in a RICO analysis, because ultimately, co-conspirators are liable for one another's acts. However, this reasoning cannot apply to breach of fiduciary duty claims, because the touchstone of such claims is a heightened duty arising from a specific type of relationship. Therefore, the Court recommends that these claims be dismissed.

Because the FAC already represents the Trustee's second bite at the apple, the Court is somewhat reluctant to grant leave to amend. However, it will nonetheless recommend that leave be granted in this instance. In light of the Court's conclusion that the RICO, securities fraud, and express common law fraud claims largely survive, it is clear that the Trustee could successfully state claims for breach of fiduciary duties against all or most of the Defendants. All that really remains is to delineate these claims with somewhat more precision. Therefore, the Court recommends that the Trustee be allowed an opportunity to submit a Second Amended Complaint, which must clarify: 1) the specific relationship between each individual defendant and the relevant claimant entity or entities that gives rise to a fiduciary relationship, 2) the dates of this relationship and, 3) most critically, the specific acts, transactions, or

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  29**

categories of transactions that are alleged to constitute the breach.[9]

**B.      Aiding and Abetting Breach of Fiduciary Duty (Counts 10 and 25)**

In seeking to dismiss Counts 10 and 25, Defendants' main argument appears to be  that the Trustee is seeking to hold Defendants liable *both* for a primary breach of fiduciary duty *and* for aiding and abetting at the same time, when aiding and abetting of necessity would involve someone who is *not* a fiduciary. Alternative pleading is permissible, so this motion will be denied.

**C**.  **Civil Conspiracy–Counts 11 and 26**

The FAC adequately states a claim for civil conspiracy.  While civil conspiracy is not an independent tort, it can give rise to legal remedies "if there is an agreement between two or more [individuals] to accomplish an unlawful objective in an unlawful manner."  *See, e.g. Mannos v. Moss,* 143 Idaho 927, 935, 155 P.3d 1166, 1174 (2007); *Gibson v. Credit Suisse,* 787 F.Supp.2d 1123, 1139 (D. Idaho 2011).  In this case, the underlying torts sounding in fraud support a claim for civil conspiracy.  *Cf McPheters v. Maile,* 138 Idaho 391, 395 (2003), (rejecting a civil conspiracy claim where the underlying torts sounded in negligence).  Read as a whole, the FAC gives rise to the inference that an agreement existed among the

---

[9]The amendment may be accomplished in the form of a chart that expands Exhibit A so as to include the requested information.  The Court will also specifically rule that if individual transactions are too numerous to list, categories of transactions may be described.  Though individual transactions will obviously have to be provided to Defendants in accordance with the discovery rules, the Court does not consider it a worthwhile use of time to have the Trustee engage in another painstaking pleading exercise for the sake of claims that, overall, are obviously viable.

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  30**

Defendants to disguise DBSI's true financial condition from investors.

**D.    Unjust Enrichment/Creation of Trust Relationship/Misappropriation of Funds–(Counts 12, 23, 24, and 32)**

With one exception, the Court will also recommend denying the motion to dismiss Counts 12, 23, 24, and 32. Defendants' argument in favor of dismissing the claims for unjust enrichment and breach of trust are that these claims are barred by the existence of an express contract. While the issue may be one that is appropriate for summary judgment, it is not something the Court can decide now, without reference to the relevant contracts.

Misappropriation, however, is not a valid claim on these facts. The Trustee argues that the Insider Defendants misappropriated funds when they commingled the "Accountable Reserve" money with general operating accounts. However, the very fact of the co-mingling forecloses an equitable claim for misappropriation under Idaho law. *See, Taylor v. McNichols,* 243 P.3d 620 (2010) (money in a misappropriation claim must be described as a specific chattel); *Warm Springs Properties Inc. v. Andora Villa, Inc.,* 96 Idaho 270, 272, 526 P.2d 1106, 1108  (1974) (holding that a misappropriation claim did not lie once funds at issue lost their specific identity through mixture into defendant's general checking account.).

**E.    Contract Claims "Boot-strapped" into Tort Claims (Counts 12, 19, 21-26, 29, and 32.)**

Next, the Defendants argue that various causes of action should be dismissed on the basis that "where a duty to perform arises from a contract, the cause of action lies in contract, not tort, when the duty is breached."  This argument is without merit.  Though the Trustee has brought some contract claims, the overall thrust of the FAC is one sounding in fraud, a tort.

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  31**

**F.      Negligent Misrepresentation (Count 21)**

Negligent misrepresentation is a tort that the Idaho courts have recognized only in the specific, narrow context of an accountant-client relationship. *Duffin v. Idaho Crop. Improvement Ass'n.,* 126 Idaho 1002, 1010, 895 P.2d 1195, 1203 (1995).  Therefore, the Court recommends that Count 21 be dismissed.

## CONCLUSION

A few final words are in order.   This case is at the pleading stage.  Despite legal requirements that the Court weigh inferences of fraudulent versus non-fraudulent intent, the Court is well aware that the factual allegations detailed in the Trustee's complaint are only part of the DBSI story.  Thus, nothing in this opinion should be taken as an indication that the Court has "pre-judged" this case.  The Court is also aware that aspects of the FAC emphasized in this decision may not end up bearing as much significance once the Defendants have had an opportunity to conduct discovery and present the Court with a fuller picture of the facts. Therefore, the only conclusion that any party is to draw from this Report and Recommendation is that, purely as a matter of pleading practice, the FAC states claims that meet the relevant standards.

## RECOMMENDATION

1.      The undersigned recommends that the first Motion to Dismiss (Dkt. 188) be

largely **DENIED**.  The only exceptions are the fraudulent concealment claims

(Count 29), the federal and Idaho Rule 10b-5 securities fraud claims (Count 27)

against Var Reeve, and the **<u>federal</u>** portion of the control person liability claims

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  32**

against Var Reeve (Count 28), all of which should be **DISMISSED**.

2.    With respect to the second motion (Dkt. 189), the Court recommends that it be **GRANTED IN PART AND DENIED IN PART**.  Specifically, the motion should be **DENIED** as to counts 10, 11, 25, and 26, and **GRANTED** as to counts 9, 21, and 24.  As to Counts 12 and 23, the misappropriation claims should be **DISMISSED,** but the unjust enrichment claims survive.

3.    The undersigned recommends that the District Court grant the Trustee leave to amend to clarify the scope of the breach of fiduciary duty claims (Counts 9 & 24), and to clarify the basis for the securities fraud claims (Counts 27 and 28) against Var Reeve.  Otherwise, the Court recommends that all dismissals be **<u>without leave to amend</u>**.  Any amendment should be filed no later than fifteen days after the District Court's order adopting, rejecting, or modifying this Report.

4.    Written objections to this Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1, or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

DATED: January 25, 2013.

_Mikel H. Williams_
Honorable Mikel H. Williams
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS  33**