**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| JAMES R. ZAZZALI, as Trustee for the DBSI Estate Litigation Trust and as Trustee for the DBSI Private Actions Trust, | Case No. 1:12-CV-224-EJL-MHW |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT (COUNTS 7 & 8)** |
| DOUGLAS L. SWENSON; CHARLES HASSARD; JOHN M. MAYERON; WALTER E. MOTT; FARRELL BENNETT; JOHN D. FOSTER; THOMAS VAR REEVE; GARY BRINGHURST; JEREMY SWENSON; DAVID SWENSON; MICK & ASSOCIATES PC LLO; BRYAN S. MICK; JOHN DOE 1-50; and XYZ CORPORATION 1-50. | |
| Defendants. | |

Pending before the Court is the Trustee's Motion for Summary Judgment as to Counts 7 and 8, referred to as the "Loans Payable/Book Account Counts." (Dkt. 211). By this motion, the Trustee seeks to hold Douglas Swenson, Charles Hassard, and John Mayeron

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 1**

(hereafter "Defendants" or the "Individual Defendants") liable for some $196,689.254 of debt listed on the books of certain DBSI entities, namely DBSI Investments Limited Partnership and DBSI Redemption Reserve.  On October 17, 2012, this case was referred to the undersigned United States Magistrate Judge for all dispositive as well as non-dispositive matters. (Dkt. 217).  The Court heard oral argument on June 5, 2013 and has carefully reviewed the parties' submissions with respect to this motion.[1]  Pursuant to Rule 56(g) of the Federal Rules of Civil Procedure, the Court recommends that not all the relief requested by the motion be granted; however, certain defenses raised by the Defendants can be ruled on at this time in favor of the Trustee.

## BACKGROUND

Because Defendants have not contested the primary theory of liability at issue in this motion, only a few facts  are critical to an understanding of the issues presented.  This case stems from the collapse of DBSI, Inc., for many years a large and successful real-estate investment corporation located in Boise, Idaho.  In 2008, during the midst of the economic downturn, various DBSI entities filed for bankruptcy in the District of Delaware.  A plan of Chapter 11 Plan of Liquidation  (hereafter "the Plan") was submitted in August of 2010 and confirmed on October 26, 2010.  (Hassard and Mayeron Opposition Appendix, pp. 82 -315, Dkt. 317-1 through 317-10).[2]  Most crucial to the discussion herein, the Plan called for the

_____

[1]The relevant docket entries are: 211, 317-323, 331-333, 335-338, 345, and 346.

[2]The Opposition Appendix filed by Defendants Hassard and Mayeron at Docket 317 will be referred to henceforth as "App. Opp." Unless otherwise indicated, all page citations the

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 2**

substantive consolidation of estates of various DBSI debtor and related non-debtor entities, which meant that the assets and liabilities of these entities would be merged to create a single fund from which creditors' claims could be satisfied.  (App. Opp at pp. 180-183, Dkt. 317-5). In the Order of Confirmation, the bankruptcy court engaged in an extensive discussion of the reasons supporting its decision to substantively consolidate the debtor and non-debtor estates. To vastly simplify the bankruptcy court's reasoning as to substantive consolidation, the court determined that the books of the various DBSI entities reflected transactions of such staggering complexity that sorting out their claims against each another would have consumed the estate's limited resources.    (Confirmation Order, App. Opp,  pp. 248-260, Dkt. 317-8). The Plan and the Order of Confirmation also authorized the creation of various trusts.  (App. Opp at pp. 46-48, Dkt. 317-9).  First, they authorized the creation of the Estate Litigation Trust and the  Private Action Trust (the "ELT" and the "PLT") that are the Plaintiffs in this action.  (*Id.*).  Next, they authorized the creation of two Liquidating Trusts, the purpose of which is to hold and liquidate the assets of the various debtor and non-debtor estates so they can ultimately be distributed to creditors.  (*Id.*). The Trustee of the Litigation Trusts is James Zazzali, the Plaintiff in this case; the Trustee of the Liquidating Trusts is Conrad Myers. (Myers depo., App. Opp. at p. 14, Dkt. 317-1). The Liquidating Trusts or Myers Trusts are the sole beneficiaries of the claims that the Litigation Trusts are pursuing in this case. (Myers

_____

Opposition Appendix refer to the boldfaced Bates-stamped page number in the lower right-hand corner, and not the pagination generated by CMECF or internal pagination specific to the document being referenced.

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 3**

depo, App. Opp. at p. 27, Dkt. 317-1).   The claims at issue in this motion are essentially claims to recover inter-company debts from individuals who were general partners of the relevant entities, and are being brought on behalf of the ELT.

Besides these facts, a detailed discussion of the Trustee's theories of liability is crucial to an understanding of the issues raised in this motion.   The Trustee originally asserted two theories of liability against the Defendants.   The first theory involves an attempt to hold the Individual Defendants liable for the debts of certain DBSI entities, either directly, because they were general partners of those entities, or indirectly, on a theory of "interlocking" partnership liability.   Specifically, in Count Seven of the First Amended Complaint (Dkt. 62), the Trustee asserts  that the Defendants are personally liable for some $101,144,847 of debt owed by an entity known as DBSI Investments Limited Partnership ("Investments") to another DBSI entity known as DBSI Redemption Reserve ("DRR.").   The basis of this claim was simply that the Individual Defendants, as general partners of Investments, are personally liable for the debts of the partnership under Idaho's version of the Uniform Limited Partnership Act, specifically, I.C. § 53-2-404.   In Count 8, the Trustee seeks to hold the Individual Defendants liable for some $196,689.254 worth of debts owed by DRR to DBSI, Inc.  The theory of liability at issue in this count is less direct than that in Count Seven, but is nonetheless relatively straightforward.   Essentially, the Trustee claims that because Investments was also a general partner of two entities known as DBSI Investors IX and DBSI Investors XI, which in turn were general partners of DRR, that the Individual Defendants are

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 4**

also liable, as the general partners of Investments, for all debts running up the chain of interlocking partnerships.  Because the hundred-and-one million dollar debt was included within the hundred and ninety-six million dollar debt, the Trustee seeks judgment in the total amount of $196,689,254.  This amount was calculated as of  December 31, 2008 and according to the Trustee, was taken from books maintained by DBSI's accountant to track inter-company loans and receivables. (Trustee's Opening Brief, pp. 4-5, Dkt. 211).

The Trustee alleges that once the funds at issue were loaned to the relevant entities (Investments or DRR), that they were disbursed to various DBSI insiders and also advanced to various technology start-up companies in which the DBSI enterprises invested heavily. (*Id,* p. 5).    It is undisputed that the Liquidating Trustee is in possession of the technology company assets purchased with the loaned funds, and the primary issue in this motion is whether any judgment that may ultimately be entered must account for the value of these assets currently held by the Liquidating Trustee.

Finally, the Trustee also asserts that Investments owed a third entity known as DBSI Real Estate Funding Corporation ("DBSI REFC") some $6,536,679 by the end of 2008.  (*Id.,* p. 7).  The Trustee's explanation of the  basis of this claim was rather scant, considering that it is a hefty sum in and of itself.  It is not clear if this claim is separate from or contained within the $196,689,254 figure that the Trustee is otherwise seeking.

None of the Defendants have contested the basic legal theory that as general partners of Investments, they are directly or indirectly liable for all debts running up the interlocking

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 5**

chain of partnerships.   Instead, Defendants Hassard and Mayeron have argued that their liability was discharged, along with the liability of various debtor and non-debtor entities, either by operation of law when the bankruptcy court confirmed the Plan of Liquidation, or by language in the Order of Confirmation itself. They also argue that the Trustee's motion is premature, because it fails to present admissible evidence on the proper measure of damages. Relatedly, the Defendants also argue that the Trustee's request for immediate entry of judgment in the amount of $196,689,254 would constitute an unlawful excessive recovery, because the assets purchased with the loaned funds are already in the possession of the Liquidating Trustee, which would reduce the amounts they owe as general partners. Defendants argue that in this context, the only lawful measure of damages would be the face value of the debts *minus* the value of the assets held by the Liquidating Trustee.  Hassard and Mayeron have also requested relief under Rule 56(d) of the Federal Rules of Civil Procedure, on the theory that they have not been granted adequate time to conduct discovery into the value of the assets currently being held by the Liquidating Trustee. (Dkt. 319 & 320). Swenson, who is currently facing criminal prosecution, did not file a substantive response to the Trustee's motion, but instead joined in Mayeron and Hassard's arguments and filed his own separate request for Rule 56(d) relief. (Dkts. 321-323).

The Trustee's second avenue of liability was based on a theory of judicial estoppel. Essentially, the Trustee argued that because Defendants claimed personal responsibility for portions of the relevant debts in their individual tax returns, they should be estopped from

denying liability at least as to the amounts claimed, by dint of having avoided significant tax consequences as a result of their representations.[3]  Because Defendants did not contest the general notion that they are liable, as general partners of Investments, for the debts of the relevant partnerships, the judicial estoppel theory appears to be moot.

## LEGAL STANDARDS

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which provides, in pertinent part, that judgment shall be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party may move for summary judgment at any time until thirty days after the close of all discovery. *Id.* While the court must consider the facts in the light most favorable to the non-moving party and give that party the benefit of any reasonable inferences, s*ee, e.g. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), summary judgment is  not a "disfavored procedural shortcut," but rather the one of the chief mechanisms by which "factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327  (1986). The initial burden is on the moving party to show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Steckl v. Motorola,*

---

[3]The Trustee asserts that for the years 2004 through 2007, the Defendants claimed losses that totaled $80,466,599 for Douglas Swenson, $14,950.467 for John Mayeron, and $16,842,574 for Charles Hassard.  (Trustee's Revised Appendix "C," Dkt. 335, p. 18).

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 7**

*Inc.*, 703 F.2d 392, 393 (9th Cir. 1983).  "[I]f a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc.*, 809 F.2d 626, 631 (9th Cir. 1987); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When a party opposing a motion for summary judgment cannot present "facts essential to justify his opposition" to the motion, Rule 56(d) permits the party to submit an affidavit or declaration stating the reasons the party is unable to present the evidence, and the court may continue or deny the motion if the opposing party needs to discover essential facts. The burden is on the party seeking additional discovery pursuant to Rule 56(d) to demonstrate that (1) the information sought would prevent summary judgment, and (2) that the information sought exists. *Blough v. Holland Realty, Inc.,* 574 F.3d 1084 (9th Cir. 2009); *Izaguirre v. Greenwood Motor Lines, Inc.,* 2011 WL 5325658 at * 6 (D. Idaho 2011).  Rule 56(d) requires that a non-movant "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  *Id.,* Fed. R. Civ. P. 56(d).  It is critical that the non-moving party explain why he or she cannot oppose the motion via means of an affidavit or declaration.  Explanations that are merely contained in a memorandum are not sufficient.  *Brae Transp. Inc. v. Coopers & Lybrand,* 790 F.2d 1439, 1443 (9th Cir. 1986).  *See also, Cross v. State Farm Ins. Co.*, ___F.Supp.2d ____, 2013 WL 665002 at *7 (N.D.N.Y. 2013) (applying rule that applications for extensions be made via affidavit to current Rule 56(d)).

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8), Page 8**

## DISCUSSION

Because Defendants have not contested the Trustee's basic theory of liability, there are essentially only two issues for the Court to resolve.   The first of these is whether the Defendants' liability as general partners was extinguished by the Confirmation Order liquidating the debts of DBSI debtor and related non-debtor entities.   The Court has no difficulty concluding that both the Plan and the Order of Confirmation explicitly preserve the claims at issue in this motion.   The second question is whether the Trustee is entitled to recover the full face amount of the debts, or whether some other measure of damages is appropriate.   The Court agrees with Defendants that the proper measure of damages is face value of debts minus the value of assets held by the Liquidating Trustee.   The Court also concludes that the Defendants' arguments on this point are in the nature of affirmative defenses upon which they bear the burden of proof.   However, the time frame previously imposed for discovery was insufficient, particularly because the valuation of businesses or assets is something for which expert testimony is highly probative.   Thus, the Court concludes that the case is not ripe for summary adjudication at this time, and recommends that the motion for summary judgment be denied to the extent it seeks a money judgment in a sum certain against the Defendants.

**I.      The Plan and Order of Confirmation Did Not Extinguish the Loans Payable/Book Account Claims Against the Individual Defendants.**

The Court has no difficulty concluding that the claims against the Individual Defendants were not discharged either by operation of law or by any specific language in the

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 9**

Plan or the Order of Confirmation.  It is black-letter law that discharge of a debt in bankruptcy does not result in the complete extinguishment of the underlying debt, but rather merely discharges the bankruptcy debtor from personal liability.  *See, e.g., Underhill v. Royal*, 769 F.2d 1426, 1431-32 (9th Cir. 1985), *rejected on other grounds, Reves v. Ernst & Young,* 494 U.S. 56, 62-65 (1990); *In re Matter of Edgeworth,* 993 F.2d 51, 53-54 (5th Cir. 1993); *Star Phoenix Mining Co. v. West Bank One,* 147 F.3d 1145, 1146-48 (9th Cir. 1998); *United States v. Tharp,* 973 F.2d 619, 621-23 (8th Cir. 1992).  Defendants' argument is premised on the idea that discharge of the debt against them individually would have been the normal result of the Plan of Liquidation and Order of Confirmation, but a bankruptcy does not determine the status of a debt owed by a guarantor, surety or partner of a debtor.

The Ninth Circuit's decision in *Star Phoenix* is all but dispositive on this point.  Like this case, *Star Phoenix* involved a Chapter 11 liquidating plan.  In that case, a creditor sought recovery against the guarantor of a debt where the principal debtor had liquidated in bankruptcy.  The Court held that the liquidation of the bankruptcy debtor via the confirmation of a plan of liquidation did not discharge the guarantor's liability for the underlying debt.  *Id.* at 1147.  The only real difference between the *Star Phoenix* case and this one is that this case involves a partner/partnership relationship instead of a guarantor/principal relationship.  This is a distinction without a difference.

Next, it is apparent that the Plan and Order of Confirmation specifically preserve the causes of action at issue here.  This is apparent at numerous points in these documents. Paragraph 62 of the Confirmation Order in particular bears quoting nearly verbatim. It states:

> Retention of Claims and Causes of Action.  As authorized by section 1123(b)(3), Section R of Article VI of the Plan provides for the retention of all Estate Causes of Action, (including all causes of action held by Consolidated Non-Debtors), not expressly released or settled under the Plan, including, but not limited to, any and all Estate Causes of Action, (included all causes of action held by all consolidated non-Debtors), including without limitation preferential or fraudulent transfers, and other Avoidance Actions held by the Note/Fund Consolidated Debtors, the DBSI Consolidated Debtors, and the Consolidated Non-Debtors, including, without limitation, DBSI Investments, DBSI Redemption, Stellar, and the Non-Debtor Affiliates described in Schedule 1 to the Disclosure Statement. For the avoidance of doubt, notwithstanding that the Plan provides for the substantive consolidation of the DBSI Consolidated Debtors (including the Consolidated Non-Debtors) and the substantive consolidation of the Note/Fund consolidated Debtors *nunc pro tunc* to November 10, 2008, and the subordination of Inter-Company claims, (I) the rights of each DBSI Consolidated Debtor (including each Consolidated Non-Debtor) to prosecute any cause of action that could have been brought by such DBSI Consolidated Debtor (including each such Consolidated Non-Debtor) at any time, including but not limited to Avoidance Actions, are reserved and preserved for prosecution by the DBSI Estate Litigation Trustee . . . . In accordance with Article VI of the Plan, all Estate Causes of Action (which includes all causes of action held by the Consolidated Non-Debtors) are vested in, and may be prosecuted by, the DBSI Estate Litigation Trustee.

(App. Opp. pp. 267-68, Dkt. 317-9). The term  "Estate Causes of Action" is defined in the Plan as "Avoidance Actions *and any all other Causes of Action held by any or all of the Estates.*" (emphasis added).  (Plan, App. Opp. p. 101, Dkt. 317-1).  "Consolidated Non-Debtors" includes both Investments and DRR. (App. Opp. p. 93, Dkt. 317-1). Thus, the Order of Confirmation specifically states that it is preserving all causes of action held by any of the

Estates of the Debtors, which would include the $196 million debt previously held by DBSI, Inc., and the $101 million debt previously held by Consolidated Non-Debtor DRR which represents the loans to Investments.

The cross-referenced language in section R of Article VI of the Plan in turn provides as follows, with the crucial language italicized:

> *Except as otherwise provided in the Plan, the Confirmation Order, or in any Plan documents*, in accordance with section 1123(b) of the Bankruptcy Code, (I) *any and all Estate Causes of Action,* including preferential and fraudulent transfers and other Avoidance Actions of the Note/Fund Consolidated Debtors, the DBSI Consolidated Debtors, and the Consolidated Non-Debtors, including, without limitation, DBSI Investments, DBSI Redemption, Stellar and the Non-Debtor Affiliates described in Section 1 of the Disclosure Statement, *shall remain assets of the Estate, shall be part of the Assets of the DBSI Estate Litigation Trust and shall vest in the DBSI Estate Litigation Trust with the DBSI Estate Litigation Trustee being the representative of the Estates with respect to such causes of action,* whether or not litigation relating thereto is pending on the Effective Date, and *whether or not any such Estate Causes of Action have been listed or referred to in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court.*

Plan, App. Opp, p. 206, Dkt. 317-6).  In other words, the Plan clearly attempts, in language as broadly stated as possible, to preserve "any and all" causes of action available to the Trustee.

Another section of the Plan also specifies that assets of DBSI Consolidated Non-Debtors (which, again, includes Investments and DRR) are to be preserved and made available to the Estate Litigation Trustee:

> Upon the substantive consolidation of the DBSI Consolidated Non-Debtors into DBSI, all Estate Causes of Action held by the separate Estate of Each Consolidated Non-Debtor, including, but not limited to Avoidance Actions

against non-debtor transferees, including preferential and fraudulent transfer claims, shall be available and preserved and the DBSI Estate Litigation Trustee shall have the right to prosecute such Estate Causes of Action, in accordance with Article VI(R) of the Plan.

(Plan, App. Opp. p. 182, Dkt. 317-5).

Various other places in the Confirmation Order contain similarly strong language.  For example, Section 8(h) of the Confirmation Order, entitled "Retention of Causes of Action/Preservation of Rights" states that  "all Estate Causes of action that are not expressly released under the Plan [shall] be retained and preserved by the DBSI Estate Litigation Trust." (App. Opp. p. 302, Dkt. 317-10).   Article V of the Plan, entitled "Intercompany Claims and Claims Settlement," also provides:

> [N]otwithstanding that no such distributions shall be provided, the Plan shall not in any way, impair, affect, diminish, or cause a waiver of any cause of action held by any DBSI Consolidated Debtor or any Note/Fund Consolidated Debtor against any non-debtor Person, including, but not limited to, a Cause of Action based upon an Intercompany claim, and the DBSI Estate Litigation Trust's Rights with respect to such causes of action shall be preserved and unimpaired by the Plan in all respects.

(App. Opp. p. 177, Dkt. 317-5). Finally, Article 7H(v) of the Confirmation Order explicitly provides that claims against Insiders are not being released.  It states:

> For the further avoidance of doubt, notwithstanding anything herein to the contrary, neither the Global Claims Settlement nor any other release provided for herein or in the Plan shall release or waive any Causes of Action . . .the DBSI Consolidated Debtors may hold against any insider as that term is defined in Section 101(31) of the Bankruptcy Code and/or any other applicable law.

(Confirmation Order, App. Opp. 304, Dkt. 317-5).  It is difficult to imagine how the Plan or Order of Confirmation could have stated more clearly or more thoroughly that all available causes of action were being preserved.

Defendants do not advance an alternate interpretation of the provisions quoted above. Rather, they assert that a single paragraph in the Order of Confirmation, which they refer to as the "Exclusion Provision," negates the numerous provisions in the Plan and Order of Confirmation that expressly state that all causes of action are being preserved.  Again, quotation at some length is necessary:

> Limited Insider Claims:   The Plan provides for the *nunc pro tunc* substantive consolidation of the Consolidated Non-Debtors effective November 10, 2008. The plan also anticipates that certain causes of action may be pending or initiated or pursued against certain former insiders in litigation, arbitration, or otherwise, including, without limitation, Consolidated Non-Debtor Avoidance Actions, Estate Causes of Action, Non-Estate Causes of Action, the Spann Action and Other Class Actions.  Any such causes of action pursued against [Mssrs. Swenson, Hassard, and Mayeron] ("Limited Insider Claims") shall be subject to the following limitations:
>
> > Notwithstanding anything in the Plan or any other pleading or other document filed in the Debtors' bankruptcy cases to the contrary, and notwithstanding any position taken by a party in the Debtors' bankruptcy cases, the preclusive effect (under the doctrines of collateral estoppel, res judicata, or otherwise) of the Court's decision regarding substantive consolidation of the Consolidated Non-Debtors as set forth in the Confirmation Order shall be limited, solely as to the defendants of the Limited Insider Claims, to the specific relief granted in the Confirmation Order – e.g., nunc pro tunc substantive consolidation of the Consolidated Non-Debtors; provided, however, that for the avoidance of doubt, (I) the Court's decision regarding substantive consolidation of the Consolidated Non-Debtors shall not have any other preclusive effect with respect to the Limited Insider Claims, (ii) the preclusive effect of the Confirmation Order shall not be subject to any

limitation in connection with affirmative claims that may be asserted by Messrs. [Swenson, Hassard, and Mayeron]; and (iii) the non-objection of Messrs. [Swenson, Hassard, and Mayeron] to substantive consolidation of the Consolidated Non-Debtors shall not be deemed an admission or concession of any factual or legal issue in connection with the Limited Insider Claims.

(Confirmation Order, App. Opp. p. 293-294, Dkt. 317-10).

Though admittedly somewhat verbose, the intent of this passage is nonetheless clear. Far from changing the numerous provisions in the Plan and Order of Confirmation addressing the preservation of causes of action, the quoted language actually underscores the fact that all possible claims are being preserved. Defendants rely on the following passage, which, preserving their ellipses and emendations, reads as follows: "Notwithstanding anything in the Plan or [elsewhere in the bankruptcy] . . . the preclusive effect . . . of the court's decision regarding substantive consolidation of the Consolidated Non-Debtors [that means Investments] . . . shall be limited, solely as to the defendants of the Limited Insider Claims, to the specific relief granted in the Confirmation Order – e.g. nunc pro tunc substantive consolidation of the Consolidated Non-Debtors." Defendants' argument as to why this language negates every other provision in the Plan and Order of Confirmation is convoluted in the extreme, so much so that it is difficult even to summarize it accurately. Essentially, however, the argument seems to rely 1) upon the language limiting the "preclusive effect" of the bankruptcy court's order of substantive consolidation to exactly that–substantive consolidation, and 2) upon a notion that substantive consolidation by definition involves the extinguishment of inter-company claims. These arguments fail. Though substantive

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 15**

consolidation usually results in the extinguishment of inter-company claims by pooling them into the same fund, *In re Bonham,* 229 F.3d 750, 763-767 (9th Cir. 2000), the Court does not read that case as requiring that claims against general partners of debtor entities must also be extinguished.   Rather, a careful reading of the *Bonham* court's discussion of substantive consolidation indicates that it is an inherently flexible equitable tool that bankruptcy courts are free to fashion as they choose, with the goal being to maximize recovery for unsecured creditors.  *Id.* Nothing in *Bonham* suggests that substantive consolidation is intended to absolve potentially liable non-debtor guarantors, sureties or partners of their personal liability for a debtor entity's debts. The Defendants also ignore the fact that the introductory language of the so-called "Exclusion Provision" specifically states that "the plan also anticipates that certain causes of action may be pending or initiated or pursued against certain former insiders in litigation, arbitration, or otherwise."   Though the Order of Confirmation does state that "Limited Insider Claims" will be subject to certain limitations, these limitations do not have the effect of eliminating any cause of action.

Further, Defendants' argument also ignores the subparagraphs that follow the sentence beginning "provided, however, for the avoidance of doubt."  Subsection I in particular states that the order of substantive consolidation *"shall not have any other preclusive effect"* with respect to the Limited Insider Claims.  It would be strange indeed to read a paragraph that specifically states that it is *limiting* the preclusive effect of substantive consolidation as doing precisely the opposite, by eliminating an entire class of claims.

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 16**

Nor does subsection iii of the so-called "Exclusion Provision" change the result. Subsection iii simply clarifies that the non-objection of various DBSI Insiders to substantive consolidation of the Consolidated Non-Debtors "shall not be deemed an admission or concession of any factual or legal issue in connection with the Limited Insider Claims."  Put in plainer terms, the passage is simply clarifying that the order of substantive consolidation will not affect certain factual or legal issues that may arise in pending or potential litigation. All in all, the Trustee's proffered interpretation, i.e. that the "Exclusion Provision" was intended to preserve Defendants' ability to contest certain factual or legal issues, such as veil piercing, in future litigation, but not to eliminate any cause of action, makes infinitely more sense.[4]  As with other provisions of the Plan and Order of Confirmation, it is clear that the intent of the so-called Exclusion Provision is to preserve, not eliminate, as many causes of action as possible.

In light of the overall clarity of the Plan and Order of Confirmation on this point, it is perhaps understandable that Defendants have also presented a subtly different argument as to why their liability was discharged in the bankruptcy.  In this argument, Defendants assert that the Plan and the Order of Confirmation did not so much discharge their liability as preserve their defenses based upon what they call the "extinguished liability rule."

---

[4]Defendants argument that the language of the "Exclusion Provision" was added in response to their objections to the Plan is unavailing. Even if the Court could consider extrinsic evidence, which it cannot, given that the overall intent of the Plan and Order of Confirmation is clear, the Defendants have not submitted any actual evidence in admissible form that would relate to the alleged last minute negotiations prior to the Confirmation of the Plan.

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 17**

According to the Defendants, the extinguished liability rule is a rule arising under state law which states that the act of extinguishing a partnership's primary obligation also extinguishes a partner's derivative liability.  (Hassard and Mayeron Opposition Brief, pp. 7-9, Dkt. 317).  Even assuming this interpretation of the Confirmation Order to be correct, the extinguished liability rule is not a rule of Idaho law at all.  In fact, such a rule would appear to run directly counter to Idaho's partnership statutes.   Idaho's limited partnership act specifically contemplate that creditors, *once they have obtained a judgment*, may attach the assets of partners to recover on a partnership debt when a partnership is in bankruptcy.  *See,* I.C. § 53-2-405(3)(b). This statute obviates the argument that Idaho law contains something akin to an "extinguished liability rule."  If such a rule actually existed, there would be no reason to have a statute specifically allowing a judgment creditor to attach the assets of a general partner to satisfy partnership debts when a partnership is in bankruptcy.[5]

Nor do Defendants make a particularly strong case for the existence of the "extinguished liability rule" as a rule of common law in other states.  Most of the cases they cite arise in the context of vicarious liability for tort claims, a far different situation than the one the Court is presented with here.  *See, Saliba v. Exxon Corp.,* 865 F.Supp. 306, 310

---

[5]  The Court is aware that words such as "discharge" and "extinguishment" are terms of art in the bankruptcy context and are not necessarily the best fit here.  Organizations, as opposed to individuals, typically do not obtain "discharges" of their debts.  *Cf., Star Phoenix,* 147 F.3d at 1147 n.2 (noting that the notion of a "discharge" does not apply in a liquidating Chapter 11 case).  Nonetheless, the Defendants' argument is premised on the idea that the DBSI Plan and Order of Confirmation somehow "extinguished" or "discharged" DBSI's debts, and the Court preserves the use of those terms here, albeit according to their everyday, dictionary usage.

(W.D.Va. 1994) (involving tort claims arising from an employment relationship); *Kinetics Inc. v. El Paso Products, Co.,* 653 P.2d 522, 524-38 (N.M. Ct. App. 1982) (vicarious liability of for products liability claim); *Steel v. Watch Hill Management Corp.,* 2011 WL 70387 at * 7 (S.D.N.Y. 2011) (tort claim). It is one thing to release general partners from liability where a litigant has settled tort claims against the partnership and then attempted to pursue the same claims against the partners; it is quite another to hold that specific debts simply disappear when a partnership is released via a bankruptcy. In the case of a tort claim, the liability of a general partner is vicarious. In the case of partnership debts, the liability of partners is not vicarious at all, but rather, is considered direct and primary. *See,e.g., In re Keck, Mahin & Cate,* 241 B.R. 583, 594 (Bkrtcy. N. D. Ill. 1999); *Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis,* 849 F.2d 264, 271 (7th Cir. 1988); *Matter of Elsub Corp.* 66 B.R. 172, 184 (Bkrtcy. D. N.J. 1986) (*quoting Francis v. McNeal,* 228 U.S. 695, 702 (1912)); *In re I-37 Gulf Ltd. Partnership*, 48 B.R. 647, 648-49 (Bkrtcy. D. Tex. 1985).

For all these reasons, the Court concludes that the Plan and Order of Confirmation explicitly preserve the causes of action at issue here. There is no genuine dispute that the individual defendants are jointly and severally liable for the debts of the relevant partnerships and no genuine dispute that the claims at issue in Count 7 and 8 were explicitly preserved by the Plan and Order of Confirmation. Though questions remain as to the value of the assets currently held by the Liquidating Trustee, and thus as to the total amount of judgment that should be entered, the Court recommends that the District Court enter an order pursuant to

Rule 56(g) holding that there is no genuine dispute as to Defendants' liability for these debts, up to the total amount requested of $196,689.254.

## II.   The Proper Measure of Value is Face Value of Debts Minus the Value of Assets.

The next question relates to the total amount of the judgment that should be entered. The Trustee's assertion that it is entitled to a judgment on the face value of the debts, without regard to the value of assets held by the Liquidating Trustee, is misplaced. There is some merit to Defendants' analogy that this would be similar to a situation where a bank foreclosed upon a piece of real property and then sought to obtain not a deficiency judgment, but a judgment for the full amount of the loan. It is undisputed that the Liquidating Trust or Trusts (which, after all, are the sole beneficiaries of the Litigation Trusts) currently have in their possession assets that were purchased with the loaned funds. Any money judgment that may ultimately be entered, therefore, would have to take into account the value of those assets.

The Trustee does not precisely contest this notion. Instead, it falls back on a number of ideas, some of which amount to equitable arguments as to why the Court should be free to engage in the rather startling act of granting summary judgment on claims where the amount is uncertain. First and foremost among these is the notion that, because the Defendants are not likely to ever be able to pay a judgment for fifty or a hundred million dollars, let alone one for nearly two hundred million, the Court should go ahead and enter judgment for the face amount of the debt so that DBSI's creditors may finally obtain some relief. (Trustee's Reply Brief, p. 11, Dkt. 335). Related to this is the Trustee's concern, expressed at oral argument,

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 20**

that further delay will only result in a diminution of Defendants' assets that may ultimately be available to satisfy a judgment.

These are weighty and legitimate concerns.  However, they are not concerns that this Court is empowered to address, at least not when it is acting in its legal, as opposed to its equitable, capacity. As one district court has explained, the Federal Rules of Civil Procedure require courts "to undertake very precise drafting when granting summary judgment." *Blakemore v. Pekay,* 895 F.Supp. 972, 984 (N.D. Ill. 1995).   "[C]ourt[s] must award a specific amount of damages in order to enter summary judgment, which is a final judgment in the case." *Id.*  The necessity of identifying a specific dollar amount of damages to award creates obvious difficulties in a case such as this one, where it is all but acknowledged that the amount actually owed may be somewhat lower than the face amount of the debt.

The Trustee does make a case, though not a strong one, for entering immediate judgment in the face amount of the debts.  Specifically, the Trustee suggests that if judgment is entered now for the full $196,689.254 and paid in full,  Defendants could later apply for a credit for the amount of money they may have overpaid if the Trustee is able to recover money that is properly attributed to the assets purchased with the loaned funds.  (Trustee's Reply Brief, p. 16.).  However, the cases cited by the Trustee do not support such a result. *United States v. Mosallem,* 2011 WL 6338815 (S.D.N.Y. 2011) involved a refund of restitution payments by criminal defendants, and therefore has no applicability to the present context. *Arkadelphia Milling Co. v. St. Louis Southwestern Railway,* 249 U.S. 134 (1919) is

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 21**

a nearly hundred year old Supreme Court case that involved a dispute over railroad rates and it is not clear how it relates to the present issues.  Courts cannot simply say "close enough" when it comes to entering judgment. Nothing the Trustee has submitted suggests that there is a valid reason to depart from this bedrock rule.

The Trustee makes a number of other suggestions for how to address the problem of uncertainty as to amount of damages such that judgment may be entered now.  None of them hold water.  First, the Trustee relies on a portion of Idaho's Uniform Limited Partnership Act, which provides that a judgment against a partnership may be satisfied from a partner's assets if the partnership is in bankruptcy.  I.C. § 53-2-405(3)(b).[6] However, the question here is not whose assets are available to pay a judgment, but what the amount of judgment should be in the first place.   This portion of the limited partnership act has nothing to do with the value of potential offsets or credits, but rather with the sources from which a creditor may seek payment *once a judgment is obtained*.  It is thus inapplicable to the questions presented herein.

The Trustee's argument that the Plan prohibits the Defendants from asserting affirmative defenses in the nature of offset or partial payment also fails.  The relevant language in the Plan provides:

> As a result of the substantive consolidation of the DBSI Consolidated Debtors and the Note/Fund Consolidated Debtors, as applicable, except as otherwise expressly provided for herein, the Holders of the foregoing Intercompany Claims will not receive any Distribution under the Plan on account of such

---

[6] Idaho Code § 53-3-307(d) contains an identical provision for general partnerships.

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 22**

> Claims; provided, however, that notwithstanding that no such Distributions shall be provided, the Plan shall not, in any way, impair, affect, diminish, or cause a waiver of any cause of action held by any DBSI Consolidated Debtor or any Note/Fund Consolidated Debtor against any non-debtor Person, including, but not limited to, a Cause of Action based upon an Inter-company Claim, and the DBSI Estate Litigation Trust's rights with respect to such Estate Causes of Action shall be preserved and unimpaired by the Plan in all respects.

(Plan. App. Opp. at 177, Dkt. 317-5).  The quoted language is inapplicable.  The intent of this provision of the Plan is simply to clarify, consistent with the goal of substantive consolidation, that certain classes of creditors (i.e. holders of certain Intercompany claims, such as DRR's claims against Investments, or DBSI Inc.'s claims against DRR) would not receive distributions under the plan.   But the Defendants in this case were not "Holders of Intercompany Claims" as that term is used in the Plan.  Thus, deducting the value of assets already held by the Myers Trusts does not in any way run afoul on the Plan's prohibition on allowing distributions to "Holders" of Intercompany claims.

For similar reasons, the injunction provision at Article 21(A)(i)(4) of the Order of Confirmation does not prevent Defendants from obtaining a credit for the value of assets attributable to the loans, because that credit is not an "offset" or "set-off" of the kind contemplated by the bankruptcy court. (See App. Opp. at p. 312-313, Dkt. 317-10).  Even assuming that Swenson, Hassard, and Mayeron made claims against DBSI in the bankruptcy, the Trustee has not shown that the credit they are presently requesting is  "on account of" or "with respect to" such claims. (Confirmation Order, ¶ 21A(i), App. Opp. 313, Dkt. 317-10). The Defendants are not claiming a right to a deduction in the face amount of the debt because

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 23**

of some independent and unrelated claim they might have had against one of the DBSI entities.  Rather, they are claiming that before the Trustee is entitled to any judgment against them as general partners, there should be  a credit for payments already made or, to put the matter more precisely, *for value already given,* on the debts owed.  The injunction would apply, for example, to independent tort or wage claims that the Defendants may have had against the DBSI Consolidated Debtor or Non-Debtor entities, but not to the offsets requested here.[7]  For similar reasons, the Court rejects the Trustee's argument that any offset or credit should be treated as a "claim" for which recovery may be had only on the same terms as any other creditor's claim.  An offset or credit for value already given is not the same as a "claim" made by a creditor in the bankruptcy context.

For all these reasons, the Court concludes that the proper measure of damages must be the face value of the loans minus the value of the assets purchased with loaned funds and already in the possession of the Liquidating Trustee.  This ruling, however, leaves open the question of what that value is.  Since the evidence on that issue presented by the Defendants was sparse, this question must be addressed in the context of Defendants' motions for Rule 56(d) relief.

---

[7]At oral argument, counsel for Messrs. Hassard and Mayeron indicated that his clients had claims against various DBSI entities for unpaid wages and that they had also lost significant sums of money in various DBSI ventures.

## III.   Defendants Are Entitled to Rule 56(d) Relief.

Though Defendants were able to present some evidence as to the value of the assets currently being held by the Myers Trusts, that evidence was rather scant.  It consisted mainly of past estimates and future projections as to the value of interests in various technology companies that were purchased at least in part with loaned funds.  According to the Defendants Hassard and Mayeron, the value of these various companies ranges from "tens of millions to many scores of millions."  (Hassard & Mayeron Opp. p. 16, Dkt. 317).  For example, Conrad Myers, the Liquidation Trustee, testified in his deposition that the value of the interests held by Stellar that were pledged to secure inter-company liabilities was in the neighborhood of nineteen to twenty million dollars.[8]  (Myers Depo., App. Opp. 54-56, Dkt. 317-1).   Another witness testified that the estimated liquidation value of Stellar and Western Technologies as of August of 2010 was somewhere in the neighborhood of twenty-five to sixty-five million dollars.  (McKinlay depo., App. Opp. P. 359-63, Dkt. 317-12).  Defendants also provided valuation spreadsheets for various technology companies, including Wavetronix, BioReaction,

---

[8]The Court is aware of the fact that not all of the funds loaned from DBSI, Inc. to DRR, or from DRR to Investments may actually have gone to fund purchases of technology company assets.  According to the Confirmation Order, some of the loaned monies went not to fund interests in the technology companies, but for Insider Payments. Also, it is clear that other DBSI entities besides Investments invested in these companies.  This is apparent from Mr. Stewart's own affidavit, which asserts that all together, "the Tech Companies received a total of between about $120,000,000 and $200,000,000 *from the Companies, including Investments*." (emphasis added).   Stewart Affidavit ¶ 4.  Based on this fact alone, it seems unlikely that there could be a one-to-one relationship between the value of the tech company assets and any credit the Defendants may eventually be entitled to claim.  However, these are not issues that the Court must resolve today, in light of the recommendation that the Defendants be granted additional time in which to conduct discovery and obtain expert opinions on the issue of value.

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 25**

GigOptix, and Western Electronics that indicate estimated or projected values in millions of dollars.[9]  These are all significant sums, but are obviously far less than the $196 million that the Trustee is seeking.

As a threshold matter, the Court must first decide who bears the burden of proof on the issue of value. However one chooses to characterize Defendants' arguments as to value of the assets held by the Liquidating Trustee–whether it be as a partial payment, offset, set-off, credit, or double recovery–their arguments are in the nature of an affirmative defense.  *See, e.g. Convoy v. Sperry Rand Corp*., 601 F.2d 385, 390 (in dissent) (holding that "double recovery as a defense is an affirmative defense," akin to the defenses of payment and release, and that the burden of proof is therefore on the defendant).[10]  Most other cases treat defenses of this nature in the same way.  *See e.g., Fox ex rel. Fox v. Barnes,* 2013 WL 2111816 at *10 (N.D. Ill. 2013) (holding that issue of setoff or offset is an affirmative defense upon which the defendant bears the burden of proof); *Aristocrat Leisure Ltd v. Deutsche Bank Trust Co. Americas,* 727 F.Supp.2d  256, 290 (S.D.N.Y. 2010) (collecting cases, the majority of which hold that set-offs, offsets, recoupments, or credits are affirmative defenses).  Thus, the Court concludes that Defendants bear the burden of proof as to the issue of value.

_____

[9]Because counsel for one of the technology companies requested that these spreadsheets be filed under seal, and because the Court is recommending that additional time be granted to conduct discovery on the issue of value, this opinion will not reference the specific numbers provided in the spreadsheets filed at Dkt. 317-11.

[10]The majority opinion in *Convoy v. Sperry Rand* did not address the issue of burden of proof.

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 26**

Nevertheless, the Court concludes that relief under Rule 56(d) is warranted, for two reasons.  First, the Defendants attempted to take the deposition of Paul Judge during the time allotted for discovery on this motion, but were unable to do so.  Mr. Judge is a former president of Stellar, one of the technology companies that in turn invested in numerous other technology companies.  He is thus believed to have information related to the valuation of the those companies.  Due to the withdrawal of counsel for Bringhurst, Jeremy Swenson, and David Swenson and the subsequent mandatory twenty-one day stay, the Defendants were unable to obtain Mr. Judge's deposition during the time frame previously allowed for discovery.  The Court has reviewed the submissions of defense counsel on this topic, and concludes that, contrary to the Trustee's assertions, counsel for Hassard and Mayeron actually engaged in extensive efforts to obtain Mr. Judge's testimony despite the unforseen difficulties created by the stay.  He was ultimately unable to do so  because Mr. Judge's attorney refused to make his client available for deposition twice.  This, however, was a turn of events beyond his control. (Stewart Affidavit, ¶ 10 & Exhs. 18-29, Dkt. 317-13). For this reason alone, a brief extension of time under Rule 56(d) would be appropriate.

In addition to the matter of the Judge deposition, the Court also concludes that additional relief is warranted in order to give Defendants time to identify  expert witnesses and prepare an expert report on the value of the assets maintained by the Liquidating Trustee.  If the Trustee chooses to proceed in the manner it has chosen, i.e. by seeking a judgment against the general partners before it has actually liquidated all the relevant assets, then expert testimony as to the

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 27**

value of those assets is highly probative.[11]  It is axiomatic that expert testimony is appropriate in cases where the valuation of property or assets is an issue.  Fed. R. Civ. P. 702. *See also United States v. 87.98 Acres of Land,* 530 F.3d 899, 905-906 (9th Cir. 2008); *Northwest Pipeline Corp. v. 95.02 Acres of Land,* 2003 WL 25768634 at * 3 (D. Idaho 2003); *Alamar Ranch, LLC v. County of Boise,* 2010 WL 5055917 at *3 (D. Idaho 2010).   Given the need for expert testimony and the magnitude of the claims against Defendants, the Court concludes that the time frame previously imposed for discovery was insufficient.  Therefore, the Court will grant the Defendants request for additional time, and give them until October 31, 2013 in which to obtain expert opinions.

The Court concludes that Swenson's request for Rule 56(d) relief, (Dkt.  321), which he filed independently of his joinder in Hassard and Mayeron's motion, lacks merit.  Swenson's independent motion is based on a number of factors, namely, 1) the perceived need to review the Trustee's voluminous document production; 2) the motion to compel filed by Swenson; 3) Swenson's pending criminal prosecution and 4) the exhaustion of an insurance policy that was

---

[11]The Trustee also has the option of liquidating all of the assets and seeking a deficiency judgment against the general partners, if indeed a deficiency turns out to exist.  This would be similar to what is provided for under 11 U.S.C. § 723 for partnerships in liquidation under Chapter 7 of the Bankruptcy Code.  Under that section, where there is a deficiency of property in the estate to pay in full all claims of the partnership, the trustee has a claim for this sum against the general partner.  *In re Bell& Beckwith,* 44 B.R. 664, 666 (Bktrcy. D. N. D. Ohio 1984). Some courts have concluded that the principles of section 723 may be used in chapter eleven liquidating cases as well.  *See, e.g. Labrum & Doak,* 237 B.R. 275, 291-292 (Bkrtcy. E.D. Pa. 1999) (holding that there is no reason why concepts developed in section 723 cases cannot be applied in Chapter 11 deficiency cases as well); *Matter of Elsub Corp.,* 66 B.R. 172 (Bktrcy. D. N.J. 1986).

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 28**

being used to fund his defense, and 5) the government's seizure of his other assets.  None of these present grounds for Rule 56(d) relief.  As to the first issue, Swenson asserts that emails between various DBSI Insiders and/or the production of the Relativity Database might reveal that the parties to the loans agreed to limit the default rule of general partner liability.  However, this assertion is based on nothing more than speculation.  As explained above, requests for Rule 56(d) relief must be made via affidavit; generalized statements in memoranda do not suffice. *Cross v. State Farm Ins. Co.,* 2013 WL 665002 at *7; *Family Home & Finance Cntr.,* 525 F.3d at 827.   Additionally, if the standard rule of partner liability was changed for any of the relevant transactions, Swenson himself would seem to be in a position to explain this information via affidavit, without reference to emails and other unspecified sources of electronic discovery.

As to the remaining issues, the Court has already ruled on the outstanding discovery motions (Dkt. 357), and Swenson's motion to compel was largely denied. To the extent that the Court granted or reserved ruling on issues raised in Swenson's motion (as was the case with the Trustee's communications with the government and ESI issues), the subject matter does not relate to the issues in the present motion.  The Court has already stated that the pending criminal prosecution does not by itself constitute a reason to delay discovery, or any other proceeding, in this case.  Nor does Mr. Swenson's lack of funds entitle him to more time to respond to the Trustee's summary judgment motion, any more than it does for the many thousands of indigent litigants in the federal court system.  Thus, though Swenson will of course be afforded the same

opportunity to depose Paul Judge and to obtain expert witnesses that the Court is granting to Messrs. Hassard and Mayeron, his independent request for 56(d) relief is should be denied.

To summarize, though it is clear that the defendants will be liable, as general partners of Investments, for up to $196,689.254 of partnership debts, the proper measure of damages is the face amounts of the debts minus value of the relevant assets.  The 56(d) Motion filed by Defendants Hassard and Mayeron is meritorious and  more time is necessary in order to allow them the opportunity to conduct discovery, particularly to obtain the deposition of Paul Judge and/or obtain expert reports on the question of value.  The Court takes no position, at this time, on the proper methodology to be used in valuing the relevant assets.   Swenson's request for 56(d) relief should be denied, except to the extent that it overlaps with the issues raised in Hassard's and Mayeron's motion.

## IV.   Judicial Estoppel Arguments and Swenson's Post-Hearing Submission

Finally, the Court need not reach the issue of judicial estoppel.  The Trustee conceded as much in a post-hearing brief filed in response to Swenson's own post-hearing submission of certain IRS Affidavits.  (Dkt. 346, p. 3). No Defendant contested the basic notion that general partners are jointly and severally liable for partnership debts.  Nor did the Defendants submit any argument or evidence in response to the Trustee's estoppel arguments.  In a sealed post-hearing submission that the Court allowed Swenson to file, (Dkt. 345), his counsel appears to suggest that it would be incongruous to hold general partners personally liable for debts that may have been illusory.  Even if this material had been submitted early enough to allow the

Trustee a proper opportunity to respond, it would not change the Court's recommendations. There is nothing incongruous or inappropriate about holding a defendant liable for phantom or illusory partnership debts, even if those debts were nothing more than paper transactions that bore no relationship to the actual flow of money.  To rule otherwise would only encourage businesspeople to manufacture illusory debt.  For these reasons, Swenson's post-hearing submissions do not change the result.

## RECOMMENDATION

1.      The Court recommends that the Trustee's Motion for Summary Judgment (Dkt. 211) be **DENIED,** at least at this time.  However, the Court also recommends, pursuant to Fed. R. Civ. P. 56(g), that the District Court rule that the Plan and Order of Confirmation specifically preserve the causes of action at issue in Counts 7 and 8, and that Defendants' personal liability for debts up to $196,689.254 be treated as a fact established in this case.  All that remains to be established is the amount of the offset or credit properly attributable to the assets held in the Liquidating Trusts, an issue upon which Defendants bear the burden of proof.

2.      The Court also recommends that Hassard's and Mayeron's Motion for 56(d) relief (Dkt. 319 & 320) be **GRANTED.**  The Court further recommends that Swenson's request for 56(d) Relief (Dkt. 321) be **DENIED,** except to the extent that it overlaps with the issues raised by Hassard and Mayeron. The Defendants, including Swenson, shall have until **<u>October 31, 2013</u>** to obtain the deposition of Paul Judge and obtain expert opinions on

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 31**

the subject of offset value. The Trustee is free to renew the motion for summary judgment at that time, if the circumstances so warrant.

4.      Alternatively, the Trustee may choose to simply liquidate the relevant assets currently held by the Liquidating Trusts, and seek a deficiency judgment from the Defendants thereafter.

5.      As to housekeeping matters, the Trustee's Motion to file an over-length brief (Dkt. 331) is **GRANTED**.  Hassard and Mayeron's Motion for leave to file a sur-reply (Dkt. 337) is **DENIED.**  The parties are hereby reminded that sur-replies are intended to address only arguments that are truly new, and in many cases are unnecessary given that the Court typically grants oral argument.  Given the complexity of this case, however, the Court will be amenable to granting reasonable extensions of the normal page limitations for future *substantive* (not discovery) motions.  The parties may contact Elaine Lee, the law clerk assigned to this case, for guidance as to such issues.

5.      Written objections to the Recommendations set forth in paragraphs 1 through 3 must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1,

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 32**

or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

DATED: August 6, 2013.

_____
Honorable Mikel H. Williams
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ( COUNTS 7 & 8),  Page 33**